**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA  MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA             :

            v.                         :Criminal NO. **00-157**(01)(RCL)
                          NEXT: SENTENCING: To be set.
KEVIN L. GRAY, et al.                :
        Defendants.

## KEVIN L. GRAY'S NEW TRIAL MOTION

**INDEX**                                                                **PAGE**

I.    NEW TRIAL STANDARD . . . . . . . . . . . . . . . . .  3

II.   IMPROPERLY ADMITTED OTHER CRIMES EVIDENCE,
       MISJOINDER AND STATEMENTS OF NON-COCONSPIRATORS . .  5

     A.   BAIT AND SWITCH: WRONG JUSTIFICATION . . . . . . .  6

     B.   MURDER OF ALVIN "FLUBBY" HENSON. . . . . . . . . . 13

     C.   ATTEMPTED MURDER OF WITNESS NUMBER ONE
          AND OBSTRUCTION OF JUSTICE. . . . . . . . . . . 19

     D.   EVIDENCE IN RELATION TO MR. GRAY'S DETENTION
          AT OAK HILL JUVENILE FACILITY: JULIUS
          LAYTON and KENNETH JACKSON. . . . . . . . . . . 22

     E.   DELIVERY OF MARIJUANA AND A CELL PHONE TO
          MR. GRAY AT D.C. JAIL: ANDREA GIBBS
          and MAURICE ANDREWS. . . . . . . . . . . . . . 27

     F.   RETRIBUTION FOR PURCHASING A STOLEN CAR:
          DAMIEN EVANS. . . . . . . . . . . . . . . . . 28

     G.   TESTIMONY OF DRUG DEALING UNRELATED TO
          ANY CHARGED CRIMES: PHYLLIS WEBSTER. . . . . . 41

     H.   TESTIMONY OF MONEY LAUNDERING:
          THE BETHESDA JEWELRY EXCHANGE. . . . . . . . . 51

     I.   ADDITIONAL EVIDENCE OF MONEY LAUNDERING:
          SEARCH OF 13903 GRENFELL PLACE,
          BOWIE, MARYLAND. . . . . . . . . . . . . . . . 56

     J.   FINANCIAL ANALYSIS OF LIONEL NUNN: LISA MILLER. . . 60

     K.   RODMAN LEE'S CONTROLLED SUBSTANCE: JERRY WALKER. . 62



III. INSTRUCTIONAL ERRORS

    A.    USE OF JUVENILE ACTIONS . . . . . . . . . . . . . . .  67

    B.    LACK OF UNANIMITY: HOMICIDE OF ANTHONY WATKINS  . .  70

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .  72

    CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . .  73

Kevin L. Gray, through counsel, moves this Court pursuant to F.R.Cr.P. 33[1] for a New Trial.

## I.    NEW TRIAL STANDARD.

When the guilt verdicts were returned on January 9, 2003, this Court extended the period for filing a New Trial Motion for sixty days. Mr. Gray, however, did not finished the Penalty Phase of his capital case until March 13, 2003. At the request of counsel for Rodney Moore, a co-defendant, this Court, on March 10, 2003, granted all defendants, from Group I,[2] 90 additional days to file New Trial Motions. Thus, this pleading is timely.[3]

Whether a new trial should be granted is left to the sound discretion of this Court.[4] Mr. Gray must be able to show that the errors during his trial were substantial, not harmless, and that

---

[1]

        Subsection (a) currently reads:
            Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

[2]

        Group I consists of Kevin L. Gray, Rodney Moore, John Raynor, Calvin Smith, Timothy Handy and Lionel Nunn.

[3]

        Because February this year had 28 days, the 60th day fell on March 10, 2003.

[4]

        United States v. Dale, 991 F.2d 819, 838 (D.C.Cir.1993); United States v. Rogers, 918 F.2d 207, 213 (D.C.Cir.1990); United States v. Sensi, 879 F.2d 888, 901 (D.C.Cir.1989).

they "affected the defendant's substantial rights."[5] Further, we must show that "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."[6]

The defense finds that now, after hearing the testimony at trial, we are in a position to present these arguments with both comprehension and precision. Some of the matters could have been sorted out before trial. But, the defense was prevented from doing so pretrial by the lack of detailed information about the actual evidence in this case. When asked by the defense during informal discovery about how events were connected to the indicted conspiracies, who did what during an event, or the exact details of incidents, the government would, quite often, respond in curt terms without specifics. The defense, thus, was unable to properly articulate these claims because of a lack of discovery and also because of this Court's pretrial rulings denying our request for a Bill of Particulars, allowing the government to hide the names of its witnesses (despite 18 U.S.Code §3432 [7]), and, among other

---

[5]  United States v. Johnson, 769 F.Supp. 389, 395-96 (D.D.C.1991).

[6]  United States v. Martinez, 763 F.2d 1297, 1312-1313 (11th Cir.1985) (citations omitted), *cited with approval in* United States v. Edwards, 765 F.Supp. 1112, 1118-1119 (D.D.C.1991).

[7]      The section reads, in relevant part:
         A person charged with treason or other capital offense
         shall at least three entire days before commencement
         of trial be furnished with a copy of... a list
         of...the witnesses to be produced on the trial for

-4-

things, allowing the government to withhold Jencks, <u>Brady</u>, and <u>Giglio</u> material until the Thursday before a witness testified. <u>See</u>, *Memorandum Opinion and Order filed February 7, 2002*. The harsh reality of the trial process was, however, that the government presented the defense with some of the Jencks/Brady/<u>Giglio</u> material either on the morning of a witness' testimony or as the witness walked through the door of the courtroom. Despite defense objections, the government was allowed to continue this practice as it saw fit. The defense was constantly kept guessing which mystery witness would next take the stand or what they would say. <u>See</u>, <u>infra</u>, pp. 28-30.

We represent as follows:

## II.  <u>IMPROPERLY ADMITTED OTHER CRIMES EVIDENCE, MISJOINDER AND STATEMENTS OF NON-COCONSPIRATORS</u>.

The government took the basic core of its evidence and dressed it with a lengthy string of crimes outside the scope of the conspiracies alleged or with evidence of other separate conspiracies. At times, crimes actually indicted were never connected by evidence to the alleged goals and purposes of the conspiracy within the indictment. At other times the prosecutors merely introduced crimes which had nothing to do with the objectives or foundation of the conspiracies alleged in the indictment without satisfying the parameters of Fed.R.Evid.

---

proving the indictment, stating the place of abode of each...witness...

404(b).[8] All such evidence was continually introduced over pretrial written objections and mid-trial oral objections.

## A.    BAIT AND SWITCH: WRONG JUSTIFICATION.

By constantly repeating the justification that all other crimes or bad acts were actually part of the conspiracy, the government sought to avoid the necessary legal considerations this Court should have employed in order to determine whether or not to admit the other bad acts. The government's pretrial and mid-trial positions have always been the same:

> While the government will provide notice of any such [other crimes] evidence, the government submits that all of the evidence it intends to elicit at this time falls outside the requirements of Rule 404(b)....
> The evidence the government will introduce at trial does not fall under the definition of Rule 404(b).
> *Government's Omnibus Opposition to Defendants' Pretrial Motions, filed January 2, 2002, p. 76.*

It is curious to note that the defense never received from the government any 404(b) notice throughout the course of the ten months of the innocence/guilt phase of the trial. Also, the

---

[8]
This subsection reads:
Evidence of other crimes, wrongs and acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

-6-

government describes the other bad acts evidence they intend to introduce as facts which do "not fall under the definition of Rule 404(b)." Now, the definition of evidence prohibited by Rule 404(b) is "other crimes, wrongs and acts," which "prove the character of the person." If the evidence offered to be introduced does not fulfill the goals and purposes of the conspiracies, as described by the grand jury, then the facts adduced at trial must be used, under this definition, to show the jury Mr. Gray's character. The other bad acts introduced by the government did not go to prove the existence of a fact or element supporting the charged crime since they do not directly relate to the crimes charged. Thus, they were introduced to make the jury believe that it was more likely, than not, that Mr. Gray actually committed the charged crime simply because his character was demonstrated by facts tending to show that he committed the other bad acts. None of the bad acts at issue go to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," as required for admission under Rule 404(b).[9]

Also, if the other crimes introduced at trial cannot be found in the indictment, they are, by definition, other bad acts. If the grand jury did not indict the specific acts sought to be introduced, they are outside the crimes charged.

Once the government said the other crimes and bad acts were part of the indicted conspiracies, this Court heard nothing further

---

[9]

See, note 8, p. 6, supra.

and never provided the defense with the reasoning for its determination of whether, in fact, the other bad acts evidence were an integral part of the alleged conspiracies. Additionally, the Court never employed any test for the admission of other bad acts under Fed. R. Evid. 404(b) or even made a relevancy determination under Fed.R.Evid. 403,[10] even though the defense challenges were partially grounded on relevancy.

The talisman utilized by the government, that is the evidence they wanted to introduce was part of the charged conspiracy, froze out any other consideration this Court should have employed for the admission of that evidence.

Perhaps the quick and truncated approach utilized by this Court could be overlooked in a long trial if there was but a single incident of bad acts proposed for admission by the prosecutors. But, that was not the case here. If nothing else the constant repetition of defense objections, the lengthy stream of unindicted bad acts dropped before the jury and the identical governmental justification for admission should have set off alarms in the Court's deliberative process. It did not. The Court should have done more than accept the bare prosecutorial assertions of linkage. The absence of substantive facts from the government which

---

[10] The Rule reads:
Although relevant, evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

supported the proposition that the bad acts were part of the conspiracy, left this Court without an informed basis to make the admission determination.

Many of the bad acts introduced at trial were not indicted. The prosecution 's excuse, however, that other crimes were "overlapping," or near in time to the events charged in the indictment did not relieve this Court of the need to consider the elements of Fed.R.Evid. 404(b). "[T]reating evidence as inextricably intertwined not only bypasses Rule 404(b) and its attendant notice requirement, but also carries the implicit finding that the evidence is admissible for all purposes notwithstanding its bearing on character, thus eliminating the defense's entitlement, upon request, to a jury instruction (citation omitted)."[11] This was error affecting the substantial rights of Mr. Gray.

Lacking a substantive informational foundation to make a decision, the subsequent determinations to admit the evidence by this Court was an abuse of discretion.[12] This Court cannot be said to have applied an informed deliberative process to the evidence in question when the Court was not given a sufficient factual predicate by the government to allow it to make a proper and informed decision. Quite often the government 's reason for

---

[11]
    United States v. Bowie, 232 F.3d 923, 928 (D.C.Cir.2000).

[12]
    The decision to admit other crimes evidence is reviewed for an abuse of discretion. United States v. Abel, 105 S.Ct. 465, 470-71 (1984).

admission in support of the claim the evidence was part of the
conspiracy charged was nothing more than the facts themselves. The
fact that another bad act occurred does not, in and of itself,
justify admission.[13] The sole purpose for the introduction of bad
acts evidence was to inject the concept that Mr. Gray had the
propensity to commit the acts alleged within the indictment, that
he was a bad person or to try demonstrate a trait which might infer
an criminal allegation from the indictment. This was improper.
Thus, erroneously admitted evidence was spilled, time and again,
in large quantities, before the jury, all to the prejudice of Mr.
Gray. Because of the volume and severity of the other bad acts
allowed to be introduced without notice by the prosecutors and the
absence of appropriate considerations for admission, it cannot said
with any degree of certainty that the other bad acts did not
significantly impact upon the verdicts in this case and, thus, the
integrity and validity of the verdicts in this case can no longer
be assured.

Never did this Court conduct the analysis of the other bad
acts evidence, as required by Rule 404(b). But, beyond that, this
Court never went through the relevancy review, based on the defense
objections. In <u>United States v. Bowie</u>, 232 F.3d 923 (D.C.Cir.2000),
our Circuit Court said:

---
13

    "If the prosecution's evidence did not `explain' or
`incidentally involve' the charged crime, it is difficult to see
how it could pass the minimal requirement for admissibility that
evidence be relevant (emphasis in original). *See* Fed.R.Evid. 401
and 402." <u>United States v. Bowie</u>, <u>supra</u>, 232 F.3d at 928.

Compliance with Rule 404(b) does not itself assure admission of the other crimes evidence. If the defendant moves under Rule 403, the court may exclude the evidence on the basis that it is "unfairly prejudicial, cumulative or the like, its relevance notwithstanding. " *See* Old Chief v. United States, 519 U.S. 172, 179, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)....

Rule 404(b) thus is not so much a character rule as a special aspect of relevance, constituting but one of many exceptions to the general rule that "all relevant evidence is admissible." Fed.R.Evid. 402....

Stated more formally, a Rule 404(b) objection will not be sustained if: 1) the evidence of other crimes or acts is relevant in that it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, " Fed.R.Evid. 401; 2) the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act (citation omitted).[14]

Even if the evidence should fit under one or more of the specifically delineated reasons for admission under Fed.R.Evid.404(b) (a position never argued to this Court by the prosecutors), the Court has to conduct a relevancy determination.[15] As a part of such review, the Court would still be required to conduct the balancing test: prejudicial versus probative.[16] Because

---

[14]

    United States v. Bowie, supra, 232 F.3d at 930.

[15]

    Rules 403 and 404(b) are not "...obstacles to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial based upon the evidence presented, not upon inferences of criminal predisposition or by confusion of the issues." United States v. Foskey, 636 F.2d 517, 525 (D.C.Cir.1980).

[16]

    "Even if relevant, however, evidence that a defendant has committed prior bad acts is likely to be prejudicial, for juries

the Court was immediately swayed by the governmental claim that each incident was an integral part of the conspiracies charged, it also never undertook the probative versus prejudicial[17] balancing procedure as required by Fed.R.Evid. 403. "In determining whether `the probative value is *substantially* outweighed by the danger of *unfair* prejudice' it is a sound rule that the balance should generally be struck in favor of admission **when the evidence indicates a <u>close</u> relationship to the event charged** (emphasis added)."[18] Such a relationship does not exist for each of the incidents we set forth in this pleading. Finally, there was never a limiting instruction given, even though it was requested at times by the defense.[19]

Additionally, since none of the incidents which we recount herein are legitimately part of the conspiracies charged,

---

may be tempted to use evidence of previous transgressions as the basis for convicting a defendant of the crime for which he is charged." <u>United States v. Moore</u>, 732 F.2d 983, 993 (D.C.Cir.1984)(Mikva, J., dissenting), *citing*, <u>United States v. Shelton</u>, 628 F.2d 54, 56 (D.C.Cir.1980).

[17]

"The prejudice that the court must assess is the prejudice that `lies in the danger of the jury misuse of the evidence.'" <u>United States v. Mitchell</u>, 49 F.3d 769, 777 (D.C.Cir.1995), *citing,* <u>United States v. Brown</u>, 490 F.2d 758, 764 (D.C.Cir.1973).

[18]

<u>United States v. Day</u>, 591 F.2d 861, 878 (D.C.Cir.1978); <u>United States v. Harrison</u>, 679 F.2d 942, 948 (D.C.Cir.1982).

[19]

"In some cases, of course, a limiting instruction would not suffice to avoid unfair prejudice caused by the introduction of bad acts testimony." <u>United States v. Moore</u>, <u>supra</u>, 732 F.2d at 990 n.47 (D.C.Cir.1984).

-12-

statements admitted in relation to those incidents are in violation of the rules. "Under Fed.R.Evid. 801(d)(2)(E), a statement made by a coconspirator in furtherance of the conspiracy is nonhearsay. A statement comes within this Rule if there was a conspiracy whose members included the declarant and the party against whom the statement is offered, and the statement was made during the course of and in furtherance of the conspiracy." United States v. Thai, 29 F.3d 785, 813 (2d Cir.1994), *citing*, Bourjaily v. United States, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778-79 (1987); United States v. Rivera, 22 F.3d 430, 435 (2d Cir.1994); United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir.1993),

The following are the improperly admitted evidence:

**B.    MURDER OF ALVIN "FLUBBY" HENSON.**[20]

This offense was charged, improperly we argue, as a part of the Conspiracy to Distribute and Poss with the Intent to Distribute Five Kilograms or More of Cocaine, Fifty Grams or More of Cocaine Base, One Kilogram or More of Heroin, and Marijuana, 21 U.S. Code §846 (Count One)("Narcotics Conspiracy") and the Conspiracy to Participate in a Racketeer Influenced Corrupt Organization, 18 U.S.Code §1962(d) ("RICO Conspiracy")(Count Three) in this indictment. It was not charged as a stand-alone substantive crime.[21]

---

[20]

Count One, Overt Act 1 and Count Three, Racketeering Act 20.

[21]

The substantive homicide offense actually was previously charged against Mr. Gray in the Superior Court of the District

-13-

Yet, a review of the actual indictment shows that the offense bears no relation to the conspiracies charged in Counts One and Three.

In relation to the Murder of Alvin "Flubby" Henson Count One (the Narcotics Conspiracy), Overt Act One charges:

> On or about May 1, 1989, in the 3100 block of Robinson Street, S.E., in the District of Columbia, **KEVIN L. GRAY**, while armed with a firearm, shot and killed Alvin N. Henson, aka Flubby, because Henson assaulted the uncle of **KEVIN L. GRAY**.

As you might imagine, Count One was focused on obtaining and distributing various types of narcotics. There was, however, violence related to the purchase, maintaining and distribution of those narcotics. It was described in the indictment under Count One as one of the goals of the conspiracy:

> It was a further goal of the conspiracy to commit murder, robbery, assault, and other acts of violence for the following purposes, among others: to enrich the members of the conspiracy; to create, maintain and control a market place for the distribution of its controlled substances; to enforce discipline among members of the conspiracy; to collect monies owed to members of the conspiracy; to protect the conspiracy and its members from detection, apprehension and prosecution by law enforcement; to prevent and retaliate against acts of violence threatened or perpetrated against members of the conspiracy; and to promote and enhance the reputation and standing of the enterprise and its members.
> Count One, B.(2).

One of the Ways, Manner and Means to Accomplish the Narcotics Conspiracy was described by the Indictment as:

> It was further part of the conspiracy that the defendants and co-conspirators possessed, carried and used firearms to protect their drug trafficking operation from theft, robbery, and competition from rival sellers, and to commit acts of violence in furtherance of the conspiracy. These weapons were possessed, carried and used for various reasons, including but not limited to: to retaliate against others for harm

---

of Columbia. Case No. **F-10893-89**. But, the case was dismissed by the government mid-trial and, thus, was barred by the principles of double jeopardy.

caused to members of the organization; to protect the organization's cocaine, cocaine base, also known as crack cocaine, heroin, and marijuana and the proceeds of drug distribution; to ensure that drug distribution activities were controlled by the defendants and co-conspirators; to intimidate others from distributing cocaine, cocaine base, also known as crack cocaine, heroin, and marijuana in the organization's area; to rob other drug sellers of their drugs and money in order to prevent them from competing for illegal drug sales in the organization's area; to enforce discipline within the organization; and to ensure the personal safety of the members of the organization.
Count One, C.1.(e).

None of the objectives or means set forth in the Narcotics Conspiracy remotely relates to the murder of Alvin "Flubby" Henson. The homicide was not committed during the course of distribution nor was it committed because of a narcotics related argument. There was no evidence, at all, that Mr. Gray's Uncle Mo, whose beating allegedly caused the homicide, was ever part of any alleged narcotics conspiracy.[22]

In Count Three the RICO Conspiracy, Racketeering Act 20 charges:

> On or about May 1, 1989, in the District of Columbia, **KEVIN L. GRAY** and co-conspirators not indicted herein, while armed with a firearm, purposely and with deliberate and premeditated malice, killed Alvin Henson, aka Flubby, by shooting him with a firearm on or about

---

[22]    This is symptomatic of a larger and continual problem during the trial. The government never provided this Court with a list of unindicted co-conspirators, despite the pretrial and mid-trial objections from the defense. See, e.g. Bench discussion about the absence of this information. Transcript of June 11, 2002 PM Session, pp. 72-75, **EXHIBIT-2**, attached. The government never gave the Court or the defense this list and this Court never required it to do so. Therefore, every time the defense objected to hearsay, the government's stock reply was: the individual were part of the conspiracy. The specific conspiracy was never identified. This Court never required the prosecutors to provide it with more than their bare statement of this position before ruling against the defense time and again.

> May 1, 1989, thereby causing injuries from which Alvin Henson, aka
> Flubby died on or about May 1, 1989, in violation of 22 D.C. Code
> Sections 2401, 3202 and 105.

The RICO Conspiracy in Count Three, as described in the Indictment,
also was related to the purchase, warehousing and distribution of
narcotics. Towards that end, one of the means of achieving its
purposes, as described in the Indictment, was:

> A principal goal of the organization was to obtain money and other things of value.
> It was a further goal of the organization to traffic in controlled substances, including
> cocaine, cocaine base, also known as crack cocaine, heroin, and marijuana, and to
> commit acts of murder, murder-for-hire, burglary, robbery, assaults and other acts of
> violence for the following purposes, among others:  to enrich the enterprise and its
> members; to create, maintain and control a market place for the distribution of its
> controlled substances; to enforce discipline among members of the enterprise; to
> protect the enterprise and its members from detection, apprehension and prosecution
> by law enforcement; to prevent and retaliate against acts of violence perpetrated
> against the enterprise and its members; to promote and enhance the reputation and
> standing of the enterprise and its members.
> Count Three A.2.

But this goal, as well as all the goals of the RICO Conspiracy are
foreign to the objectives of the death of Mr. Henson.

According to the government's evidence, this homicide was the
product of nothing more than a fight between Mr. Gray's Uncle and
Mr. Henson, followed by the alleged actions of Mr. Gray in
retribution for the beating suffered by his Uncle. There is nothing
about the motives, argument or objectives of this incident that is
related to narcotics, other than the fact that the homicide takes
place in what was described as an "oil joint," a location where
people went to buy and use narcotics. Even the oil joint where the
homicide took place had nothing to do with, was not owned by, nor

was run by any of those alleged to be associated with Mr. Gray in either the Narcotics Conspiracy or the RICO Conspiracy. The argument between Mr. Gray 's Uncle and Mr. Henson was not about narcotics, it was not over a debt owed for narcotics distributed, and it was not done to boost the reputation of any narcotics distribution ring associated with Mr. Gray. In fact, the government offered no evidence which even speculated at a reason for the argument which precipitated Mr. Henson's death. If those foundations existed perhaps admission could arguably place the homicide under the umbrella of either Count One or Count Three. But here, absolutely none of the listed goals or objective of either the Narcotics Conspiracy nor the RICO Conspiracy are connected to the death of Mr. Henson.

> If the so-called "intrinsic" act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). The rule bars bad acts evidence only when the evidence is offered solely to        "prove the character of a person in order to show action in conformity therewith." Fed.R.Evid.404(b).[23]

At trial, this was bourne out by the government's own witnesses. Jermaine "Pappy" Vick, the first time he appeared,[24] testified on direct:

---

[23]

    United States v. Bowie, supra, 232 F.3d at 927.

[24]

    The government was allowed, over defense objection, to recall several of its cooperator witnesses a second time to the witness stand. Mr. Vick was one of those recalled a second time. The others were Raymond "Bald Head Raymond" Sanders, Frank "Fat Frank" Howard, Maurice "Mo" or "Mo Brown" Andrews, Dennis Robinson, and Helen Clyburn.

Q.   Tell us as best you can recall what Kevin Gray told you about what happened to Flubby?

A.   Flubby got into an altercation with his uncle.

Q.   Whose Uncle?

A.   Kevin Uncle Moe. And Moe came and got Kevin. And Kevin shot him in his behind and the result of it Flubby dies.

Q.   Did you know or did Kevin tell you where that occurred, where the shooting occurred?

A.   In [sic] incurred in the oil house.

Trial Transcript, Jermaine Vick, 1st apperance, May 29, 2002, PM Session, p. 85, **EXHIBIT-1,** attached.

This was supported by the subsequent testimony of Maurice Reid when he said in response to the prosecutor's questions:

Q.   Tell us what happened when you were with Kevin Gray on Robinson Street on the day Flubby got killed?

A.   We was standing out there...His uncle Mo came out.

Q.   Whose uncle?

A.   Kevin's uncle.....

                 *        *        *        *

Q.   How did he appear?

A.   Like he be [sic] been fighting.

Q.   What made you say that?

A.   He had a little swelling on his face and stuff like that.

Q.   How was he acting?

A.   Like he just ran out the house for his life. You know, he come running out there. He was like, man, they jumped me.

-18-

    *    *    *    *

Q. Before you got in the car, did you see what
   Kevin Gray and his Uncle Mo, what they did?

A. They was -- I looked like that. They was going
   to the oil house.

    *    *    *    *

Q. [After his return to the location] What did
   Kevin Gray say to you at that point?

A. He said, oh, man, you late, man...He said I
   already shot him...He said, I shot him in his
   butt.

   Trial Transcript, Maurice Reid, June 11, 2002,
   PM Session, pp. 71-72,76,77-78, **EXHIBIT-2**,
   attached.

Based upon the testimony at trial, the evidence of Mr. Alvin Henson's death was not part of the Narcotics Conspiracy nor the RICO Conspiracy. It was a family feud placed in this case to show that Mr. Gray has the propensity to have and use firearms against others. This was improper and prejudicial.

## C. ATTEMPTED MURDER OF WITNESS NUMBER ONE[25] AND OBSTRUCTION OF JUSTICE.

Witness Number 1 is actually Joseph Melton, who testified at trial. See, Testimony of May 20, 2002. This offense also was not charged as a substantive offense in this indictment. [26] The Obstruction of Justice relates to both the shooting of Mr. Melton,

---

[25]

   Count One, Overt Act 11 and Count Three, Racketeering Act 21.

[26]

   Mr. Gray has never been charged with any separate substantive offenses related to any attempts to murder witness number 1.

but also to steps taken to hide Kenneth "Bink" Gray, Mr. Kevin
Gray's brother, who allegedly was allowed to stay at a girl's house
during part of the pendency of the Superior Court case against Mr.
Kevin Gray. Jermaine Vick testified:

> Q.    Why, at that particular time, was it necessary
>       -- did Kevin tell you why it was necessary to
>       hide his brother at Dawn's house during that
>       particular time?
>
> A.    I mean, his trial was coming up or something.
>       So it was hide Bink there so he wouldn 't be
>       able to testify.
>
>       Trial Transcript, Jemaine Vick, 1st appearance,
>       May 29, 2002, PM Session, p. 90, **EXHIBIT-1**,
>       attached.

The only relation these allegations have to this case come
through Count One and Count Three.

Count One, Overt Act 2, reads:

> In or about sometime in 1989 or 1990, in the District of Columbia, **KEVIN L.
> GRAY** and **RODNEY L. MOORE, aka Rasoo** relocated a relative of **KEVIN L.
> GRAY** and co-conspirator, who was a witness to the murder of Alvin Henson, with
> the intent to prevent that witness from testifying in the trial of case F-10893-89, then
> pending in the Superior Court of the District of Columbia.

Additionally, the Narcotics Conspiracy, Count One, Overt Act 11
says:

> In or about sometime in January or February of 1992, near the intersection of 16th
> Street and Good Hope Road, S.E., in the District of Columbia, **KEVIN L. GRAY**,
> while armed with a firearm, shot Witness #1, a witness to the murder of Alvin
> Henson, aka Flubby, in order to prevent that witness from testifying against **KEVIN
> L. GRAY** in the trial of case F-10893-89, then pending in the Superior Court of the
> District of Columbia.

The crime also appears in Count Three, the RICO Conspiracy,
Racketeering Act 21:

The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 21:

(a)     From on or about May 1, 1989 to and including sometime in 1992, in the District of Columbia, **KEVIN L. GRAY, RODNEY L. MOORE, aka Rasoo,** and co-conspirators not indicted herein did unlawfully, knowingly and willfully combine, conspire, confederate, and agree together to murder and hide witnesses to the murder of Alvin Henson, aka Flubby, in violation of 22 D.C. Code §§ 2401, 2403, 3202.

I. Object of the Conspiracy

It was the primary object of the conspiracy for the defendants and co-conspirators not indicted herein, to murder and hide witnesses to the murder of Alvin Henson, aka Flubby, to prevent the conviction of **KEVIN L. GRAY** in case F-10893-89, then pending in the Superior Court of the District of Columbia.

II. Overt Acts

In furtherance of the conspiracy and in order to effect the object thereto, the defendants and co-conspirators not indicted herein, in various combinations, directly and indirectly, committed overt acts including, but not limited to, the following overt acts alleged in Count 1, which overt acts are realleged and incorporated herein by reference as though fully set forth in this Count:

Overt Acts: 1, 2, 4, 5, 6, 11.

(Conspiracy to Commit Murder, in violation of Title 22, D.C. Code, Section 105(a)).

We would adopt and incorporate our arguments set forth in Paragraph I.B., supra, pp. 13-19. These particular alleged actions in no way relate to buying narcotics, to delivering controlled substances to runners nor to the distribution of narcotics, in any form. None of these actions enhance anyone's reputation as a drug dealer. The alleged violence here was not to defend narcotics distribution or to scare off other drug dealers. These crimes were improperly joined with the allegations of Count One and Three. "[I]t cannot be that all evidence tending to prove the crime is part of the crime. If that were so, Rule 404(b) would be a nullity."[27] They were placed before the jury in order to show Mr. Gray 's propensity, again, to use a weapon and to interfere with the justice system,

---

[27]     United States v. Bowie, supra, 232 F.3d at 929.

allegations which surface at a later time in connection with other events.

**D.    EVIDENCE IN RELATION TO MR. GRAY'S DETENTION AT OAK HILL JUVENILE FACILITY: JULIUS LAYTON and KENNETH JACKSON.**

The extensive testimony related to Mr. Gray's detention at the Oak Hill Juvenile Facility in no way related to any of the core allegations of this case. This evidence was placed before the jury to show Mr. Gray's propensity to engage in criminal activity, even from a very early age. Character testimony of this ilk is not allowed.

Count One, the Narcotics Conspiracy had Overt Acts which read:

4.    On or about February 5, 1990, **KEVIN L. GRAY** escaped from the Oak Hill Youth Center in Laurel, Maryland by driving a truck through a fence.

5.    On or about June 26, 1990, **KEVIN L. GRAY, CALVIN SMITH, aka Asay**, and co-conspirators not indicted herein escaped from the Oak Hill Youth Center in Laurel, Maryland by cutting a hole in a perimeter fence and climbing through it.

6.    On or about September 12, 1990, **KEVIN L. GRAY, CALVIN SMITH, aka Asay,** and co-conspirators not indicted herein escaped from the Oak Hill Youth Center in Laurel, Maryland by cutting a hole in a perimeter fence and climbing through it.

None of these Overt Acts relate to any of the objectives of the alleged narcotics conspiracy nor the means of implementation. The evidence was placed before the jury to show Mr. Gray's character as a person who, from a very early age, was involved with criminal activity.

Moreover, this evidence was hammered into the brain of the jury during the presentation of the testimony of several witnesses.

On May 23, 2002, the government started with Julius Layton, who was

a Youth Correctional Officer at the Oak Hill Juvenile Facility in

the late 1980s and early 1990s. His direct testimony, after

background introduction, started with the following:

> Q.   How did you know Kevin Gray?
>
> A.   He had been back and forth to the institution
>      several times and also housed in that
>      particular unit, meaning 7.
>
>              *         *         *         *         *
>
> Q.   Now, how would you describe Kevin Gray's role
>      at the Oak Hill Youth Center among the other
>      students?
>
> MR. CARTER:     Objection. Foundation.
> THE COURT:      Overruled.
>
> BY MS. JEFFRESS:
> Q.   You may answer.
>
> A.   Oh, okay. He was a leader. He was somewhat
>      looked up to by the other students. He was
>      very high up on the institutional ladder as
>      far as the students are concerned.
>
> MR. CARTER:     Objection. Can we approach, please?
>
> Trial Transcript, Julius Layton, May 23, 2002 AM Session,
> pp. 113, 114-115, **EXHIBIT-3**, attached.

A subsequent bench conference reviewed the defense objections. We

articulated our objections in a lengthy manner. Clearly we called

this evidence what is was: other crimes character evidence:

> MR. CARTER:     ...It's a slur, it          's character
>                 representation. It has nothing to do with
>                 the conspiracy.....The difficulty I have,
>                 Your Honor, is none of this evidence of
>                 this    escape,   but    much    less    the
>                 relationship between the two men [i.e.
>                 Kevin L. Gray and Calvin Smith], have
>                 anything to with the goals and
>                 purposes and objectives of the conspiracy

as stated in the indictment.

Trial Transcript, Bench Conference, May 23, 2002 AM Session, pp. 115, 116-117.

The Court's resolution did not prohibit what we were addressing, that is both the testimony regarding the multiple escapes as well as the relationship of Mr. Gray to others, but admonished the prosecutor to stay away from the *ad hominem* testimony by ruling:

> THE COURT:    I think you ought to try to limit it to a factual presentation rather than perceptions that others have.
>
> Id. at p. 120.

If the Court viewed the admission of this opinion testimony as improper, it never advised the jury of that fact and that they should ignore it. There was no hint that this Court even for a moment considered the steps of review required by Fed.R.Evid. 404(b), or the relevancy concerns under Fed.R.Evid. 403, of any of this testimony in relation to the crimes charged. The mischief of this entire line of testimony[28] was:

1.  The fact that Mr. Gray was housed at a juvenile facility inferentially told the jury that he had one or more involvements with the juvenile justice system.

2.  The fact that Mr. Layton was allowed to testify that Mr. Gray had been "back and forth to the institution several times," clearly flagged the issue of juvenile recidivism to the jury.

3.  What Mr. Gray's "role" was among other residents at the juvenile facility was solely placed before the jury show

---

[28]

"The mere insinuation of improper conduct in the prosecutor's question was unfairly prejudicial regardless of [the defendant's] ability to explain his actions to the jury." United States v. Given, 164 F.3d 389, 393 (7th Cir.1999), *citing,* United States v. Tomblin, 46 F.3d 1369, 1388 (5th Cir.1995).

-24-

to his character, nothing else.

4.    The **opinion** of Mr. Layton that Mr. Gray was a "leader" and was "very high up on the institutional ladder as far as the student are concerned," was solely placed before the jury to support the governments argument that Mr. Gray was, in fact, one of the leaders of the conspiracies charged.

5.    There was no testimony that Mr. Gray <u>lead</u> or <u>directed</u> any of the three escapes from the juvenile facility. [29] The mere fact that he escaped did not support any of the narcotics related allegations from the indictment. But, it did paint Mr. Gray as a bad person, early in his life: character evidence.

Thereafter, Mr. Layton was lead on a detailed description of the grounds of the Oak Hill Youth Center, photographs of the exterior and interior of the student cottages, designating which cottages are for discipline and how there were escapes by multiple students from the grounds February 5, 1990 and June 26, 1990.

Just to be sure that the Court clearly understood our position, the defense for Mr. Gray specifically joined a subsequent and different objection from counsel for Calvin Smith:

MR. CARNEY:    Outside [the presence of the jury], Your Honor. I would ask that the record reflect we have a continuing objection to

---

[29]

When asked about Mr. Gray during the incident of September 12, 1990, Mr. Layton said:

Q.    Now, you had said that Kevin Gray was also on detail that evening?

A.    Yes, ma'am.

Q.    Did you see Kevin Gray at anytime in the hall way while this was going on?

A.    No, ma'am.

Trial Transcript, Julius Layton, May 23, 2002 AM Session, at p. 7, **EXHIBIT-3**, attached.

as this being outside of the time of conspiracy.

MR. CARTER:    I join in his eloquent objection.

THE COURT:    Okay. Its overruled.

Trial Transcript, Bench Conference, May 23, 2002, PM Session, p. 5, **EXHIBIT-4**, attached.

Mr. Layton was then allowed to testify about the September 12, 1990 escape incident, being pushed from behind into a student's room and shackled by two persons who were never charged in the indictment: Jerry Kibler and Charles Gant. Id. at p. 5-8.

Further, the error was compounded when the government, on May 28, 2002, brought in Kenneth Jackson, a former Oak Hill Youth Correctional Officer to again, recount the multiple incidents of the escape from the facility during the summer of 1990.

The testimony related to the several escape incidents was outside the conspiracy and was used by the government to show Mr. Gray's association with persons who do, as well as Mr. Gray's own propensity to, participate in crime. The admission was erroneous. Moreover, because this was a juvenile facility, the evidence was extremely prejudicial.

The defense did nothing to bring to the attention of the jury material connected to the period of time when Mr. Gray was committed to the juvenile facility. In fact, we made it clear that we would avoid any examination on facts related to Mr. Gray 's detention at the juvenile facility, but for the fact that the Court had ruled this information would be allowed in the government 's

case-in-chief.[30]

This evidence in combination with all the other improperly admitted evidence greatly impacted upon the substantial rights of Mr. Gray.

None of the statements from either Mr. Gray or others at the juvenile facility were properly admitted since they were not in furtherance of any conspiracy charged. Fed.R.Evid. 801(d)(2)(E).

**E.    DELIVERY OF MARIJUANA AND A CELL PHONE TO MR. GRAY AT D.C. JAIL: ANDREA GIBBS and MAURICE ANDREWS.**

On May 29, 2002, the government introduced Ms. Andrea Gibbs. She testified that while he was incarcerated, Mr. Gray asked her to deliver a quantity of marijuana for him to the ladies' restroom on the ground floor of the D.C. Jail. The greenish weed in a plastic bag was placed in the bottom of the trash can in the restroom. There was more than one such trip. On one occasion, Mr. Gray asked Ms. Gibbs to deliver a cell phone to him in the same

---

[30]
    Oak Hill Youth Facility related material was first raised during the direct testimony of Joseph Melton in connection with the homicide of Alvin "Flubby" Henson. At the bench, the defense said, in relevant part:

> I understand Your Honor has denied our motions about keeping juvenile information out, and I just want to make sure that I am only bringing in the evidence that my client was at Oak Hill because your Honor has already ruled that the floodgates are wide open on the juvenile stay, the juvenile escape, and so all of that is coming in, and I would not bring in, I would not use cross-examination whatsoever of anything having to do with the fact that he was, in fact, incarcerated at Oak Hill in the Alvin Henson case if Your Honor had not already made that ruling.
> Trial Transcript, May 20, 2002 AM Session, pp. 16-17, **EXHIBIT-4A**, attached.

manner. She did so.

Although one of the products was a controlled substance, there was no distribution, and it does not support the goals and objectives of either the Narcotics Conspiracy (Count One) or the RICO Conspiracy (Count Three). The evidence was placed before the jury to show that Mr. Gray is prone to violate rules and laws, even when incarcerated.[31] This in combination with all the other improperly admitted evidence in great measure impacted upon the substantial rights of Mr. Gray.

## F.    RETRIBUTION FOR PURCHASING A STOLEN CAR: DAMIEN EVANS.

On July 10, 2002, the government began introducing this evidence through Maurice "Mo Brown" "Mo" Andrews, the first of five renditions of testimony covering Mr. Gray's purchase of a Mazada RX-7 for the mother of his two daughters. Although not appearing in the Indictment, the government provided no notice that they intended to introduce this evidence of other crimes. This evidence did not appear in any of the Jencks or Giglio material related to Maurice Andrews and was sprung upon the defense without any notice or warning.[32] The introduction of this evidence was done despite the

---

[31]

    See, United States v. Shelton, 628 F.2d 54, 57 (D.C. Cir.1980)(defendant charged with assaulting a federal officer, but govt through cross-examination "sought to persuade the jury that the defendant and one of his principal witnesses were members of the drug underworld involved in all sorts of skullduggery.").

[32]

    The government provided, among the 18,000 plus sheets of paper in discovery, an official form, P.D. 251 (Report of Incident) from the Metropolitan Police Department which outlined in a sketching manner subsequent the shooting incident. No gun

failure of the prosecutors to provide any information of Mr. Andrews' knowledge of these facts in informal discovery, nor did we received any such information in response to any of the formal Motions to Compel Discovery filed by the defense. This Court denied of our request for a Bill of Particulars.

The defense was only provided information about three other vehicles which were seized and forfeited. The defense was never notified that this particular car was subsequently found to be stolen. If we were aware that the car purchased by Mr. Gray was stolen, we could have objected to Andrews' testimony as being other crimes evidence. Instead, the government operated in trial by ambush.[33] The defense, moreover, was never told about any nexus between a shooting incident on Division Avenue[34] and the purchase of the stolen car. The testimony about this incident took the

---

man was identified by that document. A supplementary report showing that the complainant did not later cooperate with police and several photos of the alleged scene taken years after the incident were also disclosed. In none of the discovery received by the defense was there ever any indication that Mr. Andrews knew anything about the purchase of a stolen car not the later related shooting. The defense did not receive any prior notice (written or otherwise) that Andrews would testify to anything in connection with this incident. It was not until after he had testified about this incident that the defense was really aware of what had coming out of his mouth. This was symptomatic of the hidden witnesses and the stealth presentation of government evidence allowed by this Court. See, supra, pp. 4-5.

[33]

    "Rule 404(b) does not empower a district judge to excuse the government from providing *any* notice that it intends to use bad acts evidence." United States v. Spinner, 152 F.3d 950, 961 (D.C.Cir.1998)(emphasis in original).

[34]

    See, supra, note 32, p. 28-29, and infra, note 36, p.32.

defense completely by surprise. If this was later-discovered information, the defense should have been given any FBI Form 302s which covered conversations on this topic. The Court, however, never required the government to provide any FBI 302 forms to the defense during the innocence/guilt phase of the trial, despite the demands of the defense and the opposition by the prosecutors.

According to Mr. Andrews' testimony the purchase of the car and thereafter the shooting of the stolen car seller had nothing to do with the purchase, warehousing or distribution of narcotics. It was never related or connected by the government to either the Narcotics Conspiracy nor the RICO Conspiracy. Thus, the evidence was outside any of the allegations in this indictment. Instead, the evidence was used to show that Mr. Gray was a very bad man.

On July 10, 2002, Maurice Andrews started the second day of his direct testimony from his first appearance for the government[35] by telling the jury about Mr. Gray buying the Mazada. Mr. Andrews did not know the name of the person who sold the car to Mr. Gray. Within days, Mr. Gray learned the car was stolen and subsequently began looking for the guy who sold the car to him. Andrews recounted what happened when the man was found:

    Q.    And what happened when he [Mr. Gray] bumped
          into the guy?

    A.    They said they seen the guy on Division
          Avenue. The guy pulled over and he [Mr. Gray]
          got out the car like everything was cool, was

---

[35]

    Mr. Andrews appeared twice in the governments case-in-chief, as did four other cooperators. See, note 24, supra, at p.17.

> talking to the guy, then he [Mr. Gray]
> reached, pulled his gun out, shot the guy, and
> his gun jammed up once he shot the guy, so he
> [Mr. Gray] just got back in the car. He said
> the guy ran. He [Mr. Gray] got back in the car
> with Frank and them.

Trial Transcript, July 10, 2002 AM Session, Maurice Andrews, 1st appearance, pp 12-13, **EXHIBIT-5** attached.

On July 17, 2002, when the government attempted to interject additional testimony about this incident during the second appearance of Frank "Fat Frank" Howard, the defense for Mr. Gray detailed its objection:

> MR. CARTER:    Your Honor, we would object to the
> introduction of this evidence. It's not in the
> indictment, and if it's other crimes, then I
> would like to know what does it prove.

> MS. JEFFRESS:    Actually, Mr. Andrews has already testified
> about this incident, Your Honor. This is the
> shooting of Damien Evans, and Mr. Gray shot
> him because of the -- because he sold him a
> stolen car. In short, Mr. Andrews has already
> testified about it and there was no objection.
> The relevance is that this goes to show
> further -- it further demonstrates the
> conspiracy. Mr. Gray had gone to look for the
> person who sold him the stolen car. It shows
> -- generally it goes to prove how Mr. Gray
> responded to people who tried to take
> advantage or cheat him. It's an act that is
> evidence of the conspiracy and comes in for
> those purposes.

> MR. CARTER:    Number one, it doesn't further the conspiracy
> at all. It has nothing to do with the goals or
> the objectives of the conspiracy. At the best,
> its is a tangent that is on the side.
> Secondly, because they know about it
> doesn't mean that they were involved, either
> Fat Frank or Maurice Andrews.
> Thirdly, nobody has identified this
> person by name. The only time we know a name
> was when Ms. Jeffress just got it. He just
> talked about some unknown person, Maurice
> Andrews talked about some unknown person in

-31-

Northeast, we don't have a time, we don't have a name, and we don't have a place of the shooting. So therefore, none of this is really relevant to any of the goals or the furtherance of the conspiracy.

Every criminal act cannot be dumped into this to say that it is a part of the conspiracy without some connection or nexus, and other than some parties who they alleged to be a part of the conspiracy being involved at some point, at some level, it doesn't make it a part of the conspiracy in this case.
In addition, it doesn't -- if it is other crimes because it is not indicted, again, the government has not indicated what exactly does this prove. Other crimes must go towards some objective.

         *          *          *          *

MS. JEFFRESS:     I could just add a couple things to our proffer. One is that we did provide a police report which lists the date and the place and the victim's name to counsel.[36] In terms of the proffer of the facts, Mr. Howard, Mr. Robinson and Mr. Vick were all present for the shooting, they all assisted Mr. Gray in locating this person. It shows their willingness to listen to him, to follow directions, his role as a leader. It shows the discipline that he had in the organization and it's very strong proof of the conspiracy itself and we believe it's relevant for that reason.

---

[36]

     In a March 28, 2002 letter, the government advised they would seek to introduce evidence that Mr. Gray shot a man on May 25, 1996, on Nannie Helen Burroughs Avenue, N.E. There was no indication WHATSOEVER OF WHO WOULD SO TESTIFY. Appended to their discovery letter, among other things, was a 3-page Metropolitan Police Department form PD 251 (Bates Stamped 16329-16331), **EXHIBIT-6A**, attached; a 2-page form PD 252 (Bates Stamped 16332-16333), **EXHIBIT-6B**, attached; and single page PD 252 dated December 4, 1996 (Bates Stamped 16334), **EXHIBIT-6C**, attached. No where on any of those forms is there an apparent nexus between the discovery material and the purchase of a stolen car by Mr. Gray.

-32-

THE COURT:        The objections are overruled.

MR. CARTER:       Instead of continuing to object, may I have a
                  continuing objection?

THE COURT:        Yes.

Trial Transcript, July 17, 2002 AM Session, Bench
Conference (at the commencement of Frank Howard 's
testimony), pp. 58-59, 61-62, **EXHIBIT-7**, attached.

The testimony was allowed and Mr. Howard talked about what he did
or did not see as he rode in the car with Mr. Gray, Dennis Robinson
and Jermaine Vick during the shooting.

On July 18, 2002, the government presented Detective Thomas
Webb, who recounted the identification procedures used with Mr.
Evans on March 27, 2002, almost a month after jury selection had
commenced in this case. Also, on July 18, 2002, the government
produced the testimony of Damien Evans, the person who sold the
stolen car and was later shot.

On July 24, 2002, Dennis D. Robinson, in his second appearance
in the government's case-in-chief, testified to what he saw as he
rode in the car during the incident. On September 9, 2002, Jermaine
Vick, in his second appearance in the government's case-in-chief,
also testified about learning of the car being stolen and also
being present in Frank Howard's car at the time of the shooting.

As you can see, this was not a small amount of evidence nor
isolated testimony in a trial whose innocence/guilt phase took ten
months. Time and again, over practically the entire length of the
case, the prosecutors hammered at this improperly admitted evidence

-33-

before the jury with different witnesses. [37] This was, without question, for the purpose of prejudicing Mr. Gray in the jury 's deliberations. The event had absolutely nothing to do with narcotics or any of the core allegations of this indictment. [38] Damien Evans was specifically asked if beyond the $3,100 was there anything else involved in the purchase price. He assured the jury there was nothing else involved. [39] Thus, narcotics was not a

---

[37]

    "This movement between the past acts and present acts invited the jury to consider prior act and present act testimony equally relevant, and to consider the prior bad acts testimony for more than its limited purpose." United States v. Moore, supra, 732 F.2d at 996 (Mikva, J., dissenting).

[38]

    "It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." United States v. Bagaric, 706 F.2d 42, 64 (2nd Cir), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 134 (1983),

[39]

    Damien Evans testified on cross-examination, in relevant part:

    Q.  And he gave you, as Mr. Heaphy said, he gave you cash, $3,100?

    A.  Right.

    Q.  Was there anything else exchanged?

    A.  No.

    Q.  Was there anything else talked about?

    A.  No.

    Q.  So it was just he gets the car. You get 3,100. And there was no other consideration or terms or side things going on?

    A.  No.

component of the purchase price nor were they the commodity bought.

The initial excuse for admission offered by the prosecutor (to show Mr. Gray's reaction to people who cheat him) is pure character evidence or, by definition, propensity evidence. This incident was not indicted; the facts were unrelated to other bad acts and were presented for the sole purpose of showing that Mr. Gray would use firearms on anybody. This type of character evidence is impermissible, without satisfying the limited parameters of Fed.R.Evid. 404(b).

For the sake of argument, we examine the second set of excuses offered by the prosecutor for the admission of this evidence when called to respond to defense objections during trial. They were: (1) demonstrates how Mr. Gray responded to people who took advantage or cheated him,[40] (2) shows that others listen to Mr. Gray,[41] (3) testimony of others following his direction as well as a demonstration of the leadership role of Mr. Gray,[42] and finally, (4) shows the discipline Mr. Gray had in his organization.[43] The problem for the government is that the evidence from the three

---

[40] Trial Transcript, July 18, 2002 PM Session, Damien Evans, pp. 54-55, **EXHIBIT-8**, attached.

[41] Bench Conference Transcript, July 17, 2002 AM Session, **EXHIBIT-7**, supra at 19.

[42] Id., supra at 20.

[43] Id.

[43] Id.

persons in the car who testified in their case-in-chief, as well as the testimony of Damien Evans himself, did not support any prong of their proffered foundation.[44]

Initially, none of the justifications, proffered as foundational reasons for the admission of the evidence, matter if the justifications themselves are not somehow related to the core objectives of the indictment. If each rationalization for admission of this incident shows a <u>character</u> trait, as each category propounded by the government inherently does, none are admissible unless each is evidence of a legitimate element of the charges in furtherance the goals and objectives of the Narcotics Conspiracy or the RICO Conspiracy.[45] Because there is a total lack of nexus to the conspiratorial claims, the basis for admission is hollow. To admit them was error affecting the substantial rights of Mr. Gray.

The first governmental justification cannot support the admission of this evidence. Unless the retaliation by Mr. Gray to

---

[44]

"So far as we can tell, the only consequence of labeling evidence `intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request (citations omitted)." <u>United States v. Bowie</u>, <u>supra</u>, 232 F.3d at 927.

[45]

"[U]se of other crimes is troubling because it involves a kind of particularized character inference. The defendant entertained the criminal intent on a prior occasion, so on the occasion of the charged offense he likely had the same intent. Very little space separates this inferential logic from the general propensity inference the FRE 404 seeks to prevent (he did it before, so he is the sort who behaves that way and probably did it this time)." <u>United States v. Mitchell</u>, 49 F.3d 769, 777 (D.C.Cir.1995), *citing,* Christopher B. Mueller & Laird C. Kirkpatrick, 1 Federal Evidence §112 at 648.

cheating or taking advantage of him is in some manner related to narcotics or the acts of violence associated with the purchase, warehousing or distribution of narcotics, the evidence, as we have argued, merely shows that Mr. Gray is vindictive. But, how Mr. Gray responds to those who cheat him is not admissible unless it is relevant. The same can only be relevant if "the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant 's character or propensity to commit crime."[46] Following the logic, the government is prohibited from demonstrating character when the defense has not introduced the same. Fed.R.Evid. 404(a).[47]

Here, Damien Evans assured the jury that there were no side deals. The only matter to be negotiated was the sale of a car which subsequently Mr. Gray learned was stolen -- a fact denied by Evans under oath before the jury[48] but supported by the testimony of every

---

[46]
    This is the second prong of considerations for the relevancy determination as set forth in United States v. Bowie, supra, 232 F.3d at 930. See, supra at p. 11, for all three considerations.

[47]
        Federal Rule of Evidence 404(a), in pertinent part, reads:
        Evidence of a person's character or a trait of
        character is not admissible for the purposes of
        proving action in conformity therewith on a particular
        occasion...

[48]
    Trial Transcript, Damien Evans, July 18, 2002 PM Session, p. 57, **EXHIBIT-8**, attached.

other government witness.[49]

The second justification (others will listen to him) is not supported by the evidence. Mr. Gray does not ask anyone to do anything during this incident. No one other than Mr. Gray does anything but ride around in a car. None of the cooperators said they were ordered or required to ride along because of their allegiance to, or fear of, Mr. Gray. It is Mr. Gray who gets out of the car, talks with Damien Evans and actually shots him, according to the prosecutor's case-in-chief. The car is occupied by Frank Howard (the driver), Dennis Robinson and Jermaine Vick; the latter two are back seat passengers in the car. No one has to follow any orders from, listen to, or respond to Mr. Gray at all during the entire episode, or the period which proceeds the shooting. None of the government witnesses who were cooperators gave any hint that they felt compelled to ride along with Mr. Gray.

The third governmental-proffered foundation (others follow the directions of Mr. Gray, the leader) and the last justification (discipline) really do not exist from the evidence. Again, the government's evidence lacks any indicia of compulsion, as we have

---

[49]

Maurice Andrews ("Well, I found out that the car was a flip car, it was a stolen car that they had flipped."), Trial Transcript, July 10, 2002 AM Session, p. 9, **EXHIBIT-5**; Frank Howard ("Kevin had told me he had let the twins look at the car, that when they looked at the car, they told Kevin the car was stolen, that it was flipped, because the serial numbers on it was changed."), Trial Transcript, July 17, 2002, p. 63, **EXHIBIT-7**; Jermaine Vick ("It was really a stolen car. The serial numbers and -- they changed the serial numbers and all that."), Trial Transcript, September 9, 2002 AM Session, p. 126, **EXHIBIT-9.**

argued. Frank Howard specifically testified that Mr. Gray <u>requested</u> that he drive Mr. Gray to the Northeast section of the city to find Monterro Moore, the intermediary for the car sale.[50] Mr. Howard never testified that he felt the request from Mr. Gray to drive him was really an "or else" situation inferring severe or, for that matter, any consequences would flow if Frank Howard did not comply.

Dennis Robinson gives no hint that there was any coercion by, or orders from, Mr. Gray involved. In fact, Robinson says they were riding around Northeast Washington when they accidently spotted the guy who sold Mr. Gray the car. In response to the prosecutor 's question, he said:

> Q.   Was it daytime or nighttime that you were on Nannie Helen Burroughs Avenue?
>
> A.   It was daytime.
>
> Q.   And what happened while Frank Howard was driving the rest of you on Nannie Helen Burroughs that day?

---

[50]

> Q.   Okay. And did he ask you to do anything with him?
>
> A.   Yes.
>
> Q.   What did he ask you to do?
>
> A.   He asked me to drive over to Monterro house.
>
> Q.   Okay. How did he feel about Monterro?
>
> A.   He was -- at the time, he was mad at Monterro, too, because when he -- he asked me to drive him over there, I told him I was going to drive him over there,...

Trial Transcript, Frank Howard, 2nd appearance, July 17, 2002 AM Session, pp. 67-68, **EXHIBIT-10**, attached.

-39-

A.    Well, we was riding round, so we -- we on
      Nannie Helen Burroughs, so we see this guy
      that's in the -- I think it was like a
      burgundy Caravan, if I 'm not mistaken. So
      Kevin had flagged the guy down, told the guy
      to pull over ....

Trial Transcript, Dennis Robinson, 2nd appearance, July
24, 2002 AM Session, p. 22, **EXHIBIT-11**, attached.

The randomness of the encounter is further supported by Jermaine
Vick when he said:

      The times he [Mr. Gray] went over there [in
      northeast] on his own or whoever else, I
      wasn't with him. But there was a time we was
      just riding, riding in that area, and it just
      so happens the dude just was behind us blowing
      -- he was hitting the horn, you known, trying
      to get our attention because he saw Frank's
      Lincoln,...

Trial   Transcript, Jermaine   Vick,  2nd  appearance,
September 9, 2002 AM Session, p. 129, **EXHIBIT-9** attached.

The absence of evidentiary justification for the admission of
this shooting incident was, or should have been, known by the
government before they put their witnesses on the stand. But the
sad truth is that the incident was not apart of the indictment, not
related to any allegations in the indictment, and the government
by using its canard foundation for admission prohibited this Court
from utilizing the appropriate evaluation process to determine _if_
the evidence should have been admitted under the other bad acts
regime of considerations.[51]

---

[51]
    "As we have said, all relevant prosecution evidence
explains the crime or completes the story. The fact that
omitting some evidence would render a story slightly less
complete cannot justify circumventing Rule 404(b) altogether."
United States v. Bowie, supra, 232 F.3d at 929.

Because the evidence was so prejudicial and was paraded multiple times before the jury for almost the entire length of the innocence/guilt portion of the trial, it did affect the substantial rights of Mr. Gray. This evidence in combination with all the other improperly admitted evidence significantly impacted upon the substantial rights of Mr. Gray. A new trial is in order.

Additionally, the statements of Mr. Gray and Mr. Evans admitted into evidence through others were prohibited by Fed.R.Evid. 801(d)(2)(E). The statements describing the incident were merely "idle chatter" or were "entirely retrospective" and, thus, are not in furtherance of the conspiracies charged.[52]

**G.    TESTIMONY OF DRUG DEALING UNRELATED TO ANY CHARGED CRIMES: PHYLLIS WEBSTER.**

The government was allowed to present testimony of large scale narcotics dealing unrelated to any of the allegations in this case. The enormous weight of this unaffiliated narcotics distribution was unlike any of the evidence previously presented. The introduction of this evidence inferentially allowed the government to argue the enormity of the operations allegedly associated with Mr. Gray. This was error.

On September 25, 2002, Phyllis Marie Webster testified about her extensive dealings with Lionel Nunn, a co-defendant, in connection with her own distribution ring, which significantly predated any alleged actions from this indictment. Before her

---

[52]
    United States v. Lieberman, 637 F.2d 95, 102-03 (2d Cir.1980).

**-41-**

testimony, counsel for a co-defendant filed *Lionel Nunn's Motion to Exclude Testimony of Phyllis Webster Regarding Uncharged Crimes, Specifically, Drug Dealing with Defendant Nunn Prior to Nunn 's Alleged Involvement in the Criminal Conspiracies Charged in the Indictment in this Case* filed September 24, 2002. This was argued to the Court on September 24, 2002.[53] When asked by this Court whether this was evidence to be considered under Fed.R.Evid. 404(b), government counsel argued:

> MS. JEFFRESS:  Your Honor, our submission is that Ms. Webster's conspiracy overlaps with the conspiracy that's charged in this case and that's for the following reasons.
> Ms. Webster did supply Lionel Nunn with cocaine in the beginning of their relationship and that was from '97 to '98. Ms. Holt [Lionel Nunn's defense counsel] is correct that she that she stopped supplying him with cocaine some point in 1998. However, their relationship shifted and Mr. Nunn supplied Ms. Webster with drugs actually from the beginning as far back as 1997 and continuing into 1998, 1999 and even early 2000 which obviously overlaps with the conspiracy that's charged in this case.
> She was receiving drugs from him at the same time during which Mr. Nunn was supplying Kevin Gray with drugs and Kevin Gray was conducting acts of violence for Mr. Nunn.
> So we believe it is a separate but overlapping conspiracy and that her testimony is relevant on that basis.
> Trial Transcript, September 24, 2002 PM Session, pp. 150-151, **EXHIBIT-12,** attached.

As you can see, the government concedes that Ms. Webster's

---

[53]

In conformity with the Court's practices, any objection from one defendant is considered to be made by all, unless defense counsel specifically opts out. Additionally, undersigned counsel specifically, on the record, joined this Motion. See, Trial Transcript, September 25, 2002 AM Session, p. 7, **EXHIBIT-13** attached. Thus, Mr. Gray preserved his objection to this evidence.

distribution was not associated with any allegation in this case. Because Mr. Nunn may have been on the receiving end of an unconnected distribution ring at some earlier time does not prove that he was later distributing to Mr. Gray, especially when there is no allegation that any of Ms. Webster's narcotics subsequently were passed on to Mr. Gray. [54] In fact, Ms. Webster testified that her distribution to Mr. Nunn was for a total of four deliveries, beginning in February, 1997. [55] According to the government's evidence Mr. Nunn does not <u>start</u> dealing with Mr. Gray until 1999. Therefore, any early drug dealings between Ms. Webster and Mr. Nunn are prejudicial to any considerations of the jury regarding the indicted allegations. The evidence of early dealings was not proffered as Fed.R.Evid. 404(b) evidence and it fails miserably under any considerations as being close in time or in any way related to the indicted allegations.[56] The evidence of early dealings had nothing whatsoever to do with any of the evidence in

---

[54]

    The first sentence of Fed.R.Evid. 404(b) reads:
    Evidence of other crimes, wrongs, or acts is not
    admissible to prove the character of a person in order
    to show action in conformity therewith....

[55]

    Trial Transcript, September 25, 2002 AM Session, p. 42,
**EXHIBIT-13**, attached.

[56]

    "There is, as well, a danger that finding evidence
`inextricably intertwined' may too easily slip from analysis to
mere conclusion. What does the `inextricably intertwined'
concept entail? When is a defendant's crime or act so
indistinguishable from the charged crime that an item of
evidence is entirely removed from Rule 404(b)?" <u>United States v.
Bowie</u>, <u>supra</u>, 232 F.3d at 928.

-43-

this case and should not have been admitted.[57]

The second part of the government 's excuse for admission alleges that the relationship between Ms. Webster and Mr. Nunn in 1998, before any dealer relationship existed between Mr. Nunn and Mr. Gray, inverted, that is, Mr. Nunn began to distribute to Ms. Webster. This switch of positions on the distribution chart between Ms. Webster and Mr. Nunn also cannot support the admission of the evidence of later dealings. None of the categories for admission under Fed.R.Evid 404(b) are satisfied by the fact that the Nunn/Webster relationship morphed.[58] Nor can the government enter evidence of unrelated drug dealings by Mr. Nunn which have no bearing at all upon the indicted events. There was no suggestion that Ms. Webster ever, in any manner, had contact or dealings with Mr. Gray and those who might have something to do with the indicted crimes.[59]

---

[57]

"On the other hand, we are confident that there is no general `complete the story' or `explain the circumstances' exception to Rule 404(b) in this Circuit." United States v. Bowie, supra, 232 F.3d at 929.

[58]

In relevant part, the second sentence of Fed.R.Evid. 404(b) reads:
> ...[Evidence of other crimes] may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...

[59]

This, again, points out the mischief caused by the Court's failure to require the government to produce, even to the Court in camera, a list of unindicted coconspirators. The ground upon which the prosecutors based the indicted conspiracies were (and probably still are) shifting in order to meet whatever defense

While Ms. Webster's later dealings with Lionel Nunn may have coincided with actions Mr. Nunn was alleged to have taken with Mr. Gray, this basis would not have supported its admission under Fed.R.Evid 404(b).[60] The government reverts back to its original excuse: Nunn got large amounts of narcotics from Webster, so when Nunn began supplying Webster it shows he would have supplied Gray also. Is this not character evidence? Does the government really propose that they can introduce evidence of absolutely _everybody_ who may have received drugs from Lionel Nunn in order to prove that Nunn gave Gray drugs? There is no nexus between any distribution either received from, or delivered to, Ms. Webster and any alleged distribution to Mr. Gray. In fact, when pressed to respond to defense counsel's oral argument, the prosecutor said:

> We do intend, Your Honor, to present evidence of the period during which Ms. Webster was supplying Mr. Nunn. We believe it overlaps closely with his role in the conspiracy in this case. We, also, believe it's relevant to his ascension as a drug dealer and that he was receiving cocaine from her and then started supplying her. So we believe that all of Ms. Webster's testimony about her direct drug dealing with Mr. Nunn is relevant to his role in the conspiracy that's charged in our case....
> Trial Transcript, September 24, 2002 PM Session, p. 156, **EXHIBIT-12,** attached.

---

objection or challenge may arise. At some point, the government must be made to settle on who was or was not a part of the indicted conspiracies. But, when that will happen is not evident. See, also, note 22, p. 15, _supra_.

60

"We see no reason to relieve the government and the district court from the obligation of selecting from the myriad of non-propensity purposes available to complete most any story." United States v. Bowie, _supra_, 232 F.3d at 929.

Lionel Nunn's rise to distribute to Ms. Webster, or Ms. Webster's demotion on the distribution chain, cannot support any of the evidentiary elements the prosecutors want to make here. [61] Whatever the position of Lionel Nunn, it still would not change where the government alleges Mr. Gray was in the scheme of things. Gray was always way down from the larger distribution command positions even if the loftier seat rotated between Nunn and Webster. Remember the government's alleged evidence was that even in the early relationship between Nunn and Webster, Lionel Nunn was receiving multiple kilograms of narcotics. Gray always received quantities much smaller than that measure. The testimony was that Gray received quantities that did not even fill a brown paper bag. Whether Nunn was under Webster or vice versa, does not matter at all to the comparatively small amounts received by Gray under the government's evidence. Therefore, a glacial shift at the top had no impact on what the government could present against Mr. Gray in the indicted conspiracy.

None of the integral parts of the alleged Webster/Nunn conspiracy, regardless of the time frame, are identical to any alleged actions Nunn took with Gray. The same narcotics brand name, so to speak, is not present. There is no identifiable wrapper on the narcotics of either conspiracy. The manner of distribution is not the same. Persons from the Webster conspiracy are in no way

---

[61]

"The `complete the story' definition of `inextricably intertwined' threatens to override Rule 404(b)." United States v. Bowie, supra, 232 F.3d at 928.

involved with any of the alleged actions related to Mr. Gray. Beyond Lionel Nunn, there is no nexus to the indicted conspiracies, and if Nunn's actions with Ms. Webster were separate, as the government concedes, even Lionel Nunn himself does not supply the government with the necessary evidentiary link between the Webster conspiracy and the conspiracies indicted in this case.

Our Circuit Court has said:

> ...[S]ome uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime (citation omitted).[62]

Here, however, there is no "facilitate" aspect. Nothing Lionel Nunn did with Phyllis Webster did anything to help, make easier, or promote the alleged distribution from Nunn to Gray. Thus, the government's claim that these acts were "overlapping" is insufficient to support the admission of the evidence.

The Webster distribution weight was significantly prejudicial to Mr. Gray. Before Ms. Webster's testimony, the evidence had focused upon street sales to individuals. The weight, in comparison to the evidence from her, was minuscule. Now the jury heard testimony from Ms. Webster on how she received twenty-five to fifty kilograms from her partner in Florida and she had to move it within two weeks.[63] This would happen two to four times year. The initial delivery to Mr. Nunn in the February, 1997, was five to eight

---

[62]    United States v. Bowie, supra, 232 F.3d at 929.

[63]    Trial Transcript, September 25, 2002 AM Session, supra, p. 24, **EXHIBIT-13**, attached.

kilograms for the price of somewhere near $80,000. [64] The next shipment was the summer of 1997, for ten to fifteen kilograms at $20,000 to $25,000 a kilogram. [65] There were, according to Ms. Webster, one or two other shipments in remainder of 1997. [66] Ms. Webster traveled to Miami, Florida with Mr. Nunn to see her supplier about heroin.[67] Mr. Nunn offered Ms. Webster $100,000 to become his partner.[68] Somewhere in 1997-98, Ms. Webster bought some heroin on a single occasion from Mr. Nunn for $3,500-$5,000.[69] Three times Ms. Webster bought 20 pounds of marijuana for $500-$600 a pound beginning in 1998.[70] In September, 1999, Mr. Nunn, according to Ms. Webster, sold her 75 to 80 pounds of marijuana and three kilograms of powder cocaine.[71] Finally, in late 1999 or January, 2000, she purchased 40 to 60 pounds of marijuana and one or two kilos of cocaine from Mr. Nunn.[72] In sum, Ms. Webster estimated that

---

[64]
    Id., pp.29-30, **EXHIBIT-13**, attached.

[65]
    Id., p. 35, **EXHIBIT-13**, attached.

[66]
    Id., p. 40, **EXHIBIT-13,** attached.

[67]
    Id., p. 42-43, **EXHIBIT-13**, attached.

[68]
    Id., p. 46, **EXHIBIT-13**, attached.

[69]
    Id., pp. 49-50, **EXHIBIT-13**, attached.

[70]
    Id., pp.52-53, **EXHIBIT-13**, attached.

[71]
    Id., p. 54, **EXHIBIT-13**, attached.

[72]
    Id., p. 57-59, **EXHIBIT-13**, attached.

she bought seven to eight kilograms of cocaine from Mr. Nunn during 1999-2000, and that earlier, Mr. Nunn purchased 30 to 35 kilograms of cocaine from her during the period of 1997 to 1998.[73]

Not satisfied with muddying the proceeding with testimony of narcotics from a separate conspiracy, the government also introduced evidence that Mr. Nunn lost $20,000 to Ms. Webster through illegal gambling by shooting dice.[74] What did that have to do with Nunn's subsequent distribution to Gray? Nothing. But it does add another ingredient to our argument that all of this was used to prejudice Mr. Gray before the jury.

But the government did not stop there with this witness, they were allowed to throw another log onto the conflagration of prejudicial evidence. Ms. Webster was allowed to testify about a conversation with Mr. Nunn wherein he described being robbed at gun point by Brian Tribble of 15 kilograms of cocaine worth over $300,000.[75] The damage to Mr. Gray was compounded with evidence that Mr. Nunn thereafter carried a handgun in an ankle holster.[76]

Moreover, the injurious testimony was highlighted and repeated, on September 26, 2002, through the subsequent testimony of FBI Special Agent ("SA") Richard K. Diana, who was assigned to

---

[73]

    Id., pp. 75-76, **EXHIBIT-13**, attached.

[74]

    Id., p. 80, **EXHIBIT-13,** attached.

[75]

    Id., pp. 91-92, **EXHIBIT-13**, attached.

[76]

    Id., p. 94, **EXHIBIT-13**, attached.

the surveillance team which followed Phyllis Webster. The sole purpose of his testimony was to corroborate the testimony concerning the unrelated Webster conspiracy.

The admission of this evidence was argued again after the first full day of Ms. Webster 's testimony but the motion for mistrial by Mr. Gray's defense was denied by this Court.[77]

After the jury had been deluged with all of these bad acts, none of which were allied in any way with the indicted crimes, Mr. Gray's defense repeated our objections and for a second time asked for mistrial. This was denied without an oral defense from the government.[78] Under this Court's standard procedure of including all defendants in objections by another unless specific exclusion was sought, we then joined in a co-defendant's request for at least a limiting instruction, but that was denied.[79]

The breath of these other bad acts was extensive and the quantity of this evidence was significant. The weighty quantities of narcotics and the immense amounts of money catapulted this case into a stratosphere not supported by the previous (or subsequent)

---

[77]

    Id., p. 100, **EXHIBIT-13**, attached.

[78]

    Trial Transcript September 26, 2002 AM Session, Bench Conference, p. 47, **EXHIBIT-14**, attached.

[79]

    "THE COURT: All right. And the government's theory, which I agree with, is that it's not 404 evidence, so there is no basis for a limiting instruction, so that request is denied as well." Trial Transcript, September 26, 2002 AM Session, pp. 47-48, **EXHIBIT-14**, attached.

evidence against Mr. Gray.[80] This testimony, even though it was not about the indicted conspiracy, by inference, glamorized and pumped up the status of the government's case unconnected to the actual relevant evidence from the indicted conspiracy.[81] This evidence in combination with all the other improperly admitted evidence significantly impacted upon the substantial rights of Mr. Gray, fatally infecting his trial.

Finally, all the statements of Ms. Webster to Nunn or vice versa (e.g. amount of narcotics, wanting to pay her to be her partner, being robbed and carrying a gun, among others) have nothing whatsoever to do with the conspiracies charged. They are prohibited by Fed.R.Evid. 801(d)(2)(E).[82]

**H.    TESTIMONY OF MONEY LAUNDERING: THE BETHESDA JEWELRY EXCHANGE.**

On September 25, 2002, a day before the actual presentation of this evidence disaffiliated with the indicted conspiracy, Mr.

---

[80]

    For example, on September 30, 2002, Special Agent Kyle Fulmer of the FBI testified about an undercover purchase by his cooperating witness, Walter Douglas, from Kevin Gray for **31 grams** of crack cocaine which was exchanged for 3 AVERIX leather jackets. As you can see the weight connected to the indicted conspiracy is, comparatively, paltry.

[81]

    See, e.g., United States v. Betts, 16 F.3d 748, 759 (7th Cir.1994)(abuse of discretion to admit evidence of possession of large quantities of marijuana two years subsequent to charged act of conspiracy to distribute marijuana).

[82]

    United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir.)(person to whom statements are made need not be a co-conspirator so long as the statements were meant to prompt him to respond in a way that promoted or facilitated the carrying out of goals of the conspiracy), cert. denied, 493 U.S. 93, 110 S.Ct. 324 (1989).

-51-

Gray's defense raised its objections to the admission of evidence connected to a money laundering scheme run out of the Bethesda Jewelry Exchange.[83]

The government, however, was allowed to present the testimony of Christopher Sakala, a Montgomery County (Maryland) police officer, who was assigned, in late 1998, to the Task Force of the Washington-Baltimore High Intensity Drug Trafficking Area (HIDTA).[84] This was a joint operation between several federal agencies, as well as state law enforcement for Maryland and for the District of Columbia. On September 26, 2002, Officer Sakala told the jury how their investigation focused upon two brothers, Danny Mutai and Moshe Motai, who were suspected of laundering money obtained from narcotics trafficking in exchange for jewelry. He was allowed to go into the initial investigation of a store owned by the brothers

---

[83]

"MR. CARTER: ....We've been in this trial more than six months and there is no discussion of any of these six men [on trial] ever having jewelry, outlandish rings, outlandish necklaces or diamonds or anything like that, so there just is no connection whatsoever to this case with those videotapes other than to prejudice these defendants because there's conversations of eight-carat diamonds and five-carat diamond rings and Rolex watches and how much they cost and their resell value, and there's just none of that anywhere in this case, Your Honor, and it is just not related....I would object to its entry completely...it's just totally prejudicial, Your Honor." Trial Transcript, September 25, 2002 AM Session, Bench Conference, pp.5-7, **EXHIBIT-13**, attached.

[84]

Thus, the money laundering crimes connected to the Bethesda Jewelry Exchange were not even investigated or tracked by those law enforcement officers who were responsible for following the facts in this indictment. The investigation of Phyllis Webster, Lionel Nunn, et al. really was distinct and separate. The facts in this indictment were investigated by the Safe Streets Task Force, a joint FBI and Metropolitan Police operation.

located in Georgetown, arrests made there, and the new branch store which was opened in suburban Maryland. The Task Force received a Order from the U.S. District Court for the District of Maryland authorizing the placement of a camera in the back business office of the Bethesda Jewelry Exchange. Neither of the brothers, nor their alleged illegal activities, were related in any way to the allegations in this case.

The government had Officer Sakala tell how they observed Mr. Lionel Nunn, a co-defendant here, at the Bethesda Jewelry Exchange, how they learned he was using identification with an alias and how they tracked and recorded his three visits to the store. The government was then allowed to play two videotapes from the covert camera in the back office of the jewelry store in October and November, 1998.[85] The tapes displayed written transcript at the bottom of each frame which allowed the jury to easily follow the conversations recorded. In addition to talking about the purchase of jewelry, Mr. Nunn sought to buy a scale for, according to the tape, weighing money. None of the conversations recorded were a part of any conspiracy alleged in this case. The conversations on the tape and any testimony about those conversation are prohibited by the rules. See, Fed.R.Evid. 801(d)(2)(E).

The discussion of buying jewelry with funds obtained from selling narcotics had no connection with the indicted crimes. The huddle in the back room where the owners said they would pay Mr.

---

[85]

    This, of course, predated any narcotics distribution association between Lionel Nunn and Mr. Gray.

Nunn kickbacks if he got other drug dealers to purchase jewelry was not related to the indicted charges. [86] The obvious familiarity between Lionel Nunn and the store managers who laundered narcotics funds brought another dimension of criminality before the jury not supported by the facts of this case. All this was prejudicial to Mr. Gray.

Officer Sakala was then allowed to talk about the search of Lionel Nunn's house pursuant to a warrant. During that search they recovered a safety deposit key, see, Govt Exhibit **SW-LN-413,** and a bank business card, see, Govt Exhibit **SW-LN-414.** Another warrant was obtained and $54,980 was later taken out of the safety deposit box on March 21, 2000. The jury was shown photographs of the safe deposit box, see Govt Exhibit **SW-LN-127,** and the money found, both inside, see, Govt Exhibit **SW-LN-128,** and outside the safety deposit box. See, Govt Exhibit **SW-LN-129.** No connection was ever made between the currency found and the indicted conspiracies.

None of this money had anything to do with the conspiracy in this case. Mr. Nunn actually plead guilty to Conspiracy to Launder Money, 18 U.S.Code §1956(h), before J. Friedman of this Court in Case No. **00-105** on July 3, 2001. See, Govt Exhibit **LN-3,** Transcript

---

[86]

    "Relevancy does not exit in a vacuum. It `exists only as a
relation between an item of evidence and a matter properly
provable in the case.'" <u>United States v. Latney</u>, 108 F.3d 1446,
1449 (D.C.Cir.1997) *citing* Fed.R.Evid. 401 advisory committee's
notes.

of July 3, 2001, **EXHIBIT-15**, attached.[87] The money laundering charge was premised upon facts involving Phyllis Webster and her cohorts. The search of Mr. Nunn's house was from a warrant from the federal court in Maryland based upon the facts related to the Webster conspiracy, not this case. While some of the activities affiliated with Ms. Webster were near in time to separate actions between Mr. Nunn and Mr. Gray, this does not support the admission of the all this prejudicial evidence from another conspiracy without Fed.R.Evid. 404(b) considerations.[88]

For example, according to the government's proffer at the time of Mr. Nunn's plea, the relevant period of time for the money laundering activities spanned from January, 1998 through March, 2000. See, Plea Transcript of July 3, 2001, **EXHIBIT-15**, p.3, attached. The scale purchased at the jewelry store was to be used, if you follow the recorded banter on the videotape, to weigh money and thus, was connected to the Webster money laundering conspiracy.

The government's pumping of large volumes of cash into evidence along with protracted discussions of purchasing top-shelf

---

[87]
This document was introduced into evidence in this case right after the complete testimony of Phyllis Webster on September 26, 2002.

[88]
This issue was formally raised by counsel for Mr. Nunn pretrial. Mr. Nunn's defense counsel, however, raised the Rule 404(b) issue in relation to the search of her client's house again just before opening statements. Under the Court's standing rules, the objection applied to all, unless otherwise noted. The Court denied the objection to the admission of the evidence. Trial Transcript, May 9, 2002 PM Session, p.3, **EXHIBIT-15A**, attached.

jewelry elevated the financial aspects of this case considerably beyond the evidence related to the charges in this case. This prejudiced Mr. Gray before the jury, pushing the financial scope of the indicted conspiracy far beyond its own merits. This in combination with all the other improper evidence impacted upon the substantial rights of Mr. Gray.

## I. ADDITIONAL EVIDENCE OF MONEY LAUNDERING: SEARCH OF 13903 GRENFELL PLACE, BOWIE, MARYLAND.

While the government gave the jury a peak into the search of Lionel Nunn's house on March 20, 2000, with the testimony of Officer Christopher Sakala, the barrier between this case and the Phyllis Webster conspiracy was obliterated when they next presented the testimony of Special Agent ("SA") Alexander A. Miris of the U.S. Custom's Service on September 26, 2002. He, like Officer Christopher Sakala of the Montgomery County Police, was a member of the  Task Force of the Washington-Baltimore High Intensity Drug Trafficking Area (HIDTA), a joint operation between several federal agencies, as well as state law enforcement for Maryland and for the District of Columbia.

The jury witnessed an extensive parade of photographs of items located inside, and physical exhibits taken from, Mr. Nunn's house located in Bowie, Maryland. Law Enforcement photographed, see, Govt Exhibit **SW-LN-112,** and seized small quantities of heroin (3.5 grams), see, Govt Exhibit **SW-LN-407**, and marijuana (26.3 grams), see, Govt Exhibit **SW-LN-408**. But, the bulk of the material seized were items commonly related to money laundering. A yellow digital

scale seen on the previously shown videotape and apparently purchased by Mr. Nunn at the Bethesda Jewelry Exchange was marked in evidence. See, Govt Exhibit **SW-LN-403**.[89] A money counting machine was photographed. See, Govt Exhibit **SW-LN-107.** The jury was shown photographs of a large group of expensive watches and jewelry (valued at over $100,000) seized from the master bedroom. See, Govt Exhibit **SW-LN-109.** A Black BMW 700 series automobile was photographed in the driveway of the house. See, Govt Exhibit **SW-LN-102.** From the garage, law enforcement photographed and seized a .380 pistol,[90] its clip with an ankle holster, ammunition of another caliber and a gun box with papers covering operation, cleaning, etc. See, Govt Exhibits **SW-LN-401a,b,c,d, & e.**

But the real core of this search evidence was the money found inside the house. The jury saw the samba of photographs of $6,900 seized from the glove box of a Ford Contour parked in the driveway of the house, see, Govt Exhibit **SW-LN-117,** a black plastic bag located in the top of the master bedroom closet had $10,400, see, Govt Exhibit **SW-LN-118,** a bundle of $6,640 in rubber bands was

---

[89]
    On October 28, 2002, the government presented the testimony of Eileen M. Waninger, a FBI Forensic Chemist. She testified that traces of heroin, cocaine and procaine were detected from tests conducted on this yellow and black scale. We would include this testimony among our basis for a New Trial since this evidence is prejudicial and flows directly from the erroneously admitted testimony about the scale and its seizure.

[90]
    Mr. Nunn entered a plea to Possession of this Weapon After Conviction of a Felony, 18 U.S.Code §922(g) on December 12, 2000, in the U.S. District Court for Maryland, Southern Division in Case No. **AW-00-0211.** See, Govt Exhibit **LN-2,** Redacted Plea Transcript, **EXHIBIT-16,** attached.

found in a file cabinet next to the bed in the master bedroom, <u>see</u>, Govt Exhibit **SW-LN-119,** $6,225 was discovered inside a Chanel Box in the loft near the master bedroom, <u>see</u>, Govt Exhibits **SW-LN-120, 121, 122, & 409** and finally (but not least of all) a yellow duffel bag was located in the attic where law enforcement found $310,000 inside, <u>see</u>, Govt Exhibits **SW-LN-123, 124, & 125 & 410.** In total, law enforcement seized $342,909 from Mr. Nunn's house during the search. <u>See</u>, Govt Exhibit **SW-LN-425** (copy of cashier's check for that amount).

All of this information was admitted by this Court without the government providing any nexus whatsoever to the indicted conspiracy.[91] Again, the fact that Lionel Nunn did something with Mr. Gray during a period in time when he was actively involved in a money laundering conspiracy with Phyllis Webster and others does not, and cannot, support the admission of all this evidence.

In fact, Special Agent Miris provided information to undermine the admission of this evidence. Under cross-examination, Agent Miris admitted that in 1998, he and others assigned to the Joint Task Force were assigned to investigate money laundering by drug traffickers.[92] This investigation began with a focus on the Bethesda

---

[91]

    "The evidence is weaker because the link is weaker." <u>United States v. Latney</u>, <u>supra</u>, 108 F.3d at 1450.

[92]

    Trial Transcript, September 26, 2002 PM Session, p. 77-78, **EXHIBIT-17**, attached.

-58-

Jewelry Exchange.[93]  The investigation involved Ms. Webster, Mr. Nunn and others but <u>NOT</u> any of the other defendants in this case.[94] The warrant to search Mr. Nunn's house was justified and supported by facts and information related to activities of Ms. Webster, Mr. Nunn and the others in the money laundering scheme.[95] The Task Force investigating the money laundering conspiracy went to Mr. Nunn's house looking for money from the conspiracy he was investigating and that was what they seized.[96] After the seizures, Mr. Nunn was charged with possession of the gun in federal court in Maryland and the other evidence was used to bring charges of a drug trafficking/money laundering conspiracy against Phyllis Webster, Harry Singleton, Lionel Nunn and others in a separate (unrelated case) indictment in this court.[97]

Eventually, the evidence seized in Mr. Nunn's house was turned over to the FBI, who were doing the investigation of this indicted case but all of the items presented were a part of his money laundering investigation.[98]

---

[93]
Id., p. 78, **EXHIBIT-17**, attached.

[94]
Id.

[95]
Id., p. 79, **EXHIBIT-17**, attached.

[96]
Id. pp.79-80, **EXHIBIT-17**, attached.

[97]
Id., p. 81, **EXHIBIT-17**, attached.

[98]
Id., p. 83, **EXHIBIT-17**, attached.

The evidence from the search of Lionel Nunn's house provided the government with very little in the way of narcotics to support the alleged conspiracy in this case. The evidence from the Webster/Nunn separate conspiracy did, however, supply elements hereinbefore not present, that is gargantuan amounts of drugs, currency, and jewelry.[99] This was prejudicial and it affected the substantial rights of Mr. Gray. This in combination with all the other improperly admitted evidence significantly impacted upon the substantial rights of Mr. Gray.

## J.   **FINANCIAL ANALYSIS OF LIONEL NUNN: LISA MILLER.**

Having stained the record with evidence of Phyllis Webster, et al.'s separate narcotics distribution, Lionel Nunn's gambling habits, money laundering at the Bethesda Jewelry Exchange, money stashed in a safe deposit box and immense quantities of cash and jewelry from Nunn's house, the prosecutors were emboldened to pile on. The government was allowed, on September 26 and September 30, 2002, to present the testimony of FBI Special Agent Lisa Miller who tracked the finances of Lionel Nunn. She testified that she was brought in to investigate the finances of Mr. Nunn by, among others, SA Richard K. Diana,   see, supra, pp. 49, whose sole function was to focus upon the drug trafficking/money laundering

---

[99]

"Appropriate deference to [the interests sought to be served by the Federal Rules of Evidence] requires the prosecution to conduct its presentation of [bad acts] evidence in a manner *likely to make clear to jurors the limited purpose for which it is properly admissible.*" United States v. DeLoach, 654 F.2d 763, 772 (D.C.Cir.1980)(Tamm, J. concurring)(emphasis added), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717(1981).

**-60-**

conspiracy related to Phyllis Webster, et al.          _See_, Trial Transcript, September 26, 2002 PM Session, p. 100, **EXHIBIT-18,** attached. There was no effort made to differentiate between what potential illegal funds of Nunn 's money laundering case from activities connected with this case. Those funds were received from the much larger money laundering conspiracy connected to Phyllis Webster and Harry Singleton, et al. Lumping all of the evidence together gave the jury the impression that those discrete activities connected to Mr. Gray were, in fact, responsible for some, part, or all of the drugs, finances, jewelry or other property which were the subject of Special Agent Miller 's testimony. This Court granted Mr. Gray 's defense a continuing objection to SA Miller's entire testimony.[100]

As we said, _supra_ at p. 58-59, Special Agent Alexander Miris testified that the money laundering investigation began in 1998. The financial information presented by SA Lisa Miller just happened to begin in 1998 and covered primarily the currency, watches, jewelry, receipts, payments and documented income beginning in 1998. _See_, Govt Exhibits **LM-1 (cash deposits and cash**

---

[100]
    MR. CARTER:    Your Honor, if we could just have a
                   continuing objection to the testimony of
                   Special Agent Lisa Miller particularly the
                   information about 1998 which we believe is
                   outside the scope of the conspiracy. We move
                   to strike her testimony. So if we could just
                   have that continuing.
    THE COURT:     Yes, you may.
Trial Testimony, September 26, 2002 PM Session, pp. 124-125,
**EXHIBIT-18,** attached.

expenditures), **LN-2 (liquid assets in 2000), LM-3 (legitimate sources of income) & LM-4 (seizures at time of arrest and searches), EXHIBITS-19a, b, c & d,** attached. The massive amounts of cash, jewelry, property and financial matters were never connected to this indictment and were placed into evidence for their "shock value." This conclusion is inevitable when you consider that the government placed into evidence a Certification from the Internal Revenue Service that there was no evidence of Mr. Nunn filing a tax return from 1990 until 1999. See, Govt Exhibit **LN-800, EXHIBIT-20,** attached. The first eight to nine of those years had absolutely nothing to do with the conspiracy in this case. This in combination with all the other improperly admitted evidence significantly impacted upon the substantial rights of Mr. Gray.

**K.    RODMAN LEE'S CONTROLLED SUBSTANCE: JERRY WALKER.**

The Court may recall that Rodman Lee's van was in the Exxon Station on Pennsylvania Avenue, S.E. when Mr. Ricardo Bailey was shot on May 31, 1996. Both Mr. Gray (passenger) and Mr. Lee (driver) were seen by Detective George Blackwell of the Metropolitan Police[101] driving out of the gas station lot in the white van. Subsequently, Mr. Lee (driver) and Mr. Gray (passenger) were arrested near Texas Avenue and East Capitol Street, S.E. in this van. At some point following the arrest, an extensive search

---

[101]

See, Trial Transcript, November 13, 2002 AM Session, pp. 11-12, 23-24, 29-30.

of the van located several secret compartments which held both cocaine and cocaine base. The search was not undertaken by the Metropolitan Police, who were investigating the shooting of Ricardo Bailey. Instead, the van search, the narcotics seizure, the filling out of the documentation or DEA-7 form,[102] the storage and subsequent testing of the suspected narcotics were all done by the Drug Enforcement Administration ("DEA"), who were leading the Joint Task Force investigating the unassociated narcotics conspiracy targeting Rodman Lee. This investigation, as well as the facts discovered as a result of it, were completely unrelated to anything Mr. Gray was subsequently alleged to have been involved with. There was no testimony that Mr. Gray was in the van to pick-up some narcotics nor that the Mr. Gray and Mr. Lee were in the process of delivering controlled substance to anyone connected to Mr. Gray.

At trial the government presented evidence of the separate distribution ring of Rodman Lee. In fact, Mr. Lee was the target of the separate investigation run by the jointly operated DEA and Metropolitan Police group.[103] Special Agent ("SA") Timothy McGrath of the Drug Enforcement Administration ("DEA") testified on July 22 and 23, 2002, about the recruitment of Ricardo Bailey as an informant in their investigation of Rodman Lee. While the

---

[102]

     The DEA-7 form was Govt Exhibit **RB-501, EXHIBIT-24,** attached. The controlled substances were documented as seized by, written up by, processed by, and received by the lab from, SA Timothy McGrath of the Drug Enforcement Administration.

[103]

     See, Trial Transcript, July 22, 2002 PM Session, pp. 109-113, **EXHIBIT-25,** attached.

government through several witnesses sought to link Mr. Gray to the shooting of Ricardo Bailey, they never had anyone say the narcotics found in the van was a payment to, nor destined to be delivered to, Mr. Gray.

On October 23, 2002, the government began the testimony Jerry Walker, an analytical chemist from the DEA who testified as an expert. He testified about tests done on suspected controlled substance seized from various people during a period from 1993 through 2000. He used reports and notes of others who worked for his agency. The government presented a summary chart of those findings styled: **DEA LABORATORY ANALYSIS OF DRUGS EVIDENCE** as Govt Exhibit **JW-500**. <u>See</u>, **EXHIBIT-21** attached.

A review of that Exhibit reveals comparatively small quantities of narcotics seized, with one notable exception: the drugs seized from Rodman "Chinaman" Lee's white van. The problem is, of course, that the government never connected the large quantity of narcotics found in that van with either Mr. Gray or any of the activities of the conspiracy charged in this case. There was extensive testimony that Rodman Lee was, simultaneous to Mr. Ricardo Bailey's death, operating his own, distinct and diverse distribution ring.

The narcotics evidence found in Lee's van was identified at trial during the testimony of SA Timothy McGrath of the DEA on July

23, 2002.[104] Mr. Gray's defense objected to the admission of the controlled substance until such time as chemist testified as to what the substance was.[105] It was also anticipated by the defense that at some point during the trial Rodman Lee would testify for the prosecutors since the discovery material provided by the government made the defense aware that Lee had entered into a cooperation agreement. He did not appear at trial and the government never closed the circle on its proof that the drugs discovered in Lee's white van had anything to do with the indicted conspiracy.

When Jerry Walker, the DEA Chemist, resumed his testimony on October 30, 2002 (three months after SA McGrath first talked about these controlled substances), the defense objected to that portion of Govt Exhibit **JW-500** which listed the narcotics discovered in

---

[104]

     <u>See</u>, Trial transcript, July 23, 2002 AM Session, pp. 9-21, **EXHIBIT-22**, attached. Govt Exhibits **RB-428a,b,c,d & e** (the last items was packaging and tape).

[105]

| | |
|---|---|
| "MR. BAUGH: | Your Honor, **so I can preserve any objection**, I'm going to object to this officer -- this agent publicizing the analysis, including the conclusions of the -- whoever did the tests, and his designation of crack and powder, the differentiation on the report. I think until the chemist testifies, this man can't do it. |
| THE COURT: | Overruled. |
| MR. BAUGH: | Thank you. |
| THE COURT: | I can strike it if the chemist doesn't match. |

Trial Transcript, July 23, 2002 AM Session, p. 13, **EXHIBIT-22**, attached (emphasis added).

Rodman Lee's van.[106] Mr. Gray's defense made it clear that we had an

objection to the admission of the summary chart of drug evidence,

as well as the admission of the narcotics seized from Lee's white

van, based on the failure of the government to link up the

controlled substance found in Lee's white van with any conspiracy

within the indictment:

> MR. BAUGH: ....Your Honor, because of the way the case
> is developing, when we stated this trial, I was under the
> impression Rodman Lee was going to testify for the United
> States.
>     There's a whole lot of drugs that they're introducing
> in this case that was found in a secret compartment in
> Rodman Lee's car. There is no indication of
> foreseeability. There is no indication of possession.
> There is no indication that it was part of any conspiracy
> between my client and Rodman Lee, because Rodman Lee also
> had his own thing going.
>     I would object to the introduction of the drugs at
> this time, because that amount of drugs is highly
> prejudicial. When they first came in, as I said earlier,
> I thought there was going to be more connection. However,
> based upon the representations of the United States the
> last few nights, I get the impression Mr. Lee is not
> going to testify.
>     So we would make the objection we should have made,
> and we would have made had we known who was going to be
> appearing for the government. And we ask it be included
> [sic] until such time as a proper nexus is laid.
>
> THE COURT: Denied.
>
> Trial Transcript, October 30, 2002 PM Session, pp. 24-25,
> **EXHIBIT-23**, attached.

---

106

    Jerry Walker's testimony was divided. On October 23, 2002,
he began testifying about the seized narcotics. The government,
however, had not released to the defense all the DEA-7 forms
containing the analysis for every item about which they sought
to have Mr. Walker testify. Thus, the rest of Mr. Walker's
testimony was continued until October 30, 2002.

The erroneous introduction of this prodigious quantity of drugs prejudiced Mr. Gray before the jury. The impression of a major drug operation the prosecutors sought to portray to the jury was delivered by the admission of these drugs. [107] This in combination with all the other improperly admitted evidence significantly and adversely impacted upon the substantial rights of Mr. Gray.

## III.  INSTRUCTIONAL ERRORS.

### A.    USE OF JUVENILE ACTIONS.

Pretrial the defense convinced both the prosecutors and this Court that the jury could view the actions of Mr. Gray before his eighteenth birthday only to determine if he had become a member of a conspiracy but could not use that same information to convict him of the conspiracy. That position apparently changed in the final jury instructions.

On December 3, 2001, the defense filed *Mr. Gray's Motion to Dismiss Based on Mr. Gray's Age at the Time of the Offenses*. This Motion covered the following:

---

[107]

The damage we described was done both alone by this evidence, as well as in combination with other prejudicial testimony. We have previously listed our objections concerning the gargantuan quantities of controlled substances being distributed, the vast amounts of money being laundered, financial proceeds from narcotics sales and the jewelry purchased, all outside of any conspiracy indicted in this case. See, the testimony of Phyllis Webster, supra, pp.41-51, the testimony about the Bethesda Jewelry Exchange, supra, pp. 51-56, the information related to the search of Lionel Nunn's house, supra, pp. 56-60, and the financial analysis of Lionel Nunn, supra, pp.60-62.

1.    Count One, Overt Act 1 reads:
      On or about May 1, 1989, in the 3100 block of Robinson
      Place, S.E., in the District of Columbia, KEVIN L. GRAY,
      while armed with a firearm, shot and killed Alvin N.
      Henson, aka Flubby, because Henson assaulted the uncle
      of KEVIN L. GRAY.

2.    Count One, Overt Act 2 reads:

      In or about sometime in 1989 or 1990, in the District of
      Columbia, KEVIN L. GRAY and RODNEY L. MOORE, aka Rasso
      relocated a relative of KEVIN L. GRAY and co-conspirator,
      who was a witness to the murder of Alvin Henson, with the
      intent to prevent that witness from testifying in the
      trial of case F-10893-89, then pending in the Superior
      Court of the District of Columbia.

3.    Count Two, charging a Continuing Criminal Enterprise,[108] states
      in the beginning paragraph that the alleged enterprise starts
      in 1988, at a time when Mr. Gray was a juvenile.

4.    Count Three charges a RICO Conspiracy [109] beginning in 1988,
      when Mr. Gray was a juvenile. Further, Racketeering Act 20
      charges:

      May 1, 1989 Murder of Alvin Henson, aka Flubby. On or
      about May 1, 1989, in the District of Columbia, KEVIN L.
      GRAY and co-conspirators not indicted herein, while armed
      with a firearm, purposely and with deliberate and
      premeditated malice, killed Alvin Henson, aka Flubby, by
      shooting him with a firearm on or about May 1, 1989,
      thereby causing injuries from which Alvin Henson, aka
      Flubby does on or about May 1, 1989, in violation of 22
      D.C.Code §2401, 3202 and 105.

Mr. Gray's date of birth is June 15, 1971, making him underage at

the time of each of these events.

      Although the government opposed our Motion, they conceded:

      Defendant Gray is correct that he cannot be convicted of
      the conspiracy charges based on his juvenile conduct.
      [United States v.] Thomas, 114 F.3d [228,] at 266
      [(D.C.Cir.1997)]. As noted above, however, that does not

---

[108]
      21 U.S.Code §848(a) and (b).

[109]
      18 U.S.Code §1962(d).

-68-

> mean that evidence of his juvenile conduct is not
> admissible as evidence of those conspiracies, but only
> that the jury cannot base its verdicts on the conspiracy
> charges on that evidence.... The government agrees that
> a limiting instruction would be appropriate and has no
> objection to this request [citation omitted].
> *Governments Omnibus Opposition to Defendants' Pretrial
> Motions* filed 1-2-02 at p. 37.

In its Memorandum Opinion and Order Filed February 7, 2002, this Court said, among other things, at p. 59-60:

> In order to protect the defendant from any undue
> prejudice resulting from the presentation of evidence of
> criminal acts committed while the defendant was a minor,
> the Court will instruct the jury that the defendant may
> not be convicted of any conspiracies solely on the basis
> of acts committed while a minor, and that any evidence
> of criminal acts that defendant may have committed while
> a minor may only be used to determine the defendant's
> knowledge of the conspiracy, when the defendant joined
> the conspiracy, the scope of the conspiracy agreed to by
> the defendant, and the foreseeability of the acts of co-
> conspirators. See, Thomas, 114 F.3d at 266.

Based on this apparent agreement among the parties and the bench, this Court gave Gray's Proposed Instruction Number One. See, **EXHIBIT-26**, attached. This was given to the jury when the Court read the Indictment.[110] It was given again after the last witness testified about the Alvin "Flubby" Henson homicide.[111]

Inexplicably, on December 9, 2002, seven months later at the end of the case, the language for this instruction was completely changed in the final version provided to the jury.    See, JURY INSTRUCTION NO. 40: EVIDENCE OF DEFENDANT 'S ACTIVITIES WHILE A

---

[110]

   See, Trial Transcript, May 8, 2002 P.M. Session, p. 3, **EXHIBIT-27**, attached.

[111]

   See, Trial Transcript, May 20, 2002 P.M. Session, pp. 54-57, **EXHIBIT-28**, attached.

JUVENILE, **EXHIBIT-29**, attached. Instead of telling the jury they could not use juvenile actions to convict, the Court instructed:

> If that is proved beyond a reasonable doubt, you may consider both the defendant's pre-18-years act[s] and his post-18-years acts on the conspiracy count.

This was error of a constitutional magnitude, prohibited by case law which the defense gave to this Court.

### B.   LACK OF UNANIMITY: HOMICIDE OF ANTHONY WATKINS.

On November 7, 2002, the defense for Mr. Gray, while making our Motion for Judgment of Acquittal, brought to the attention of this Court that the Indictment had contradictory allegations in relation to the homicide of Anthony Watkins, which took place on August 9, 1999. Count One, the Narcotics Conspiracy, 18 U.S.Code §846, in Overt Act 203 reads:

> In or about sometime in 1999, in the District of Columbia, **LIONEL NUNN, aka Brotherman** met with **KEVIN L. GRAY** and solicited **KEVIN L. GRAY** <u>to murder Anthony Watkins</u> and Andre Sanders, <u>**because the organization owed Watkins money**</u>, and because Sanders had been involved in a prior conflict with **LIONEL NUNN, aka Brotherman** (emphasis added to underlined portion).

But, Count Three, the RICO Conspiracy, Racketeering Act 60 alleges, in relevant part:

> The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 60:
>
> (a) From on or about sometime in 1999 to August 9, 1999, in the District of Columbia, **LIONEL NUNN, aka Brotherman, KEVIN L. GRAY, JOHN RAYNOR, aka Buck, RONALD ALFRED, aka Boo**, and co-conspirators not indicted herein did unlawfully, knowingly and willfully combine, conspire, confederate, and agree together to commit murder for hire of Andre Sanders and Anthony Watkins, in violation of 22 D.C. Code §§ 2401, 2403, 3202.
>
> I. Object of the Conspiracy

> It was the primary object of the conspiracy for the defendants and co-conspirators not indicted herein, **to murder Anthony Watkins for hire, because Watkins owed money to the organization**, and to murder Andre Sanders for hire, because Sanders had a prior conflict with **LIONEL NUNN, aka Brotherman**.

At the time of our F.R.Cr.P. 29 Motions for Judgment of Acquittal, this Court took the matters under advisement. The issue was not finally decided until the defense was about to do their closing argument in the innocence/guilt phase.[112] The defense raised the issue and the government asked the Court not to require them to take a position, even though the charging document held diametrically opposed positions in why Watkins was shot. We reminded the Court, in response to a government request to strike the language in each Count, that they could not amend the Indictment; they could only dismiss the particular Overt Act or Racketeering Act.[113] The Court denied our Motion to have them chose which to keep. Further, when we asked for a unanimity instruction.[114] It was denied.[115]

---

[112]    See, Trial Transcript, November 26, 2002 A.M. Session, pp.5-6, **EXHIBIT-30**, attached.

[113]    Id.

[114]    In United States v. Mangieri, 694 F.2d 1270, 1281 (D.C.Cir.1982) our Circuit approved the District of Columbia rule which holds: "because of the possibility of a nonunanimous verdict, when one charge encompasses two separate incidents, the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which indictment or incident they find the defendant guilty." citing Hack v. United States, 445 A.2d 634, 641 (D.C.1982).

[115]    See, Trial Transcript, November 26, 2002 A.M. Session, p.6, **EXHIBIT-30**, attached.

This Court cannot say with fair assurance under which theory was Mr. Gray convicted. He was prejudiced. The Court did not have the jury vote on the 216 Overt Acts of Count One, but all were submitted for the jury to consider. We cannot say with any assurance that Mr. Gray was not convicted of Count One based on Overt Act 203, even though the jury did not _have_ to based their decision on all 216 Overt Acts. No one can say whether any juror rejected all other Overt Acts but settled upon Overt Act 203. Because other Overt Acts may be valid does not determine if any juror utilized those other provisions. Further, the jury did find that the government proved Count Three, Racketeering Act 60, as well as being guilty of Counts 72[116] and 73.[117] Were the latter based on the theory from Count Three or the separate and distinct theory of Count One? Can this Court say whether some jurors agreed with the theory from Count One while other jurors agreed with the theory from Count Three when they voted on Counts 72 and 73? The Court cannot. Therefore, Mr. Grays conviction for Count One, Count Three, Count 72 and Count 73 must be vacated.

## IV.  **CONCLUSION**.

Wherefore, the foregoing being considered, Mr. Gray prays that this Court GRANT this Motion for a New Trial.

---

[116]

First Degree Murder while armed of Anthony Watkins.

[117]

Murder in Aid of Racketeering Activity of Anthony Watkins.

**-72-**

Respectfully submitted,

_____
FRANCIS D. CARTER, ESQ.
D.C. Bar Number 164376
Counsel for Mr. Gray
1730 Rhode Island Avenue, N.W.
Suite 717
Washington, D.C. 20036-3115
(202) 393-4330


_____
DAVID P. BAUGH, ESQ.
Virginia Bar No. 22528
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111


_____
SARA G. DAVIS HARMON, ESQ.
Va Bar No. 43463
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111


## CERTIFICATE OF SERVICE

This is to certify that a copy of Kevin L. Gray's New

Trial Motion was mailed, postage prepaid, this 20th day of May,

2003, to the offices of:

Timothy J. Heaphy, Esq.
Matt G. Olsen, Esq.
Amy Jeffress, Esq.
Assistant U.S. Attorneys
555 Fourth Street, N.W.
Third Floor
Washington, D.C. 20530.


-73-

Barry Coburn, Esq.
Coburn & Schertler
1150 18th Street, N.W.
Suite 850
Washington, D.C. 20036
(Counsel for Rodney Moore)

Steve J. McCool, Esq.
Mallon & McCool, LLC
1776 K Street, N.W.
Suite 300
Washington, D.,C. 20036
(Counsel for Rodney Moore)

G. Godwin Oyewole, Esq.
601 Pennsylvania Avenue, N.W.
Ninth Floor
Washington, D.C. 20004
(Counsel for John Raynor)

Tom Saunders, Esq.
10 N. Calvert Street
Suite 715
Baltimore, MD 21202-1882
(Counsel for John Raynor)

John Carney, Esq.
Carney & Carney
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C. 20004
(Counsel for Calvin Smith)

Cary Clennon, Esq.
P.O. Box 29302
Washington, D.C. 20017-9302

(Counsel for Brian Bostick)

Diane M.B. Savage, Esq.
PO Box 14846
Research Triangle Park, NC
 27709
(Counsel for Brian Bostick)

Fred Jones, Esq.
901 Sixth Street, S.W.
Suite 409
Washington, D.C. 20024
(Counsel for Derrick Moore)

Andrea Antonelli, Esq.
Evans, Antonelli & Cox
419 Seventh Street, N.W.
Suite 201
Washington, D.C. 20004
(Counsel for Derrick Moore)

Frederick J. Sullivan, Esq.
McCarthy & Sullivan
2127 Sadler Lane
Bowie, Maryland 20715
(Counsel for Roy Johnson)

Alan B. Soschin, Esq.
400 Seventh Street, N.W.
Washington, D.C. 20004
(Counsel for Roy Johnson)

Joseph E. Beshouri, Esq.
419 Seventh Street, N.W.
Suite 201
Washington, D.C. 20004
(Counsel for Kenneth Simmons)

Lexi Negin Christ, Esq.
419 Seventh Street, N.W.
Suite 201
Washington, D.C. 20004
(Counsel for Kenneth Simmons)

Sabastian K.D. Graber, Esq.
P.O. Drawer 189
Wolftown, VA 22748
(Counsel for Larry Wilkerson)

Christopher Leibig, Esq.
Leibig, Mosely & Dillard, P.C.
209 Commerce Street, 2nd Flr
Alexandria, VA 22314
(Counsel for Larry Wilkerson)

Michael Lasley, Esq.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(Counsel for Timothy Handy)

John K. Zwerling, Esq.
Zwerling & Kemler, P.C.
108 N. Alfred Street
Alexandria, Virginia 22314
(Counsel for Lionel Nunn)

Matthew Wartel, Esq.
Bynum & Jenkins, PLLC
300 N. Lee Street
Suite 475
Alexandria, VA 22314
(Counsel for Ronald Alfred)

Manuel J. Retureta, Esq.
601 Pennsylvania Avenue, N.W.
Suite 900
South Building, PMB-256
Washington, D.C. 20004
(Counsel for Franklin Seegars)

Kenneth D. Auerbach, Esq.
Metropolitan Building
Suite 704
8720 Georgia Avenue
Silver Spring, MD 20910
(Counsel for Deon Oliver)

William J. Garber, Esq.
717 D Street, N.W.
Suite 400
Washington, D.C. 20004
(Counsel for Wilford Oliver)

Frances DAntuono, Esq.
218 Seventh Street, S.E.
Washington, D.C. 20003
(Counsel for Keith McGill)

Adgie OBryant, Esq.
1107 Seventh Street, N.W.
Washington, D.C. 20001-3609
(Counsel for Timothy Handy)

David Carey Woll, Esq.
Woll & Woll, P.A.
11501 Georgia Avenue
Suite 201
Wheaton, MD 20902
(Counsel for James Alfred)

Idus J. Daniel, Jr., Esq.
Daniel & Jamison, LLP
729 Eighth Street, S.E.
Suite 300
Washington, D.C. 20003
(Counsel for Ronald Alfred)

Jon W. Norris, Esq.
800 7th Street, N.W.
Suite 201
Washington, D.C. 20001
(Counsel for Franklin Seegars)

Joseph J. Bernard, Esq.
5425 Connecticut Ave.,N.W.
Suite 318
Washington, D.C. 20015
(Counsel for Deon Oliver)

Cynthia Katkish, Esq.
601 Penna. Avenue, N.W.
Suite 900-S pmb221
Washington, D.C. 20004
(Counsel for Wilford Oliver)

Francis D. Carter, Esq.

-75-

United States of America v.          CR 00-157                May 29, 2002
Kevin L. Gray, et al.                                           Volume 48

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

    - - - - - - - - - - - - - - - x
                                  :
    UNITED STATES OF AMERICA,      :   Docket No. CR 00-157
                                  :
          Plaintiff,               :   Washington, D.C.
                                  :   May 29, 2002
    v.                            :   2:20 p.m.
                                  :
    KEVIN L. GRAY, RODNEY MOORE,  :
    JOHN RAYNOR, CALVIN SMITH,    :
    TIMOTHY HANDY, LIONEL NUNN,   :
                                  :
          Defendants.              :
                                  :
    - - - - - - - - - - - - - - - x
```

                    DAY 48 - PM SESSION
                   TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ROYCE C. LAMBERTH
            UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:      TIMOTHY J. HEAPHY, ESQ.
                        MATTHEW G. OLSEN, ESQ.
                        AMY JEFFRESS, ESQ.
                        Assistant United States Attorneys
                        555 Fourth Street, Northwest
                        Washington, D.C. 20001

For Defendant Gray:     FRANCIS D. CARTER, ESQ.
                        1730 Rhode Island Avenue, Northwest
                        Suite 717
                        Washington, D.C. 20036
                        DAVID P. BAUGH, ESQ.
                        Law Offices of David P. Baugh, PC
                        223 South Cherry Street
                        Richmond, Virginia 23241

                   Pages 1 through 148
                DOLORES A. BYERS, CSR, RPR
                  Official Court Reporter

FILED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District Court                                  Dolores A. Byers, CSR RPR
For The District of Columbia                                 Official Court Reporter
                      U.S. v. KEVIN L. GRAY
                    Cr.No. 00-157(01); Exhibit-1

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 29, 2002
Volume 48

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
    Coburn and Schertler
    1150 18th Street, Northwest
    Washington, D.C. 20036

    STEVEN MC COOL, ESQ.
    Mallon and McCool, LLC
    16 South Calvert Street, Suite 1002
    Baltimore, Maryland 21202
For Defendant Raynor:  G. GODWIN OYEWOLE, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    THOMAS SAUNDERS, ESQ.
    207 East Redwood Street, Suite 205
    Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
    Law Offices of Carney and Carney
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    JONATHAN RUBENS, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004
For Defendant Hardy:  MICHAEL LASLEY, ESQ.
    1730 K Street, Northwest, Suite 304
    Washington, D.C. 20006
    ADGIE O'BRYANT, JR., ESQ.
    Anderson and O'Bryant, PC
    1107 Seventh Street, Northwest
    Washington, D.C. 20001

For Defendant Nunn:  VERONICE A. HOLT, ESQ.
    3003 Van Ness Street, Northwest
    Suite W-919
    Washington, D.C. 20008

---

**Page 3**

CONTENTS

WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS
On behalf of the government:
Jermaine Vick
  By Mr. Olsen (resumed)  4

EXHIBITS

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. RS-1 | | 41 |
| No. LW-1 | | 41 |
| No. A-4 | | 52 |
| No. WO-1 | | 72 |
| No. LG-1 | | 73 |
| No. MG-100 | | 117 |
| No. G-2 | | 121 |

---

**Page 4**

1              AFTERNOON SESSION
2       (Jury entered courtroom.)
3       THE COURT:  All right.  Mr. Olsen, you may
4   proceed.
5       MR. OLSEN:  Thank you.
6             DIRECT EXAMINATION
7       BY MR. OLSEN:
8   Q  Good afternoon, Mr. Vick.
9   A  Good afternoon.
10  Q  When we broke for lunch, I said I wanted to move to a
11  new area.  You testified before lunch that in 1989 you were
12  arrested; is that right?
13  A  Yes.
14  Q  At the time you were arrested, how old were you?
15  A  Fourteen.
16  Q  You were 14 when you were arrested?
17  A  Yeah.
18  Q  Were you found guilty of that offense?
19  A  Yes.
20  Q  What was your sentence?
21  A  Two-year sentence.
22  Q  I'm sorry?
23  A  A two-year sentence.
24  Q  Were you sent somewhere to serve that sentence?
25  A  Yes.

---

**Page 5**

1   Q  Where?
2   A  In the Oak Hill Youth Center.
3   Q  Where is Oak Hill Youth Center?
4   A  It's in Laurel, Maryland.
5   Q  Now, before you were sent there, where were you staying?
6   A  With Edna Reid at 3300 block of Stanton Road.
7   Q  Whose mother is Edna Reid?
8   A  Maurice and Michael Reid.
9   Q  Maurice and Michael Reid?
10  A  Yes.
11  Q  Was there a time when Kevin Gray was also staying there
12  with you?
13  A  Yes.
14  Q  Was that in the time period prior to when you were
15  arrested and sent to Oak Hill?
16  A  Yes.
17  Q  When you went to Oak Hill, did you know anybody who was
18  there already?
19  A  Yes.
20  Q  Who?
21  A  Kevin was there and a few other guys from out of the
22  neighborhood.
23  Q  So Kevin Gray was there?
24  A  Yes.
25  Q  Which unit were you assigned to at Oak Hill?

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 29, 2002
Volume 48

---

Page 82

1   direct or our case and our cross. I'd ask the government if
2   any of these other witnesses that are in the courtroom is
3   involved in this case in any way other than assisting them
4   with administrative matters.
5         MR. OLSEN: Your Honor, the other police officers
6   other than the three investigators have no connection to the
7   investigation of the case and are not going to be witnesses.
8         MR. LASLEY: Thank you very much.
9         THE COURT: The objection is overruled to this.
10        (End bench conference.)
11        BY MR. OLSEN:
12  Q   Good afternoon, again, Mr. Vick.
13  A   Good afternoon.
14  Q   I want to change topics from talking with you about
15  drugs and drug sales and turn our attention to acts of
16  violence at this point. All right?
17        I want to refer you back to 1989 prior to you
18  going to Oak Hill. Did you know a person nicknamed Flubby?
19  A   Yes.
20  Q   How did you know him?
21  A   He was an addict that was in the neighborhood.
22  Q   Where were you living at that time in early 1989?
23  A   Staying with Ms. Edna Reid.
24  Q   Maurice Reid's mother?
25  A   Yes.

---

Page 83

1   Q   On which street?
2   A   The 3300 block of Stanton Road.
3   Q   Where is that in relationship to 15th Place?
4   A   It's, like, a block away.
5   Q   What sort of drug did Flubby use? You say he was an
6   addict.
7   A   Heroin.
8   Q   Did you actually ever sell him drugs?
9   A   No.
10  Q   How is it that you knew that he was a heroin addict?
11  A   He was on the strip of 15th Place where all the heroin
12  is used. He used to be in the oil house and stuff like that
13  using drugs.
14  Q   Do you know his real name?
15  A   No.
16  Q   Let me show you a picture, H-100. It's in evidence.
17        Do you recognize that person?
18  A   Yes.
19  Q   And who is that?
20  A   That's Flubby.
21  Q   Do you remember hearing anything about something
22  happening to him?
23  A   Yes.
24  Q   I'll direct your attention to May 1, 1989. What did you
25  hear happen to him?

---

Page 84

1         MR. COBURN: Objection. Hearsay.
2         THE COURT: Overruled.
3         MS. HOLT: Objection. Leading.
4         THE COURT: Overruled.
5         BY MR. OLSEN:
6   Q   You can answer the question. What did you hear happened
7   to him?
8   A   He was murdered.
9   Q   Do you remember, thinking back, do you remember around
10  the time frame that he was murdered?
11  A   I can't remember months and dates.
12  Q   But just in terms of your own memory, do you remember
13  learning about him being murdered?
14  A   Yes.
15  Q   At that time were you home or were you locked up?
16  A   I was home.
17  Q   How old were you, about? Do you remember?
18  A   I think probably, like, 14 back then.
19  Q   And you were staying, again, you were staying with
20  Ms. Reid?
21  A   Yes.
22  Q   Who else was staying with you at that time?
23  A   Me, Maurice Reid and Kevin was staying there.
24  Q   Did you actually talk to Kevin Gray about what had
25  happened to Flubby?

---

Page 85

1   A   Yes.
2   Q   Did he have a conversation with you?
3   A   Yes.
4   Q   Who else was involved in that conversation?
5   A   Me, Maurice Reid and the individuals of that household
6   that I just named.
7   Q   You, Maurice Reid, Kevin Gray. Anybody else?
8   A   No. That's it.
9   Q   Just those there? You three people?
10  A   Right.
11  Q   Tell us as best you can recall what Kevin Gray told you
12  about what had happened to Flubby?
13  A   Flubby got into an altercation with his uncle.
14  Q   Whose uncle?
15  A   Kevin Uncle Moe. And Moe came and got Kevin. And Kevin
16  shot him in his behind and the result of it Flubby died.
17  Q   Did you know or did Kevin tell you where that occurred,
18  where the shooting occurred?
19  A   In occurred in the oil house.
20  Q   When you say oil, are you saying oil, like, O-I-L?
21  A   Yeah. It's a house that's used to shoot drugs up at.
22  Q   Were you familiar with that particular location?
23  A   Yes.
24  Q   Where was it?
25  A   I believe that's Bruce Street, on Bruce Street.

---

22 (Pages 82 to 85)

United States of America v.                          CR 00-157                          May 29, 2002
Kevin L. Gray, et al.                                                                   Volume 48

---

Page 86

1  Q  Did anyone in particular, like someone that you know or
2  someone's name that you associate -- was there a name that
3  you associate with that particular place?
4  A  Well, not back then.  They call it something now, the
5  Boulevard or something now.
6  Q  Who lived in that oil house?
7  A  A lady named Pearl and her husband named Jimmy.
8  Q  Did Kevin tell you where it was that he -- where he was
9  when he shot Flubby?
10  A  Where he was?
11  Q  Yeah.  Where the location was.
12  A  No.
13  Q  Did he tell you whether it was in the oil house or
14  somewhere else?
15  A  Inside the oil house but where at in there in a room, I
16  don't know if it's inside the house.
17  Q  He didn't tell you specifically which room inside the
18  house?
19  A  No.
20  Q  When he told you this, did Kevin Gray tell you which gun
21  he used to shoot Flubby?
22  A  Yeah.
23  Q  What did he say?
24  A  A 38 revolver.
25  Q  Were you familiar with that gun?

---

Page 87

1  A  Yes.
2  Q  How is it that you were familiar with that gun?
3  A  That gun was stashed at Ms. Reid house and we used to
4  use that gun.
5  Q  Who is we?
6  A  Me, Maurice Reid and Mr. Gray.
7  Q  Where did you keep it in Ms. Reid's house?
8  A  Under the mattress in the drawer somewhere.
9  Q  At that time in 1989 did you have access to a lot of
10  different kinds of guns?
11  A  No.  Not at that time.
12  Q  How many different guns did you have access to?
13  A  Like two.
14  Q  And was this particular gun one of the two that you had
15  access to?
16  A  Yes.
17  Q  And was it a revolver or semiautomatic?
18  A  A revolver.
19  Q  Did Kevin Gray in this conversation talk to you about
20  his brother being present?
21  A  I can't remember.  I can't remember whether he said Bink
22  was present or not.
23  Q  Did you later learn from Kevin Gray that his brother was
24  present?
25  A  Yes.

---

Page 88

1  Q  Tell us about that?
2  A  I know that his brother was present because his brother
3  supposed to made some statements supposed or something like
4  that against him --
5      MR. CARTER:  Objection.  Hearsay.
6      THE COURT:  Who told you that?  Kevin?
7      THE WITNESS:  Yes.
8      THE COURT:  Okay.  The objection is overruled.
9      BY MR. OLSEN:
10  Q  What did Kevin tell you about his brother making some
11  statements against him?
12  A  His brothers made some statements to the fact of him
13  shooting Flubby.
14  Q  When you say some statements, who were those statements
15  made to?
16  A  The police.
17  Q  What's, Kevin's brother, what's his name?
18  A  Kenneth Gray.
19  Q  And what did you call him?
20  A  Bink.
21  Q  I'm sorry?
22  A  Bink.
23  Q  Did you or did you take any steps along with Kevin Gray
24  to do anything about the fact that his brother Bink had made
25  some statements to the police about him shooting Flubby?

---

Page 89

1  A  No.
2  Q  Did Kevin Gray take any steps?
3  A  He took steps in terms of, not to harm him, but in terms
4  of to hide him from law enforcement officials.
5  Q  Why?
6  A  So that he wouldn't testify.
7  Q  What steps did he take?
8  A  He hid him in various places, hotels and girls house and
9  stuff like that.
10  Q  Were you involved in that?
11  A  Yeah.
12  Q  What did you do?
13  A  What do you mean what did he do?
14  Q  Well, how were you involved in that?
15  A  Some of those spots I stayed with him a few nights at
16  some spots.
17  Q  Who did you stay with?
18  A  The one particular spot.  This girl Kevin used to deal
19  with named Dawn he used to stay over her house sometimes.
20  Q  Where was her house?
21  A  Her house was on -- I believe that's 3rd Street,
22  Southeast.
23  Q  And you actually stayed there?
24  A  Yes.
25  Q  And who else stayed there with you?

---

United States District Court                          Dolores A. Byers, CSR RPR
For The District of Columbia                          Official Court Reporter

United States of America v.                          CR 00-157                                    May 29, 2002
Kevin L. Gray, et al.                                                                            Volume 48

Page 90

1   A   Me, Bink and Kevin.
2   Q   Why, at that particular time, was it necessary -- did
3   Kevin tell you why it was necessary to hide his brother at
4   Dawn's house during that particular time?
5   A   I mean, his trial was coming up or something. So it was
6   hide Bink there so he wouldn't be able to testify.
7   Q   Did Kevin Gray talk to you, Mr. Vick, about another
8   person who was an eyewitness to this murder?
9   A   Yes.
10  Q   What did he tell you about that person?
11  A   I can't remember his name. It was a guy that supposed
12  to have been seen the murder or something, you know. I
13  don't remember his name or nothing like that. I don't even
14  know how he look.
15  Q   Did you get any information from Kevin Gray about where
16  he might be able to find this guy who was an eyewitness to
17  the murder?
18  A   Yes.
19  Q   Where?
20  A   We rolled one time on Good Hope Road to look for a guy
21  that supposed to have been a witness to that murder.
22  Q   You and who?
23  A   Me and Mr. Gray.
24  Q   Where did you go?
25  A   On Good Hope Road.

Page 91

1   Q   What other streets are near there?
2   A   16th Street.
3   Q   In what part of the city?
4   A   Southeast.
5   Q   And were you looking for any particular -- did you have
6   information about any particular residence or apartment
7   building or anything like that?
8   A   Yes. It was apartment building across from Mason's
9   Funeral Home down there and we went down there looking for a
10  guy but never saw him.
11  Q   How many times did you go looking for the guy?
12  A   Just that one time I went with him.
13  Q   Did Kevin Gray tell you that there were other times that
14  he went looking?
15  A   No. He didn't say.
16  Q   The time that you went with Kevin Gray to look for the
17  witness, were either you or Kevin Gray armed with a gun?
18  A   Yes.
19  Q   Who?
20  A   We both was.
21  Q   What was going to happen if you found the guy?
22  A   He was going to get murdered.
23  Q   Did you ever hear, Mr. Vick, whether or not that person
24  was shot or killed?
25  A   No.

Page 92

1   Q   You never heard one way or the other?
2   A   No.
3   Q   What happened with the case, with Kevin Gray?
4   A   I believe that case was dismissed against him or
5   mistrial -- I don't know whether it was dismissed or
6   mistrial or something like that. Something of that nature
7   happened to that case. I don't know which one it was.
8   Q   Now let me ask you about another murder, if I can. Did
9   you know a guy nicknamed Fish?
10  A   Yes.
11  Q   How did you know him?
12  A   He's sell on 15th Place.
13  Q   Sell what?
14  A   Heroin.
15  Q   At the same time that you were out there selling drugs
16  he was out there?
17  A   Yeah.
18  Q   Do you know his real name?
19  A   No.
20  Q   Let me show you what's marked as Government's Exhibit AD
21  No. 1. It's in evidence, I believe, AD-100.
22         Do you recognize that person?
23  A   Yes.
24  Q   Who is that?
25  A   Fish.

Page 93

1   Q   Did he sell drugs -- was he, also, a drug user or was he
2   just someone who sold drugs?
3   A   He used drugs.
4         MS. HOLT:  Objection.
5         THE COURT:  Overruled.
6         BY MR. OLSEN:
7   Q   I'm sorry?
8   A   He used drugs.
9   Q   Do you know who supplied him with drugs?
10  A   I don't know who was his main supply. He used to get
11  stuff from Rodney sometimes.
12  Q   And what did he sell? Cocaine or heroin or both?
13  A   Heroin.
14  Q   Did you ever talk to Kevin Gray about Fish owing anyone
15  some money?
16  A   No.
17  Q   Did you ever hear from Rodney Moore about Fish owing him
18  some money, owing Rodney Moore some money?
19  A   He didn't directly tell me that Fish owe him some money.
20  I heard it in a conversation. It wasn't directly meant for
21  me. I just heard it within a conversation.
22         MR. COBURN:  Motion to strike.
23         THE COURT:  From whose lips did you hear.
24         THE WITNESS:  Mr. Moore.
25         THE COURT:  Mr. Moore?

24 (Pages 90 to 93)

2

Page 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,               .

          Plaintiff,       .   Docket No. CR 00-157

                       .   Washington, D.C.
          v.               .   Tuesday, June 11, 2002
                       .   1:40 p.m.

KEVIN L. GRAY, RODNEY MOORE,             .
JOHN RAYNOR, CALVIN SMITH,               .
TIMOTHY HANDY, and LIONEL NUNN,          .

          Defendants.       .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DAY 55 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:          TIMOTHY J. HEAPHY, ESQ.
                            MATTHEW G. OLSEN, ESQ.
                            AMY JEFFRESS, ESQ.
                            Assistant United States Attorneys
                            555 4th Street, N.W.
                            Washington, D.C. 20001
For Defendant Gray:         FRANCIS D. CARTER, ESQ.
                            1730 Rhode Island Avenue, N.W.
                            Washington, D.C. 20036
                            DAVID P. BAUGH, ESQ.
                            Law Offices of David P. Baugh, PC
                            223 South Cherry Street
                            Richmond, Virginia 23241

Pages 1 through ^

**FILED**

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

June 11, 2002
P.M. Session/Day 55

---

**Page 2**

APPEARANCES - Continued:
For Defendant Moore:     BARRY COBURN, ESQ.
                         Coburn and Schertler
                         1150 18th Street, N.W.
                         Washington, D.C. 20036
                         STEVEN McCOOL, LLC
                         Mallon and McCool, LLC
                         16 South Calvert Street
                         Baltimore, Maryland 21202

For Defendant Raynor:    G. GODWIN OYEWOLE, ESQ.
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004

                         THOMAS SAUNDERS, ESQ.
                         207 East Redwood Street
                         Baltimore, Maryland 21202

For Defendant Smith:     JOHN CARNEY, ESQ.
                         Law Offices of Carney and Carney
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004
                         JONATHAN RUBENS, ESQ.
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004
For Defendant Handy:     MICHAEL LASLEY, ESQ.
                         1730 K Street, N.W.
                         Washington, D.C. 20004
                         ADDIE O'BRYANT, JR., ESQ.
                         Anderson and O'Bryant, PC
                         2207 7th Street, N.W.
                         Washington, D.C. 20001

For Defendant Nunn:      VERONICE A. HOLT, ESQ.
                         3003 Van Ness Street, N.W.
                         Washington, D.C. 20008

Court Reporter:          DENNIS A. DINKEL, RDR, CRR
                         Official Court Reporter
                         Room 6818, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 289-8661

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

**Page 4**

1   Q.  What's your home institution?
2   A.  What you mean by that?
3   Q.  Where were you before you were in Arlington?
4   A.  Baltimore, Baltimore penitentiary.
5   Q.  All right.  And are you serving a sentence?
6   A.  Yes.
7   Q.  What are you serving a sentence for?
8   A.  Murder.
9   Q.  When were you convicted?
10  A.  In '94, '95, between '94, '95.
11  Q.  Have you been locked up since the date of your conviction
12  for murder?
13  A.  Yes.
14  Q.  Where did that murder occur, in what jurisdiction?
15  A.  Maryland.
16  Q.  Which county, do you recall?
17  A.  PG.
18  Q.  Which sentence, what is the sentence that you're serving?
19  A.  Life plus 25.
20  Q.  What does that mean, life plus that?
21  A.  Rest of your life in jail.
22  Q.  In addition to the murder conviction, Mr. Reid, were you
23  also convicted of carrying a pistol without a license back in
24  1994?
25  A.  Yes.

---

**Page 3**

1              AFTERNOON SESSION - (1:40 p.m.)
2        (Jury in at 1:42 p.m.)
3           THE COURT:  All right.  Good afternoon, ladies and
4   gentlemen.  The government may call your next witness.
5           MR. OLSEN:  Your Honor, the government calls Maurice
6   Reid to the witness stand.
7           MAURICE REID, GOVERNMENT'S WITNESS, SWORN
8                    DIRECT EXAMINATION
9   BY MR. OLSEN:
10  Q.  Good afternoon, Mr. Reid.
11  A.  Good afternoon.
12  Q.  Mr. Reid, can you begin, please, by introducing yourself
13  to the ladies and gentlemen of the jury and spelling your name
14  for the court reporter.
15  A.  My name Maurice Reid, M-A-U-R-I-C-E, R-E-I-D.
16  Q.  Mr. Reid, how old are you?
17  A.  30.
18  Q.  What year were you born?
19  A.  '72.
20  Q.  Mr. Reid, are you currently in prison?
21  A.  Yes.
22  Q.  Where are you currently incarcerated right now?
23  A.  Arlington.
24  Q.  Is there a jail in Arlington?
25  A.  Arlington County.

---

**Page 5**

1   Q.  Let me ask you some questions, Mr. Reid, if I can about
2   your background.  All right?
3        Where did you grow up as a young child?
4   A.  Southeast Washington.
5   Q.  Where did you live when you were young?
6   A.  Parkland.
7   Q.  And where is Parkland?  What street is that near?
8   A.  Alabama Avenue.
9   Q.  Alabama Avenue, any particular cross street?
10  A.  Stanton Road, Stanton Road and Alabama.
11  Q.  All right.  When you were living in Parkland, who were you
12  living with?
13  A.  My mother.
14  Q.  Anybody else?
15  A.  My mother, Pappy, my brother, Kevin --
16  Q.  You named a number of people.  What about when you were
17  like, say, five, six, seven years old.  Who else lived with you
18  in Parkland?
19  A.  Just me and my brother and Pappy.
20  Q.  All right.  And when you say Pappy, who are you talking
21  about?  What's his full name?
22  A.  Jermaine Vick.
23  Q.  What's your mother's full name?
24  A.  Edna Reid.
25  Q.  How old were you when Jermaine Vick started living with

---

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

June 11, 2002
P.M. Session/Day 55

**Page 66**

1 look, there's a coke shortage, but it only going to last about
2 like two to three months, but I said, but for right now I'm
3 going to have to raise the prices up on the drugs, and stuff
4 like that, so I can see some money, a profit off of it. But I
5 said after two or three months, you know, everything will go
6 back to normal.
7 Q.  Did you tell Jermaine that?
8 A.  I told everything that. I had all of them there. They
9 was like okay. But he was like, well, I don't want no more
10 drugs and stuff like that. I was like all right.
11 Q.  And after that, who did you see him with?
12 A.  He started being with Kevin and them a lot.
13      MR. CARTER:  May we have a timeframe, please, Your
14 Honor?
15 BY MR. OLSEN:
16 Q.  What time period are you talking about? What year, do you
17 recall?
18 A.  '91.
19 Q.  Let me ask you this. Do you remember when Scott Downing
20 was killed?
21 A.  Yes.
22 Q.  How long before Scott Downing was killed was that coke
23 shortage?
24 A.  It was still in '91 when the coke shortage was in.
25 Q.  At this point you were getting supplied by whom in '91?

**Page 67**

1 A.  I was getting supplied by PeeWee and like that and stuff.
2 Q.  Who is PeeWee, what's his full name; do you know?
3 A.  No.
4 Q.  Was there anyone that you were trying to emulate, trying
5 to copy in terms of your own drug selling?
6 A.  Well, not really. You know, like that and stuff. You
7 know, I just always kept in the back of my head what Rodney
8 told me and stuff like that. You know. But basically no.
9      MR. OLSEN:  Your Honor, this might be a good place to
10 take a break.
11      THE COURT:  We'll take our afternoon recess.
12      (Jury out at 2:52 p.m.)
13      (Recess.)
14      (Jury in at 3:04 p.m.)
15      THE COURT:  All right, Mr. Olsen, you may proceed.
16 BY MR. OLSEN:
17 Q.  Good afternoon, Mr. Reid, again.
18      Mr. Reid, as we broke, I was asking you about your drug
19 selling in 1991.
20      Did that essentially stay the same, your drug selling
21 operation, through 1992, up until the time that Scott Downing
22 was killed?
23 A.  Excuse me? Can you repeat that?
24 Q.  Did that stay the same, your drug selling, through 1992?
25 A.  Yes.

**Page 68**

1 Q.  Did it change in any way? Did you sell more, less? Did
2 it vary?
3 A.  Sold more.
4 Q.  Explain that.
5 A.  I mean, we just started buying more -- more than what we
6 was buying at first, like that, so, you know, I can do more
7 things then. You know, like that and stuff. And get guys that
8 was working for me more drugs and stuff like that.
9 Q.  Did you continue to be partners with Scott Downing?
10 A.  Yes.
11 Q.  Did you continue to sell the drugs that you had on
12 Robinson Place, Southeast?
13 A.  Yes.
14 Q.  And now let me turn to a series of acts of violence and
15 ask you what you know about these.
16      Beginning, Mr. Reid, with a murder of a man named Alvin
17 Henson, nicknamed Flubby, on April 1, 1989.
18      Did you know Flubby?
19 A.  No, I didn't know him.
20 Q.  Did you know of him? Did you know who he was?
21 A.  I knew him because I seen him around.
22 Q.  Where would you see him?
23 A.  On the dope strip.
24 Q.  Where? Where on the dope strip?
25 A.  Around 15th.

**Page 69**

1 Q.  15th Place?
2 A.  15th and Robinson.
3 Q.  When you say Robinson, you talking about Robinson Place or
4 Robinson Street?
5 A.  Robinson Street.
6 Q.  Was Flubby, when you saw him on the dope strip, was he
7 somebody using, selling, what was he doing on the dope strip?
8 A.  Using.
9 Q.  Now, at that time, May 1, 1989, where were you living?
10 A.  Excuse me.
11 Q.  Where were you living in May of 1989?
12 A.  1989? I was living with my son's mother.
13 Q.  Whereabouts?
14 A.  That was around Robinson Place.
15 Q.  What's her name?
16 A.  Tonya.
17 Q.  What about Kevin Gray -- let me ask you this: Where was
18 your mother living?
19 A.  She was still living there by the store.
20 Q.  Near Stanton Road?
21 A.  Yes.
22 Q.  At any time prior to this May of 1989, did Kevin Gray stay
23 with you or with your mother at that house on Stanton Road?
24 A.  Stayed with my mother.
25 Q.  Why would he stay with your mother there?

18 (Pages 66 to 69)

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

June 11, 2002
P.M. Session/Day 55

---

**Page 70**

1  A.  We was like a little family.  Like I considered him as a
2  brother then, like that.  Then my mother, she liked him and
3  stuff like that.  Treated him like a son and stuff.
4  Q.  How often would Kevin Gray stay at your mother's house on
5  Stanton Road?
6  A.  Every night.  You know, if he ain't going out with a girl
7  or something like that, or I ain't out with a girl, or we met
8  girls together and went out, stuff like that, we would both
9  stay at the house.
10  Q.  Were there time periods when Kevin Gray -- I'm sorry, when
11  your mother would not be staying at the house on Stanton Road?
12  A.  Yes.
13  Q.  Where would she be?
14  A.  She be out in Maryland.
15  Q.  Would that happen for extended periods of time?
16  A.  Yes.  For like the whole summer.
17  Q.  When that happened, would anyone stay at the house on
18  Stanton Road?
19  A.  Me and Kevin.
20  Q.  Now, what about Jermaine Vick.  Did he spend time in that
21  area?
22  A.  It be like me, Kevin, Jermaine, and Bink staying at the
23  house, and then, you know, sometimes, you know, we go to our
24  girlfriend's house and stuff like that and spend nights, and
25  stuff like that, but you know, we basically slept all at the

---

**Page 71**

1  house and stuff like that.
2  Q.  Now, on the particular night, going back to Flubby, did
3  there come a time in that evening when you saw or when you were
4  with Kevin Gray on Robinson Street?
5      Say yes or no for the court reporter.
6  A.  Yes.
7  Q.  Tell us what happened when you were with Kevin Gray on
8  Robinson Street.
9      MR. CARTER:  May we have a timeframe, Your Honor?
10  BY MR. OLSEN:
11  Q.  Do you recall the date of Flubby's murder?
12  A.  I can't recall that particular date.
13  Q.  Can you think back to that particular time?
14  A.  I know it was in the summertime.
15  Q.  Tell us what happened when you were with Kevin Gray on
16  Robinson Street on the day Flubby got killed?
17  A.  We was standing out there.  If I'm not mistaken, I think
18  he ran from Oak Hill or something like that.  We was standing
19  out there, talking, stuff like that.  His uncle Mo came out.
20  Q.  Whose uncle?
21  A.  Kevin's uncle.  Came out and said --
22      MR. CARTER:  Objection.  Hearsay.
23      THE COURT:  Sustained.
24      THE WITNESS:  Kevin's uncle --
25      MR. CARTER:  Objection.

---

**Page 72**

1  BY MR. OLSEN:
2  Q.  Did you see Kevin's uncle?
3  A.  Yes.
4  Q.  How did he appear?
5  A.  Like he be been fighting.
6  Q.  What made you say that?
7  A.  He had a little swelling on his face and stuff like that.
8  Q.  How was he acting?
9  A.  Like he just ran out the house for his life.  You know, he
10  come running out there.  He was like, man, they jumped me.
11      MR. CARTER:  Objection.  Hearsay.
12      THE COURT:  Leave out what he said.  Just say what
13  you observed.
14      THE WITNESS:  Well, I observed Kevin's uncle running
15  out of the house and sweating, face a little swollen, and he
16  told us --
17      THE COURT:  Don't say what he told you.
18      MR. OLSEN:  May we approach, Your Honor?
19      THE COURT:  All right.
20      (Bench conference on the record.)
21      MR. OLSEN:  The statement is that he told Kevin that
22  he had gotten beat up and asked Kevin to do something about it.
23  I think that's essentially what the statement is, that Kevin's
24  uncle says to Kevin and Maurice Reid.
25      It is not hearsay for two reasons.  It is a

---

**Page 73**

1  coconspirator's statement.  Maurice Reid was a coconspirator of
2  Kevin Gray in a conspiracy to kill Alvin Henson.  After that,
3  Kevin Gray's Uncle Mo and Kevin Gray go into the oil house, and
4  Kevin Gray kills Alvin Henson.
5      Not only that, but it is not hearsay because it is an
6  excited utterance.  I think it is a classic excited utterance
7  given the foundation laid by this witness that he was beaten
8  up, sweating, a fair inference from the testimony is that he
9  was agitated, and it would be admissible as an excited
10  utterance.  I offer it under those two grounds.
11      THE COURT:  The uncle is who?
12      THE WITNESS:  First name is Mo.  I believe that his
13  last name is Salmon, but I'm not sure.
14      THE COURT:  Your proffer is that he's part of the
15  conspiracy with Kevin Gray?
16      MR. OLSEN:  For the purpose of a conspiracy to kill
17  Alvin Henson.
18      THE COURT:  All right.
19      MR. CARTER:  Here's the problem, Your Honor.  I've
20  been complaining about this since the beginning of the trial.
21  We don't know who the unnamed coconspirators are.  Every time
22  we come up and object on hearsay, he says he's a coconspirator.
23      If you look at the count in the conspiracy involving this,
24  there is nowhere mentioned this uncle.  There is no way a
25  reference to the uncle as being a coconspirator.  If so, that

---

19 (Pages 70 to 73)

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

June 11, 2002
P.M. Session/Day 55

Page 74

1    drops the brother out. That drops the other people out.
2    Because we've already had testimony from Joseph Melton that
3    allegedly my client was there with two other people, and if you
4    look at the way the phraseology of this overt act and the
5    conspiracy, there can't be now additional coconspirators.
6         Secondly, it is not an excited utterance. What he says
7    was the guy was sweating and looked beat up. Mr. Olsen put in
8    the word "agitated." This man doesn't say he's excited or
9    anything. He just said he was beat up and sweating. That
10   doesn't qualify for an excited utterance, it appears to me.
11        So, therefore, to this man it is truly hearsay. Again, I
12   don't know that Maurice Reid at this point is a coconspirator
13   because they've never been named. We're again dealing with
14   shadows constantly, Your Honor. All the government says all
15   the time is that was an unindicted coconspirator.
16        If at least the Court had a menu, as I asked from the
17   beginning of case, the Court could look at the menu and say,
18   no, he's not named, or yes, he is named. With the continual
19   experience these are unindicted coconspirators, they justify
20   every piece of hearsay.
21        It seems the Court can't make an intelligent informed
22   decision on my objection just like now. You just can't make it
23   because in the heat of the moment, they're trying to describe
24   this person as coconspirator without having given Your Honor a
25   menu up front of who are and who are not coconspirators.

Page 75

1         THE COURT: Okay. The objection is overruled. You
2    may proceed.
3         (End of bench conference.)
4         THE COURT: Give me just a moment.
5         (Pause.)
6         THE COURT: All right, Mr. Olsen, you may proceed.
7    BY MR. OLSEN:
8    Q.  All right, Mr. Reid, when you were out there with Kevin
9    Gray, you said you saw Kevin Gray's Uncle Mo; is that right?
10   A.  Yes.
11   Q.  What did he say to you when you saw him?
12   A.  He said that some dudes jumped him, and we was like,
13   "Ooh," like that. He said that they in the oil house.
14   Q.  What's an oil house?
15   A.  That's where junkies go in and shoot dope.
16   Q.  Did you know what particular oil house he was talking
17   about when he said they're in the oil house?
18   A.  Yeah.
19   Q.  What did you say or what -- what did Kevin Gray say in
20   response to that?
21   A.  He said you know, man, go get the gun, like that.
22   Q.  Who did he say that to?
23   A.  He said it to me.
24   Q.  Did you know what he was talking about when he said go get
25   the gun?

Page 76

1    A.  Yeah.
2    Q.  What did you do?
3    A.  I got in the car to go get the gun.
4    Q.  Before you got in the car, did you see what Kevin Gray and
5    his Uncle Mo, what they did?
6    A.  They was -- I looked like that. They was going to the oil
7    house.
8    Q.  Now what happened then?
9    A.  Then after that, I got in the car, drove off. Soon as I
10   was -- as soon as I turned the corner, I heard something go
11   (indicating), so I stopped the car, and I was like, nah. I
12   kept on driving. I went to go get the gun.
13   Q.  When you said, nah, what was in your mind?
14   A.  I heard a gunshot. I was like he couldn't shoot nobody
15   because I'm going to get the gun, like that. So I drove around
16   the house to go get the gun.
17   Q.  Where did you go?
18   A.  To his mother's house.
19   Q.  Where was that?
20   A.  I don't know the address on it.
21   Q.  What street?
22   A.  Around Robinson Place.
23   Q.  And how far is that from Robinson Street?
24   A.  Right around the corner.
25   Q.  Did you actually go to that house?

Page 77

1    A.  Yes.
2    Q.  What happened when you got there?
3    A.  I knocked on the door. One of his parents came to the
4    door. I went in the room and got the gun, came right back out.
5    Drove back around there. Parked the car on the side. I got
6    out of the car with the gun. I said, man, where he at? I'm
7    going to shoot him. I'm going to shoot him.
8    Q.  Who said I'm going to shoot him?
9    A.  I did.
10   Q.  Who did you tell that to?
11   A.  I told that to Kevin.
12   Q.  Where did you see Kevin?
13   A.  He was walking back up on the same sidewalk where I was
14   at. I said, where he at, I'm going to shoot him.
15   Q.  Who was Kevin with at that point; do you recall?
16   A.  Marvin.
17   Q.  Do you remember Marvin's last name?
18   A.  No.
19   Q.  Was he with other people, or was it just the two of them?
20   A.  Just him and Marvin.
21   Q.  What did Kevin Gray say to you at that point?
22   A.  He said, oh, man, you late, man.
23        I said, what do you mean I'm late?
24        He said, I already shot him.
25        I was like, you shot him? He was like, yeah.

20 (Pages 74 to 77)

Phone: (202) 289-8661
e-mail: dadinkel@directvinternet.com

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

June 11, 2002
P.M. Session/Day 55

**Page 78**

1      I said, man, where did you shoot him at?  He said, I shot
2   him in his butt.
3   Q.  How did you react to that?
4   A.  I said, you shot him in the butt?  He said, yeah.
5      I said, oh, man, you ain't supposed to shoot him in the
6   butt, like that.
7      He said the dude was talking about, all right, man, I'm
8   dead, I'm dead.  Like that.
9   Q.  Who did he attribute -- who did he say was saying that,
10  I'm dead, I'm dead?
11  A.  He said Flubby said that.
12  Q.  Did Kevin -- did you know what kind of gun Kevin used
13  to -- Kevin Gray used to shoot Flubby?
14  A.  I said, who gun you used.  He said, I used Marvin gun,
15  like that.  I said, what kind of gun you used.  He said, I used
16  a .38.  Marvin pulled it out and showed it to me.
17  Q.  Did Marvin have a gun at that point?
18  A.  Yes.
19  Q.  What did you do after that, Mr. Reid?
20  A.  We left.  We joked about it all that night and stuff like
21  that.  Ah, man, I'm dead.
22  Q.  Who is we?
23  A.  Me and Kevin.  Then we told Rodney.  Then All three of us
24  was together.  We laughed.  Told him what happened, stuff like
25  that.

**Page 79**

1   Q.  Where did Kevin Gray spend that night; do you recall?
2   A.  I believe at a hotel.
3   Q.  Did you see anything on the news about that?
4   A.  Yes.
5   Q.  When?
6   A.  The next day.
7   Q.  What was reported on the news?
8   A.  That the person -- you know -- died, and I looked at him
9   and I said, damn, he died.  Like that, you know, we just left
10  it alone.  Then about like a week later or two weeks later --
11  Q.  Let me ask you this, let me ask you this, Mr. Reid:
12  When -- you said Kevin Gray spent that night in a hotel, did he
13  continue to spend nights in the hotel?
14  A.  Yes.
15  Q.  The same hotel or different hotels?
16  A.  Different hotels.
17  Q.  How did he get from hotel to hotel?
18  A.  You know, we were carrying him from hotel to hotel.  I
19  carry him and sometimes Rodney carry him, stuff like that.
20  Q.  And what was the reason for staying in a hotel?
21  A.  'Cause you know the police was looking for him.
22  Q.  Was Mr. Gray eventually arrested?
23  A.  Yes.
24  Q.  Do you know what happened to that case?
25  A.  No.  I don't know what happened to it.

**Page 80**

1   Q.  As far as you know, did Mr. Gray ever serve a sentence for
2   that case?
3   A.  No.
4   Q.  Did you ever talk to Rodney Moore about who the witnesses
5   might be against Kevin Gray?
6          MR. McCOOL:  Objection, leading.
7          THE COURT:  Overruled.
8          THE WITNESS:  You know, he said it was two junkies
9   and Bink.
10  BY MR. OLSEN:
11  Q.  Who is Bink?
12  A.  Kevin Gray's brother.
13  Q.  And two junkies?
14  A.  Yes.
15  Q.  Did Rodney Moore say anything else about what those
16  witnesses said?
17  A.  He just said that -- you know -- oh, man, you know Kevin
18  going to be all right; the witness ain't going to show up.
19  They ain't going to find the witnesses.
20  Q.  Let me move on, Mr. Reid, to another -- another murder.
21      Did you know a guy nicknamed Fish?
22  A.  Yes.
23  Q.  Did you know his real name?
24  A.  No.  I didn't know his real name.
25  Q.  If we could see AD-100?

**Page 81**

1          THE DEPUTY CLERK:  Is this new?
2          MR. OLSEN:  No.
3   BY MR. OLSEN:
4   Q.  Do you recognize that person?
5   A.  Yes.
6   Q.  Who is that?
7   A.  This is Fish.
8          MR. OLSEN:  This is already in evidence, Your Honor.
9   BY MR. OLSEN:
10  Q.  Let me go back and ask you one more question about the
11  murder of Flubby.  You said you actually saw the gun?
12  A.  Yes.
13  Q.  What was the caliber.
14  A.  .38.
15  Q.  Do you recall if it was a revolver or a semiautomatic?
16  A.  Revolver.
17  Q.  Do you know the difference between a revolver and a
18  semiautomatic?
19  A.  Yes.
20  Q.  All right.  Tell us a little bit about who Fish was.
21  A.  I mean Fish was a dude around the way, that sold -- you
22  know -- dope and stuff like that.
23  Q.  Where did he sell?
24  A.  Sold it on 15th Place.
25  Q.  Dope is heroin?

21 (Pages 78 to 81)

3

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :   CR Number 00-157
                                    :
              Government,           :
                                    :
       v.                           :   Washington, D.C.
                                    :   Thursday, May 23, 2002
KEVIN L. GRAY, RODNEY MOORE,        :   9:53 a.m.
JOHN RAYNOR, CALVIN SMITH,          :
TIMOTHY HANDY and LIONEL NUNN,      :
                                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - -x

DAY 46 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          TIMOTHY J. HEAPHY, ESQUIRE
                             MATTHEW G. OLSEN, ESQUIRE
                             AMY JEFFRESS, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEYS
                             U.S. ATTORNEY'S OFFICE
                             555-4th Street, N.W.
                             Washington, D.C.  20001
                             (202)  353-8822

For Defendant Gray:          FRANCIS DARRON CARTER, ESQUIRE
                             1730 Rhode Island Avenue, N.W.
                             Suite 717
                             Washington, D.C.  20036
                             (202)  393-4330
                             DAVID P. BAUGH, ESQUIRE
                             DAVID P. BAUGH, P.C.
                             SARA DAVIS, ESQUIRE
                             223 South Cherry Street
                             P.O. Box 12137
                             Richmond, Virginia  23241
                             (804) 643-8111
                    Pages 1 through 145

FILED

THERESA M. SORENSEN,

MAY 2 0 2003

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
— Cr.No. 00-157(01); Exhibit-3 —

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.                    CR 00-157                              May 23, 2002
Kevin L. Gray, et al                          AM Session                                Volume 46

Page 2

```
                    APPEARANCES (Continued):
                    For Defendant Moore:      BARRY COBURN, ESQUIRE
                                              COBURN & SCHERTLER
                                              1150 18th Street, N.W.
                                              Suite 850
                                              Washington, D.C.  20036
                                              (202)  628-4199

                                              STEVEN J. McCOOL, ESQUIRE
                                              1776 K Street, N.W.
                                              Suite 300
                                              Washington, D.C.  20006
                                              (202)  393-7088

         For Defendant Raynor:      G. GODWIN OYEWOLE, ESQUIRE
                                              601 Pennsylvania Avenue, N.W.
                                              9th Floor
                                              Washington, D.C.  20004
                                              (202)  347-7777
                                              THOMAS J. SAUNDERS, ESQUIRE
                                              10 N. Calvert Street
                                              Suite 715
                                              Baltimore, Maryland  21202
                                              (202) 550-4662 & (410) 547-9087

         For Defendant Smith:       JOHN J. CARNEY, ESQUIRE
                                              CARNEY AND CARNEY
                                              601 Pennsylvania Avenue, N.W.
                                              Suite 900
                                              Washington, D.C.  20004
                                              (202)  434-8234
                                              JONATHAN RUBENS, ESQUIRE
                                              601 Pennsylvania Avenue, N.W.
                                              Suite 900
                                              Washington, D.C.
                                              (202)  487-3633

         For Defendant Handy:       MICHAEL LASLEY, ESQUIRE
                                              1730 K Street, N.W.
                                              Suite 304
                                              Washington, D.C.  20006
                                              (202)  508-3690
                                              ADGIE O'BRYANT, JR., ESQUIRE
                                              ANDERSON & O'BRYANT, P.C.
                                              1107 Seventh Street, N.W.
                                              Washington, D.C.  20001
                                              (202)  371-0013


                                              THERESA M. SORENSEN,
         OFFICIAL COURT REPORTER
```

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

Page 3

APPEARANCES (Continued):

For Defendant Nunn:        VERONICE A. HOLT, ESQUIRE

                           3003 Van Ness, N.W.

                           #W919

                           Washington, D.C.  20008

                           (202)  244-2659


Court Reporter:            THERESA M. SORENSEN, CVR-CM

                           Official Court Reporter

                           Room 4800-H, U.S. Courthouse

                           Washington, D.C.  20001

                           (202) 273-0745


                    Proceedings reported by stenomask recording,

            transcript produced by transcription.


                                        THERESA M. SORENSEN,

       OFFICIAL COURT REPORTER

United States of America v.  
Kevin L. Gray, et al

CR 00-157  
AM Session

May 23, 2002  
Volume 46

---

**Page 106**

1    Northeast.
2    Q.    And what's the closest part of Maryland?
3    A.    P.G. County.
4    Q.    Now, Mr. McCool asked you some questions about
5    whether Rayful Edmond testified about a date for this
6    stabbing. Do you remember those questions?
7    A.    Yes, I do.
8    Q.    Do you remember what years Rayful Edmond testified
9    were the years that he was in most frequent contact with
10   Rodney Moore?
11        MR. McCOOL: Objection, Your Honor. Beyond the
12   scope.
13        THE COURT: Overruled.
14        THE WITNESS: I believe he said '86, '87, I think.
15   BY MS. JEFFRESS:
16   Q.    And Mr. McCool also asked you some questions about
17   whether there were any police reports for this incident.
18   Did you make an effort to locate police reports from this
19   stabbing?
20   A.    Yes, I did.
21   Q.    What did you learn in trying to locate those records?
22   A.    That records prior to 1990 have been destroyed.
23        MS. JEFFRESS: Nothing further, Your Honor.
24        THE COURT: You can step down.
25        (Witness excused.)

---

**Page 107**

1         THE COURT: Next witness.
2         MS. JEFFRESS: The United States calls Julius
3    Layton, Your Honor.
4         JULIUS LAYTON, GOVERNMENT'S WITNESS, SWORN
5              DIRECT EXAMINATION
6    BY MS. JEFFRESS:
7    Q.    Good morning, Mr. Layton.
8    A.    Good morning.
9    Q.    Could you please introduce yourself to the jury by
10   stating your full name?
11   A.    My name is Julius Layton.
12   Q.    Could you spell both your first and last names for
13   the court reporter?
14   A.    J-u-l-i-u-s L-a-y-t-o-n.
15   Q.    Mr. Layton, how old are you?
16   A.    Forty-five.
17   Q.    And where do you live?
18   A.    Maryland.
19   Q.    How long have you lived in the Washington area?
20   A.    Forty-five years basically.
21   Q.    And where do you work currently?
22   A.    Oak Hill.
23   Q.    What is Oak Hill?
24   A.    A youth detention center.
25   Q.    How long have you worked at Oak Hill?

---

**Page 108**

1    A.    Since November 1987.
2    Q.    And where did you work before you worked at Oak Hill?
3    A.    United States Army.
4    Q.    What was your position in the United States Army?
5    A.    First sergeant, drill sergeant, Special Forces 95B,
6    trainer.
7    Q.    How long were you in the Army as a -- well, how long
8    were you in the Army?
9    A.    I'm still presently in; 19 years.
10   Q.    And what do you mean by still presently in?
11   A.    Right now, I'm presently in the Reserves.
12   Q.    Now, where is the Oak Hill Youth Detention Center?
13   A.    Laurel, Maryland.
14      (Whereupon, Government's Exhibit No. KG90-100 was
15   marked for identification.)
16        MS. JEFFRESS: Could we bring up KG90-100.
17   BY MS. JEFFRESS:
18   Q.    There should be a photograph on the screen in front
19   of you, Mr. Layton.
20   A.    Yes.
21   Q.    Could you take the pen and see if you can move the
22   arrow --
23   A.    Sure.
24   Q.    -- away from the picture so you can see it a little
25   better? Move the pen down to the bottom corner.

---

**Page 109**

1    A.    Oh, okay.
2    Q.    Okay.
3    A.    All right.
4    Q.    Thank you.
5         Do you recognize this picture?
6    A.    Yes, I do.
7    Q.    What is shown in that picture?
8    A.    What it is, is an aerial view of Oak Hill.
9    Q.    Does that fairly and accurately show what the Oak
10   Hill Youth Center looks like, the grounds of Oak Hill?
11   A.    Yes, it does.
12        MS. JEFFRESS: I would like to move Government's
13   Exhibit KG90-100 into evidence.
14        MR. CARNEY: Same objection.
15        THE COURT: It's received.
16      (Whereupon, Government's Exhibit No. KG90-100 was
17   received in evidence.)
18   BY MS. JEFFRESS:
19   Q.    Now, Mr. Layton, could you show the jury first of all
20   where the parking lot and entrance is to the Oak Hill Youth
21   Center?
22   A.    You want me to move the arrow?
23   Q.    If you like.
24   A.    Okay. The parking lot is in this area right in here.
25   The front entrance should be right in this area right here.

---

United States District Court  
For The District of Columbia

Theresa M. Sorensen, CVR-CM  
Official Court Reporter

United States of America v.                    CR 00-157                          May 23, 2002
Kevin L. Gray, et al                           AM Session                         Volume 46

Page 110

1  Q.    Was that it that was just -- oh, we're going to get a
2  better one. Is that the entrance there?
3  A.    Yes, it is.  That's the entrance, correct, right
4  here.
5  Q.    Now, could we go back to the main picture, and could
6  you just show the jury where the main buildings are on the
7  complex?
8  A.    Sure.  As you come in, you're going to have the
9  administrative building, the school building, vocational
10  building, gymnasium, Unit 10A and 10B, culinary, Mod-1,
11  Mod-2, 7A, 7B, 9A, 9B, and the building that you can just
12  slightly see is going to be 8A and 8B.
13  Q.    Now, the units that you've referred to by numbers, 7,
14  8, 9 and 10, what are those units?
15  A.    Those are the units that house the students at Oak
16  Hill.
17  Q.    What's your current position at Oak Hill?
18  A.    Unit manager/OD.
19  Q.    What does OD stand for?
20  A.    Officer of the Day.
21  Q.    How long have you had that position?
22  A.    Off and on for the last three years.
23  Q.    And what are your duties as the OD?
24  A.    Supervisor of the grounds.
25  Q.    Who do you supervise?

Page 111

1  A.    The correctional officers on that particular shift.
2  Q.    Now, have you held the same position -- you said you
3  had held that position for three years.  What was your
4  position when you first started at Oak Hill?
5  A.    YCO, youth correctional officer.
6  Q.    And have you held any other positions during your
7  time there?
8  A.    Yes, ma'am.
9  Q.    What were those?
10  A.    Procurement, inspector, environmentalist, lead
11  officer, shift leader, OD of the school building.  That's
12  about it.
13  Q.    Now, could you explain a little bit -- you said that
14  you were the ground supervisor now as the OD.  Could you
15  explain a little bit how the chain of command works at the
16  Oak Hill Youth Center?
17  A.    Yes, ma'am.  When I am the OD, below me, I would have
18  my unit managers, my lead officers and then my correctional
19  officers.
20  Q.    Now, what was your position back in 1990?
21  A.    Nineteen-ninety, youth correctional officer.
22  Q.    What are the duties of a youth correctional officer?
23  A.    The supervise, the care, security and custody of the
24  youth assigned at Oak Hill.
25  Q.    And let me go into those duties in a little more

Page 112

1  detail.  You talked about care of the students.  What duties
2  do you have in connection with care for the students?
3  A.    As far as care, make sure they're properly dressed,
4  medical, make sure they get to and from the medical unit.
5  At that particular time, also assisting them in calling
6  their lawyers, social workers, recreational area, making
7  sure they get proper exercise, make sure they go to school
8  and attend school.
9  Q.    In exercising those duties, did you have a lot of
10  contact with the students?
11  A.    Yes, we do.
12  Q.    Now, you also mentioned supervision.  Could you
13  explain what that involved.
14  A.    Making sure that they are safe, making sure that they
15  remain in the Oak Hill area, making sure that they don't go
16  places that they don't supposed to go.
17  Q.    And you also mentioned custody.  Could you explain
18  what you mean by custody?
19  A.    Custody, making sure that they remain at Oak Hill.
20  Q.    Now, in interacting with the students, did you come
21  to know the students that you worked with there?
22  A.    Yes.  Pretty much we do.  Yes, we do.
23  Q.    Now, from your position in 1990, from that time, did
24  you know a student named Kevin Gray?
25  A.    Yes, I did.

Page 113

1  Q.    How did you know Kevin Gray?
2  A.    He had been back and forth to the institution several
3  times and also housed in that particular unit, meaning 7.
4  Q.    And were you responsible for Unit 7?
5  A.    Not responsible for Unit 7.  I was a YCO at that
6  time.
7  Q.    I see.  So you were a youth correctional officer
8  assigned to that unit?
9  A.    Yes, ma'am.  I wasn't in a supervisory position at
10  that time.
11     MS. JEFFRESS:  Could we bring up KG90-107.
12     (Whereupon, Government's Exhibit No. KG90-107 was
13  marked for identification.)
14  BY MS. JEFFRESS:
15  Q.    Do you recognize the photograph that is in front of
16  you on the screen?
17  A.    Yes, ma'am.
18  Q.    What does that show?
19  A.    What you're looking at is going to be the --
20  Q.    The jury can't see it yet.  Could you just state what
21  is in it?
22  A.    Oh.  Sure.  It's going to be a building, it's going
23  to be the B side of Unit 7.
24  Q.    Does that fairly and accurately show what Unit 7
25  looked like in 1990?

United States District Court                   Theresa M. Sorensen, CVR-CM
For The District of Columbia                           Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

Page 114

1   A.   Yes, ma'am, it does.
2        MS. JEFFRESS:  I would like to move the admission
3   of KG90-107.
4        THE COURT:  Received.
5        (Whereupon, Government's Exhibit No. KG90-107 was
6   received in evidence.)
7   BY MS. JEFFRESS:
8   Q.   Now, Mr. Layton, could you just show the jury the
9   features of Unit 7 that you were about to show a moment ago.
10  A.   Sure.
11  Q.   What you're looking at here is an open door on the 7B
12  side.  This is where the air-condition unit and everything
13  is housed.  To the left of that, which you can barely see,
14  is going be the A side.  This whole building is going to be
15  7 in which the students of Oak Hill in 7A and 7B is housed.
16  Q.   Now, you mentioned that Kevin Gray had been assigned
17  to Unit 7 at the time that you were a counselor there?
18  A.   Yes, ma'am.
19  Q.   How well did you get to know Kevin Gray?
20  A.   Pretty well.
21  Q.   Now, I realize this was ten years ago, but would you
22  recognize him if you saw him again?
23  A.   I'm not sure, ma'am.
24  Q.   Now, how would you describe Kevin Gray's role at the
25  Oak Hill Youth Center among the other students?

Page 115

1        MR. CARTER:  Objection.  Foundation.
2        THE COURT:  Overruled.
3   BY MS. JEFFRESS:
4   Q.   You may answer.
5   A.   Oh, okay.  He was a leader.  He was somewhat looked
6   up to by the other students.  He was very high up on the
7   institutional ladder as far as the students are concerned.
8        MR. CARTER:  Objection.  Can we approach, please?
9        THE COURT:  All right.
10       (Whereupon, a discussion was held at the bench on the
11  record.)
12       MR. CARTER:  May I have a proffer of what he is
13  going to say?
14       MS. JEFFRESS:  He's going to talk about his
15  leadership there and how the other students looked up to
16  him.  They also did respect and fear him, and he will
17  probably talk about that as well.  We don't believe -- go
18  ahead.
19       MR. CARTER:  He has already said he was a leader.
20  He was about to say, "He's fairly high up on," and that's
21  why I stopped him.  It's a slur, it's character
22  representation.  This whole thing is character.  It has
23  nothing to do with the conspiracy, but that specifically is
24  character representation, and none of this has anything to
25  do with escaping.  Whether he's a leader, whether he's a

Page 116

1   follower, whether he's a middle person, whether he is a
2   spare-carrier has nothing to do with it because this man in
3   neither incident or in none of these incidents does this man
4   see Kevin Gray leave the facility according to the Jencks
5   material I have.  And so saying that he is a leader is
6   character assassination, and I strongly object and once
7   again move for a mistrial on all of this evidence, Your
8   Honor.
9        MR. COBURN:  Your Honor, could I add something
10  just very briefly?  My concern, and, of course, this relates
11  principally to Mr. Carter's client, but my concern has to do
12  with the notion that the government would elicit testimony
13  from a witness like this to the effect that one of the
14  principals in this conspiracy are feared.  That I do think
15  is innuendo.  I mean, I do understand the way the rules of
16  evidence work in terms of reputational evidence, but there
17  is still a 403 balancing that the Court, of course, would
18  undertake, as with any other piece of evidence.  And I think
19  that there is some real concern about the notion that
20  individuals should be convicted because they are feared or
21  they are generally thought of in the community as being bad
22  people.
23       I think even if that evidence were admissible on
24  its face under the Federal Rules of Evidence, which my
25  submission is it isn't, I think its prejudicial value

Page 117

1   outweighs any probative value.
2        THE COURT:  Go ahead.
3        MS. JEFFRESS:  Your Honor, as the Court knows from
4   our pleadings on these issues, we are introducing the
5   evidence of the escapes as overt acts not only to prove the
6   escapes themselves, but also to show associations between
7   particularly Kevin Gray and Calvin Smith.  The acts that
8   they committed here are highly probative of their
9   association.  He is also going to discuss Calvin Smith.
10       Now, with respect to the leadership that he
11  observed Kevin Gray demonstrate among other students, that
12  is highly relevant of not only Kevin Gray's association with
13  Calvin Smith, but also his role in the escapes.
14       We are also charging Kevin Gray with a continuing
15  criminal enterprise and in order to prove that, we have to
16  prove that he had a management role in the conspiracy, and
17  this is evidence of the early formation of the conspiracy,
18  particularly between Kevin Gray and Calvin Smith, and Kevin
19  Gray's role as a leader at that time is probative of those
20  issues, and those are the purposes for which we believe it's
21  relevant, Your Honor.
22       MR. CARTER:  The difficulty I have, Your Honor, is
23  none of this evidence of this escape, much less the
24  relationship between the two men, have anything to do with
25  the goals and purposes and objectives of the conspiracy as

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

---

Page 118

1  stated in the indictment. Whether they are friends, whether
2  the stay together, is not towards showing that the purposes
3  and goals of the conspiracy are achieved, and their
4  relationship, whether they go to lunch together, whether
5  they read the newspaper together, may show they know each
6  other, and that's fine, but to say that he's feared and to
7  say that he leads everybody around, that's pure character
8  assassination and it's prejudicial and it's not probative,
9  and it doesn't prove any evidence with regard to the
10  conspiracy, which is what we have to remain focused upon
11  here.
12       MS. JEFFRESS: Your Honor, Anthony Dent, the
13  murder we just presented evidence on, Anthony Dent was
14  killed less than one month after Kevin Gray and Calvin Smith
15  escaped together from Oak Hill. We believe their escape
16  together and murder that followed immediately thereafter the
17  escape is highly relevant. They were escaping from Oak Hill
18  for criminal purposes.
19       THE COURT: I understand the argument about the
20  actions they took. I am not sure I fully understand the
21  argument about how others viewed them and his perception of
22  how other students viewed them is -- what is that
23  demonstrating?
24       MS. JEFFRESS: Their leadership, Kevin Gray and
25  Calvin Smith's leadership among the students is one of the

---

Page 119

1  reasons why they became friends there and subsequently
2  planned and committed criminal acts together. They were
3  viewed as leaders; they bonded because of that.
4       THE COURT: How does this witness know that?
5       MS. JEFFRESS: He will testify about their
6  association together.
7       THE COURT: What he observed of their association
8  is different than what people were telling him, isn't it?
9       MS. JEFFRESS: I don't believe that what he
10  observed is what people were telling him. In other words, I
11  don't believe he will testify that any student told him that
12  that student viewed Kevin Gray or Calvin Smith in a
13  particular way.
14       He has already testified he was responsible for
15  supervising, maintaining custody of these students, and in
16  order to accomplish that, those duties, he had to know who
17  were leaders. It helped him know who to focus his attention
18  on, how to manage the students at the center.
19       MR. CARTER: Again, Your Honor, if he wants to
20  say,
21  "I always talked to Kevin Gray," or "I always had Kevin Gray
22  help me with other inmates," that's different from saying
23  he's feared, he rules everybody. That part is character and
24  that was what was about to drip out of his mouth. If he
25  wants to go facts, then come with the facts.

---

Page 120

1       THE COURT: I think you ought to try to limit it
2  to a factual presentation rather than perceptions that
3  others have.
4       MR. CARTER: Thank you, Your Honor.
5       (End of discussion at the bench.)
6  BY MS. JEFFRESS:
7  Q.   Now, let me ask you about another person, Mr. Layton.
8  Did you know a student named Calvin Smith?
9  A.   Yes, ma'am.
10  Q.   How did you know Calvin Smith?
11  A.   Same way. He was housed in Unit 7; also been in the
12  system for a while.
13  Q.   And do you remember his nickname?
14  A.   Yes, ma'am.
15  Q.   What is that?
16  A.   Assay.
17  Q.   How well did you know Calvin Smith?
18  A.   Pretty well, ma'am.
19  Q.   And again, would you recognize him if you saw him
20  again?
21  A.   That I'm not sure, ma'am.
22  Q.   Now, do you know whether Kevin Gray and Calvin Smith
23  associated with one another?
24  A.   Yes. Yes, they did, ma'am.
25  Q.   How did they associate with one another? What did

---

Page 121

1  you observe?
2  A.   They seemed to be pretty close. They seemed to be
3  friends.
4  Q.   How much time did they spend together in your
5  observations?
6  A.   Quite a bit.
7  Q.   Were they assigned to Unit 7 at the same time?
8  A.   Yes, ma'am.
9  Q.   Now, Mr. Layton, were you on duty on February 5th of
10  1990?
11  A.   Yes, ma'am.
12  Q.   Was there an escape that day?
13  A.   Yes, ma'am.
14  Q.   And have you had an opportunity recently to review an
15  incident report that you wrote that day in order to refresh
16  your memory about that day?
17  A.   Yes, I did, ma'am.
18  Q.   What is an incident report?
19  A.   Any time anything occurs at Oak Hill, and it can be
20  anywhere from the slightest to something that is very
21  important, an incident report must be written.
22  Q.   Now, what was your shift on February 5th of 1990?
23  A.   Three-thirty -- no, I'm sorry, ma'am -- 2:30 to
24  11:00.
25  Q.   What unit were you working in that day?

---

31 (Pages 118 to 121)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

---

Page 122

1　A.　That's going to be Unit 7.
2　Q.　Now, was Kevin Gray assigned to that unit at that
3　time?
4　A.　Yes, ma'am.
5　Q.　What did Kevin Gray do on the afternoon of February
6　5th while you were working in Unit 7?
7　A.　On that particular day, ma'am, in reviewing my
8　incident, which is my incident, he went to -- we had band
9　practice that particular day.  He was sent to band practice,
10　ma'am.
11　　　MS. JEFFRESS:  Could we see 100 again?
12　BY MS. JEFFRESS:
13　Q.　Could you show the jury again where Unit 7 is on this
14　photograph?
15　A.　Yes, ma'am.  Unit 7 is going to be right here.
16　Q.　And that's the unit that was just in the picture that
17　was previously displayed?
18　A.　Yes, ma'am.
19　Q.　Now, where was band practice that day?
20　A.　Band practice is going to be housed in this building
21　right here, ma'am.
22　Q.　Now, when you say Kevin Gray went to band practice,
23　what exactly did he do?
24　A.　He was taken from Unit 7, he was taken to the
25　blacktop, ma'am, he was eyeballed from this point -- this is

Page 123

1　the blacktop in this area here -- to this point right here
2　where another officer picked him up, ma'am.
3　Q.　And when you say he was eyeballed, did you personally
4　observe that?
5　A.　Yes, ma'am.
6　Q.　Now, did anyone go with him to band practice?
7　A.　That particular day, ma'am, I believe so.  Yes, they
8　did, ma'am.
9　Q.　Do you remember who that was?
10　A.　Yes, ma'am.
11　Q.　Who was that?
12　A.　That was Mr. Smith, ma'am.
13　Q.　Are you sure about that?
14　A.　I'm relatively sure, yes, ma'am.
15　Q.　Would it refresh your memory to review your incident
16　report?
17　A.　Yes, ma'am.
18　　　MS. JEFFRESS:  May I approach the witness, Your
19　Honor?
20　　　THE COURT:  Yes.
21　BY MS. JEFFRESS:
22　Q.　Mr. Layton, I am showing you a document, a two-page
23　document.  Is this your incident report from February 5th,
24　1990?
25　A.　Yes, ma'am, it is.

Page 124

1　Q.　Could you just take a look at that and see if that
2　refreshes your recollection as to who Kevin Gray went to
3　band practice with on February 5th.
4　　　(Brief pause in proceedings.)
5　BY MS. JEFFRESS:
6　Q.　Did reviewing that document refresh your memory?
7　A.　Yes, ma'am.  Thank you.
8　Q.　And do you remember who it was?
9　A.　Yes, ma'am.
10　Q.　Who was it?
11　A.　Okay.  I'm sorry, ma'am, it was Mr. Jones, Steven
12　Jones.
13　Q.　Now, after Kevin Gray and Steven Jones were picked up
14　by the other officer at band practice, did they report back
15　to your unit, to Unit 7?
16　A.　No, ma'am.
17　Q.　How do you know that?
18　A.　They never arrived back.  We had an incident that
19　took place --
20　　　MR. CARTER:  May we approach, please?
21　　　THE COURT:  Yes.
22　　　(Whereupon, a discussion was held at the bench on the
23　record.)
24　　　MR. CARTER:  Excuse me, Your Honor.  He said they
25　never arrived back.  Now I would like a proffer on what he

Page 125

1　is about to talk about, what incident.
2　　　MS. JEFFRESS:  He was responsible for their
3　custody.  As the officer for Unit 7 that day, he was
4　responsible for ensuring that they got back.  When they did
5　not get back, he had to report that and they were missing.
6　He also observed how they had escaped.  He observed the
7　perimeter fence having been knocked down.  He can't talk
8　about -- he can't testify to what they did exactly; he can
9　talk about the perimeter fence being knocked down and their
10　being absent.
11　　　THE COURT:  There is not some other incident he's
12　about to get into?
13　　　MS. JEFFRESS:  Oh, no.
14　　　THE COURT:  Okay.
15　　　MR. CARTER:  It seems to me he can say, "After the
16　fact, this is what I saw," because he doesn't see anything.
17　　　MS. JEFFRESS:  He saw what he saw.  That's what
18　we'll elicit.
19　　　MR. CARTER:  But I mean after the fact.
20　　　THE COURT:  Right.
21　　　(End of discussion at the bench.)
22　BY MS. JEFFRESS:
23　Q.　Now, Mr. Layton, you were saying that Kevin Gray and
24　Steven Jones never arrived back to Unit 7?
25　A.　No, ma'am.

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.          CR 00-157                    May 23, 2002
Kevin L. Gray, et al                 AM Session                   Volume 46

Page 126

1   Q.    What happens when students do not report back as they
2   are required?
3   A.    Well, if they don't call back -- return back to the
4   unit -- our procedures have changed since then.
5   Q.    I need to know what your procedures were then.
6   A.    Were back then?
7   Q.    Right.
8   A.    One, we contact the OD; two, we go look for them,
9   ma'am.
10  Q.    And did you do those things when Kevin Gray failed to
11  report back on February 5th, 1990?
12  A.    Yes, ma'am.
13  Q.    Who again is the OD?
14  A.    The OD is the Officer of the Day, ma'am.
15  Q.    And was there a search for Kevin Gray and Steven
16  Jones?
17  A.    Yes, ma'am.
18  Q.    Were they located on the grounds?
19  A.    No, ma'am.
20  Q.    Did you observe, either that day or right thereafter,
21  any signs of how they left the grounds?
22  A.    Yes, ma'am.
23  Q.    What did you see?
24  A.    If my memory serves me correct, ma'am, a van which
25  hit the fence, the fence fell, and that's what I observed,

Page 127

1   ma'am.
2   Q.    And at the time that you saw it, where was the van
3   positioned?
4   A.    The van was positioned against the fence.  It had
5   pushed the fence down.
6   Q. .  And it had pushed the fence down how far?
7   A.    Quite a bit, ma'am.
8   Q.    Would someone have been able to walk over the fence
9   in the position that it was in?
10  A.    Yes, ma'am.
11        MS. JEFFRESS:  Could we see KG90-109?
12        (Whereupon, Government's Exhibit No. KG90-109 was
13  marked for identification.)
14  BY MS. JEFFRESS:
15  Q.    Do you recognize that photograph, Mr. Layton?
16  A.    Yes, ma'am.  It's the -- yes, ma'am, I do.
17  Q.    What is that photograph?
18  A.    That is the fence area that surrounds Oak Hill.
19  Q.    Is that a fairy and accurate depiction of the fence
20  surrounding Oak Hill?
21  A.    Currently, yes, ma'am, it is.
22  Q.    Now, you said currently.  Is it any different now
23  than it was back in 1990?
24  A.    Yes, ma'am.
25  Q.    How is it different?

Page 128

1         MR. CARNEY:  Same objection.
2         THE COURT:  Overruled.
3         THE WITNESS:  The difference is, ma'am, is that we
4   have added more Constantine wire in this area here, and also
5   you can't see it, it's more Constantine wire between the
6   fences.
7   BY MS. JEFFRESS:
8   Q.    The fence behind the Constantine wire, the big fence
9   that is visible in the photograph, is that the same -- in
10  the same condition that it was in in 1990?
11  A.    Okay.  Are you referring to this fence area here,
12  ma'am?
13  Q.    No, I'm not.  The main fence that goes --
14  A.    The main -- yes, it is, ma'am.
15        MS. JEFFRESS:  I would like to move the admission
16  of KG90-109.
17        THE COURT:  It's received.
18        (Whereupon, Government's Exhibit No. KG90-109 was
19  received in evidence.)
20        MR. CARNEY:  We would object, Your Honor.
21        THE COURT:  Overruled.
22  BY MS. JEFFRESS:
23  Q.    Now the jury can see it, Mr. Layton.  Could you just
24  again explain for the jury's benefit what this photograph
25  shows?

Page 129

1   A.    Okay.  What the fence shows, ma'am, is the
2   Constantine wire here, the Constantine wire up top.  All
3   this was present at that particular time.  The Constantine
4   wire down at the bottom in the '90s was not present.  That's
5   something that we recently added, I guess about six years
6   ago, ma'am.
7   Q.    And is this a photograph of the fence in the area
8   where the van had driven over it back on February 5th, 1990?
9   A.    I can't say it's the approximate area, ma'am, but
10  yes, it's around in this area, yes, ma'am.
11  Q.    Now, explain for the jury where exactly the van was,
12  what exactly the van had done when you saw it?
13  A.    Well, when I saw the -- when I observed the van,
14  ma'am, the van was -- it was against the fence.  The fence
15  was leaning over towards the outside and the van was up on
16  the fence slightly.
17        MS. JEFFRESS:  Now could we have KG90-100 again on
18  the screen?
19  BY MS. JEFFRESS:
20  Q.    Could you show the jury again with the arrow what
21  portion of the fence along the perimeter fence surrounding
22  Oak Hill the van had been driven up against the fence?
23  A.    Yes, ma'am.  It's going to be around in this area in
24  here, ma'am.
25  Q.    And again, where was -- okay.  Is that it right

United States District Court                    Theresa M. Sorensen, CVR-CM
For The District of Columbia                          Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

---

Page 130

1  there?
2  A.    I think we're a little bit slightly -- right in --
3  this is the football field area here. We're looking -- it's
4  about right in this area right in here.
5  Q.    Okay. Is this area --
6  A.    Yes, ma'am. That's a little bit more accurate.
7  There is the other fence right there, I believe, ma'am, yes.
8  Q.    That's the other fence that you could view through
9  the fence in 109?
10  A.    Yes, ma'am.
11        MS. JEFFRESS: Could we click back?
12  BY MS. JEFFRESS:
13  Q.    Now, where again was band practice?
14  A.    Band practice is going to be in this area right here.
15  Q.    And that is two buildings away from the area of the
16  fence that you've just shown for the record; is that
17  correct?
18  A.    Yes, ma'am.
19        MR. CARTER: May we approach, please?
20        THE COURT: Yes.
21     (Whereupon, a discussion was held at the bench on the
22  record.)
23        MR. CARTER: Your Honor, before the opening
24  statements, I asked if Your Honor would ask the government
25  if they would provide you a list of the unindicted or

---

Page 131

1  unnamed coconspirators, and I would like to know whether
2  Steven Jones is on that list. If he's not, I move for a
3  mistrial because this has nothing to do with the conspiracy.
4  Steven Jones is not part of that conspiracy at all. It's
5  completely separate and it's put in to smear my client and
6  it's character assassination, and it's impeachment by
7  juvenile records which --
8        THE COURT: Your request is denied.
9        MR. CARTER: I apologize Your Honor. As to even
10  knowing whether he is a coconspirator?
11        THE COURT: Denied.
12        MR. CARTER: Thank you.
13     (End of discussion at the bench.)
14  BY MS. JEFFRESS:
15  Q.    Now, Mr. Layton, there was another escape on June
16  26th of 1990 involving 17 students. Were you on duty at the
17  time that that took place?
18  A.    I want to say no, I was not, ma'am.
19  Q.    Now I would like to move to a third date, and I will
20  draw your attention to September 12th of 1990. Were you on
21  duty on that day?
22  A.    Yes, ma'am.
23  Q.    And have you again had an opportunity to review an
24  incident report that you wrote about an event that took
25  place that day?

---

Page 132

1  A.    Yes, ma'am.
2  Q.    What unit were you working in on September 12th of
3  1990?
4  A.    I was working in Unit 10A, ma'am.
5  Q.    And what shift were you working?
6  A.    Once again, ma'am, it was the 2:30 to 11 shift,
7  ma'am.
8        (Whereupon, Government's Exhibit No. KG90-102 was
9  marked for identification.)
10        MS. JEFFRESS: Could we see KG90-102?
11  BY MS. JEFFRESS:
12  Q.    Do you recognize that photograph?
13  A.    Yes, ma'am.
14  Q.    What is shown there, Mr. Layton, just briefly?
15  A.    What you are looking at, ma'am, is unit, as you see
16  it identified to the right here, Unit 10A.
17  Q.    Is this a fair and accurate depiction of what Unit
18  10A looked like in 1990?
19  A.    Yes, ma'am.
20        MS. JEFFRESS: I would like to move the admission
21  of KG90-102.
22        THE COURT: Received.
23     (Whereupon, Government's Exhibit No. KG90-102 was
24  received in evidence.)
25        THE WITNESS: I would also say, ma'am.

---

Page 133

1        MS. JEFFRESS: Before you answer, I have to wait
2  for the jury to see it.
3        THE WITNESS: Sure.
4  BY MS. JEFFRESS:
5  Q.    Could you just explain again what you identified in
6  my last question?
7  A.    This is Unit 10A, which you see identified there. It
8  also can be identified by the red stripe. One of the things
9  that are different that we did not have back then was these
10  air-condition units that you see right here.
11  Q.    Other than the air-conditioners, does it look the
12  same as it did in 1990?
13  A.    Yes, ma'am.
14  Q.    Now, Mr. Layton, what is Unit 10A?
15  A.    It's our security unit, ma'am.
16  Q.    And how is the population -- is the population there
17  in 10A different from the population in other units?
18  A.    Yes, ma'am.
19  Q.    How is it different?
20  A.    At that particular time, ma'am, we used it to house
21  students that were considered to be very aggressive,
22  students that were considered to be escape risks, students
23  that were in altercations with other students on the
24  compound.
25  Q.    How is Unit 10A -- or is Unit 10A physically

---

34 (Pages 130 to 133)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

Page 134

1  different from the other units?
2  A.    Yes, ma'am.
3  Q.    How is it physically different?
4  A.    One, it's housed with three staff instead of two. It
5  is self-contained; in other words, you do not have to leave
6  the unit for anything. The rooms have -- they are security
7  rooms with steal doors. They have their own self-contained
8  commode system.
9  Q.    And why do the rooms there have their own commodes in
10 the rooms?
11 A.    That is just in case you get in situations, ma'am,
12 where you would not have to let a student out of his room;
13 in other words, he can use the bathroom right in his room,
14 ma'am.
15 Q.    Are there restrictions on the students' movement
16 within Unit 10A that do not apply in the other units?
17 A.    Yes, ma'am.
18 Q.    What are those restrictions?
19 A.    At that particular time, ma'am, they went in Unit
20 10A, remained in 10A until their time was served.
21 Q.    So it was a permanent assignment?
22 A.    Yes, ma'am.
23 Q.    And with respect to moving around during the day,
24 were there restrictions in 10A that did not apply to
25 students in other units?

Page 135

1  A.    It was pretty much self -- back then, ma'am, it was
2  pretty much a self-contained unit. They have an exercise
3  room. Periodically, they would go to the gymnasium. They
4  would be escorted, which is determined by the OD, ma'am.
5  Q.    And how many hours did students in 10A spend outside
6  of that unit per day?
7  A.    Meaning on the compound, ma'am?
8  Q.    That's right.
9  A.    Zero.
10 Q.    And what about the other students not in 10A? How
11 would --
12 A.    The ones not in 10A, ma'am, would have a normal day
13 in which they would go to school, they would get pound time
14 meaning recreation time on the pound, they would go to the
15 gym, they would eat in the culinary, ma'am. These students
16 up 10A ate in also -- ate in 10A.
17 Q.    All right. Now, on September 12th, 1990, where was
18 Kevin Gray assigned -- or was Kevin Gray at Oak Hill on that
19 day?
20 A.    Yes, ma'am.
21 Q.    Was Calvin Smith at Oak Hill on that day?
22 A.    Yes, ma'am.
23 Q.    And where was Kevin Gray assigned?
24 A.    They were assigned to Unit 10A at that particular
25 time, ma'am.

Page 136

1  Q.    Kevin Gray and Calvin Smith both were assigned to
2  10A?
3  A.    Yes, ma'am.
4  Q.    Did you have, Mr. Layton, a conversation with Calvin
5  Smith in Unit 10A that night?
6  A.    Yes, ma'am.
7  Q.    Now, how was it that Calvin Smith had contact with
8  you given the restrictions that you've described in that
9  unit?
10 A.    I was sent to that unit that particular evening,
11 ma'am, because they had a shortage. That was not my normal
12 unit to work. The staff at that particular time, ma'am, we
13 had a -- we had something what is called detail, and those
14 students were picked for detail by the regular staff of Unit
15 10.
16 Q.    And what is detail? What does that mean?
17 A.    Well, detail consists of, ma'am, you clean the unit;
18 you answer the doors if somebody knock; you take something,
19 if someone needs it, to the room with the, you know, along
20 with the counselor. Pretty much what you do, you clean the
21 unit. It's an extra privilege type of thing, ma'am.
22 Q.    You say it's a privilege. How is it a privilege?
23 A.    Not every student gets detail.
24 Q.    And the students on detail, are they allowed greater
25 freedom within the unit than the students who are not on

Page 137

1  detail?
2  A.    Yes, ma'am, they are.
3  Q.    Now, who was on detail on the evening of September
4  12th, 1990?
5  A.    Mr. Gray, Mr. Smith, and the third young man escapes
6  me right now.
7  Q.    Now let me go back and ask, did you have a
8  conversation with Calvin Smith while he was on detail that
9  night?
10 A.    Yes, ma'am.
11 Q.    What was that conversation?
12 A.    I can't remember the conversation, but it was more or
13 less just regular --
14      MR. CARNEY:  Objection, Your Honor.
15      THE COURT:  Overruled.
16 BY MS. JEFFRESS:
17 Q.    You can answer.
18 A.    It was just regular, you know, chitchat, nothing --
19 Q.    Did he answer a knock on a particular door in 10A
20 that evening?
21      MR. CARNEY:  Objection.  Leading.
22      THE COURT:  Overruled.
23      THE WITNESS:  Yes, ma'am.
24 BY MS. JEFFRESS:
25 Q.    And did he approach you about what that student had

United States of America v.           CR 00-157                May 23, 2002
Kevin L. Gray, et al               AM Session                   Volume 46

Page 138

1  requested?
2  A.    Yes, ma'am.
3  Q.    You had said earlier that the detail students
4  answered other student's requests for assistance; is that
5  right?
6  A.    In other words, ma'am, the staff would say, okay, go
7  see what this particular student want, and they'll, you
8  know, come back and let us know what that student needs.
9  Q.    And is that what this conversation with Calvin Smith,
10  is that how it began?
11  A.    No, ma'am.  We were just sitting there talking,
12  that's all.
13  Q.    At some point, did Calvin Smith answer a student's
14  request for assistance?
15  A.    Yes, ma'am.
16  Q.    And what did that student want?
17  A.    Toilet paper, ma'am.
18  Q.    What did you do when he told you that the student --
19  that a student wanted toilet paper?
20  A.    He did, to my memory, ma'am, grabbed the toilet
21  paper.
22  Q.    What did you do after he grabbed toilet paper?
23  A.    At that particular time, ma'am, there was a third
24  staff working -- there were two other staff working up
25  there, so one of the other staff told the gentleman on

Page 139

1  detail, "It's time for you all to go, anyway."
2  Q.    Okay.  So what did you -- or what did Calvin Smith do
3  with the toilet paper that he had taken?
4  A.    He grabbed and he proceeded down the hallway along
5  with me, ma'am.
6  Q.    And was anyone else with you?
7  A.    Yes, ma'am.
8  Q.    Who else was with you?
9  A.    Another young man, ma'am, that name escapes me right
10  now.
11  Q.    Is that the third person on detail who I asked you
12  about just a moment ago?
13  A.    Yes, ma'am.
14  Q.    How did you get to Room -- I'm sorry.  Do you
15  remember which room the student was in who needed toilet
16  paper?
17  A.    Yes, ma'am.
18  Q.    Which room was that?
19  A.    Room 15.
20  Q.    How did you get to Room 15?
21  A.    By walking, ma'am.
22  Q.    And how did you have to go to get to Room 15?
23  A.    We went out the -- there are two doors to the office.
24  We went out the back -- the side door closest to the rooms
25  on the back hall, ma'am.

Page 140

1  Q.    Now, you said you were walking with Calvin Smith and
2  a second student.  How exactly were you walking?  Side by
3  side?  Behind one another?  Do you recall?
4  A.    Yes, ma'am, I do.  I remember that Calvin, Mr. Smith,
5  was either -- he was more or less in front of me.  It wasn't
6  exactly side by side, but he was more or less in front of me
7  right here, ma'am.
8  Q.    And the second student, where was he?
9  A.    He was behind me, ma'am.
10  Q.    Now, what happened when you got to Room 15?
11  A.    I unsecured the door, ma'am.  Slightly unsecured the
12  door.
13  Q.    How did you unsecure the door?
14  A.    By placing the key into the lock and turning it,
15  ma'am.
16  Q.    What happened when you turned the key in the lock?
17  A.    I was hit and pushed from behind, ma'am.
18  Q.    Where exactly on your body were you hit and pushed?
19  A.    I would say from this area here.
20  Q.    And you're pointing to the back of your head just
21  above your neck?
22  A.    Yes, ma'am.  Well, right in the neck area, just a
23  little bit above on down, because it was more or less like a
24  whole push, you know, of a whole body.
25  Q.    And how hard were you hit from behind?

Page 141

1  A.    It was quite hard, ma'am.
2  Q.    Could you tell whether you were hit by an object or a
3  body part?  Could you feel that?
4  A.    Yes, ma'am.  It was not an object, it was a body
5  part.
6  Q.    And what did it feel like had hit you from behind?
7  A.    A person, ma'am.
8  Q.    What body part?  What part of the person were you hit
9  with?
10  A.    It felt like more or less the whole -- the arm part
11  on down with, you know -- like if you just put your arm up
12  like that and just ram into someone.
13  Q.    And you're holding your forearm up in front of you as
14  you say that; is that right?
15  A.    Yes, ma'am.
16  Q.    What happened once you were hit and pushed from
17  behind?
18  A.    I was pushed into the room, ma'am.
19  Q.    And was anyone in the room?
20  A.    Yes, ma'am.
21  Q.    Who was in the room?
22  A.    Another student, ma'am.
23  Q.    Was this the student who had asked for toilet paper?
24  A.    Yes, ma'am.
25  Q.    Do you remember his name?

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 23, 2002
Volume 46

---

Page 142

```
 1   A.    I want to say Charles Gant, ma'am.
 2   Q.    Now, what happened after you were pushed into the
 3   room?
 4   A.    I was pushed into the room.  The push was hard enough
 5   to push me to the bed area.  Another student, which was the
 6   young man in the room, grabbed me also as I was coming
 7   through and assisted me to the bed area.
 8   Q.    And that was Mr. Gant who was in the room who grabbed
 9   you and pulled you to the bed area?
10   A.    Yes, ma'am.
11   Q.    And what happened when he pulled you towards the bed?
12   A.    The other young man whose name escapes me, ma'am, I'm
13   sorry --
14   Q.    Would anything refresh your recollection as to the
15   student's name?
16   A.    Yes, ma'am.
17   Q.    Would your incident report from that day --
18   A.    Yes.
19   Q.    -- refresh your memory?
20   A.    Yes, ma'am.
21         THE COURT:  Let's take that up at two o'clock.  We
22   will take our luncheon recess.  Don't talk about the case.
23   I will see you all at two o'clock.
24         (Whereupon, the proceedings in the above-entitled
25   matter were recessed for lunch at 12:34 p.m., scheduled to
```

---

Page 143

```
 1   reconvene at 2:00 p.m.)
 2
 3                    C O N T E N T S
 4   WITNESSES:        DIRECT CROSS REDIRECT RECROSS
 5   On behalf of the government:
 6   Rodney Armstrong      33    58    --      --
 7                         61
 8   Curtis E. Lancaster   67    73    --      --
 9   George R. Taylor, Jr. 74    77    87      --
10                         78
11   Richard F. Watkins    89    97    105     --
12                        102
13   Julius Layton        107    --    --      --
14
15               E X H I B I T S
16            MARKED FOR        RECEIVED
17   GOVERNMENT'S:    IDENTIFICATION    IN EVIDENCE
18   No. AD-301          33          33
19   No. AD-401A         34          35
20   No. AD-101          36          36
21   No. AD-102          37          38
22   No. AD-103          38          39
23   No. AD-104          39          40
24   No. DH-301          43          44
25   No. DH-401          45          46
```

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| On behalf of the government: | | | | |
| Rodney Armstrong | 33 | 58 | -- | -- |
| | 61 | | | |
| Curtis E. Lancaster | 67 | 73 | -- | -- |
| George R. Taylor, Jr. | 74 | 77 | 87 | -- |
| | 78 | | | |
| Richard F. Watkins | 89 | 97 | 105 | -- |
| | 102 | | | |
| Julius Layton | 107 | -- | -- | -- |

---

Page 144

E X H I B I T S  (Continued)

| GOVERNMENT'S: | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
| --- | --- | --- |
| No. DH-402 | 46 | 46 |
| No. DH-403 | 47 | 47 |
| No. DH-404 | 47 | 47 |
| No. DH-405 | 47 | 48 |
| No. DH-406 | 48 | 48 |
| No. DH-407 | 48 | 49 |
| No. DH-408 | 49 | 49 |
| No. DH-409 | 49 | 50 |
| No. DH-410 | 50 | 50 |
| No. DH-411 | 50 | 50 |
| No. DH-412 | 51 | 51 |
| No. DH-413 | 51 | 52 |
| No. DH-414 | 52 | 52 |
| No. DH-415 | 52 | 53 |
| No. DH-416 | 53 | 53 |
| No. DH-417 | 53 | 54 |
| No. DH-418 | 54 | 54 |
| No. DH-419 | 54 | 54 |
| No. DH-420 | 55 | 55 |
| No. DH-421 | 55 | 56 |
| No. DH-422 | 56 | 57 |
| No. DH-423 | 57 | 58 |

---

Page 145

E X H I B I T S  (Continued)

| GOVERNMENT'S: | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
| --- | --- | --- |
| No. AD-401B | 70 | 71 |
| No. AD-401C | 71 | 72 |
| No. RM86-501 | 93 | 95 |
| No. RM86-502 | 93 | 95 |
| No. KG90-100 | 108 | 109 |
| No. KG90-107 | 113 | 114 |
| No. KG90-109 | 127 | 128 |
| No. KG90-102 | 132 | 132 |

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct
transcript from the record of proceedings in the above-
entitled matter.

_____
Theresa M. Sorensen, CVR-CM
Official Court Reporter

---

37 (Pages 142 to 145)

4

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 24, 2002
Volume 46

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,     :    Docket No. CR 00-157
                              :
        Plaintiff,            :    Washington, D.C.
                              :    May 23, 2002
v.                            :    2:08 p.m.
                              :
KEVIN L. GRAY, RODNEY MOORE,  :
JOHN RAYNOR, CALVIN SMITH,    :
TIMOTHY HANDY, LIONEL NUNN,   :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - x

DAY 46 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 Fourth Street, Northwest
                          Washington, D.C. 20001

For Defendant Gray:       FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, Northwest
                          Suite 717
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241

Pages 1 through 120
DOLORES A. BYERS, CSR, RPR
Official Court Reporter

FILED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

—    U.S. v. KEVIN L. GRAY    —
Cr.No. 00-157(01); Exhibit-4

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 24, 2002
Volume 46

---

Page 2

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
    Coburn and Schertler
    1150 18th Street, Northwest
    Washington, D.C. 20036

    STEVEN MC COOL, ESQ.
    Mallon and McCool, LLC
    16 South Calvert Street, Suite 1002
    Baltimore, Maryland 21202
For Defendant Raynor: G. GODWIN OYEWOLE, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    THOMAS SAUNDERS, ESQ.
    207 East Redwood Street, Suite 205
    Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
    Law Offices of Carney and Carney
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    JONATHAN RUBENS, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004
For Defendant Handy:  MICHAEL LASLEY, ESQ.
    1730 K Street, Northwest, Suite 304
    Washington, D.C. 20006
    ADGIE O'BRYANT, JR., ESQ.
    Anderson and O'Bryant, PC
    1107 Seventh Street, Northwest
    Washington, D.C. 20001

For Defendant Nunn:   VERONICE A. HOLT, ESQ.
    3003 Van Ness Street, Northwest
    Suite W-919
    Washington, D.C. 20008

---

Page 3

## C O N T E N T S

WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS
On behalf of the government:
Julius Layton (resumed)
    By Ms. Jeffress       5
    By Mr. Rubens              23
    By Ms. Jeffress                 29
Donald Gossage
    By Mr. Olsen         30
    By Mr. Carter              46
Richard Steven Griffin
    By Mr. Olsen         69
    By Mr. Carter              75
Timothy Allen Trozzi
    By Mr. Olsen         84
    By Mr. Carter              100

### E X H I B I T S

| GOVERNMENT | MARKED | REC'D |
| --- | --- | --- |
| No. KG90-101 | 9 | |
| No. KG90-105 | 12 | |
| No. KG90-106 | 13 | |
| No. KG90-104 | 15 | |
| No. KG90-103 | 16 | |
| No. G92-KG301 | 43 | |

---

Page 4

### E X H I B I T S (Continued)

| GOVERNMENT | MARKED | REC'D |
| --- | --- | --- |
| No. G92-GK102 | 44 | |
| No. G92-KG401 | 45 | |
| No. G92-KG402 | 74 | |
| Nos. G92-KG403A and G92-KG403 | | 75 |
| No. G92-KG405 | 94 | |
| No. G92-KG406 | 97 | |
| No. G92-KG407 | 99 | |

---

Page 5

```
1              AFTERNOON SESSION
2         MR. CARNEY:  Outside, Your Honor.  I would ask
3    that the record reflect we have a continuing objection to as
4    this being outside of the time of conspiracy.
5         MR. CARTER:  I join in his eloquent objection.
6         THE COURT:  Okay.  It's overruled.
7         (Jury entered courtroom.)
8         THE COURT:  Government may proceed.
9         MS. JEFFRESS:  Thank you, Your Honor.
10            DIRECT EXAMINATION
11      BY MS. JEFFRESS:
12   Q  Mr. Layton, before we took our lunch break, I was about
13   to hand you your incident report from September 12th, 1990,
14   so that you could see whether that refreshes your
15   recollection as to the name of that student who was walking
16   behind you.
17        MS. JEFFRESS:  May I approach the witness, Your
18   Honor?
19        THE COURT:  Yes.
20        BY MS. JEFFRESS:
21   Q  Now, Mr. Layton, I'm handing you a copy of your incident
22   report from September 12th, 1990, and why don't you take a
23   look at that?
24   A  (Witness reviewed document.)
25   Q  Did that refresh your memory of who that student was who
```

---

2 (Pages 2 to 5)

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 24, 2002
Volume 46

---

Page 6

1  was behind you?
2  A  Yes, ma'am.  The incident does.
3  Q  And who was the student who was behind you?
4  A  I want to say Kibler.
5  Q  Kibler?
6  A  Yes, ma'am.
7  Q  And is that Jerry Kibler?
8  A  Yes, ma'am.
9  Q  Now, you said that you were walking down the hall way
10  with Calvin Smith just slightly in front of you and
11  Mr. Kibler behind you; is that correct?
12  A  Yes, ma'am.
13  Q  What happened when you got to the door of Room 15?
14  A  As I stated earlier, ma'am, it was, as I opened up the
15  door, there was a push from behind more, or less like a
16  whole body push with the forearm up around my head and neck
17  area.  Pushed me into the room.
18  Q  Could you tell from where and from how you were hit from
19  behind how big the student was who hit you in that way?
20  A  Yes, ma'am.
21  Q  And how big did you think the student was who hit you in
22  that way?
23  A  He was a pretty good size student, ma'am.
24  Q  Could you see who it was while you were being hit from
25  behind?

---

Page 7

1  A  No, ma'am.
2  Q  Could you describe Mr. Kibler, what size was he
3  physically?
4  A  He was larger than Mr. Smith now.
5  Q  Now --
6  A  At that particular time.  Yeah.
7  Q  Now, you had said that Kevin Gray was also on detail
8  that evening?
9  A  Yes, ma'am.
10  Q  Did you see Kevin Gray at anytime in the hall way while
11  this was going on?
12  A  No, ma'am.
13  Q  Now, what happened after you were pushed from behind?
14  A  The other gentleman in the other room, Mr. Gant, grabbed
15  me.  I don't remember exactly who had the handcuffs.  I
16  believe it was Mr. Gant.  No.  I'm sorry.  It was
17  Mr. Kibler.  Okay.
18  Q  Now, did you see him with the handcuffs?
19  A  No, ma'am.
20  Q  Are you assuming that it was him who was behind you?
21  A  Yes, ma'am.
22  Q  What did they do with the handcuffs?
23  A  I'm sorry, ma'am.  They weren't handcuffs.  They were
24  shackles.
25  Q  With the shackles.  What did they do with the shackles?

---

Page 8

1  A  They shackled one of my legs and the other to the bed,
2  ma'am.
3  Q  After you were shackled to the bed, what happened?
4  A  The door was secured behind -- put me in the room.  The
5  student that was in the room, of course, left the room.  I
6  heard somebody going out the back side door of unit 10A.
7  Q  Now, let me show you some pictures again, Mr. Layton.
8  Could we see 90-101, KG90-101.  Do you recognize the picture
9  that's on the screen in front you?
10  A  Yes, ma'am.
11  Q  What is that?
12  A  This is unit 10A.
13  Q  Can you also see 10B in that picture?
14  A  Yes, ma'am.  This is going to be the 10B area over here.
15  Q  Does this picture and area accurately show 10A and 10B
16  as they looked in 1990?
17  A  Yes, ma'am.
18       MS. JEFFRESS:  I'd like to move the admission of
19  KG90-101.
20       THE COURT:  Received.
21            (Government's Exhibit No. KG90-101
22             was received into evidence.)
23  BY MS. JEFFRESS:
24  Q  Now the jury can see it, Mr. Layton.  Could you just
25  show the jury where 10A and 10B are on that picture?

---

Page 9

1  A  This area right here to be more accurate, ma'am, is the
2  medical unit area, which is part of 10.  10A is going to be
3  straight down this walkway here, which would lead to a door
4  which you cannot see right here.
5  Q  Where on the picture is 10B?
6  A  10B, ma'am, is going to be right in that area there.
7  Q  Now I'd like to show you, Mr. Layton, KG90-102, which I
8  believe was already admitted.
9       Is this the doorway to 10A?
10  A  Yes, ma'am.
11  Q  Now, this is taken from the outside.  But could you show
12  the jury by indicating where on the outside of the building
13  you were when you had the conversation with Mr. Calvin Smith
14  about taking toilet paper to the student in Room 15?
15  A  Okay.  Ma'am, it's a red steel door here.  If you were
16  to go open up this door.  There's a screen door here.  Both
17  of them are secured doors.  If you were to go inside here,
18  you will see an office, which is directly right there in
19  front of you.
20  Q  Is that where you were, in the office?
21  A  Yes, ma'am.
22  Q  Now, when you walked down the hall way with Mr. Smith
23  and Mr. Kibler, which way did you go?
24  A  It's going to be going down the back side of this area
25  here.

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 24, 2002
Volume 46

---

Page 10

1 Q Could we have the whole photograph again?
2    And which direction is Room 15 looking from this
3 photograph?
4 A It's going to be in this area here, ma'am, on the
5 opposite side.
6 Q Now I'd like to show you what has been marked as
7 Government's Exhibit KG90-105. Do you see that photo on
8 your screen now?
9 A Yes, ma'am.
10 Q What's in that photograph?
11 A I'm sorry, ma'am?
12 Q What is in that photograph?
13 A It's a steel door with a fiberglass top and bottom.
14 Can't see the bottom as a top and bottom. You also see a
15 bed in the area, air condition at the top in the back of the
16 brick wall.
17 Q Were you present when this photograph was taken?
18 A Yes, ma'am.
19 Q Do you know which room this is the doorway to?
20 A Yes, ma'am.
21 Q Which room is that?
22 A That's Room 15, ma'am.
23 Q Does this photograph fairly and accurately depict the
24 door of Room 15?
25 A Currently. Yes.

---

Page 11

1    MS. JEFFRESS: I'd like to move the admission of
2 KG90-105.
3    MR. CARNEY: Objection, Your Honor.
4    THE COURT: Did it look differently in 1990?
5    THE WITNESS: Yes, sir.
6    THE COURT: What was the difference?
7    THE WITNESS: The difference, sir, is that the
8 fiberglass area was not present. Instead, these doors were
9 recently put in. It was just a small open window there with
10 fiberglass, hard plexiglass over it, and also a steel cover.
11    BY MS. JEFFRESS:
12 Q The room itself is visible through that window in the
13 photograph. Is that substantially the same as it was in
14 1990?
15 A The bed area, yes, ma'am. It's probably even still the
16 original bed.
17    MS. JEFFRESS: I would like to move the admission
18 of KG90-105.
19    THE COURT: It will be received.
20    (Government's Exhibit No. KG90-105
21    was received into evidence.)
22    BY MS. JEFFRESS:
23 Q Now, Mr. Layton, if you could, just show the jury the
24 features you were discussing earlier with respect to the
25 door to Room 15 here?

---

Page 12

1 A Okay. The difference between the present door, which
2 you're viewing now is the present door, is that the door at
3 that particular time was all steel door. These are special
4 observations doors which we use now. It had one small, I
5 would say twelve by twelve steel -- I mean, twelve by twelve
6 window with a steel grade cover over it with plexiglass.
7 Q Now, where was the lock mechanism on the door as it was
8 in 1990?
9 A You can barely see the lock mechanism. Right there,
10 ma'am.
11 Q And is that in roughly the same place that it was in
12 1990?
13 A Yes, ma'am.
14 Q Now I'd like to show you KG90-106, Mr. Layton. What's
15 depicted in this photograph?
16 A What you see in that particular photograph, ma'am, is
17 the bed, the door, the back wall, the bolted down desk.
18 Q Does this fairly and accurately show those areas of the
19 room as they were in 1990?
20 A Yes, ma'am.
21    MS. JEFFRESS: I would like to move the admission
22 of KG90-106.
23    THE COURT: Received.
24    (Government's Exhibit No. KG90-106
25    was received into evidence.)

---

Page 13

1    BY MS. JEFFRESS:
2 Q Is this the area of the room, Mr. Layton, where you were
3 when the students shackled you to the bed?
4 A Yes, ma'am.
5 Q Where exactly did this take place?
6 A Right there, ma'am.
7 Q How were you connected to that bedpost that you're
8 indicating with the arrow?
9 A Yes, ma'am.
10 Q How exactly were you connected to it?
11 A One was on my ankle, one was attached to this post right
12 here, ma'am.
13 Q Okay. And let me show you one more. What happened
14 after they shackled you to the bed?
15 A At that particular time, ma'am, the door was closed and
16 secured.
17 Q Where were your keys?
18 A The keys to the -- they were still in the door, ma'am.
19 Q What happened to your keys?
20 A Well, after the door was secured, I heard some noise in
21 this back area because right behind this, right to the right
22 of this door where I was, it's going to be the side front
23 door which opens up into the outside. It has a steel door
24 and it also has a screen steel door.
25 Q Okay. Let me show you KG90-104. Do you recognize that

---

4 (Pages 10 to 13)

United States of America v.       CR 00-157      May 20, 2002
Kevin L. Gray, et al      AM Session      Volume 43

Page 1

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

        UNITED STATES OF AMERICA,      :  CR Number 00-157
                                       :
                   Government,         :
                                       :
             v.                        :  Washington, D.C.
                                       :  Monday, May 20, 2002
        KEVIN L. GRAY, RODNEY MOORE,   :  9:45 a.m.
        JOHN RAYNOR, CALVIN SMITH,     :
        TIMOTHY HANDY and LIONEL NUNN, :
                                       :
                   Defendants.         :
                                       :
        - - - - - - - - - - - - - - - -x

                     DAY 43 - AM SESSION
                   TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE ROYCE C. LAMBERTH
                  UNITED STATES DISTRICT JUDGE

        APPEARANCES:
        For the Government:     TIMOTHY J. HEAPHY, ESQUIRE
                                MATTHEW G. OLSEN, ESQUIRE
                                AMY JEFFRESS, ESQUIRE
                                ASSISTANT UNITED STATES ATTORNEYS
                                U.S. ATTORNEY'S OFFICE
                                555-4th Street, N.W.
                                Washington, D.C.  20001
                                (202)  353-8822

        For Defendant Gray:     FRANCIS DARRON CARTER, ESQUIRE
                                1730 Rhode Island Avenue, N.W.
                                Suite 717
                                Washington, D.C.  20036
                                (202)  393-4330
                                DAVID P. BAUGH, ESQUIRE
                                DAVID P. BAUGH, P.C.
                                SARA DAVIS, ESQUIRE
                                223 South Cherry Street
                                P.O. Box 12137
                                Richmond, Virginia  23241
                                (804)  643-8111

                     Pages 1 through 142


                                    THERESA M. SORENSEN,
        OFFICIAL COURT REPORTER
```

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-4a

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 20, 2002
Volume 43

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
COBURN & SCHERTLER
1150 18th Street, N.W.
Suite 850
Washington, D.C. 20036
(202) 628-4199

STEVEN J. McCOOL, ESQUIRE
1776 K Street, N.W.
Suite 300
Washington, D.C. 20006
(202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
601 Pennsylvania Avenue, N.W.
9th Floor
Washington, D.C. 20004
(202) 347-7777
THOMAS J. SAUNDERS, ESQUIRE
10 N. Calvert Street
Suite 715
Baltimore, Maryland 21202
(202) 550-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
CARNEY AND CARNEY
601 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 434-8234
JONATHAN RUBENS, ESQUIRE
601 Pennsylvania Avenue. N.W.
Suite 900
Washington, D.C. 20004
(202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(202) 508-3690
ADGIE O'BRYANT, JR., ESQUIRE
ANDERSON & O'BRYANT, P.C.
1107 Seventh Street, N.W.
Washington, D.C. 20001
(202) 371-0013

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
3003 Van Ness, N.W.
#W919
Washington, D.C. 20008
(202) 244-2659

Court Reporter:    THERESA M. SORENSEN, CVR-CM
Official Court Reporter
Room 4800-H, U.S. Courthouse
Washington, D.C. 20001
(202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

```
 1            P R O C E E D I N G S
 2        THE DEPUTY CLERK:  This is the case of The United
 3   States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
 4   Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5   2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6   United States; Mr. Carter, Mr. Baugh, Ms. Davis, Mr. Coburn,
 7   Mr. McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr.
 8   Rubens, Mr. Lasley, Mr. O'Bryant and Ms. Holt for the
 9   defendants.
10        THE COURT:  Did you have any other redirect?  Are
11   we ready for the next witness?
12        MR. OLSEN:  No, Your Honor.  I do have a couple of
13   brief preliminary matters, if I could raise those now?
14        THE COURT:  All right.  Okay.
15        MR. OLSEN:  Your Honor, the first issue is with
16   respect to two government agents, Detective Gus
17   Giannakoulias and Special Agent Dan Sparks.
18        When we litigated the motions in this case, the
19   Court ruled that -- denied the defendant's motions to
20   exclude those law enforcement agents from the courtroom,
21   relying on Rule 615, which expressly exempts investigative
22   agents from the rule against witnesses, and I raised with
23   this at least Mr. Carter this morning.  He may have an
24   objection, I understand, but I think the issue has been
25   resolved, and I would cite the Court to page 38 of its
```

---

**Page 5**

```
 1   memorandum of opinion and order, which I have a copy of.
 2   But we're asking that they be allowed to be in the
 3   courtroom.  They would be in the back; they're not going to
 4   be at counsel table.
 5        That's one issue.  The other two issues relate
 6   specifically to the first witness, Joseph Melton.
 7        Mr. Melton has received approximately -- well, he
 8   has received exactly $492.45 in assistance, hotel and food,
 9   over the last few days.  That was provided to him based on
10   -- largely based on information he relayed to us that
11   someone had come up to him and said, you better watch your
12   back.  This happened early last week.  He was, as the Court
13   may recall, identified as a witness two weeks ago, perhaps
14   longer, during the motions hearing.
15        My position is that I won't necessarily go into
16   the fact of giving him the $492 if the defense isn't going
17   to go into it, but my position is also that if the defense
18   is going to go into that, then I should be allowed to elicit
19   from this witness that he did receive this warning from
20   somebody he knew and that he took it as a serious warning.
21        THE COURT:  Save it for rebuttal.  See if the door
22   is opened.
23        MR. OLSEN:  Very well.
24        MR. BAUGH:  Could we have the name of the person
25   who issued the threat?
```

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

May 20, 2002
Volume 43

---

Page 14

1  protesting "I have no deal, I'm not going to get anything,"
2  and then all of a sudden he gets these results, I think
3  under bias cross-examination, I can bring those in, Your
4  Honor.
5          THE COURT: All right.
6          MR. OLSEN: He testified -- Joseph Melton
7  testified in the Grand Jury he had no deal, he was not
8  cooperating, no promises were made. In fact, no promises
9  were made. He received no benefit at all at the time that
10 he testified in the Grand Jury then or ultimately at the
11 trial in 1992. He was convicted of two misdemeanors. There
12 is no evidence -- I'm not aware of anything suggesting that
13 he did receive any benefit at that time. He certainly has
14 no -- is receiving no benefit now, and I would suggest that
15 to use those prior convictions to -- either to impeach him
16 for bias or to impeach is credibility would be more
17 prejudicial than probative.
18         THE COURT: I don't agree. I agree with Mr.
19 Carter. So I think you can -- I think Mr. Carter can use
20 those.
21         MR. CARNEY: Your Honor, I had filed a motion for
22 sequestration of government witnesses earlier and I think
23 it's appropriate now to raise it.
24         What I'm seeking is that when the government
25 brings their comeback witnesses, that they are kept away

Page 15

1  from other witnesses in the courthouse. I believe Your
2  Honor --
3          THE COURT: I denied that. It's not practical.
4  I'm not going to do it.
5          MR. CARNEY: Okay. I just want to make sure that
6  the record understands --
7          THE COURT: The record is clear. I am not going
8  to do that.
9          MR. CARNEY: All right.
10         The second thing is, I have asked for 302s with
11 respect to Raymond Sanders. The government indicates that
12 they are not going to turn over any 302s, and I would ask
13 that the government submit the pleading so we can address
14 that.
15         With respect to the other issue, I wasn't given an
16 opportunity to argue the point and I just want to point out
17 to Your Honor there is a possibility that Agent Sparks may
18 be called in the defense case, and if he's sitting here and
19 he's listening to what's going on, he's following where I'm
20 headed, I'm sure he can review transcripts, but I think that
21 it's inappropriate to have someone that may be a potential
22 witness in a case seated during the trial.
23         In the Fourth Circuit, they only allow the summary
24 witness to be present to help the government. This goes
25 beyond that. I interpret that rule to mean they can have an

Page 16

1  investigative case agent in the courtroom. Maybe I've
2  misinterpreted it, but that's how I read that note.
3          We have one other matter Mr. Carter is going to be
4  raising relating to the juvenile matter and I will follow-up
5  with him.
6          MR. CARTER: A brief bit of background, if you
7  don't mind, Your Honor.
8          Joseph Melton testified before the Superior Court
9  on March 16th and 17th that he had seen -- that he knew the
10 gunman in the incident involving Alvin Henson. When he was
11 asked how he knew him, he said he had seen him 100 times,
12 every day he had seen him for the last two months.
13         I believe Your Honor may remember from the motions
14 hearing that there are records of Oak Hill that would show
15 --
16         THE COURT: Right.
17         MR. CARTER: -- that my client was actually
18 incarcerated at that time. The government and I -- the
19 government has agreed to the admissibility of those records.
20 I am fighting for a stipulation of all of the -- the bases
21 for that admission, but we're still talking on that.
22         I understand Your Honor has denied our motions
23 about keeping juvenile information out, and I just want to
24 make sure that I am only bringing in the evidence that my
25 client was at Oak Hill because Your Honor has already ruled

Page 17

1  that the floodgates are wide open on the juvenile stay, the
2  juvenile escape, and so all of that is coming in, and I
3  would not bring in, I would not use cross-examination
4  whatsoever of anything having to do with the fact that he
5  was, in fact, incarcerated at Oak Hill in the Alvin Henson
6  case if Your Honor had not already made that ruling.
7          THE COURT: All right.
8          MR. CARNEY: Your Honor, likewise, I'm in the same
9  position as Mr. Carter. I had also raised in one of my
10 pleadings that I believe that these correctional officers
11 testifying without having approval a misdemeanor
12 violation, Superior Court, Title 16. They are using
13 juvenile records from the institution, and I have checked
14 with Rosenthal -- Rosenall, who is the chief over in -- just
15 to make sure I'm not off the wall that these records are
16 supposed to be protected, and he has given me the citation,
17 which is in the pleading, and I have given that to the
18 government.
19         I am asking now for all juvenile records that they
20 have obtained and I would like a proffer as to where they
21 were able to obtain these juvenile records, and I will give
22 Your Honor an ex parte later on something relating to this,
23 but for the present, I need that --
24         THE COURT: Well, insofar as I am aware, they
25 issued a subpoena or something or other, and I have the

---

5 (Pages 14 to 17)

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

5

United States of America v.         CR 00-157               July 10, 2002
Kevin L. Gray, et al            AM Session              Volume 70

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,    :  CR Number 00-157
                          :
        Government,        :
                          :
     v.                :  Washington, D.C.
                          :  Wednesday, July 10, 2002
KEVIN L. GRAY, RODNEY MOORE,  :  9:41 a.m.
JOHN RAYNOR, CALVIN SMITH,   :
TIMOTHY HANDY and LIONEL NUNN, :
                          :
        Defendants.       :
                          :
- - - - - - - - - - - - - - - -x


DAY 70 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      TIMOTHY J. HEAPHY, ESQUIRE
                        MATTHEW G. OLSEN, ESQUIRE
                        AMY JEFFRESS, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEYS
                        U.S. ATTORNEY'S OFFICE
                        555-4th Street, N.W.
                        Washington, D.C.  20001
                        (202)  353-8822

For Defendant Gray:      FRANCIS DARRON CARTER, ESQUIRE
                        1730 Rhode Island Avenue, N.W.
                        Suite 717
                        Washington, D.C.  20036
                        (202)  393-4330

                        DAVID P. BAUGH, ESQUIRE
                        DAVID P. BAUGH, P.C.
                        SARA DAVIS, ESQUIRE
                        223 South Cherry Street
                        P.O. Box 12137
                        Richmond, Virginia  23241
                        (804) 643-8111

Pages 1 through 151

FILED

THERESA M. SORENSEN,

MAY 2 0 2003

OFFICIAL COURT REPORTER

U.S. DISTRICT COURT

Theresa M. Sorensen, CVR-CM
Official Court Reporter

  —  U.S. v. KEVIN L. GRAY  —
Cr.No. 00-157(01); Exhibit-5

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 10, 2002
Volume 70

Page 2

APPEARANCES (Continued):
For Defendant Moore:    BARRY COBURN, ESQUIRE
COBURN & SCHERTLER
1150 18th Street, N.W.
Suite 850
Washington, D.C. 20036
(202) 628-4199

STEVEN J. McCOOL, ESQUIRE
1776 K Street, N.W.
Suite 300
Washington, D.C. 20006
(202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
601 Pennsylvania Avenue, N.W.
9th Floor
Washington, D.C. 20004
(202) 347-7777
THOMAS J. SAUNDERS, ESQUIRE
10 N. Calvert Street
Suite 715
Baltimore, Maryland 21202
(202) 530-4662 & (410) 547-9087

For Defendant Smith:    JOHN J. CARNEY, ESQUIRE
CARNEY AND CARNEY
601 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 434-8234
JONATHAN RUBENS, ESQUIRE
601 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.
(202) 487-3633

For Defendant Handy:    MICHAEL LASLEY, ESQUIRE
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(202) 508-3690
ADGIE O'BRYANT, JR., ESQUIRE
ANDERSON & O'BRYANT, P.C.
1107 Seventh Street, N.W.
Washington, D.C. 20001
(202) 371-0013

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

Page 3

APPEARANCES (Continued):
For Defendant Nunn:     VERONICE A. HOLT, ESQUIRE
3003 Van Ness, N.W.
#W919
Washington, D.C. 20008
(202) 244-2659

Court Reporter:     THERESA M. SORENSEN, CVR-CM
Official Court Reporter
Room 4800-H, U.S. Courthouse
Washington, D.C. 20001
(202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

Page 4

1    P R O C E E D I N G S
2        THE DEPUTY CLERK:  This is the case of The United
3    States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
4    Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
5    2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
8    Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
9        THE COURT:  Mr. Rubens is not present today and
10   Mr. Carney has advised me he will be absent for some time
11   doing investigative work.
12       MR. OLSEN:  Your Honor, I have some
13   representations to make at the bench.
14       THE COURT:  Okay.
15       (Whereupon, a discussion was held at the bench on the
16   record.)
17       MR. OLSEN:  And this is actually in response to
18   Ms. Holt's request regarding the shootings.
19       Your Honor, in response to the request yesterday
20   afternoon about the three shootings to which Mr. Andrews
21   admitted responsibility in his plea agreement, I checked in
22   the 302s, the FBI reports of the interviews, this
23   information was not reflected in any 302.  It was, however,
24   recorded in notes taken by Mr. Heaphy and myself, and what I
25   propose to do is to inform counsel at this point what those

Page 5

1    notes indicate, and that was the basis for what we included
2    in the plea agreement.  I will begin -- I think this is the
3    order in which it goes in the plea agreement -- with the
4    shooting of Tiny, last name unknown.  Mr. Andrews --
5        MS. HOLT:  Is there some possible way that you can
6    redact whichever portion of the notes and copy them so I'm
7    not trying to memorize them at the bench?  This is not a
8    good way to --
9        MR. OLSEN:  I understand it's very difficult for
10   counsel to basically write this down.  What I can do is I
11   can spend a minute and give this information to them in a
12   fashion where they can actually write it down as I am giving
13   it.  I just didn't have a chance to do anything more.
14   Checking on the 302s, I didn't have a chance to write a
15   letter or do anything other than this, so I thought this was
16   the most efficient way to convey this information at this
17   point.
18       MS. HOLT:  If we can copy -- I mean, what is the
19   issue with -- you know, the problem I'm concerned about here
20   -- let me say this -- besides the fact that, you know,
21   trying to get two or three shootings in my head in three
22   minutes and get them correctly, the second problem is, you
23   know, I want to make sure that we have a commitment as to
24   what the government is saying I was told because I don't
25   want to get up and cross-examine the witness and then be

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 10, 2002
Volume 70

**Page 6**

1  told that I got it wrong, okay?
2        So I don't know whether it's copying excerpts from
3  the notes, or if you don't want us to see your original
4  handwriting, is there somebody, a paralegal or somebody who
5  can type your excerpts from your notes, but something that
6  is in some fashion --
7        THE COURT:  You all can address it over the lunch
8  break.
9        MS. HOLT:  Okay.
10       MR. OLSEN:  Okay.
11  (End of discussion at the bench.)
12       THE COURT:  Good morning, ladies and gentlemen.
13  Mr. Andrews has resumed the stand.
14       I remind you you are still under oath.
15       Mr. Olsen, you may proceed.
16       MR. OLSEN:  Thank you, Your Honor.
17  MAURICE W. ANDREWS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
18              DIRECT EXAMINATION
19  BY MR. OLSEN:
20  Q.   Good morning, Mr. Andrews.
21  A.   Good morning.
22  Q.   Mr. Andrews, when we left off yesterday, I had asked
23  you about a murder that occurred on Robinson Place in May of
24  1996 involving a person named Marco Smith.  Do you recall
25  giving that testimony?

**Page 7**

1  A.   Yes, I do.
2  Q.   When I asked you about that particular murder, I
3  asked you about a car, I asked you about what kind of car
4  Kevin Gray was driving on the night that Marco Smith was
5  killed; do you remember that?
6  A.   Yes, I do.
7  Q.   What kind of car was Kevin Gray driving that night?
8  A.   A convertible RX-7 Mazda.
9  Q.   Do you know, Mr. Andrews, where Kevin Gray got that
10  convertible Mazda RX-7?
11  A.   Yes, I do.
12  Q.   Where did he get it?
13  A.   He bought it from a guy on 58th Street.
14  Q.   How do you know that?
15  A.   Because I was with him when he talked to the guy.
16  Q.   And why did Mr. Gray buy that particular car?
17  A.   He bought it for his baby mother, Maggie.
18  Q.   And Maggie, is that the woman that you mentioned
19  before that had the BMW?
20  A.   That's correct.
21  Q.   How did you meet this person that sold Kevin Gray the
22  white Mazda RX-7?
23  A.   He came through there with a guy that used to live
24  around our way by the name of Monterreo.
25  Q.   When you say he came through there, where did he come

**Page 8**

1  -- what do you mean?
2  A.   He came through Robinson Place.
3  Q.   The guy with the car?
4  A.   Correct.
5  Q.   All right.  And the person -- the other person you
6  named, Monterreo?
7  A.   Correct.
8  Q.   Where was he from?
9  A.   He was from around our way, too, from Southeast, 15th
10  Place.
11  Q.   What did Monterreo -- what does Monterreo look like?
12  A.   He's a younger guy, he about three years younger than
13  me, I'd say, about five-five, dark-skin guy.
14  Q.   What about the other guy, the guy that was with
15  Monterreo?
16  A.   Light-skin, short guy, about five-six, something like
17  that, light-skin.
18  Q.   Did you know that person, the person who had the car?
19  A.   No, I didn't.
20  Q.   Do you know his name?
21  A.   No, I didn't.
22  Q.   What kind of car did he drive, the person who sold
23  Kevin Gray the white Mazda RX-7?
24  A.   He drove a Caravan.
25  Q.   Did you later, after Kevin Gray bought that car,

**Page 9**

1  bought that RX-7, did you later talk to Kevin Gray about
2  that car?
3  A.   Yes, I did.
4  Q.   And did he give you some information about it?
5  A.   Well, I had found out that the car was a flip car, it
6  was a stolen car that they had flipped.
7  Q.   What does that mean?
8  A.   That mean the car was stolen, they changed all the
9  serial numbers and made a title to it.
10  Q.   And was it your understanding that that happened
11  before or after Kevin Gray bought the car?
12  A.   Before.
13  Q.   Did Kevin Gray talk to you about this information,
14  that it had been -- the car had been stolen?
15  A.   Yes.
16  Q.   What did he say about it?
17  A.   He had found out that the car was a flip as far as
18  the serial numbers had been changed and they had made a
19  title to it.
20  Q.   How did he confirm that the car was stolen or
21  flipped?
22  A.   He took it to someone.  I think it was a guy Drew
23  down City Sound -- not City Sound.  He had a -- he used to
24  put in record players and stuff like that in your car, CD
25  players.

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 10, 2002
Volume 70

Page 10

1  Q.    How did Kevin Gray react to learning that the car he
2  had bought was a stolen car?
3  A.    He was very mad.  He was very mad.
4  Q.    How do you know that?
5  A.    Because I was with him when he found out, and he told
6  me he was going to find the guy.
7  Q.    Find what guy?
8  A.    The guy who sold him the car.
9  Q.    Now, at that point in time, Mr. Andrews, did you know
10  the guy's name that sold him the car?
11  A.    No, I didn't.
12  Q.    What information did you have about the person?
13  A.    A friend of mine used to live over 58th knew the guy
14  and knew that the guy was selling stolen cars and had told
15  me that the guy was selling stolen cars.
16  Q.    What steps did you take then, Mr. Andrews, to -- or
17  what steps did Kevin Gray take to find this guy?
18  A.    We went over 58th where the guy was hanging out at
19  and where he used to be at, we went through there looking
20  for him.
21  Q.    Who did?
22  A.    Me, Kevin.
23  Q.    And did you have some specific information about
24  where the guy lived, or did you try to get some specific
25  information about where the guy lived?

Page 11

1  A.    Yeah.  We went around there looking for the guy
2  Monterreo that we knew that grew up around our way, we went
3  looking for him because he knew the guy.
4  Q.    Did you and Kevin Gray both go to see Monterreo?
5  A.    Yes, we did.
6  Q.    Did you know where he lived?
7  A.    Yes, we did.
8  Q.    And again, why did you go to see Monterreo?
9  A.    Because Monterreo knew the guy who sold the car.
10  Q.    Tell us about the time that you went to Monterreo's
11  house, then?
12  A.    Me and Kevin rolled over there.  We went looking for
13  the guy who sold the car to him, and we couldn't find him,
14  so Kevin knocked on Monterreo door looking for Monterreo.
15  Q.    When Kevin knocked on that door, did he have a gun?
16  A.    Yes, he did.
17  Q.    Did he say anything, did Kevin Gray say anything to
18  you about what he was going to do if he found the guy?
19  A.    Yes.  He said he was going to shoot him.  As soon as
20  he see him, he was going to shoot him directly in his face.
21  Q.    Who answered the door of Monterreo's house; do you
22  remember?
23  A.    I think it was his sister.
24  Q.    Did you see Monterreo that day?
25  A.    No, we didn't.

Page 12

1  Q.    Did you see the guy who sold Kevin Gray the white
2  Mazda RX-7, the stolen car, that day?
3  A.    No, we didn't.
4  Q.    Did you later, Mr. Andrews, talk to Kevin Gray about
5  whether he found the guy who sold him the stolen car?
6  A.    Yes, he did.
7  Q.    All right.  And was it Kevin Gray that you talked to?
8  A.    Yes.
9  Q.    What did Mr. Gray tell you about that?
10  A.    Him, Frank and Dennis Robinson had rolled back over
11  there looking for the guy or looking for Monterreo, either
12  one of the guys, and so happened to bump into the guy --
13  Q.    Where was that?
14  A.    -- that sold the car.
15  Q.    Where did he go to look for the guy?
16  A.    Over 58th and Division Avenue, on that side of town.
17  Q.    All right.  And where is that.  That's in Washington,
18  D.C.; is that right?
19  A.    Correct.
20  Q.    Do you know what part of town that's in?
21  A.    Northeast.
22  Q.    And what did he say happened when he bumped into the
23  guy?
24  A.    They said they seen the guy on Division Avenue.  The
25  guy pulled over and he got out the car like everything was

Page 13

1  cool, was talking to the guy, then he reached, pulled his
2  gun out, shot the guy, and his gun jammed up once he shot
3  the guy, so he just got back in the car.  He said the guy
4  ran.  He got back in the car with Frank and them.
5  Q.    Who told you all of this?
6  A.    Kevin told me that.
7  Q.    And how long after that happened -- do you have a
8  sense of how long after that shooting actually occurred that
9  he told you about it?
10  A.    Yes.  As soon as they came back, they was talking
11  about, Dennis, Frank and Kevin.
12  Q.    So are you saying the same day essentially?
13  A.    Correct.
14  Q.    Did Kevin Gray tell you whether or not he thought the
15  guy had lived or was killed?
16  A.    They didn't know.  He didn't know.  He didn't say.
17  Q.    Did he see whether the guy was able to drive off or
18  get away?
19  A.    Yes.  He said the guy ran and jumped in the car and
20  pulled off.
21  Q.    Did he say what kind of car the guy he shot was in?
22  A.    The same Caravan that we seen him in.
23  Q.    All right.  Mr. Andrews, I want to move on now to
24  later on in that same -- that same month of May of 1996.
25  A.    Uh-huh.

4 (Pages 10 to 13)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 10, 2002
Volume 70

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :    CR Number 00-157
                                    :
          Government,               :
                                    :
     v.                             :    Washington, D.C.
                                    :    Wednesday, July 10, 2002
KEVIN L. GRAY, RODNEY MOORE,        :    9:41 a.m.
JOHN RAYNOR, CALVIN SMITH,          :
TIMOTHY HANDY and LIONEL NUNN,      :
                                    :
          Defendants.               :
- - - - - - - - - - - - - - - -x


DAY 70 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822

 For Defendant Gray:       FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           SARA DAVIS, ESQUIRE
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804)  643-8111

                    Pages 1 through 151


                                    THERESA M. SORENSEN,

OFFICIAL COURT REPORTER

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 10, 2002
Volume 70

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
                       COBURN & SCHERTLER
                       1150 18th Street, N.W.
                       Suite 850
                       Washington, D.C. 20036
                       (202) 628-4199

                       STEVEN J. McCOOL, ESQUIRE
                       1776 K Street, N.W.
                       Suite 300
                       Washington, D.C. 20006
                       (202) 393-7088

For Defendant Raynor:  G. GODWIN OYEWOLE, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       9th Floor
                       Washington, D.C. 20004
                       (202) 347-7777
                       THOMAS J. SAUNDERS, ESQUIRE
                       10 N. Calvert Street
                       Suite 715
                       Baltimore, Maryland 21202
                       (202) 550-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
                       CARNEY AND CARNEY
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C. 20004
                       (202) 434-8234
                       JONATHAN RUBENS, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C.
                       (202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
                       1730 K Street, N.W.
                       Suite 304
                       Washington, D.C. 20006
                       (202) 508-2690
                       ADGIE O'BRYANT, JR., ESQUIRE
                       ANDERSON & O'BRYANT, P.C.
                       1107 Seventh Street, N.W.
                       Washington, D.C. 20001
                       (202) 371-0013

                       THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
                       3003 Van Ness, N.W.
                       #W919
                       Washington, D.C. 20008
                       (202) 244-2659

Court Reporter:        THERESA M. SORENSEN, CVR-CM
                       Official Court Reporter
                       Room 4800-H, U.S. Courthouse
                       Washington, D.C. 20001
                       (202) 273-0745




                Proceedings reported by stenomask recording,
         transcript produced by transcription.




                       THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

```
 1              P R O C E E D I N G S
 2          THE DEPUTY CLERK:  This is the case of The United
 3   States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
 4   Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5   2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6   United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
 7   McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
 8   Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
 9          THE COURT:  Mr. Rubens is not present today and
10   Mr. Carney has advised me he will be absent for some time
11   doing investigative work.
12          MR. OLSEN:  Your Honor, I have some
13   representations to make at the bench.
14          THE COURT:  Okay.
15          (Whereupon, a discussion was held at the bench on the
16   record.)
17          MR. OLSEN:  And this is actually in response to
18   Ms. Holt's request regarding the shootings.
19          Your Honor, in response to the request yesterday
20   afternoon about the three shootings to which Mr. Andrews
21   admitted responsibility in his plea agreement, I checked in
22   the 302s, the FBI reports of the interviews, this
23   information was not reflected in any 302.  It was, however,
24   recorded in notes taken by Mr. Heaphy and myself, and what I
25   propose to do is to inform counsel at this point what those
```

---

**Page 5**

```
 1   notes indicate, and that was the basis for what we included
 2   in the plea agreement.  I will begin -- I think this is the
 3   order in which it goes in the plea agreement -- with the
 4   shooting of Tiny, last name unknown.  Mr. Andrews --
 5          MS. HOLT:  Is there some possible way that you can
 6   redact whichever portion of the notes and copy them so I'm
 7   not trying to memorize them at the bench?  This is not a
 8   good way to --
 9          MR. OLSEN:  I understand it's very difficult for
10   counsel to basically write this down.  What I can do is I
11   can spend a minute and give this information to them in a
12   fashion where they can actually write it down as I am giving
13   it.  I just didn't have a chance to do anything more.
14   Checking on the 302s, I didn't have a chance to write a
15   letter or do anything other than this, so I thought this was
16   the most efficient way to convey this information at this
17   point.
18          MS. HOLT:  If we can copy -- I mean, what is the
19   issue with -- you know, the problem I'm concerned about here
20   -- let me say this -- besides the fact that, you know,
21   trying to get two or three shootings in my head in three
22   minutes and get them correctly, the second problem is, you
23   know, I want to make sure that we have a commitment as to
24   what the government is saying I was told because I don't
25   want to get up and cross-examine the witness and then be
```

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

**6**

Department

**PART I - CLASSIFICATION OF EVENT**

| 1 TYPE OF REPORT | 2 DATE AND TIME OF EVENT | 3 DATE OF REPORT | 4 TIME OF REPORT | DIST | BEAT | COMPLAINT NUMBER |
|---|---|---|---|---|---|---|

- Offense
- Incident

Start Date: 2/5/96  Start Time: 6/14/16  
Date of Report: 2/5/96  Time of Report: 1:45

DIST: 5  BEAT: 042  COMPLAINT NUMBER: 87791

**FILL IN THE OVALS COMPLETELY**
Right Mark ●
Wrong Marks ⊘ ⊗ ◐

**9 EVENT LOCATION ADDRESS**
5000 Blk NH Burroughs Ave NE

- Rear of
- In front of
- Along side of
- Inside of
- NW Corner
- NE Corner
- SW Corner
- SE Corner

**10 REPORT RECEIVED BY**
- On-scene
- Radio run
- TRU
- Walk-in

**11 IS RADIO RUN LOCATION AND EVENT LOCATION THE SAME?**
- Yes
- No

**12 PROPERTY TYPE**
- Public
- Private

**13 EVENT NO. 1**
AWIK while armed

**14** 1401

**15 EVENT NO. 2 / EVENT NO. 3**

**16 FORCED ENTRY**
- Yes
- No

**17 POINT OF ENTRY**

**18 a. Method Used** SHOOT  **b. Tools Used** GUN

**19 WEATHER CONDITIONS**
- Clear
- Cloudy
- Rain
- Snow
- Other
- Not applicable
- Unknown

**20 SUSPECTED HATE CRIME?**
- None
- Ethnic
- Racial
- Religious
- Sexual Orientation
- Other

**21 SECURITY SYSTEM (Mark all that apply)**
- Alarm/Audio
- Alarm/Silent
- Camera
- Doc
- Dead bolt
- Unlocked
- Exterior lights
- Interior lights
- Fence
- Guard
- Neighborhood watch
- Other
- Not applicable
- Unknown

**22 LOCATION TYPE (Mark only one)**
- Air/Bus/Train terminal
- Alley
- Bank/Savings & loan
- Bus stop
- Church/Synagogue/Temple
- College/University
- Commercial office building
- Construction site
- Convenience store
- Department/Discount store
- D.C. government building
- Doctor's office/Hospital
- Drug store
- Federal/Government bldg.
- Field/Woods
- Grocery/Supermarket
- Hotel/Motel/Etc.
- Jail/Prison
- Lake/Waterway
- Liquor store
- Park area
- Parking lot/Parking garage
- Public housing project
- Public/Private school
- Rental storage facility
- Residence/Home
- Restaurant
- Service station
- Sidewalk
- Specialty store
- Street/Highway/Road
- Tavern/Night club
- Other
- Not applicable
- Unknown

**23 DESIGNATED AREAS (Mark all that apply)**
- Victim's vehicle
- Suspect's vehicle
- Taxi-cab
- Bus
- Train/Metro/Amtrak/Etc.
- Hallway
- Elevator
- Stairwell
- Customer area
- Basement/Laundry room
- Apartment/Condo unit
- Single family dwelling
- Hotel/Motel room
- College/University dorm
- Classroom
- Office room
- Vacant building/room
- Storage area
- In public housing
- W/in1 block of public housing
- W/in 1,000 ft. of school
- Other
- Not applicable
- Unknown

**PART II - VICTIM INFORMATION**

**24 NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1**  W-7

**25 RELATED TO EVENT NO(S).**
- 1 - 2 - 3 - 4 - 5
- 6 - 7 - 8 - 9 - 10

**38 NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 2**

**39 RELATED TO EVENT NO(S).**
- 1 - 2 - 3 - 4 - 5
- 6 - 7 - 8 - 9 - 10

**26 VICTIM TYPE**
- Individual
- Business
- Financial inst.
- Government
- Religious org.
- Society/Public
- Police officer
- Other

**40 VICTIM TYPE**
- Individual
- Business
- Financial inst.
- Government
- Religious org.
- Society/Public
- Police officer
- Other

**28 DATE OF BIRTH** Unknown  NA

**29 AGE RANGE**
- 0-1 yr.
- 2-12 yrs.
- 13-17 yrs.
- 18-65 yrs.
- Over 65

**30 SEX**
- Male
- Female
- Unknown

**31 HOME PHONE / BUSINESS PHONE**

**32 RACE/ETHNICITY (Mark all that apply)**
- American Indian/Alaskan Native
- Asian/Pacific Islander
- Black
- Chinese
- Latino/Hispanic
- Jamaican
- Japanese
- Korean
- Vietnamese
- White
- Other
- Unknown/Refused

**41 DATE OF BIRTH** Unknown  NA

**42 AGE RANGE**
- 0-1 yr.
- 2-12 yrs.
- 13-17 yrs.
- 18-65 yrs.
- Over 65

**43 SEX**
- Male
- Female
- Unknown

**44 HOME PHONE / 45 BUSINESS PHONE**

**46 RACE/ETHNICITY (Mark all that apply)**
- American Indian/Alaskan Native
- Asian/Pacific Islander
- Black
- Chinese
- Latino/Hispanic
- Jamaican
- Japanese
- Korean
- Vietnamese
- White
- Other
- Unknown/Refused

**33 HOME ADDRESS**
- DC Resident
- Non-DC Resident
- Unknown

**47 HOME ADDRESS**
- DC Resident
- Non-DC Resident
- Unknown

**34 BUSINESS ADDRESS/SCHOOL**

**48 BUSINESS ADDRESS/SCHOOL**

FILED

**35 OCCUPATION**

**36 IS EVENT RELATED TO OCCUPATION?**
- Yes
- No
- Unknown

**49 OCCUPATION**

**50 IS EVENT RELATED TO OCCUPATION?**
- Yes
- No
- Unknown

MAY 2 0 2003

**37 ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1**

**51 ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 2**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**52 STATUS (Mark one)**
- Open
- Unfounded
- Closed
- Suspended
- Closed by arrest, attach PD-252

**53 REVIEWER**

**54 DISTRIBUTION**

PD-251 2/5.

| 55 | IS VICTIM #1 THE REPORTING PERSON. ENTER THE NAME, ADDRESS, AND PHONE NUMBER OF THE REPORTING PERSON. ○ Yes ○ No | Name: _____ Address: _____ | | Phone-Area Code: _____ |

| 56 | DID THE REPORTED EVENT OCCUR AS A RESULT OF AN INTRA-FAMILY MATTER? ○ Yes ● No | 56A WAS PD FORM 378A ISSUED? ○ Yes ○ No | 57 IS CPO/TPO OUTSTANDING? ○ Yes ○ No ○ Unknown | IF YES, ENTER CPO/TPO #: |

**58 INJURIES** Use the following codes to describe injuries. (Mark all that apply)
N = None Visible  M = Apparent Minor Injury  B = Apparent Broken Bones
O = Other Major Injury  I = Possible Internal Injury  G = Gunshot
L = Severe Laceration  T = Loss of Teeth  U = Unconscious

| INJURED | NUMBER | INJURY CODE | DESCRIBE INJURY | WHERE TAKEN | BY WHOM | DCFD AMB. | DCFD AMB. # | STATUS |
|---|---|---|---|---|---|---|---|---|
| ● Victim | ① ②③④⑤ | ⑥ N M B O I | wound to the nose | DC General | medic 7 | ● Yes ○ No | 7 | ○ Admitted ○ Released |
| Suspect | ⑥ ⑦⑧⑨ | ⑥ L T U | | | | | | |
| Victim | ①②③④⑤ | N M B O I | | | | ○ Yes ○ No | | ○ Admitted ○ Released |
| Suspect | ⑥⑦⑧⑨ | G L T U | | | | | | |
| Victim | ①②③④⑤ | N M B O I | | | | ○ Yes ○ No | | ○ Admitted ○ Released |
| Suspect | ⑥⑦⑧⑨ | G L T U | | | | | | |
| Victim | ①②③④⑤ | N M B O I | | | | ○ Yes ○ No | | ○ Admitted ○ Released |
| Suspect | ⑥⑦⑧⑨ | G L T U | | | | | | |

**59 PART III - PROPERTY**

Codes: S = Stolen  E = Evidence  R = Recovered  F = Found  I = Impounded  V = Vehicle from which theft occurred  D = Alleged drug type  L = Lost  P = Suspected proceeds of crime  O = Other

a. Property Book & Page No. | b. Location of Property Book

| Code | Description of Item(s) | Serial Number/ Operation ID No. | Model No. | Color | Size | Quantity | Comp. Value | Age | MPDC Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

TOTAL VALUE ▷

**60 VEHICLE INFORMATION** Vehicle operated/used by: ○ Victim ● Suspect ○ Victim's vehicle taken by suspect

| Code | Year | Make | Model | Color | Body | Tag No./State/Year | VIN |
|---|---|---|---|---|---|---|---|
| O | older | Merc | Linc | Grey | 4Dr | UNK | |

**61 PART IV - SUSPECT/MISSING PERSON INFORMATION** (Use narrative if additional space is needed.)

| #1 ● Suspect ○ Missing | a. Race ○ Asian ● Black ○ White ○ Latino/Hispanic ○ Unknown ○ Other | b. Sex ● Male ○ Female ○ Unknown | c. Exact Age or Range 27 | d. Height | e. Weight | f. Eyes | g. Hair |

| h. Complexion light | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using ○ Alcohol ○ Drugs ○ Computer ○ N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm ● Handgun ○ Revolver ○ Rifle ○ Shotgun ○ Semi-automatic ○ Automatic ○ Other firearm | ○ Cutting instrument ○ Blunt object ○ Motor vehicle | ○ Hands/Feet/Teeth ○ None ○ Unknown | Other (specify) | Color Blk | Make | Model | Caliber |

| #2 ○ Suspect ○ Missing | a. Race ○ Asian ○ Black ○ White ○ Latino/Hispanic ○ Unknown ○ Other | b. Sex ○ Male ○ Female ○ Unknown | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using ○ Alcohol ○ Drugs ○ Computer ○ N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm Handgun Revolver Rifle Shotgun Semi-automatic Automatic Other firearm | ○ Cutting instrument ○ Blunt object ○ Motor vehicle | ○ Hands/Feet/Teeth ○ None ○ Unknown | Other (specify) | Color | Make | Model | Caliber |

**63**

| #3 Suspect Missing | a. Race Asian Black White Latino/Hispanic Unknown Other | b. Sex Male Female Unknown | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using Alcohol Drugs Computer N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm Handgun Revolver Rifle Shotgun Semi-automatic Automatic Other firearm | Cutting instrument Blunt object Motor vehicle | Hands/Feet/Teeth None Unknown | Other (specify) | Color | | | 0016330 |

*Value of vehicles to be entered by Information Processing section

CCN 257-791

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 69 2 of 2 49-2-2 PAGE 2

| 66 IF MISSING PERSON HAS RUN AWAY BEFORE, GIVE DATE AND WHERE LOCATED: | 67 CLASSIFICATION | 68 CLASSIFIED BY: |
|---|---|---|
| | Critical<br>Non-critical | |

| 69 PHYSICAL/MENTAL CONDITION (i.e., diabetic) | 70 DESCRIBE ARTICLES OF JEWELRY WORN AND IDENTIFICATION CARRIED | 71 NAME OF PARENT/GUARDIAN |
|---|---|---|

| 72 ADDRESS OF PARENT/GUARDIAN | 73 IF JUVENILE, ENTER MOTHER'S MAIDEN NAME | 74 MISSING PERSON SECTION NOTIFIED (Name) |
|---|---|---|

**75 NARRATIVE   Describe event and action taken. If additional narrative space is needed, use PD Form 251-A.**

| Item Number Continued | |
|---|---|
| 75 | O- 91 Dodge Caravan DC ▓▓▓ VIN # ▓▓▓
C-1 STATES THAT HE WAS DRIVING THE ABOVE LISTED VEHICLE WHEN HE PULLED OVER TO TALK TO (S-1), A FRIEND. S-1 APPROACHED C-1 AND THEY WERE ENGAGED IN A CONVERSATION. S-1 THEN PRODUCED A HANDGUN FIRING ONE SHOT CAUSING THE LISTED INJURY.

THE SUSPECT WAS OPERATING THE VEHICLE LISTED IN ITEM #60 |

| 76 EVIDENCE TECHNICIAN/CSES # | 77 NAME OF INVESTIGATOR NOTIFIED | TELETYPE NOTIFIED (Name) | NOTIFICATION ALSO REQUIRED WHENEVER MISSING PERSON LOCATED | 79 TELETYPE # |
|---|---|---|---|---|
| 965/ Griffith | 762/ Brantly | | | |

| 80 REPORTING OFFICER'S SIGNATURE | ELEMENT | 81 OTHER POLICE AGENCY | 82 SECOND OFFICER'S NAME | ELEMENT | 83 SIGNATURE OF SUPERVISOR | ELEMENT |
|---|---|---|---|---|---|---|
| MPO L Johnson | | (Indicate if report prepared by officer other than MPD) | | | Robert McGee | 6D |

BADGE NUMBER / OTHER POLICE AGENCY (USCP, USSS, METRO TRANSIT, OTHER) / BADGE NUMBER

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
69
20/35:49-2-2

PAGE 3

0016331

P.D. 252 Rev. 7/86     Metropolitan Police    SUPPLEMENT REPORT

| | | DIST. | BEAT | RA | ORIGINAL CLASSIFIC | COMPLAINT NUMBER |
|---|---|---|---|---|---|---|
| ☐ Classification Change | ☒ Additional Information | 6C | 42 | | AWOL / ARMED | 287-79 |

6. DATE OF THIS REPORT: 5/25/96   7. REPORTING ELEM.: 6C   8. CLASSIFICATION OF REPORT CHANGED TO:

9. DATE AND TIME OF EVENT: 5/25/96 1416  10. DATE AND TIME OF ORIG. RPT: 5/25/96 1645  11. EVENT LOCATION: 5000 blk of N.H. Ave AE Burroughs  12. PROPERTY TYPE: ☒ PUBLIC ☐ PRIVATE

13. RADIO RUN RECEIVED ☐ YES ☒ NO  14. DESCRIBE LOCATION: Side walk W-2  15. WHERE ENTERED  16. TOOLS/WEAPONS: handgun  17. METHODS: SHOT

19. SUSPECT: ☒ SUSPECT  RACE B  SEX M  AGE 20s  COMPLEXION: dark  HAIR: bright

20. SOLVABILITY FACTORS

A. IS THERE A WITNESS ☒ YES ☐ NO

B. IS A SUSPECT NAMED? ☒ YES ☐ NO — Kevin

C. IS THE STOLEN PROPERTY TRACEABLE? ☐ YES ☐ NO — N/A

D. IS PHYSICAL EVIDENCE PRESENT? ☒ YES ☐ NO — GUN SHOT WOUND

E. IS THE PERPETRATOR KNOWN TO THE VICTIM? ☒ YES ☐ NO — ASSOCIATES

F. WAS A REFERRAL FORM GIVEN TO COMPLAINANT? ☐ YES ☐ NO

G. Robinson Pl SE

NARRATIVE: C-1 states that S-1 goes by the name "Kevin" and that he drives a white Lexus with gold BBS rims, normally. W-2 states that S-1 fled scene in a grey 5th Ave or LeBaron. The immediate areas were canvassed with neg. results. Three different lookouts were given for S-1's vehicle (all grey) Caa - Lincoln or 5th Ave (Chrysler). ☒ Check here if continuation report is made.

REPORTING MEMBER'S SIGNATURE: MPO J. Johnson 427/6D  SUPERVISOR'S SIGNATURE: Kevin McKee 5610 6D

| CONTINUATION REPORT | 1. COMPLAINT NUMBER |
|---|---|
| | 287-791 |

2. NARRATIVE CONTINUED

C-1 GAVE THE KEYS TO HIS MOTHER ON THE
SCENE AND SHE HAS POSSESSION OF HIS VEHICLE.

0016333

| 3. REPORTING OFFICER | BADGE/ORG ELM | 4. INVESTIGATOR | BADGE/ORG ELM | 5. SUPERVISOR | BADGE/ORG ELM |
|---|---|---|---|---|---|
| | 927/6D | | | | |

J-61918

Page ___ of ___ Pages

P.D. 252 Rev. 10/86    Metropolitan Police     tr        SUPPLEMENT REPORT        Wash        D

| ☐ Classification Change | ☒ XX Additional Information | 6d |
|---|---|---|

| 1. DIST. | 2. BEAT | 3. RA | 4. ORIGINAL CLASSIFI | | 5. COMPLAINT NUMBER |
|---|---|---|---|---|---|
| | | | A.W.I.K. | | 287-791 |

| 6. DATE OF THIS REPORT | 7. REPORTNG ELEM | 8. CLASSIFICATION OF REPORT CHANGED TO: |
|---|---|---|
| 12/4/96 | 6d | |

| 9. DATE AND TIME OF EVENT | 10. DATE AND TIME OF ORIG. RPT. | 11. EVENT LOCATION | 12. PROPERTY TYPE |
|---|---|---|---|
| 5/25/96  1416 | 5/25/96 | 5000 N.H.B. Ave N.E. | ☒ PUBLIC   ☐ PRIVATE |

| 13. RADIO RUN RECEIVED | 14. DESCRIBE LOCATION | 15. WHERE ENTERED | 16. TOOLS/WEAPONS | 17. METHODS |
|---|---|---|---|---|
| ☐ YES  ☐ NO | street | na | gun | assault |
| TIME RECEIVED | | | | |

| 18. COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH | COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH |
|---|---|---|---|---|---|---|---|
| A | W-7 | | | B | | | |

| 19. | | RACE | SEX | AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPLEXION | SCARS | HAT | COAT | JACKET | PANTS | SHIRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Suspect/Missing Person | ☐ SUSPECT ☐ MISSING PERSON | | | | | | | | | | | | | | |
| | ☐ SUSPECT ☐ MISSING PERSON | | | | | | | | | | | | | | |

20. **SOLVABILITY FACTORS** → Complete each item below. If additional space is needed, use the narrative section. If necessary, use PD Form 251-A. Refer to the specific item numbers when continuing information in the narrative section or on PD Form 251-A.

| | | | |
|---|---|---|---|
| A | IS THERE A WITNESS? | ☐ YES  ☐ NO | If yes, enter name(s), address(es), phone number(s), hours of availability and brief account. |
| B | IS A SUSPECT NAMED? | ☐ YES  ☐ NO | Enter the name and include any nickname used. |
| C | IS THE STOLEN PROPERTY TRACEABLE? | ☐ YES  ☐ NO | Include reason why or why not. |
| D | IS PHYSICAL EVIDENCE PRESENT? | ☐ YES  ☐ NO | Describe it. |
| E | IS THE PERPETRATOR KNOWN TO THE VICTIM? | ☐ YES  ☐ NO | If yes, describe the relationship. |
| F | WAS A REFERRAL FORM GIVEN TO COMPLAINANT? | ☐ YES  ☐ NO | Give any address, place of employment, or hangout known for the perpetrator(s). |
| H | DURING WHAT HOURS IS COMPLAINANT AVAILABLE FOR INTERVIEW | | List the name, address, phone number and any information provided when the area was canvassed. canvassed. |
| I | To be completed by crime analysis → IS AN MO OR PATTERN INDICATED? | ☐ YES  ☐ NO | DESCRIBE MO OR PATTERN |

| 21. ADDITIONAL STOLEN PROPERTY | | | | | | Property Book |
|---|---|---|---|---|---|---|
| CODE | ITEM | SERIAL NO./OPERATION ID NO. | MODEL NO. | COMP. VALUE | AGE | MPDC VALUE |
| | | | | | | BOOK/PAGE NO. |
| | | | | | | ADDITIONAL VALUE |
| | | | | | | ORIGINAL VALUE |
| YEAR | MAKE | MODEL | COLOR | BODY | TAG/STATE/YEAR | VEHICLE IDENTIFICATION NO.   * * *   TOTAL PROP. VALUE |

22. NARRATIVE: Record your activity and all developments in the case subsequent to your last report. List the names, addresses, sex,race, age, and arrest numbers of all arrested persons. Explain any change in classification. List the names, addresses, and telephone numbers of all witnesses and suspects

MCI# 96-3630

The cw was shot one time in the face during a street robbery he was transported to the hospital in serious condition. The cw was treated and admitted. The undersign interviewed the cw's mother a few weeks later and she stated that he has not been seen since being released from the hospital. She further stated that she would tell him to contact me, it's been sometime now and still no contact. Suspend case

| 23. STATUS | 24. TELETYPE NO. | 25. SOLVABILITY RAT | 0016334 |
|---|---|---|---|
| ☐ OFF.  ☐ PRIOR CLOSED  ☐ CLOSED  ☐ UNFOUNDED (EXPLAIN IN NO.22)  ☒ SUSPENDED (EXPLAIN IN NO. 22) | | | |

| 27. INVESTIGATIVE OFFICER'S RECOMMENDATION | 28. SUPERVISOR'S RECOMMENDATION |
|---|---|
| ☒ SUSPEND   ☐ INVESTIGATE FURTHER | ☒ SUSPEND   ☐ INVESTIGATE FURTHER |

| 29. REPORTING MEMBER'S SIGNATURE | BADGE/ELEM. | 30. INVESTIGATOR'S SIGNATURE | BADGE/ELEM | 31. SUPERVISOR'S SIGNATURE | BADGE/ELEM. |
|---|---|---|---|---|---|
| | | D2 332 U3 | | | 5264/67 |

| 32. INVESTIGATIVE REVIEW OFFICER | 33. SUPERVISOR | BADGE/ELEM | 34. REVIEWER | 35. DISTRIBUTION |
|---|---|---|---|---|

* * *  Value of vehicles will be entered
Data Processing Division

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-6c

PAGE __1__ OF __1__ PAGES

7

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     :   CR Number 00-157
                              :
        Government,           :
                              :
    v.                        :   Washington, D.C.
                              :   Wednesday, July 17, 2002
KEVIN L. GRAY, RODNEY MOORE,  :   9:33 a.m.
JOHN RAYNOR, CALVIN SMITH,    :
TIMOTHY HANDY and LIONEL NUNN, :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - -x


DAY 74 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822

For Defendant Gray:        FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           SARA DAVIS, ESQUIRE
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804)  643-8111

Pages 1 through 146

FILED

THERESA M. SORENSEN,

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

— U.S. v. KEVIN L. GRAY —
— Cr.No. 00-157(01); Exhibit-7 —

United States of America v.                CR 00-157                              July 17, 2002
Kevin L. Gray, et al                        AM Session                             Volume 74

---

Page 2

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
        COBURN & SCHERTLER
        1150 18th Street, N.W.
        Suite 850
        Washington, D.C. 20036
        (202) 628-4199

        STEVEN J. McCOOL, ESQUIRE
        1776 K Street, N.W.
        Suite 300
        Washington, D.C. 20006
        (202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
        601 Pennsylvania Avenue, N.W.
        9th Floor
        Washington, D.C. 20004
        (202) 347-7777
        THOMAS J. SAUNDERS, ESQUIRE
        10 N. Calvert Street
        Suite 715
        Baltimore, Maryland 21202
        (202) 350-4662 & (410) 347-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
        CARNEY AND CARNEY
        601 Pennsylvania Avenue, N.W.
        Suite 900
        Washington, D.C. 20004
        (202) 434-8234
        JONATHAN RUBENS, ESQUIRE
        601 Pennsylvania Avenue, N.W.
        Suite 900
        Washington, D.C.
        (202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
        1730 K Street, N.W.
        Suite 304
        Washington, D.C. 20006
        (202) 508-3690
        ADDIE O'BRYANT, JR., ESQUIRE
        ANDERSON & O'BRYANT, P.C.
        1107 Seventh Street, N.W.
        Washington, D.C. 20001
        (202) 371-0013

        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 3

APPEARANCES (Continued):
For Defendant Nunn:   VERONICE A. HOLT, ESQUIRE
        3003 Van Ness, N.W.
        #W919
        Washington, D.C. 20008
        (202) 244-2659

Court Reporter:   THERESA M. SORENSEN, CVR-CM
        Official Court Reporter
        Room 4800-H, U.S. Courthouse
        Washington, D.C. 20001
        (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 4

P R O C E E D I N G S

1
2        THE COURT:  This is the case of The United States
3   v. Kevin Gray, Rodney Moore, John Raynor, Calvin Smith,
4   Timothy Handy and Lionel Nunn, Criminal Case Number
5   2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6   United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7   McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
8   Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
9        Ms. Jeffress.
10        MS. JEFFRESS:  Your Honor, before the jury comes
11   in, we have told Dr. Arden -- counsel informed us last night
12   that there were no further questions and we've told him not
13   to come in and not to --
14        THE COURT:  All right.
15        MS. JEFFRESS:  -- do any redirect.  However, I
16   would like to raise one issue.  During our presentation of
17   Emanuel Brown's testimony on the Ronald Powell murder, most
18   of the photographs from that scene were excluded because of
19   the large amounts of blood.  There's one photograph in
20   particular that shows very clearly the location of both of
21   Mr. Powell's arms, and perhaps Mr. Heaphy can bring that up.
22        Mr. Coburn on cross-examination of Dr. Arden asked
23   questions about whether the victim could have been alive for
24   some time, implying that perhaps there was a chase.  He also
25   asked about whether certain things were consistent with Mr.

---

Page 5

1   Powell reaching towards his waistband.  We believe that this
2   photograph clearly shows that his arms were in a defensive
3   position, nowhere near his waistband, and that the amount of
4   blood here shows that he certainly was not being chased and
5   leaving a blood trail, but rather that he fell and lost all
6   of that blood right there on the scene.  So we believe that
7   the door has been opened to admitting this photograph, which
8   Emanuel Brown has already identified for precisely this
9   reason.
10        THE COURT:  What is the exhibit number?
11        MS. JEFFRESS:  It's RP-104, Your Honor.
12        MR. McCOOL:  Your Honor, if I may?  Thank you.  I
13   tried to stay away from opening the door to anything like
14   this.  In questioning Dr. Arden, I was only talking about a
15   step or two; I wasn't suggesting nor will I suggest to this
16   jury that Mr. Powell was chased.  What I was simply trying
17   to address was the government's suggestion that his arm
18   placement as it appears not on this photo, but on other
19   photos somehow indicated how he appeared at the time he was
20   shot to sort of address their argument, if you will, that
21   his hands were up in a defensive position, as I think that
22   they will argue to the jury.  I don't think it opens the
23   door to this very, very graphic photograph of the decedent
24   as he is laying on the ground.
25        MR. COBURN:  Your Honor, may I add a brief thought

---

2 (Pages 2 to 5)

United States District Court                            Theresa M. Sorensen, CVR-CM
For The District of Columbia                                  Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

Page 54

1   Q.  Let me show you a photograph that has already been
2 admitted, WO-1. Is that the person you know as Woofus?
3   A.  Yes.
4   Q.  And what exactly did Kevin Gray tell you about that
5 stabbing?
6   A.  He told me that after Marco had stabbed Woofus, he
7 told Woofus that he can go get his two punk-ass nephews.
8   Q.  Mr. Gray told you that Marco said this?
9   A.  Yeah.
10       MR. McCOOL: Your Honor, could we have a
11 continuing objection on this line?
12       THE COURT: Yes.
13 BY MS. JEFFRESS:
14   Q.  What exactly did he say Marco had said?
15   A.  That Woofus can go get his two punk-ass nephews.
16   Q.  Who did he mean by that? Did Mr. Gray say?
17   A.  He was referring to Derrick and Rodney.
18   Q.  Okay. And did you understand why he had stabbed
19 Woofus, why this had happened?
20   A.  No.
21   Q.  All right. Now -- and you knew about this before
22 Marco was killed; is that right?
23   A.  Yes.
24       MS. HOLT: Objection. That's leading.
25       THE COURT: Overruled.

---

Page 55

1 BY MS. JEFFRESS:
2   Q.  When in relation to when Marco was killed had you had
3 this conversation with Mr. Gray?
4   A.  This was -- I don't know how long before, but it was
5 before, way before Marco got killed.
6   Q.  Okay. Now, you had been there talking to Marco
7 Smith. While you were there talking to him, were Kevin Gray
8 and Rodney Moore right across the street?
9   A.  Yes.
10   Q.  Now, if you knew about this, were you concerned that
11 they would do something?
12       MR. McCOOL: Objection, Your Honor. Leading.
13       THE COURT: Overruled.
14       THE WITNESS: I ain't think nothing was going to
15 happen that night because it was a whole lot of people out
16 there, so I ain't really think nothing was going to go down.
17 BY MS. JEFFRESS:
18   Q.  Okay. You said earlier that you left right after the
19 shooting; is that right?
20   A.  Yes.
21   Q.  Where did you go?
22   A.  I think I went home. I ain't sure.
23   Q.  Do you remember where you were living at this time?
24   A.  Stanton Road.
25   Q.  Okay. Do you remember having a conversation about

---

Page 56

1 this at the house that you shared with Mr. Gray out in
2 Clinton that you testified earlier about?
3   A.  Nah.
4   Q.  Do you remember talking to Dennis Robinson about this
5 at any time after the shooting?
6   A.  Yes.
7   Q.  And what did Mr. Robinson tell you?
8   A.  He --
9       MR. McCOOL: Objection. Hearsay.
10       THE COURT: Overruled.
11       THE WITNESS: He told me that Rodney had owed him
12 some money for him killing Marco.
13 BY MS. JEFFRESS:
14   Q.  Okay. Did he ever tell you whether he got paid that
15 money?
16   A.  No.
17   Q.  Did you know about him getting anything in --
18   A.  I ain't never -- no.
19   Q.  Okay. Do you remember where you had this
20 conversation with Mr. Robinson?
21   A.  We was in my car.
22   Q.  And how long after the killing of Marco Smith was
23 that conversation?
24   A.  About a week later.
25   Q.  Okay. After Marco Smith was killed, after Dennis

---

Page 57

1 Robinson shot Marco Smith, do you remember talking to Kevin
2 Gray about that?
3   A.  No, I don't remember.
4   Q.  Okay. Now, Mr. Howard, let me ask you about
5 something else that happened just about a week after Marco
6 was killed. Do you recall what kind of car Mr. Gray was
7 driving around that time?
8   A.  A Lexus.
9   Q.  Okay. Do you recall Mr. Gray having a white Mazda
10 convertible?
11   A.  A white Mazda?
12   Q.  A white Mazda?
13   A.  Yes.
14   Q.  And do you know where he got that car, that white
15 Mazda?
16   A.  He had bought it from a friend of ours that we knew
17 friend of his, but we ain't know him, but it was somebody
18 that we knew, it was one of they friends that sold him the
19 car.
20   Q.  Okay. So he bought that car from the friend of a
21 friend?
22   A.  Yeah.
23   Q.  And --
24       MR. CARTER: May we approach, please, Your Honor?
25       THE COURT: Yes.

---

15 (Pages 54 to 57)

United States of America v.                CR 00-157                     July 17, 2002
Kevin L. Gray, et al                    AM Session                    Volume 74

Page 58

1    (Whereupon, a discussion was held at the bench on the
2    record.)
3        MR. CARTER: Your Honor, we would object to the
4    introduction of this evidence. It's not in the indictment,
5    and if it's other crimes, then I would like to know what
6    does it prove.
7        MS. JEFFRESS: Actually, Mr. Andrews has already
8    testified about this incident, Your Honor. This is the
9    shooting of Damien Evans, and Mr. Gray shot him because of
10   the -- because he sold him a stolen car. In short, Mr.
11   Andrews has already testified about it and there was no
12   objection.
13       The relevance is that this goes to show further --
14   it further demonstrates the conspiracy. Mr. Gray was with
15   Mr. Howard and Mr. Andrews and Mr. Gray had gone to look for
16   the person who sold him the stolen car. It shows --
17   generally it goes to prove how Mr. Gray responded to people
18   who tried to take advantage or cheat him. It's an act that
19   is evidence of the conspiracy and comes in for those
20   purposes.
21       MR. CARTER: Number one, it doesn't further the
22   conspiracy at all. It has nothing to do with the goals or
23   the objectives of the conspiracy. At the best, it is a
24   tangent that is on the side.
25       Secondly, because they know about it doesn't mean

Page 59

1    that they were involved, either Fat Frank or Maurice
2    Andrews.
3        Thirdly, nobody has identified this person by
4    name. The only time we know a name was when Ms. Jeffress
5    just got it. He just talked about some unknown person,
6    Maurice Andrews talked about some unknown person in
7    Northeast, we don't have a time, we don't have a name, and
8    we don't have a place of the shooting. So therefore, none
9    of this is really relevant to any of the goals or the
10   furtherance of the conspiracy.
11       Every criminal act cannot be dumped into this to
12   say that it is a part of the conspiracy without some
13   connection or nexus, and other than some of the parties who
14   they alleged to be a part of the conspiracy being involved
15   at some point, at some level, it doesn't make it a part of
16   the conspiracy in this case.
17       In addition, it doesn't -- if it is other crimes
18   because it is not indicted, again, the government has not
19   indicated what exactly does this prove. Other crimes must
20   go towards some objective.
21       MS. HOLT: Can I be heard?
22       THE COURT: Yes.
23       MS. HOLT: There are a number of things here, and
24   first of all, I think that when Maurice Andrews testified,
25   he didn't testify about a guy named Damien Evans. He talked

Page 60

1    about a Monterreo or a Moore and he talked about the
2    purchase of the car, and when he talked about the purchase
3    of the car, he clearly talked about a personal motivation on
4    behalf of Kevin Gray, not an act that was in furtherance of
5    the conspiracy. He said that Kevin Gray was angry because
6    the car that was bought turned out to be stolen and he gave
7    it to his girlfriend. It had nothing to do with the
8    conspiracy.
9        But secondly, you know, and I think that I put
10   those cases when I gave you that motion, if the government
11   wanted to introduce this evidence -- and our Court of
12   Appeals has made it very clear that this notice option in
13   the rules is not something that is to be casually discarded,
14   and the government did not give any notice of its intent,
15   and therefore the Court has not had before a proper
16   opportunity to have briefed and litigated the burden of
17   proof. The government must first show the relevance that it
18   comes in, and then the Court has to make a probative versus
19   prejudicial analysis, and the Court of -- I'm trying to
20   think of the case, but the Court of Appeals has recently
21   said that that analysis must be made, and we --
22       THE COURT: They are not offering it as other
23   crimes, so that doesn't matter.
24       MS. HOLT: What are they offering --
25       THE COURT: She's offering it as evidence of the

Page 61

1    conspiracy. She hasn't offered it as other crimes, so I'm
2    not balancing anything.
3        MS. HOLT: Okay.
4        THE COURT: It's either evidence of the conspiracy
5    or it doesn't come in.
6        MS. HOLT: Well, okay, I guess so I'm clear, this
7    is not a charged act in the indictment, okay? And so
8    therefore that would be my argument: A) It is not evidence
9    of the conspiracy; --
10       THE COURT: It doesn't have to be charged for them
11   to have evidence about the conspiracy.
12       MS. HOLT: -- and B) based upon the testimony that
13   they elicited from Maurice Andrews, that this was something
14   that was motivated by personal concern and not by the
15   conspiracy. She hasn't linked it up in any way possible to
16   the conspiracy. It's what -- at least that's what they're
17   saying. I'm going now on their own evidence. So it just
18   basically is evidence that is intended to sully the
19   character of individuals. That's why I used the
20   other-crimes analysis here, because it's not evidence of a
21   conspiracy.
22       MS. JEFFRESS: I could just add a couple things to
23   our proffer. One is that we did provide a police report
24   which lists the date and the place and the victim's name to
25   counsel. In terms of the proffer of the facts, Mr. Howard,

16 (Pages 58 to 61)

United States District Court                          Theresa M. Sorensen, CVR-CM
For The District of Columbia                         Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

Page 62

1   Mr. Robinson and Mr. Vick were all present for the shooting,
2   they all assisted Mr. Gray in locating this person. It
3   shows their willingness to listen to him, to follow
4   directions, his role as a leader. It shows the discipline
5   that he had in the organization and it's very strong proof
6   of the conspiracy itself and we believe it's relevant for
7   that reason.
8          THE COURT: The objections are overruled.
9          MR. CARTER: Instead of continuing to object, may
10  I have a continuing objection?
11         THE COURT: Yes.
12         MR. CARTER: Thank you, Your Honor.
13     (End of discussion at the bench.)
14  BY MS. JEFFRESS:
15  Q.   Now, Mr. Howard, you were talking about the white
16  Mazda that Mr. Gray had around this time, and you said he
17  had bought that from a friend of a friend of yours?
18  A.   Yes.
19  Q.   And the person he bought it from, do you know that
20  man's name?
21  A.   Yes. No, I don't know the man name who he bought it
22  from, but the dude that he was friends with, was one of our
23  friends, his name Monterreo.
24  Q.   Okay. So it was Monterreo's friend who sold Mr. Gray
25  the car; is that right?

Page 63

1   A.   Yes.
2          THE COURT: Monterreo was your friend?
3          THE WITNESS: Yes.
4          THE COURT: That's the way it went. All right.
5   BY MS. JEFFRESS:
6   Q.   And how did you know Monterreo?
7   A.   He grew up with us around 15th Place.
8   Q.   Okay. And what age was he? Was he around your age?
9   A.   Yes.
10  Q.   Was he still living around 15th Place at this time?
11  A.   No.
12  Q.   Where had he moved to?
13  A.   On 58th.
14  Q.   Fifty-eighth and what area of town?
15  A.   That's over Northeast, 58th Street.
16  Q.   I'm sorry. Northeast? What else did you say?
17  A.   Nothing.
18  Q.   Okay. And was there a conflict over that car that
19  Mr. Gray had bought from Monterreo's friend?
20  A.   Yes.
21  Q.   Why was that?
22  A.   Kevin had told me he had let the twins look at the
23  car, that when they looked at the car, they told Kevin the
24  car was stolen, that it was flipped, because the serial
25  numbers on it was changed.

Page 64

1   Q.   Okay. Who were these twins?
2   A.   I forgot their name. They some twins. They live
3   over in Northeast. They was just friend of ours.
4   Q.   Friends of yours who lived in Northeast?
5   A.   Yes.
6   Q.   And what did they do?
7   A.   They worked on cars, stole cars, stuff like that.
8   Q.   Okay. So they worked on cars?
9   A.   Yes.
10  Q.   And did they have some knowledge about cars and
11  stealing cars and how that works?
12  A.   Yes.
13  Q.   And you said they were from Northeast?
14  A.   Yes.
15  Q.   What did they look like?
16  A.   They was twins and they was fat.
17  Q.   Okay. And you don't know their names; is that right?
18  A.   No. We just called them Twin.
19  Q.   Okay. And when they looked at the car, they were
20  able to notice something about the serial number?
21  A.   Yes.
22  Q.   Do you remember specifically what Mr. Gray told you
23  about the serial number?
24  A.   He told me that they said the serial number was
25  changed and that the car was flipped.

Page 65

1   Q.   Okay. Were you there when he asked them to look at
2   the car?
3   A.   No.
4   Q.   How did you find out about what they had told him?
5   A.   Kevin had came and told me.
6   Q.   Okay. And had he bought the car for any particular
7   purpose? Mr. Gray.
8   A.   He had bought it for his girlfriend.
9   Q.   Which girlfriend did he buy it for?
10  A.   For Maggie.
11  Q.   Okay. And when he came and told you about this, what
12  was his reaction to the car -- to finding out that the car
13  had been stolen?
14  A.   He was mad that the car was stolen.
15  Q.   Let me just ask you a couple more questions about
16  Monterreo. Had you met the friend of Monterreo who sold Mr.
17  Gray the car?
18  A.   Yes.
19  Q.   Were you actually there when he got the car from him?
20  A.   Yes.
21  Q.   And had you seen the man before who sold him the car?
22  A.   No.
23  Q.   Okay. Had you seen him with Monterreo before?
24  A.   Yes.
25  Q.   Where had you seen him with Monterreo?

17 (Pages 62 to 65)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

Page 66

1   A.   Monterreo had brought him out to our house out
2   Clinton one day.
3   Q.   Okay. And what were you all doing out at the house
4   in Clinton the day that Monterreo brought this guy out
5   there?
6   A.   Like we was drinking and eating crabs or something.
7   Q.   Eating crabs?
8   A.   Yes.
9   Q.   Okay. And was anyone else out there with you that
10  you remember that day?
11  A.   Kevin was out there.
12  Q.   You and Mr. Gray and --
13  A.   Yeah.
14  Q.   -- Monterreo and his friend?
15  A.   Yeah.
16  Q.   Was that before or after the other guy had sold Mr.
17  Gray the white car?
18  A.   I think it was before.
19  Q.   Okay. What exactly did Mr. Gray tell you after he
20  found out the car had been stolen?
21         MR. CARTER: Objection. Could we have a time
22  frame?
23         THE COURT: Sustained.
24  BY MS. JEFFRESS:
25  Q.   Was this in May of 1996, Mr. Howard?

Page 67

1   A.   Yes.
2         MS. HOLT: Objection, Your Honor. Leading.
3         THE COURT: Sustained.
4   BY MS. JEFFRESS:
5   Q.   What exactly did Mr. Gray tell you about learning
6   that the car had been stolen?
7         MR. CARTER: Again a time frame.
8         THE COURT: Overruled.
9         THE WITNESS: He was mad, and he was like, "This
10  nigga don't know who he fucking with, going to sell me a
11  stolen car."
12  BY MS. JEFFRESS:
13  Q.   Those were his exact words?
14  A.   Yes.
15  Q.   And what did he say? Did he say that he wanted to do
16  anything as a result of learning that the car was stolen?
17  A.   He said he wanted to -- he was going to get his money
18  back for him.
19  Q.   Okay. And did he ask you to do anything with him?
20  A.   Yes.
21  Q.   What did he ask you to do?
22  A.   He asked me to drive over to Monterreo house.
23  Q.   Okay. How did he feel about Monterreo?
24  A.   He was -- at the time, he was mad at Monterreo, too,
25  because when he -- he asked me to drive him over there, I

Page 68

1   told him I was going to drive him over there, then me, him
2   and Mo or somebody else, or Pappy, one of us, we was in the
3   car, and while we was driving over there, he was mad and he
4   had said if Monterreo ain't there, he was going to kill his
5   mother. And I told him, "Man, you ain't got to hit his
6   mother."
7         So when we -- when we got over there, Kevin had
8   went and knocked on the door, and his mother answered the
9   door, and then I guess he asked was Monterreo there and she
10  said no, so we drove around, was looking for the other guy.
11  Q.   Okay. Now, let me back up a bit. When he found out
12  that the car was stolen, was that when you all started
13  looking for Monterreo?
14  A.   Yes.
15  Q.   And where again was Monterreo? Where were you
16  looking for him?
17  A.   Over by 58th.
18  Q.   Okay. And is this the same area where the other guy
19  was from --
20  A.   Yes.
21  Q.   -- as far as you knew? Okay. And what exactly did
22  he say about trying to find Monterreo?
23  A.   He was just trying to find him so we can get the
24  money back.
25  Q.   Okay. Did you know specifically where Monterreo

Page 69

1   lived?
2   A.   Yes.
3   Q.   The specific address, the house?
4   A.   Yes.
5   Q.   And who was driving when you went to look for
6   Monterreo?
7   A.   I was driving.
8   Q.   Do you remember what car you were driving?
9   A.   I had a gray Lincoln.
10  Q.   Okay. And did anyone with you have a weapon?
11  A.   Yes.
12  Q.   Who had a weapon?
13  A.   Kevin.
14  Q.   Do you remember what he had?
15  A.   He had a 9 Glock on him.
16  Q.   Where was he holding the weapon?
17  A.   On his waist.
18  Q.   Okay. And you remember driving. Do you remember
19  what you were driving?
20  A.   We was driving my -- I had a gray Lincoln.
21  Q.   And where -- you were driving. Where was Mr. Gray in
22  the car?
23  A.   In the front seat, passenger seat.
24  Q.   Okay. And you said that you thought either Mo or
25  Pappy was with you?

18 (Pages 66 to 69)

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

Page 70

1  A.   Yes.
2  Q.   Is this when you were looking for Monterreo?
3  A.   Yes.
4  Q.   Okay.  Do you remember how many other people were
5  with you?
6  A.   It was four of us together, but I don't remember who
7  else was in the back seat, but I know we was four deep in
8  the car.
9  Q.   Okay.  And what did Mr. Gray say that he wsa going to
10  do when you got to Monterreo's house?
11  A.   He had said if he knocked on the door and Monterreo
12  wasn't there, that he was going to kill his mother.
13       MR. CARTER:  Objection.  Asked and answered.
14       THE COURT:  Overruled.
15  BY MS. JEFFRESS:
16  Q.   He said that if Monterreo wasn't there -- what did he
17  say he would do?
18  A.   He wsa going to kill Monterreo mother.
19  Q.   What did you say when he said that?
20  A.   And I said, "You ain't got to hit his mother."
21  Q.   And what happened?  Did you go to Monterreo's?
22  A.   Yes.
23  Q.   What happened when you got there?
24  A.   I got there, I let Kevin out, Kevin went up to the
25  door and knocked on the door and asked for him, but he

---

Page 71

1  wasn't there.
2  Q.   Okay.  Was anyone else with him when he went to the
3  door?
4  A.   No.
5  Q.   Okay.  Could you see who opened the door?
6  A.   No.
7  Q.   How did you know who was there?
8  A.   He told me that his mother was there.
9  Q.   Okay.  So Mr. Gray came back to the car?
10  A.   Yes.
11  Q.   And what did he tell you about who had answered the
12  door?
13  A.   He said his mother answered the door, but he wasn't
14  there.
15  Q.   So he found out that Monterreo wasn't there?
16  A.   Yes.
17  Q.   Okay.  Did you try to find the other guy?
18  A.   Yes.
19  Q.   What did you do to try to find the other guy?
20  A.   We had just rolled around through the neighborhood,
21  and when we was getting ready to leave, we was on Nellie
22  Helen Burroughs, and the guy drove up on the passenger side
23  and Kevin spotted him and waved him down, and I hit the high
24  beams so he can pull over.  So when he pulled over, I pulled
25  up in front of him and Kevin got out the car and was talking

---

Page 72

1  to him for a minute.
2  Q.   Okay.  And what street was this on where you saw him?
3  A.   On Nellie Helen Burroughs.
4  Q.   Nellie Helen Burroughs Avenue?
5  A.   Yeah.
6  Q.   Okay.  And do you remember what he was driving?
7  A.   A minivan.
8       (Whereupon, Government's Exhibit No. DDE-301 was marked
9  for identification.)
10  BY MS. JEFFRESS:
11  Q.   Let me show you a photograph that's not yet in
12  evidence:  DDE-301.
13       MR. CARTER:  May we approach, please, Your Honor?
14       THE COURT:  Yes.
15       (Whereupon, a discussion was held at the bench on the
16  record.)
17       MR. CARTER:  This exhibit, Your Honor, has the
18  name, alleged name of the person who was shot.  This man
19  doesn't know the name.  That needs to be taken off and he
20  only needs to be shown the aerial and he can identify the
21  area.
22       MS. JEFFRESS:  That's fine, we'll block out the
23  name for this witness.
24       (End of discussion at the bench.)
25  BY MS. JEFFRESS:

---

Page 73

1  Q.   Showing you, Mr. Howard, Government's Exhibit
2  DDE-301, do you recognize the area that's shown in this
3  aerial photograph?
4  A.   Yes.
5  Q.   And is that Nellie Helen Burroughs Avenue that runs
6  across from left to right?
7  A.   Yes.
8  Q.   And does this photograph show the area where --
9       MR. CARTER:  Objection.  Leading.
10       THE COURT:  Overruled.
11  BY MS. JEFFRESS:
12  Q.   Does this show the area where you saw the minivan
13  that you've just testified about?
14  A.   Yes.
15  Q.   Is this a fair and accurate depiction of that area of
16  the city?
17  A.   Yes.
18       MS. JEFFRESS:  I would like to move DDE-301 as
19  it's shown now on the screen into evidence at this time.
20       THE COURT:  Received.
21       (Whereupon, Government's Exhibit No. DDE-301 was
22  received in evidence.)
23  BY MS. JEFFRESS:
24  Q.   Okay.  Now the jury can see it, Mr. Howard.  Do you
25  remember what part of Nellie Helen Burroughs Avenue you were

---

19 (Pages 70 to 73)

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

**Page 74**

1  on when you saw --
2  A.    We was in between this part right here somewhere.
3  Q.    Okay.  And you're showing the area, the grassy area
4  --
5  A.    Yes.
6  Q.    -- between 50th Street on the left and I guess that
7  half of the block before, you would get to Division Avenue
8  on the right; is that right?
9  A.    Yes.
10  Q.    Okay.  And what exactly happened when you saw the
11  minivan?
12  A.    Kevin flagged him down, I hit the high beams, then he
13  pulled over.  When he pulled over, I pulled my car in front
14  of his and Kevin got out the car and then he got out the car
15  and came around to the sidewalk.
16  Q.    Okay.  Let me just get a little more specifics on
17  what happened when you first saw him.  Which side of your
18  car was the minivan on when you saw it?
19  A.    On the right-hand side.
20  Q.    All right.  And Mr. Gray was in the passenger's seat?
21  A.    Yes.
22  Q.    Who was it who first noticed the driver of the
23  minivan?
24  A.    Kevin.
25  Q.    And what did he say when he first saw him?

---

**Page 75**

1  A.    He said, "There he go right there," and he waved him
2  down.
3  Q.    Okay.  And what happened when he waved him down?
4  A.    He pulled over and I pulled over in front of him.
5  Q.    Okay.  So the minivan pulled over?
6  A.    Yes.
7  Q.    And then you pulled over in front?
8  A.    Yes.
9  Q.    And that took place on the area that you just showed
10  the jury on the photograph?
11  A.    Yes.
12  Q.    What happened after you both pulled over?
13  A.    When we both pulled over, he got out the -- Kevin got
14  out the car and the dude got out the car, and they was
15  talking for like a half of a minute, and then Kevin shot him
16  in the face, and the dude got back in the car and pulled
17  off, and Kevin got back in the car with me and I pulled off.
18  Q.    All right.  Now, where were you when the two of them
19  had the conversation?
20  A.    I was sitting in the car.
21  Q.    And where were they in relation to the car that you
22  were sitting in?
23  A.    Right behind the car.
24  Q.    Okay.  Where were they in relation to the minivan?
25  A.    Right in front of the minivan.

---

**Page 76**

1  Q.    Okay.  So in between the minivan and your car?
2  A.    Yes.
3  Q.    And did you say they were on the sidewalk or on the
4  grassy area?
5  A.    Yes, on the grassy area like.
6  Q.    Okay.  And how long did they talk before Kevin fired?
7  A.    Like 30 seconds, something like that.
8  Q.    And could you hear what they were saying?
9  A.    No.
10  Q.    What happened after they talked for a few seconds?
11  A.    After they talked for a few seconds, I was looking in
12  my rear-view mirror at them, and Kevin shot him in the face,
13  and the dude ran back around and got in the driver's seat of
14  his car and pulled off, he bucked a U and pulled off, and I
15  -- me and Kevin -- Kevin jumped in the car with me and I
16  pulled off.
17  Q.    Now, when you say you saw the shooting, could you
18  actually see where the man was hit?
19  A.    Yes.
20  Q.    How did you -- how could you tell where he was hit?
21  A.    Because he was like holding his face, so I figured
22  that he got shot in the face because he was holding his face
23  when he was running back behind my car getting in his car.
24  Q.    Okay.  So you figured he got shot in the face --
25  A.    Yeah.

---

**Page 77**

1  Q.    -- because he was holding his face?
2  A.    Yeah.
3  Q.    Could you actually see, when he got shot, where he
4  was shot?
5  A.    Nah.
6  Q.    Okay.  And how many times did Mr. Gray shoot him?
7  A.    Once.
8  Q.    And when you saw him holding his face, where exactly
9  was he going?
10  A.    Getting back inside his car.
11  Q.    Was there anyone else with him in his minivan?
12  A.    Yeah.  It was a female in the car with him.
13  Q.    And where did he go after getting back into the van?
14  A.    When he got back into his van, he bucked a U-turn and
15  -- he bucked a U and came down, then he turned up 50th
16  Street.
17  Q.    Okay.  So he went back the other way --
18  A.    Yeah.
19  A.    -- on Nellie Helen Burroughs and then down 50th?
20  A.    Yeah.
21  Q.    Now, after Mr. Gray shot him, you said he got back in
22  the car?
23  A.    Yes.
24  Q.    How was he acting when he got back in the car?
25  A.    He was mad because the gun had jammed up on him.

---

20 (Pages 74 to 77)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

Page 78

1   Q.   What exactly did he say?
2   A.   When he got back in the car, he said like, "Damn.
3   This motherfucker done jammed up on me." And we just pulled
4   off.
5   Q.   And he was talking about the gun?
6   A.   Yes.
7   Q.   Did he say anything else about the shooting?
8   A.   Nah. That was it.
9   Q.   Okay. Did it appear to you as if the man had been
10  killed?
11  A.   Nah, it ain't appear that he was killed, but it
12  appeared that he got shot.
13  Q.   Where did you go after Mr. Gray got back into the
14  car?
15  A.   I think we went back over Southeast.
16  Q.   Okay. Do you know what happened to the gun he had
17  there?
18  A.   No.
19       MS. JEFFRESS: Your Honor, the next incident is a
20  lengthy one. We could either break now or --
21       THE COURT: All right. We will take our morning
22  recess.
23       (Whereupon, a short recess was taken.)
24       THE COURT: Ms. Jeffress, you may proceed.
25       MS. JEFFRESS: Thank you, Your Honor.

---

Page 79

1   BY MS. JEFFRESS:
2   Q.   Good morning again, Mr. Howard.
3   A.   Good morning.
4   Q.   Mr. Howard, I'm going to ask you some questions now
5   about a man named Ricardo Bailey.
6   A.   Yeah.
7   Q.   Who was Ricardo Bailey?
8   A.   It's a friend of mine who I met through another
9   friend.
10  Q.   Who did you meet him through?
11  A.   A guy from New York named Rome.
12  Q.   A guy from New York named Rome?
13  A.   Yeah.
14  Q.   Did you know Rome's full name?
15  A.   No.
16  Q.   How did you know Rome?
17  A.   I met Rome through a guy named Keith.
18  Q.   Which Keith was this?
19  A.   Keith May.
20  Q.   Where did you used to spend time with Rome?
21  A.   He had a detail shop on Central Avenue, and I used to
22  go out at his detail shop.
23  Q.   All right. That's how you met Ricardo Bailey?
24  A.   Yes.
25  Q.   Did Ricardo Bailey spend time with Rome at the Detail

---

Page 80

1   shop on Central Avenue?
2   A.   You said Ricardo Bailey?
3   Q.   We're talking about someone else, aren't we?
4   A.   Yeah.
5   Q.   Okay. I said Ricardo Bailey. I'm sorry. Did you
6   understand the wrong name?
7   A.   Yeah.
8   Q.   All right. We'll move to the incident you're
9   thinking of later.
10  A.   All right.
11  Q.   Tell me what you knew about Ricardo Bailey.
12  A.   I just know that he used to be friends with China,
13  and China thought he was working for the feds.
14  Q.   Okay. When you say he wa friends with China, that's
15  Rodman Lee?
16  A.   Yes.
17  Q.   How were they friends?
18  A.   China used to give him drugs.
19  Q.   How did you know that?
20  A.   China told me that.
21  Q.   And how much did Mr. Lee tell you? What exactly did
22  Mr. Lee tell you about his business with Ricardo Bailey?
23  A.   He just said Ricardo used to buy a lot of keys from
24  him.
25  Q.   A lot of kilos?

---

Page 81

1   A.   Yes.
2   Q.   Do you know what he was selling Ricardo Bailey, what
3   drug?
4   A.   I ain't sure if it was powder or crack.
5   Q.   Some kind of cocaine?
6   A.   Yes.
7   Q.   Did you know where Mr. Bailey was from or how he knew
8   Mr. Lee?
9   A.   No.
10  Q.   Had you ever met Mr. Bailey?
11  A.   No.
12  Q.   Okay. Did you at some point learn that Mr. Bailey
13  had a relationship to a particular woman?
14  A.   Yes.
15  Q.   What did you learn about that?
16  A.   That he was --
17       MR. CARTER: Basis of knowledge, Your Honor.
18       THE COURT: Sustained.
19  BY MS. JEFFRESS:
20  Q.   Who told you about his relationship with this woman?
21  A.   I forgot who told me. I learned over the jail from
22  somebody that --
23       MR. CARTER: Objection, hearsay.
24       THE COURT: Sustained.
25  BY MS. JEFFRESS:

---

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

8

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 18, 2002
Volume 75

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,     :    Docket No. CR 00-157
                              :
        Plaintiff,            :    Washington, D.C.
                              :    July 18, 2002
v.                            :    1:56 p.m.
                              :
KEVIN L. GRAY, RODNEY MOORE,  :
JOHN RAYNOR, CALVIN SMITH,    :
TIMOTHY HANDY, LIONEL NUNN,   :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - x

DAY 75 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:        TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 Fourth Street, Northwest
                          Washington, D.C. 20001

For Defendant Gray:       FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, Northwest
                          Suite 717
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241

Pages 1 through 161
DOLORES A. BYERS, CSR, RPR
Official Court Reporter

FILED

MAY 2 0 2003

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-8

Dolores A. Byers, CSR RPR
Official Court Reporter
U.S. DISTRICT COURT

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 18, 2002
Volume 75

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
  Coburn and Schertler
  1150 18th Street, Northwest
  Washington, D.C. 20036

  STEVEN MC COOL, ESQ.
  Mallon and McCool, LLC
  16 South Calvert Street, Suite 1002
  Baltimore, Maryland 21202
For Defendant Raynor: G. GODWIN OYEWOLE, ESQ.
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004

  THOMAS SAUNDERS, ESQ.
  207 East Redwood Street, Suite 205
  Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
  Law Offices of Carney and Carney
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004

  JONATHAN RUBENS, ESQ.
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004
For Defendant Handy:  MICHAEL LASLEY, ESQ.
  1730 K Street, Northwest, Suite 304
  Washington, D.C. 20006
  ADGIE O'BRYANT, JR., ESQ.
  Anderson and O'Bryant, PC
  1107 Seventh Street, Northwest
  Washington, D.C. 20001

For Defendant Nunn:  VERONICA A. HOLT, ESQ.
  3003 Van Ness Street, Northwest
  Suite W-919
  Washington, D.C. 20008

**Page 3**

## CONTENTS

WITNESSES:        DIRECT  CROSS  REDIRECT  RECROSS

On behalf of the government:
Damien Evans
  By Mr. Heaphy        6
  By Mr. Carter                50
Allen Larman
  By Mr. Olsen        80
Lillie Hunter
  By Mr. Olsen        129
  By Mr. Baugh                141

### EXHIBITS

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. DDE-301 | | 35 |
| No. DDE-101 | 36 | 37 |
| No. DDE-102 | 38 | 39 |
| No. DDE-103 | 40 | 40 |
| No. DDE-104 | 40 | 41 |
| No. DDE-105 | 42 | 42 |
| No. DDE-106 | 42 | 43 |
| No. RB-134 | 91 | 92 |
| No. RB-102 | 92 | 92 |
| No. RB-103 | 93 | 93 |
| No. RD-109 | 94 | 95 |
| No. RB-301 | 114 | 115 |

**Page 4**

## EXHIBITS (Continued)

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. RB-132 | 119 | 119 |
| No. RB-119 | 125 | 125 |
| No. RB-120 | 126 | 126 |
| No. RB-121 | 127 | 127 |
| No. RB-153 | 139 | 139 |
| No. RB-156 | 139 | 140 |
| No. RB-155 | 140 | 140 |

**Page 5**

1    AFTERNOON SESSION
2        THE COURT: Mr. Heaphy and one of the defense
3  counsel, let me see you at the bench.
4        (Begin bench conference.)
5        THE COURT: Mr. Daum, thanks for appearing as
6  counsel for the witness.  Have you had an opportunity to
7  speak to him now?
8        MR. DAUM: I have, Your Honor.  I met with the
9  witness.  I have briefly met with Mr. Heaphy and I have been
10  given the documentation regarding Mr. Evans' criminal
11  record.  And having had an opportunity to review the record
12  as well as speak to Mr. Evans, I'm satisfied that he does
13  not have a 5th Amendment privilege to assert.  So he is
14  ready to take the stand and testify this afternoon.
15        THE COURT: Thank you very much.
16        (End bench conference.)
17        (Jury entered courtroom.)
18        THE COURT: Good afternoon, ladies and gentlemen.
19  Mr. Damien Evans had been called and then I interrupted and
20  took the testimony of Detective Webb.  Mr. Evans was
21  previously sworn.  He has now resumed the stand, and had
22  identified himself as Damien Evans.
23        Mr. Heaphy, you may now proceed.
24        MR. HEAPHY: Thank you, Your Honor.
25        DIRECT EXAMINATION

2 (Pages 2 to 5)

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 18, 2002
Volume 75

---

**Page 50**

1    THE COURT: We'll take a short recess.
2    (Jury exited courtroom.)
3    (Brief recess.)
4    THE COURT: Mr. Carter, are we ready?
5    MR. CARTER: Yes, Your Honor. Thank you very
6    much. I appreciate it.
7    (Jury entered courtroom.)
8    THE COURT: The defendants may cross-examine.
9    MR. CARTER: Thank you.
10            CROSS-EXAMINATION
11    BY MR. CARTER:
12    Q   Good afternoon, sir.
13        Mr. Evans, for how long have you all been buying
14    cars at auctions?
15    A   You say you all.
16    Q   You. I'm sorry. Forgive me. It is you personally.
17    A   It's been since I was about 18.
18    Q   I'm sorry again?
19    A   Since I was about 18.
20    Q   Since you were about 18. And you have a garage to
21    detail them and all that?
22    A   No.
23    Q   So you do it at the house in Capitol Heights?
24    A   Yes.
25    Q   And what's that address, again, in Capitol Heights?

**Page 51**

1    A   4908 Earlios Lane.
2    Q   Earlios Lane?
3    A   Yes.
4    Q   That's a relative's house?
5    A   Yes.
6    Q   And what relative would that be?
7    A   My grandmother.
8    Q   And you were living there back in '96?
9    A   Yes.
10    Q   Do you still use that address now?
11    A   I still stay there.
12    Q   You still stay there. Okay.
13        Now, when you talked to this person about the
14    car -- I believe you testified on direct examination that
15    you asked for 3,500 and the person -- you negotiated down to
16    3,100?
17    A   Right.
18    Q   And where did this conversation take place?
19    A   At Robinson Place.
20    Q   At Robinson Place. And did you drive there?
21    A   Yes.
22    Q   And that's over in Southeast?
23    A   Yes.
24    Q   Right off Suitland Parkway?
25    A   Yes.

**Page 52**

1    Q   And did the person, this Kevin, did he just reach into
2    his pocket pull out a knot and give you a knot of bills and
3    give you $3,100 right away?
4    A   No.
5    Q   He said he needed some time to get $3,000?
6    A   He didn't say anything. He just -- it didn't happen the
7    first day that I saw him.
8    Q   I understand that. But you agreed on a price?
9    A   Right.
10    Q   And he didn't given you the money right away?
11    A   No.
12    Q   Did you all set a time or place to meet?
13    A   I don't really remember.
14    Q   Well, how did the transaction go?
15    A   A couple of days afterwards, after the first initial
16    meeting, so to speak, when I came back to Robinson Place
17    with the vehicle he purchased it at that time.
18    Q   So the first time you come you show him the car and you
19    allow him to drive around?
20    A   Right.
21    Q   You come back a couple of days later and that's when you
22    seal the deal?
23    A   Right.
24    Q   And at that time he didn't have -- let me withdraw that.
25        When you came there the first time, did you tell

**Page 53**

1    him you wanted 3,500?
2    A   Yes.
3    Q   And when you came the second time, is that when he
4    started to push you down on the numbers?
5    A   Right.
6    Q   And you knew where on Robinson Place to meet him?
7    A   I came back to the same place I saw him originally.
8    Q   Okay. And, again, when you reached this price with
9    3,100 he didn't bring money out his pocket and give it to
10    you right away?
11    A   Yes, he did.
12    Q   Right away? Right then and there?
13    A   Right.
14    Q   I thought he needed a couple of days to get it together.
15    Didn't you testify to that?
16    A   I said when he bought the car he gave me the money not
17    the first time I saw him.
18    Q   Right. But didn't he need a couple of days to get his
19    money together. Didn't you testify --
20    A   The first day that I met him we didn't do anything.
21    Q   I understand that.
22    A   He had a couple of days when I originally sold him the
23    car a couple of days afterwards.
24    Q   My question was didn't you testify that he said he
25    needed a couple of days to get the money together?

14 (Pages 50 to 53)

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 18, 2002
Volume 75

---

Page 54

1  A  I didn't testify that he said anything.  I said I
2  assumed that he needed a couple of days to get the money
3  together.
4  Q  So that was an assumption on your part because he didn't
5  whip out the money and give it to you right away?
6  A  Exactly.
7  Q  The first time that you saw him did he say he wanted the
8  car?
9  A  Yes.
10  Q  Okay.  Did he talk about price?
11  A  I told him I wanted 3,500 for it.
12  Q  And it wasn't until the second time when you drove
13  around to Robinson Place that he -- that he tried to push
14  your numbers down?
15  A  Right.
16  Q  And when you agreed on the 3,100 that's when he gave it
17  to you?
18  A  Right.
19  Q  And he gave you, as Mr. Heaphy said, he gave you cash,
20  $3,100?
21  A  Right.
22  Q  Was there anything else exchanged?
23  A  No.
24  Q  Was there anything else talked about?
25  A  No.

---

Page 55

1  Q  So it was just he gets the car.  You get 3,100.  And
2  there was no other consideration or terms or side things
3  going on?
4  A  No.
5  Q  All right.  Now, did you give him the car right there?
6  A  Yes.
7  Q  So you were walking with the paperwork.  You had the
8  paperwork available?
9  A  I was followed.
10  Q  No, no.  I mean the paperwork on the Mazda.  You had it
11  there with you when you came back the second time?
12  A  Yes.
13  Q  And so you were able to do all that right then and
14  there?
15  A  Right.
16  Q  You said that the vehicle had paper tags as the auction
17  people gave it to you?
18  A  I believe so.
19  Q  Auction houses, you just have to take the car away in
20  whatever shape it is.  They're not like a dealership.  They
21  have you paper tags?
22  A  Sometimes.  Some auctions.
23  Q  Some auctions.  And you believe this one gave you paper
24  tags?
25  A  Back then they issued paper tags.  Now they don't.  Back

---

Page 56

1  then they did.
2  Q  In '96?
3  A  Right.
4  Q  At the Capitol Auction?
5  A  Right.
6  Q  And you bought this, like, April in '96?
7  A  I don't remember which month it was.
8  Q  Well, do you remember when you were injured?
9  A  I don't remember what month it was I was injured but
10  I remember the year.
11  Q  The year was '96?
12  A  Right.
13  Q  Was it the summertime?  Spring time?  Fall?
14  A  It was warm outside.
15  A  It was warm outside.  So closer to summer or in summer?
16  A  I guess it was in the summer.
17  Q  And between the time you were injured, when was it that
18  you purchased it?
19  A  About a month or so before.
20  Q  About a month or so -- not more than two months before
21  that?
22  A  No.
23  Q  And have you been back to the Capitol Auction since?
24  A  Have I now?
25  Q  Yes.  Since that '96, have you been, I mean, the summer

---

Page 57

1  of '96, have you been back to the Capitol Auction?
2  A  Yes.
3  Q  And where is that located?
4  A  In Brentwood, Maryland.
5  Q  And you bought other cars there?
6  A  Yes.
7  Q  Since that time?
8  A  Yes.
9  Q  When you got the paper tags, when you bought that -- let
10  me withdraw that.
11      When you bought the car, you bought it in your
12  name or somebody else's name?
13  A  I had someone else with me and they put it in their
14  name.
15  Q  Why didn't you put it in your name?
16  A  I didn't have an I.D. with me that day.
17  Q  You go into an auction house and you don't take your
18  driver's license with you?
19  A  I forgot it.
20  Q  How did you get there?
21  A  I drove.
22  Q  So you're driving without a license?
23  A  Uh-huh.
24  Q  Is that a yes?
25  A  Yes.

---

15 (Pages 54 to 57)

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 18, 2002
Volume 75

---

**Page 74**

1  Q  And this same woman came by to get you sometime later to
2  go to Clinton?
3  A  Right.
4  Q  And when you drove out to Clinton, did you know where to
5  go?
6  A  Yes.
7  Q  Did you point it out to them?
8  A  Yes.
9  Q  Have you given that information to the FBI now?
10 A  Yes.
11 Q  You gave them an address?
12 A  No.
13 Q  Have you taken them there?
14 A  No.
15 Q  Back in '96 when this police officer went there, do you
16 believe you got to the right address in Clinton?
17 A  Most definitely.
18 Q  Did you see the police officer take notes about where
19 you were?
20 A  She wrote -- she jotted down something. I don't know
21 what she wrote. I wasn't really paying her any attention.
22 Q  But she writing this down after you arrived at this
23 location?
24 A  Right.
25       MR. CARTER:  May we approach please, Your Honor?

**Page 75**

1        THE COURT:  Yes.
2        (Begin bench conference.)
3        MR. CARTER:  For me, Your Honor, this document was
4  provided to us in discovery. It says seven months later.
5  They've had no contact with this compendium case. I would
6  make a demand for any notes, any other documents that can
7  substantiate this man's testimony.
8        MR. HEAPHY:  I've spoken both to Dellatre who
9  wrote this report and Barbara Brantley whose the detective
10 who actually accompanied Mr. Evans to the Clinton house.
11 They both indicate that they took no notes. I have spoken
12 to both of them about this.
13       They said that the only paperwork they have --
14 actually Brantley has none. Dellatre has this report. He
15 did indicate that he had difficulty reaching Mr. Evans. He
16 assumed the case after Brantley, I believe, had a maternity
17 issue and stopped working on the case. That was some sort
18 of a transfer. Dellatre picked it up and he's the one that
19 filled out this 252. If Mr. Carter is requesting notes,
20 I've checked with both of them and they've represented that
21 they have none.
22       MR. CARTER:  This report indicates that there has
23 been no contact at all for seven months not that there were
24 notes and a police officer went on maternity leave. Is this
25 report wrong, I would ask?

**Page 76**

1        MR. HEAPHY:  Dellatre is available to Mr. Carter
2  if he wants to interview him, Your Honor. My understanding,
3  again, of the report is that Dellatre says he has had no
4  contact with the complainant in seven months. I'm, frankly,
5  not sure what the date is on the report.
6        MR. CARTER:  It is seven months. It's December of
7  1996. This occurred in May of 1996.
8        MR. HEAPHY:  Again, Your Honor, Detective Dellatre
9  is still with the Metropolitan Police Department.
10 Mr. Carter can certainly develop this in his case.
11       THE COURT:  What about the female detective?
12       MR. HEAPHY:  I can give him her information as
13 well if he wants to contact her.
14       MR. CARTER:  If I can have both of the officers'
15 names and contact them.
16       MR. HEAPHY:  Certainly.
17       MR. CARTER:  Thank you.
18       (End bench conference.)
19 Q  Sir, as you're sitting here and I'm asking you these
20 questions, does that help you at all remember who went with
21 you and whose name you put this car?
22 A  No.
23 Q  And it's your testimony that this car was not stolen?
24 A  Not to my knowledge.

**Page 77**

1  Q  Are you the same Damien Evans who in case F4539-97 in
2  the Superior Court of the District of Columbia was found
3  guilty of unauthorized use of a motor vehicle?
4  A  Yes.
5  Q  Are you the same Damien Evans who in March of 1996 was
6  convicted in the state court of Maryland in Hyattsville for
7  attempted theft of $300 plus in value?
8  A  Yes.
9        MR. HEAPHY:  Your Honor, may we approach briefly?
10       THE COURT:  Yes.
11       (Begin bench conference.)
12       MR. HEAPHY:  Your Honor, I just want to make sure
13 that Mr. Carter is correctly reading the report because he
14 just misstated that first conviction. It is rather
15 difficult when it's a Maryland record. I just want to --
16       MR. CARTER:  The first conviction.
17       MR. HEAPHY:  The first one is correct. Obviously
18 the D.C. one. Your Honor, we've provided a series of
19 Maryland convictions.
20       MR. CARTER:  It's the next one we talked about,
21 Judge.
22       MR. HEAPHY:  If I can for Mr. Carter perhaps by
23 way of example show that the charges are numbered. No. 1 is
24 the attempted theft of $300. No. 2 is malicious destruction
25 of property with a value.

20 (Pages 74 to 77)

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

9

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 9, 2002
Volume 100

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        : CR Number 00-157
                                 :
          Government,            :
                                 :
     v.                          : Washington, D.C.
                                 : Monday, September 9, 2002
KEVIN L. GRAY, RODNEY MOORE,     : 9:43 a.m.
JOHN RAYNOR, CALVIN SMITH,       :
TIMOTHY HANDY and LIONEL NUNN,   :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - -x


DAY 100 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822

 For Defendant Gray:       FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           SARA DAVIS, ESQUIRE
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804) 643-8111

                    Pages 1 through 148

FILED

THERESA M. SORENSEN,
MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-9

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 9, 2002
Volume 100

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:    BARRY COBURN, ESQUIRE
                        COBURN & SCHERTLER
                        1150 18th Street, N.W.
                        Suite 850
                        Washington, D.C. 20036
                        (202) 628-4199

                        STEVEN J. McCOOL, ESQUIRE
                        1776 K Street, N.W.
                        Suite 300
                        Washington, D.C. 20006
                        (202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
                        601 Pennsylvania Avenue, N.W.
                        9th Floor
                        Washington, D.C. 20004
                        (202) 347-7777
                        THOMAS J. SAUNDERS, ESQUIRE
                        10 N. Calvert Street
                        Suite 715
                        Baltimore, Maryland 21202
                        (202) 550-4662 & (410) 547-9087

For Defendant Smith:    JOHN J. CARNEY, ESQUIRE
                        CARNEY AND CARNEY
                        601 Pennsylvania Avenue, N.W.
                        Suite 900
                        Washington, D.C. 20004
                        (202) 434-8234
                        JONATHAN RUBENS, ESQUIRE
                        601 Pennsylvania Avenue, N.W.
                        Suite 900
                        Washington, D.C.
                        (202) 487-3633

For Defendant Handy:    MICHAEL LASLEY, ESQUIRE
                        1750 K Street, N.W.
                        Suite 304
                        Washington, D.C. 20006
                        (202) 508-3690
                        ADGIE O'BRYANT, JR., ESQUIRE
                        ANDERSON & O'BRYANT, P.C.
                        1107 Seventh Street, N.W.
                        Washington, D.C. 20001
                        (202) 371-0013

                        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:     VERONICE A. HOLT, ESQUIRE
                        3003 Van Ness, N.W.
                        #W919
                        Washington, D.C. 20008
                        (202) 244-2659

Court Reporter:         THERESA M. SORENSEN, CVR-CM
                        Official Court Reporter
                        Room 4800-H, U.S. Courthouse
                        Washington, D.C. 20001
                        (202) 273-0745

                Proceedings reported by stenomask recording,
                transcript produced by transcription.

                        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

1    P R O C E E D I N G S
2         THE DEPUTY CLERK:  This is the case of The United
3    States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
4    Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
5    2000-157. Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
8    Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
9         THE COURT:  Are you starting with Vick?
10        MR. OLSEN:  Thomas Webb on the crime scene.
11        THE COURT:  All right.
12    (Whereupon, the jury enters the courtroom at 9:44 a.m.)
13        THE COURT:  Good morning, ladies and gentlemen.
14    The government may call your next witness.
15        MR. OLSEN:  Thank you, Your Honor.  Good morning.
16    At this time, we would call Detective Thomas Webb
17    to the stand.
18        THE COURT:  Detective Webb, you previously
19    testified, so I will remind you you are still under oath.
20    You may resume the stand.
21        THE WITNESS:  Thank you, Your Honor.  Good
22    morning.
23        THE COURT:  Good morning.
24        THOMAS R. WEBB, GOVERNMENT'S WITNESS
25             PREVIOUSLY SWORN

---

**Page 5**

1             DIRECT EXAMINATION
2    BY MR. OLSEN:
3    Q.   Good morning, Detective Webb. Could you please begin
4    just by reintroducing yourself to the ladies and gentlemen
5    of the jury.
6    A.   Yes.  My name is Detective Thomas R. Webb.
7    Q.   Where do you work?
8    A.   I'm a detective with the FBI MPD Safe Streets Task
9    Force.
10   Q.   How long have you been with the Safe Streets Task
11   Force?
12   A.   Since 1998.
13   Q.   And are you assigned, Detective Webb, to a particular
14   investigation or case?
15   A.   Yes.  The Kevin Gray investigation.
16   Q.   And how long have you been assigned to that
17   particular investigation?
18   A.   Since the onset of the investigation, the very first
19   day.
20   Q.   Let me ask you to direct your attention back to a
21   particular day, July 29th, 1998. On that day, Detective,
22   were you working on the Kevin Gray investigation?
23   A.   Actually, it hadn't even begun yet.  We were
24   primarily looking into some homicides that Kevin may have
25   been involved in, but we hadn't done anything proactive at

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 9, 2002
Volume 100

Page 126

1  hook up for Kevin to get the car.  His little friend or
2  something was selling cars.
3  Q.    And his friend, where was his friend from?
4  A.    From on that side of town.
5  Q.    Meaning where?
6  A.    In the 58th area.
7  Q.    Of Northeast?
8  A.    Yes.
9  Q.    Did Kevin actually buy the car from the guy?
10 A.    Yes.
11 Q.    And what happened after Kevin Gray bought that car?
12 A.    He drove it around for a minute.  It was a nice
13 little car, real nice.  He drove it around for a minute, and
14 then he learned that the car was flipped.
15 Q.    What does that mean, the car was flipped?
16 A.    It was really a stolen car.  The serial numbers and
17 -- they changed the serial numbers and all that.  They take
18 it to a chop shop, what they call a chop shop, change the
19 serial numbers and stuff like that around on the car.  It's
20 really a stolen car, but we call it a flipped car.  You
21 know, you get it -- somebody give you a Benz, take the
22 serial numbers off it; you just pay a lesser price.  The car
23 really stolen for real.
24 Q.    And how did Kevin Gray find out that the white Mazda
25 was stolen or flipped?

Page 127

1  A.    Through the twins, the fat twins.
2  Q.    Where were they?  Were they from Robinson Place, too?
3  A.    No.
4  Q.    And how did they find out that the car was flipped?
5  A.    They was into that type of stuff.  They was into cars
6  and, you know, they knew a whole lot about cars and fixing
7  cars, you know, building cars and all that.  That was their
8  thing, cars.  I mean, they went to school or something for
9  that type of stuff.
10 Q.    How did Mr. Gray react to learning that the car, the
11 Mazda, was flipped?
12 A.    He was furious when he learned that car was flipped.
13 Q.    Why?
14 A.    He couldn't believe somebody had the audacity to sell
15 him a flipped car.
16 Q.    What did he say about it?
17 A.    I can't remember verbatim, you know, once he found
18 out, exactly what he said.  I can't remember.  He was heated
19 about that car.  A lot of things were said, but I can't
20 remember exactly, you know, verbatim.
21 Q.    Well, after he learned that the car was stolen, did
22 he take any steps to find the person who sold him the stolen
23 car?
24 A.    Yes.
25 Q.    Tell us about that.

Page 128

1  A.    He went over there a few times to try to catch the
2  guy, try to get in -- first he called Montereo, tried to
3  talk to Montereo and told him that car was flipped and
4  Montereo to get in contact with the dude, because that's how
5  Kevin got in contact with the dude, through Montereo, and he
6  called Montereo to let him know that, you know, the guy was
7  -- the car was flipped and questioning Montereo why would he
8  let him -- let the guy sell him a flipped car like that.
9  Q.    And did you actually talk to Kevin Gray about what he
10 was able to find out?
11 A.    What you mean?
12 Q.    Did he find out where the guy was or where the guy
13 stayed?
14 A.    Montereo didn't give him that type of information.
15 Montereo was going -- he told Montereo to get in contact
16 with the guy so he can, you know, hook up and talk with the
17 guy, but Montereo knew better -- not to show his face.  He
18 knew better.  He knew better.  So he ain't -- you know, he
19 knew better, not to show his face, either.
20 Q.    All right.  Did Kevin Gray, during that time, did he
21 talk about ever going around looking for the guy over by
22 58th?
23 A.    He talked about going on there.  He went over there a
24 few times to look for the dude.
25 Q.    Did he find him at first?

Page 129

1  A.    The times that he went over there on his own or
2  whoever else, I wasn't with him.  But there was a time we
3  were just riding, riding in that area, and it just so
4  happens the dude just was behind us blowing -- he was
5  hitting the horn, you know, trying to get our attention
6  because he saw Frank's Lincoln, and he was hitting the horn
7  trying to get our attention, and we was just riding on that
8  side, and they was like, "Man, there's the dude right
9  there."
10 Q.    Let me ask you about that.  Who were you with on that
11 occasion?
12 A.    Me, Frank, Kevin and Dennis.
13 Q.    In whose car were you in?
14 A.    Frank's car.
15 Q.    And who wa driving?
16 A.    Frank.
17 Q.    And where was Kevin riding in the car?
18 A.    He was in the front seat.
19 Q.    Front passenger seat?
20 A.    Yes.
21 Q.    So you and Dennis were where?
22 A.    In the back.
23 Q.    And where were you riding when that happened, when
24 you saw the guy?
25 A.    We was riding -- we was riding on the side of town

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 9, 2002
Volume 100

Page 130

1  over there by -- right off of Nanny Helen Boroughs and all
2  that, that little area over there.
3  Q.   All right. And when you saw the guy, had you ever
4  seen him before? Were you able to recognize him yourself?
5  A.   I saw the guy, you know, like one or two times. He
6  come around Montereo. But, you know, I ain't really know
7  the guy. I ain't never dealt no business with him or bought
8  no cars from him, so --
9  Q.   Did you know his name?
10 A.   No, I ain't even know his name.
11 Q.   What kind of car was he in?
12 A.   He was in like a van.
13 Q.   And what happened after the -- you said the guy
14 honked his horn.
15 A.   Right.
16 Q.   What happened next?
17 A.   He was trying to get our attention, you know, stop
18 the car. They was like, "There go the dude right there."
19 We pulled over and Kevin got out and started talking to him.
20 Q.   At that time when Kevin got out of the car, did
21 anybody else get out of the car with him?
22 A.   No.
23 Q.   And the guy himself in the van, was he alone or was
24 he with someone else?
25 A.   I believe he was by himself in that van.

Page 131

1  Q.   All right. And what happened once -- and did he get
2  out of the car?
3  A.   Yes.
4  Q.   Do you know whether or not, when he got out, did you
5  know whether or not Kevin Gray was armed at the moment that
6  he got out of your car?
7  A.   Yes.
8  Q.   Was he armed?
9  A.   Yes.
10 Q.   Do you know what kind of gun he had?
11 A.   He had a .40.
12 Q.   All right. And so then describe for the ladies and
13 gentlemen of the jury what happened once these two men,
14 Kevin Gray and the other guy, got out of the car, out of
15 their respective cars.
16 A.   Once he got out of the car, he went to the back car.
17 They was talking for a few -- nothing but like -- it wasn't
18 even two minutes. They just had a few words, you know. And
19 then Kevin whipped the gun out and shot the dude.
20 Q.   When Kevin pulled the gun out, did you see where he
21 pulled the gun from?
22 A.   His waist.
23 Q.   And where did he shoot the guy?
24 A.   He hit him in his head.
25 Q.   What happened when he shot him in the face or in the

Page 132

1  head?
2  A.   The guy fell and the gun got jammed.
3  Q.   How do you know that?
4  A.   I'm looking, I'm looking out the back window.
5  Q.   What did -- describe for the ladies and gentlemen of
6  the jury what Kevin Gray did when the guy fell.
7  A.   He hit the dude and tried to hit him again and he
8  fell, but the gun was jammed. He was messing with the gun.
9  And, you know, it was broad daylight, the middle of traffic,
10 so we had to -- you know, he didn't have too long to stand
11 there and be messing with no gun. So he jumped in the car
12 and we rolled out.
13 Q.   When you say messing with the gun, what was he doing?
14 A.   Trying to unjam it.
15 Q.   All right. Where was the guy that had been shot?
16 Where was the guy when Kevin Gray was trying to unjam the
17 gun?
18 A.   The guy had jumped up and jumped in his van.
19 Q.   And then what did he do?
20 A.   He pulled off. He made a U-turn, went down the
21 street, pulled off.
22 Q.   What about Mr. Gray, what did he do?
23 A.   We was in the car, you know.
24 Q.   He got back in the car with you?
25 A.   Exactly.

Page 133

1  Q.   When he got back in the car, when Kevin Gray got back
2  in the car, did he say anything?
3  A.   Yeah. We was -- Frank was driving. We was talking
4  about Frank -- telling him, you know, which way to go,
5  trying to get away from the scene, because it's broad
6  daylight, you know, traffic, in the middle of traffic. We,
7  you know, know somebody seen it, but we was trying to just
8  get away, get up out that car. Frank almost killed us
9  trying to get away. We was talking about that, telling him
10 to drive right, you know, calm himself down.
11 Q.   Did he seem upset or nervous?
12 A.   Yeah, he was nervous.
13 Q.   And how did that affect his driving?
14 A.   It was -- it was very difficult. Everybody was
15 nervous. I was nervous. That's in broad daylight, you
16 know. We was nervous and, you know, rolled down, rolled
17 out, and that was it.
18 Q.   And at that point, what did you think had happened to
19 the guy? Had he lived or died?
20 A.   I was under the impression that maybe he'll drop --
21 you know, he'll ride himself to the hospital, because I seen
22 him get hit in his face, in his head. I said, maybe he'll,
23 you know, he'll fall out or something. That's what I'm
24 thinking, he'll fall out trying to get himself to the
25 hospital.

34 (Pages 130 to 133)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

**10**

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :   CR Number 00-157
                                    :
            Government,             :
                                    :
       v.                           :   Washington, D.C.
                                    :   Wednesday, July 17, 2002
KEVIN L. GRAY, RODNEY MOORE,        :   9:33 a.m.
JOHN RAYNOR, CALVIN SMITH,          :
TIMOTHY HANDY and LIONEL NUNN,      :
                                    :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - -x

                    DAY 74 - AM SESSION
                 TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROYCE C. LAMBERTH
               UNITED STATES DISTRICT JUDGE

     APPEARANCES:

     For the Government:          TIMOTHY J. HEAPHY, ESQUIRE
                                  MATTHEW G. OLSEN, ESQUIRE
                                  AMY JEFFRESS, ESQUIRE
                                  ASSISTANT UNITED STATES ATTORNEYS
                                  U.S. ATTORNEY'S OFFICE
                                  555-4th Street, N.W.
                                  Washington, D.C.   20001
                                  (202)  353-8822

     For Defendant Gray:          FRANCIS DARRON CARTER, ESQUIRE
                                  1730 Rhode Island Avenue, N.W.
                                  Suite 717
                                  Washington, D.C.   20036
                                  (202)  393-4330

                                  DAVID P. BAUGH, ESQUIRE
                                  DAVID P. BAUGH, P.C.
                                  SARA DAVIS, ESQUIRE
                                  223 South Cherry Street
                                  P.O. Box 12137
                                  Richmond, Virginia   23241
                                  (804) 643-8111

                    Pages 1 through 146

FiLED

THERESA M. SORENSEN,
MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

        __   U.S.  v.  KEVIN L.  GRAY   __
             Cr.No.  00-157(01);  Exhibit-10

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

Page 2

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQUIRE
                      COBURN & SCHERTLER
                      1150 18th Street, N.W.
                      Suite 850
                      Washington, D.C. 20036
                      (202) 628-4199

                      STEVEN J. McCOOL, ESQUIRE
                      1776 K Street, N.W.
                      Suite 300
                      Washington, D.C. 20006
                      (202) 393-7088

For Defendant Raynor:  G. GODWIN OYEWOLE, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       9th Floor
                       Washington, D.C. 20004
                       (202) 347-7777
                       THOMAS J. SAUNDERS, ESQUIRE
                       10 N. Calvert Street
                       Suite 715
                       Baltimore, Maryland 21202
                       (202) 550-4662 & (410) 347-9087

For Defendant Smith:  JOHN J. CARNEY, ESQUIRE
                      CARNEY AND CARNEY
                      601 Pennsylvania Avenue, N.W.
                      Suite 900
                      Washington, D.C. 20004
                      (202) 434-8234
                      JONATHAN RUBENS, ESQUIRE
                      601 Pennsylvania Avenue, N.W.
                      Suite 900
                      Washington, D.C.
                      (202) 487-3633

For Defendant Handy:  MICHAEL LASLEY, ESQUIRE
                      1750 K Street, N.W.
                      Suite 304
                      Washington, D.C. 20006
                      (202) 508-3690
                      ADGIE O'BRYANT, JR., ESQUIRE
                      ANDERSON & O'BRYANT, P.C.
                      1107 Seventh Street, N.W.
                      Washington, D.C. 20001
                      (202) 371-0013

                      THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 3

APPEARANCES (Continued):
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
                       3003 Van Ness, N.W.
                       #W919
                       Washington, D.C. 20008
                       (202) 244-2659

Court Reporter:    THERESA M. SORENSEN, CVR-CM
                   Official Court Reporter
                   Room 4800-H, U.S. Courthouse
                   Washington, D.C. 20001
                   (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

                   THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 4

1           PROCEEDINGS
2           THE COURT:  This is the case of The United States
3    v. Kevin Gray, Rodney Moore, John Raynor, Calvin Smith,
4    Timothy Handy and Lionel Nunn, Criminal Case Number
5    2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
8    Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
9           Ms. Jeffress.
10          MS. JEFFRESS:  Your Honor, before the jury comes
11   in, we have told Dr. Arden -- counsel informed us last night
12   that there were no further questions and we've told him not
13   to come in and not to --
14          THE COURT:  All right.
15          MS. JEFFRESS:  -- do any redirect.  However, I
16   would like to raise one issue.  During our presentation of
17   Emanuel Brown's testimony on the Ronald Powell murder, most
18   of the photographs from that scene were excluded because of
19   the large amounts of blood.  There's one photograph in
20   particular that shows very clearly the location of both of
21   Mr. Powell's arms, and perhaps Mr. Heaphy can bring that up.
22          Mr. Coburn on cross-examination of Dr. Arden asked
23   questions about whether the victim could have been alive for
24   some time, implying that perhaps there was a chase.  He also
25   asked about whether certain things were consistent with Mr.

---

Page 5

1    Powell reaching towards his waistband.  We believe that this
2    photograph clearly shows that his arms were in a defensive
3    position, nowhere near his waistband, and that the amount of
4    blood here shows that he certainly was not being chased and
5    leaving a blood trail, but rather that he fell and lost all
6    of that blood right there on the scene.  So we believe that
7    the door has been opened to admitting this photograph, which
8    Emanuel Brown has already identified for precisely this
9    reason.
10          THE COURT:  What is the exhibit number?
11          MS. JEFFRESS:  It's RP-104, Your Honor.
12          MR. McCOOL:  Your Honor, if I may?  Thank you.  I
13   tried to stay away from opening the door to anything like
14   this.  In questioning Dr. Arden, I was only talking about a
15   step or two; I wasn't suggesting nor will I suggest to this
16   jury that Mr. Powell was chased.  What I was simply trying
17   to address was the government's suggestion that his arm
18   placement as it appears not on this photo, but on other
19   photos somehow indicated how he appeared at the time he was
20   shot to sort of address their argument, if you will, that
21   his hands were up in a defensive position, as I think that
22   they will argue to the jury.  I don't think it opens the
23   door to this very, very graphic photograph of the decedent
24   as he is laying on the ground.
25          MR. COBURN:  Your Honor, may I add a brief thought

---

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.                    CR 00-157                    July 17, 2002
Kevin L. Gray, et al                          AM Session                    Volume 74

Page 66

1    A.    Monterreo had brought him out to our house out
2    Clinton one day.
3    Q.    Okay.  And what were you all doing out at the house
4    in Clinton the day that Monterreo brought this guy out
5    there?
6    A.    Like we was drinking and eating crabs or something.
7    Q.    Eating crabs?
8    A.    Yes.
9    Q.    Okay.  And was anyone else out there with you that
10   you remember that day?
11   A.    Kevin was out there.
12   Q.    You and Mr. Gray and --
13   A.    Yeah.
14   Q.    -- Monterreo and his friend?
15   A.    Yeah.
16   Q.    Was that before or after the other guy had sold Mr.
17   Gray the white car?
18   A.    I think it was before.
19   Q.    Okay.  What exactly did Mr. Gray tell you after he
20   found out the car had been stolen?
21           MR. CARTER:  Objection.  Could we have a time
22   frame?
23           THE COURT:  Sustained.
24   BY MS. JEFFRESS:
25   Q.    Was this in May of 1996, Mr. Howard?

Page 67

1    A.    Yes.
2           MS. HOLT:  Objection, Your Honor.  Leading.
3           THE COURT:  Sustained.
4    BY MS. JEFFRESS:
5    Q.    What exactly did Mr. Gray tell you about learning
6    that the car had been stolen?
7           MR. CARTER:  Again a time frame.
8           THE COURT:  Overruled.
9           THE WITNESS:  He was mad, and he was like, "This
10   nigga don't know who he fucking with, going to sell me a
11   stolen car."
12   BY MS. JEFFRESS:
13   Q.    Those were his exact words?
14   A.    Yes.
15   Q.    And what did he say?  Did he say that he wanted to do
16   anything as a result of learning that the car was stolen?
17   A.    He said he wanted to -- he was going to get his money
18   back for him.
19   Q.    Okay.  And did he ask you to do anything with him?
20   A.    Yes.
21   Q.    What did he ask you to do?
22   A.    He asked me to drive over to Monterreo house.
23   Q.    How did he feel about Monterreo?
24   A.    He was -- at the time, he was mad at Monterreo, too,
25   because when he -- he asked me to drive him over there, I

Page 68

1    told him I was going to drive him over there, then me, him
2    and Mo or somebody else, or Pappy, one of us, we was in the
3    car, and while we was driving over there, he was mad and he
4    had said if Monterreo ain't there, he was going to kill his
5    mother.  And I told him, "Man, you ain't got to hit his
6    mother."
7           So when we -- when we got over there, Kevin had
8    went and knocked on the door, and his mother answered the
9    door, and then I guess he asked was Monterreo there and she
10   said no, so we drove around, was looking for the other dude.
11   Q.    Okay.  Now, let me back up a bit.  When he found out
12   that the car was stolen, was that when you all started
13   looking for Monterreo?
14   A.    Yes.
15   Q.    And where again was Monterreo?  Where were you
16   looking for him?
17   A.    Over by 58th.
18   Q.    Okay.  And is this the same area where the other guy
19   was from --
20   A.    Yes.
21   Q.    -- as far as you knew?  Okay.  And what exactly did
22   he say about trying to find Monterreo?
23   A.    He was just trying to find him so we can get the
24   money back.
25   Q.    Okay.  Did you know specifically where Monterreo

Page 69

1    lived?
2    A.    Yes.
3    Q.    The specific address, the house?
4    A.    Yes.
5    Q.    And who was driving when you went to look for
6    Monterreo?
7    A.    I was driving.
8    Q.    Do you remember what car you were driving?
9    A.    I had a gray Lincoln.
10   Q.    Okay.  And did anyone with you have a weapon?
11   A.    Yes.
12   Q.    Who had a weapon?
13   A.    Kevin.
14   Q.    Do you remember what he had?
15   A.    He had a 9 Glock on him.
16   Q.    Where was he holding the weapon?
17   A.    On his waist.
18   Q.    Okay.  And you remember driving.  Do you remember
19   what you were driving?
20   A.    We was driving my -- I had a gray Lincoln.
21   Q.    And where -- you were driving.  Where was Mr. Gray in
22   the car?
23   A.    In the front seat, passenger seat.
24   Q.    Okay.  And you said that you thought either Mo or
25   Pappy was with you?

18 (Pages 66 to 69)

United States of America v.                CR 00-157                      July 17, 2002
Kevin L. Gray, et al                       AM Session                     Volume 74

---

**Page 70**

1   A.   Yes.
2   Q.   Is this when you were looking for Monterreo?
3   A.   Yes.
4   Q.   Okay.  Do you remember how many other people were
5   with you?
6   A.   It was four of us together, but I don't remember who
7   else was in the back seat, but I know we was four deep in
8   the car.
9   Q.   Okay.  And what did Mr. Gray say that he wsa going to
10  do when you got to Monterreo's house?
11  A.   He had said if he knocked on the door and Monterreo
12  wasn't there, that he was going to kill his mother.
13        MR. CARTER:  Objection.  Asked and answered.
14        THE COURT:  Overruled.
15  BY MS. JEFFRESS:
16  Q.   He said that if Monterreo wasn't there -- what did he
17  say he would do?
18  A.   He wsa going to kill Monterreo mother.
19  Q.   What did you say when he said that?
20  A.   And I said, "You ain't got to hit his mother."
21  Q.   And what happened?  Did you go to Monterreo's?
22  A.   Yes.
23  Q.   What happened when you got there?
24  A.   I got there, I let Kevin out, Kevin went up to the
25  door and knocked on the door and asked for him, but he

---

**Page 71**

1   wasn't there.
2   Q.   Okay.  Was anyone else with him when he went to the
3   door?
4   A.   No.
5   Q.   Okay.  Could you see who opened the door?
6   A.   No.
7   Q.   How did you know who was there?
8   A.   He told me that his mother was there.
9   Q.   Okay.  So Mr. Gray came back to the car?
10  A.   Yes.
11  Q.   And what did he tell you about who had answered the
12  door?
13  A.   He said his mother answered the door, but he wasn't
14  there.
15  Q.   So he found out that Monterreo wasn't there?
16  A.   Yes.
17  Q.   Okay.  Did you try to find the other guy?
18  A.   Yes.
19  Q.   What did you do to try to find the other guy?
20  A.   We had just rolled around through the neighborhood,
21  and when we was getting ready to leave, we was on Nellie
22  Helen Burroughs, and the guy drove up on the passenger side
23  and Kevin spotted him and waved him down, and I hit the high
24  beams so he can pull over.  So when he pulled over, I pulled
25  up in front of him and Kevin got out the car and was talking

---

**Page 72**

1   to him for a minute.
2   Q.   Okay.  And what street was this on where you saw him?
3   A.   On Nellie Helen Burroughs.
4   Q.   Nellie Helen Burroughs Avenue?
5   A.   Yeah.
6   Q.   Okay.  And do you remember what he was driving?
7   A.   A minivan.
8        (Whereupon, Government's Exhibit No. DDE-301 was marked
9   for identification.)
10  BY MS. JEFFRESS:
11  Q.   Let me show you a photograph that's not yet in
12  evidence: DDE-301.
13        MR. CARTER:  May we approach, please, Your Honor?
14        THE COURT:  Yes.
15        (Whereupon, a discussion was held at the bench on the
16  record.)
17        MR. CARTER:  This exhibit, Your Honor, has the
18  name, alleged name of the person who was shot.  This man
19  doesn't know the name.  That needs to be taken off and he
20  only needs to be shown the aerial and he can identify the
21  area.
22        MS. JEFFRESS:  That's fine, we'll block out the
23  name for this witness.
24        (End of discussion at the bench.)
25  BY MS. JEFFRESS:

---

**Page 73**

1   Q.   Showing you, Mr. Howard, Government's Exhibit
2   DDE-301, do you recognize the area that's shown in this
3   aerial photograph?
4   A.   Yes.
5   Q.   And is that Nellie Helen Burroughs Avenue that runs
6   across from left to right?
7   A.   Yes.
8   Q.   And does this photograph show the area where --
9        MR. CARTER:  Objection.  Leading.
10        THE COURT:  Overruled.
11  BY MS. JEFFRESS:
12  Q.   Does this show the area where you saw the minivan
13  that you've just testified about?
14  A.   Yes.
15  Q.   Is this a fair and accurate depiction of that area of
16  the city?
17  A.   Yes.
18        MS. JEFFRESS:  I would like to move DDE-301 as
19  it's shown now on the screen into evidence at this time.
20        THE COURT:  Received.
21        (Whereupon, Government's Exhibit No. DDE-301 was
22  received in evidence.)
23  BY MS. JEFFRESS:
24  Q.   Okay.  Now the jury can see it, Mr. Howard.  Do you
25  remember what part of Nellie Helen Burroughs Avenue you were

---

19 (Pages 70 to 73)

United States District Court                        Theresa M. Sorensen, CVR-CM
For The District of Columbia                              Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 17, 2002
Volume 74

---

**Page 74**

1  on when you saw --
2  A.    We was in between this part right here somewhere.
3  Q.    Okay. And you're showing the area, the grassy area
4  --
5  A.    Yes.
6  Q.    -- between 50th Street on the left and I guess that
7  half of the block before, you would get to Division Avenue
8  on the right; is that right?
9  A.    Yes.
10  Q.    Okay. And what exactly happened when you saw the
11  minivan?
12  A.    Kevin flagged him down, I hit the high beams, then he
13  pulled over. When he pulled over, I pulled my car in front
14  of his and Kevin got out the car and then he got out the car
15  and came around to the sidewalk.
16  Q.    Okay. Let me just get a little more specifics on
17  what happened when you first saw him. Which side of your
18  car was the minivan on when you saw it?
19  A.    On the right-hand side.
20  Q.    All right. And Mr. Gray was in the passenger's seat?
21  A.    Yes.
22  Q.    Who was it who first noticed the driver of the
23  minivan?
24  A.    Kevin.
25  Q.    And what did he say when he first saw him?

---

**Page 75**

1  A.    He said, "There he go right there," and he waved him
2  down.
3  Q.    Okay. And what happened when he waved him down?
4  A.    He pulled over and I pulled over in front of him.
5  Q.    Okay. So the minivan pulled over?
6  A.    Yes.
7  Q.    And then you pulled over in front?
8  A.    Yes.
9  Q.    And that took place on the area that you just showed
10  the jury on the photograph?
11  A.    Yes.
12  Q.    What happened after you both pulled over?
13  A.    When we both pulled over, he got out the -- Kevin got
14  out the car and the dude got out the car, and they was
15  talking for like a half of a minute, and then Kevin shot him
16  in the face, and the dude got back in the car and pulled
17  off, and Kevin got back in the car with me and I pulled off.
18  Q.    All right. Now, where were you when the two of them
19  had the conversation?
20  A.    I was sitting in the car.
21  Q.    And where were they in relation to the car that you
22  were sitting in?
23  A.    Right behind the car.
24  Q.    Okay. Where were they in relation to the minivan?
25  A.    Right in front of the minivan.

---

**Page 76**

1  Q.    Okay. So in between the minivan and your car?
2  A.    Yes.
3  Q.    And did you say they were on the sidewalk or on the
4  grassy area?
5  A.    Yes, on the grassy area like.
6  Q.    Okay. And how long did they talk before Kevin fired?
7  A.    Like 30 seconds, something like that.
8  Q.    And could you hear what they were saying?
9  A.    No.
10  Q.    What happened after they talked for a few seconds?
11  A.    After they talked for a few seconds, I was looking in
12  my rear-view mirror at them, and Kevin shot him in the face,
13  and the dude ran back around and got in the driver's seat of
14  his car and pulled off, he bucked a U and pulled off, and I
15  -- me and Kevin -- Kevin jumped in the car with me and I
16  pulled off.
17  Q.    Now, when you say you saw the shooting, could you
18  actually see where the man was hit?
19  A.    Yes.
20  Q.    How did you -- how could you tell where he was hit?
21  A.    Because he was like holding his face, so I figured
22  that he got shot in the face because he was holding his face
23  when he was running back behind my car getting in his car.
24  Q.    Okay. So you figured he got shot in the face --
25  A.    Yeah.

---

**Page 77**

1  Q.    -- because he was holding his face?
2  A.    Yeah.
3  Q.    Could you actually see, when he got shot, where he
4  was shot?
5  A.    Nah.
6  Q.    Okay. And how many times did Mr. Gray shoot him?
7  A.    Once.
8  Q.    And when you saw him holding his face, where exactly
9  was he going?
10  A.    Getting back inside his car.
11  Q.    Was there anyone else with him in his minivan?
12  A.    Yeah. It was a female in the car with him.
13  Q.    And where did he go after getting back into the van?
14  A.    When he got back into his van, he bucked a U-turn and
15  -- he bucked a U and came down, then he turned up 50th
16  Street.
17  Q.    Okay. So he went back the other way --
18  A.    Yeah.
19  Q.    -- on Nellie Helen Burroughs and then down 50th?
20  A.    Yeah.
21  Q.    Now, after Mr. Gray shot him, you said he got back in
22  the car?
23  A.    Yes.
24  Q.    How was he acting when he got back in the car?
25  A.    He was mad because the gun had jammed up on him.

---

20 (Pages 74 to 77)

11

CR 00-157
AM Session

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :  CR Number 00-157
                             :
      Government,         :
                             :
     v.                 :  Washington, D.C.
                             :  Wednesday, July 24, 2002
KEVIN L. GRAY, RODNEY MOORE,   :  9:45 a.m.
JOHN RAYNOR, CALVIN SMITH,     :
TIMOTHY HANDY and LIONEL NUNN, :
                             :
      Defendants.       :
                             :
- - - - - - - - - - - - - - -x

DAY 78 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:       TIMOTHY J. HEAPHY, ESQUIRE
                        MATTHEW G. OLSEN, ESQUIRE
                        AMY JEFFRESS, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEYS
                        U.S. ATTORNEY'S OFFICE
                        555-4th Street, N.W.
                        Washington, D.C.  20001
                        (202)  353-8822

For Defendant Gray:      FRANCIS DARRON CARTER, ESQUIRE
                        1730 Rhode Island Avenue, N.W.
                        Suite 717
                        Washington, D.C.  20036
                        (202)  393-4330

                        DAVID P. BAUGH, ESQUIRE
                        DAVID P. BAUGH, P.C.
                        SARA DAVIS, ESQUIRE
                        223 South Cherry Street
                        P.O. Box 12137
                        Richmond, Virginia  23241
                        (804)  643-8111

Pages 1 through 129

THERESA M. SORENSEN

FILED

MAY 2 0 2003

OFFICIAL COURT REPORTER

NANCY MAYER WHITTINGTON, CLERK
Theresa M. Sorensen, COURT
Official Court Reporter

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-11

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 24, 2002
Volume 78

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
COBURN & SCHERTLER
1150 18th Street, N.W.
Suite 850
Washington, D.C. 20036
(202) 628-4199

STEVEN J. McCOOL, ESQUIRE
1776 K Street, N.W.
Suite 300
Washington, D.C. 20006
(202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
601 Pennsylvania Avenue, N.W.
9th Floor
Washington, D.C. 20004
(202) 347-7777
THOMAS J. SAUNDERS, ESQUIRE
10 N. Calvert Street
Suite 715
Baltimore, Maryland 21202
(202) 550-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
CARNEY AND CARNEY
601 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 434-8234
JONATHAN RUBENS, ESQUIRE
601 Pennsylvania Avenue, W.
Suite 900
Washington, D.C.
(202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(202) 508-3690
ADGIE O'BRYANT, JR., ESQUIRE
ANDERSON & O'BRYANT, P.C.
1107 Seventh Street, N.W.
Washington, D.C. 20001
(202) 371-0013

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:   VERONICE A. HOLT, ESQUIRE
3003 Van Ness, N.W.
#W919
Washington, D.C. 20008
(202) 244-2659

Court Reporter:   THERESA M. SORENSEN, CVR-CM
Official Court Reporter
Room 4800-H, U.S. Courthouse
Washington, D.C. 20001
(202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

1    P R O C E D I N G S
2       THE DEPUTY CLERK:  This is the case of The United
3  States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
4  Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
5  2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6  United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7  McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
8  Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
9       MS. HOLT:  Without arguing, because I know we've
10  already done it, I just want to note for the record that
11  Juror Number 4 also did not look at the Tracy Medina crime
12  scene photos that had blood in them.  She looked at I think
13  the last one, the one that just had the shell casings.
14       MR. OLSEN:  Actually, I made note and commented to
15  Mr. Heaphy yesterday that I noticed Juror Number 4 looking
16  at a couple of those photographs, including the bloody ones.
17  I mean, obviously we're all trying to pay attention a little
18  bit to her to see how she's reacting, but just to put that
19  on the record, we did notice her looking at those
20  photographs.
21     (Whereupon, the jury enters the courtroom at 9:46 a.m.)
22       THE COURT:  Good morning, ladies and gentlemen.
23  Mr. Robinson has resumed the stand.
24       I remind you you are still under oath, Mr.
25  Robinson.

---

**Page 5**

1       Ms. Jeffress, you may proceed.
2       MS. JEFFRESS:  Thank you, Your Honor.
3       DENNIS ROBINSON, GOVERNMENT'S WITNESS
4          PREVIOUSLY SWORN
5          DIRECT EXAMINATION (Continued)
6  BY MS. JEFFRESS:
7  Q.   Good morning, Mr. Robinson.
8  A.   Good morning.
9  Q.   Now, at the end of the day yesterday, you had
10  discussed the transaction that you made on April 10th, 1996,
11  and reviewed the videotape of that transaction.  I want to
12  just ask you a few more questions about that.
13       Was that the case that was the basis for the
14  charge to which you pled guilty to?
15  A.   Yes.
16  Q.   And is that the case for which you are currently
17  serving a ten-year sentence?
18  A.   Yes.
19  Q.   And you testified the last time you came here that at
20  the time you entered that guilty plea, you told the FBI
21  agents that it was actually someone else who provided you
22  with those drugs; do you remember that?
23  A.   Yes.
24       MR. COBURN:  Objection.  Asked and answered.
25       THE COURT:  Overruled.

---

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 24, 2002
Volume 78

**Page 18**

1 I gave Raymond like $150 for making up the wax. I gave
2 Tomeka like maybe 3- or 400 dollars.
3 Q.   But you shared part of it with Raymond Sanders
4 because he had assisted you; is that right?
5 A.   Yes.
6 Q.   Now, you testified earlier that on April 10th, Kevin
7 Gray kept the entire amount, the entire $1,750; is that
8 right?
9 A.   Yes.
10 Q.   Did you ever get any of that money that you had given
11 him on April 10th?
12 A.   No, I didn't.
13 Q.   Did you ever ask him about it and ask why he didn't
14 give you what you were due for that?
15 A.   No, I didn't.
16 Q.   Why didn't you go to him and ask him for that money
17 if you needed the money?
18 A.   I mean basically because, you know, he said -- he
19 said that he was going to give me the money, so I ain't --
20 you know, if he said he was going to give it to me, I
21 shouldn't have to ask him for it if he said he was going to
22 give it to me.
23 Q.   And who controlled who got how much money out of a
24 transaction like that?
25 A.   Usually the one that's making the deal.

**Page 19**

1 Q.   Well you had set up that date; is that right?
2 A.   Yes.
3 Q.   Why did Kevin control who got how much money?
4 A.   Because, I mean, it was his drugs.  He the one that
5 had the -- he the one that gave me the drugs.
6 Q.   So because he was the supplier, he got to say?
7 A.   Yes.
8 Q.   And when you testified yesterday about the Marco
9 Smith murder, you also said that Kevin Gray only gave you a
10 dipper and a half out of the ounce that he had told you he
11 would give you from Rodney Moore; is that right?
12 A.   Yes.
13 Q.   How much is a dipper and a half compared to an ounce?
14 A.   Well, in a ounce, I think it's like maybe five -- I
15 think it's like five dippers in a ounce.
16 Q.   So that was about a quarter, around a quarter of what
17 he owed you?
18 A.   Yes, around a corner, exactly.
19 Q.   Did he ever give you the rest of that, of the heroin
20 that he said he was going to give you?
21      MR. COBURN: Objection. Asked and answered.
22      THE COURT: Overruled.
23      THE WITNESS: No, he didn't.
24 BY MS. JEFFRESS:
25 Q.   Did you ever ask him about that?

**Page 20**

1 A.   No, I didn't.
2 Q.   Why not if you were owed that?
3 A.   Because, I mean, like I, you know, like I just said
4 before, you know, if a guy say he going to give you
5 something, ain't no, you know, ain't no reason to keep
6 asking him for it because he, you know, he's supposed to be
7 a man of his word and give it to you.
8 Q.   And who decided how much you would get then for
9 committing that murder?
10 A.   Can you explain that a little clearer for me?
11 Q.   When you did it, did you make up a price and say,
12 "I'll do it for this amount"?
13 A.   No, I didn't.
14 Q.   Who decided how much you were going to get?
15      MR. COBURN: Objection. Asked and answered.
16      THE COURT: Overruled.
17      THE WITNESS: Rodney wsa the one that told Kevin
18 that he was going to give me a ounce of heroin.
19 BY MS. JEFFRESS:
20 Q.   And how much did Mr. Gray give you?
21      MR. COBURN: Objection. Asked and answered.
22      THE COURT: Overruled.
23      THE WITNESS: A dipper and a half.
24 BY MS. JEFFRESS:
25 Q.   And who made that decision, to give you only a dipper

**Page 21**

1 and a half out of that ounce?
2 A.   Mr. Gray.
3 Q.   Now, Mr. Robinson I want to move to another incident,
4 and this was something that happened on Nannie Helen
5 Burroughs Avenue in May of 1996.  Do you remember this
6 incident?
7 A.   Yes.
8 Q.   Was it common for you to go to that part of town,
9 Nannie Helen Burroughs Avenue?
10 A.   No, it wasn't.
11 Q.   Do you remember going there on one day in May of
12 1996?
13 A.   Yes.
14 Q.   Who were you with on that day?
15 A.   Me, Frank, Pappy and Kevin.
16 Q.   And who was driving?
17 A.   Frank was driving.
18 Q.   Do you remember what he was driving, what kind of
19 car?
20 A.   It was a white Lincoln, maybe a '88 or '89 model.
21 Q.   And where were the others seated in the car that
22 Frank Howard was driving that day?
23 A.   Kevin wsa sitting in the passenger side and Pappy was
24 sitting in the back passenger side behind Kevin.
25 Q.   And where were you?

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 24, 2002
Volume 78

Page 22

1   A.    I was sitting behind Frank.
2   Q.    Was it daytime or nighttime that you were on Nannie
3   Helen Burroughs Avenue?
4   A.    It was daytime.
5   Q.    And what happened while Frank Howard was driving the
6   rest of you on Nannie Helen Burroughs that day?
7   A.    Well, we was riding around, so we -- we on Nannie
8   Helen Burroughs, so we see this guy that's in the -- I think
9   it was like a burgundy Caravan, if I'm not mistaken.  So
10  Kevin had flagged the guy down, told the guy to pull over.
11        So when the guy pulled over, the guy pulled over
12  and --
13  Q.    Do you remember how exactly Mr. Gray flagged him
14  down?
15  A.    I don't remember exactly; I just know he told the guy
16  to, you know, pull over, pull over for a minute.
17        So the guy pull over and get out the -- get out
18  the Caravan.  So we pull like right behind, like right
19  behind the Caravan, but we still -- he pulled like to the
20  curb, but we pulled behind him, but we not to the curb, we
21  like where we can still, you know, where we can still move.
22  Q.    Were you behind the van or in front of the van?
23  A.    We was behind the van.
24        So Kevin get out the car.  When Kevin get out the
25  car, they talk, him and the guy talk like maybe a minute, a

Page 23

1   minute or so, but by now, Frank had pulled in front of the
2   -- in front of the Caravan.  So like I said, Kevin and the
3   guy talking for like a minute.  So I ain't really, you know,
4   I ain't really pay it no mind, so I hear a gunshot, so I
5   look back, I look back and I see -- I see Kevin standing
6   over top of the dude, but the gun -- the had jammed, so
7   Kevin run back to the car.  When he run back --
8   Q.    How could you tell, Mr. Robinson, that the gun had
9   jammed?
10  A.    Because when I looked -- when I looked back, he was
11  like -- Kevin was like bent over, like bent over towards --
12  bent over towards the guy.
13  Q.    And could you see the man --
14  A.    Nah, I couldn't --
15  Q.    -- at that time?
16  A.    I couldn't see -- I ain't see the guy at the time.
17  Q.    So what exactly could you see from the car that you
18  were in?
19  A.    What I seen was Kevin -- Kevin was like bent over, he
20  was like bent over, over top of the guy, like he was still
21  trying to fire the trigger of the gun, but it don't go off.
22  Q.    Now, you said that you had heard a gunshot.  Could
23  you actually see the gun when you were looking back and
24  watching Mr. Gray standing over the man?
25  A.    No, I didn't.

Page 24

1   Q.    How could you tell that the gun was jamming?
2   A.    Because like I said, when I turned back, Kevin was,
3   you know, he was like -- he was like leaned over, like bent
4   over, like he was over top of the guy, like he was over top
5   of the guy, and he just stood there -- he just stood right
6   there over top of the guy like the gun jammed, you see what
7   I'm saying, like the gun jammed up.
8   Q.    Was he making any motion that made you think that the
9   gun was jamming?
10  A.    Nah.  He was just, like I said, he was just bent
11  over, like he was bent over top of the guy.  So after that,
12  Kevin run back to the car.
13  Q.    And when he was bent over, standing over the man like
14  that, did you hear any more gunshots?
15  A.    No, I didn't.
16  Q.    When you heard the first gunshot, were you actually
17  watching and paying attention behind you?
18  A.    No, I wasn't.
19  Q.    Okay.  So you turned around and saw it after you
20  heard the first gunshot?
21  A.    Yes.
22  Q.    Okay.  So what happened after you saw Mr. Gray
23  standing over the man like that?
24  A.    After that, Mr. Gray run back and get in our -- and
25  get in the car we were driving.  So we pull off, so I look

Page 25

1   back, I see the guy -- I see the guy -- the guy was driving
2   a car, so he run -- I guess he get up and run around and get
3   back in the driver's seat.  His face -- his face was all
4   bloody.  So by now -- by now, we moving, we about to hit
5   Division Avenue because it's -- on Nannie Helen Burroughs,
6   it's like Division Avenue and Nannie Helen Burroughs meet
7   up.  So we make a right on -- we make a right on Division
8   Avenue, go up Division Avenue, hit -- what's that?  I think
9   that's East Capitol Street.  We hit East Capitol Street and
10  from right there, we go back around Robinson Place.
11  Q.    Now, when Mr. Gray got back into the car, did he say
12  anything?
13  A.    He said that the gun had jammed.  He said that -- I
14  mean, that's basically all he said, that, you know, the gun
15  had jammed.
16  Q.    Let me show you an exhibit which I think has been --
17  which has been admitted already, DDE-301.
18        Do you see what's on the aerial photograph that's
19  now in front of you?
20  A.    Yes.
21  Q.    And do you recognize that area of the city?
22  A.    Yes.
23  Q.    Could you show us what is shown in that aerial
24  photograph?
25  A.    This is where the guy got shot on Nannie Helen

12

United States of America v.             CR 00-157             September 24, 2002
Kevin L. Gray, et al.                                                     Volume 108

Page 1

```
          IN  THE  UNITED  STATES  DISTRICT  COURT
            FOR  THE  DISTRICT  OF  COLUMBIA

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :   Docket No. CR 00-157
                              :
        Plaintiff,            :   Washington, D.C.
                              :   September 24, 2002
v.                            :   2:08 p.m.
                              :
KEVIN L. GRAY, RODNEY MOORE,  :
JOHN RAYNOR, CALVIN SMITH,    :
TIMOTHY HANDY, LIONEL NUNN,   :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - x
```

```
              DAY 108 - PM SESSION
              TRANSCRIPT OF TRIAL
      BEFORE THE HONORABLE ROYCE C. LAMBERTH
           UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Plaintiff:      TIMOTHY J. HEAPHY, ESQ.
                        MATTHEW G. OLSEN, ESQ.
                        AMY JEFFRESS, ESQ.
                        Assistant United States Attorneys
                        555 Fourth Street, Northwest
                        Washington, D.C. 20001

For Defendant Gray:     FRANCIS D. CARTER, ESQ.
                        1730 Rhode Island Avenue, Northwest
                        Suite 717
                        Washington, D.C. 20036
                        DAVID P. BAUGH, ESQ.
                        Law Offices of David P. Baugh, PC
                        223 South Cherry Street
                        Richmond, Virginia 23241

```
              Pages 1 through 158
          DOLORES A. BYERS, CSR, RPR
            Official Court Reporter
```

FILED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District Court                                        Dolores A. Byers, CSR RPR
For The District of Columbia      U.S. v. KEVIN L. GRAY      Official Court Reporter
                           Cr.No. 00-157(01); Exhibit-12

United States of America  v.
Kevin L. Gray, et al.

CR 00-157

September 24, 2002
Volume 108

---

Page 2

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
    Coburn and Schertler
    1150 18th Street, Northwest
    Washington, D.C. 20036

    STEVEN MC COOL, ESQ.
    Mallon and McCool, LLC
    16 South Calvert Street, Suite 1002
    Baltimore, Maryland 21202
For Defendant Raynor:  G. GODWIN OYEWOLE, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    THOMAS SAUNDERS, ESQ.
    207 East Redwood Street, Suite 205
    Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
    Law Offices of Carney and Carney
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    JONATHAN RUBENS, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004
For Defendant Handy:  MICHAEL LASLEY, ESQ.
    1730 K Street, Northwest, Suite 304
    Washington, D.C. 20006
    ADGIE O'BRYANT, JR., ESQ.
    Anderson and O'Bryant, PC
    1107 Seventh Street, Northwest
    Washington, D.C. 20001

For Defendant Nunn:  VERONICE A. HOLT, ESQ.
    3003 Van Ness Street, Northwest
    Suite W-919
    Washington, D.C. 20008

---

Page 3

CONTENTS

WITNESSES:           DIRECT  CROSS  REDIRECT  RECROSS
On behalf of the government:
Alfred Percell Holmes
  By Mr. Lasley          4
  By Mr. Heaphy                 10
James Penn
  By Mr. Lasley         37
  By Mr. Baugh          89
  By Ms. Holt          115
  By Mr. Heaphy                116
  By Mr. Lasley                 142

EXHIBITS

GOVERNMENT                MARKED  REC'D
No. DG-305                  11
No. DG-100                  20

DEFENDANT HANDY           MARKED  REC'D

No. 180                     40

---

Page 4

AFTERNOON SESSION

1    AFTERNOON SESSION
2    (Jury entered courtroom.)
3    THE COURT:  You can resume the stand.
4    Mr. Lasley, any other questions?
5    MR. LASLEY:  Yes, sir.
6    Just a few more questions, Officer.
7    CROSS-EXAMINATION
8    BY MR. LASLEY:
9    Q  You indicated that you had done something on September
10   the 19th.  Is that of this year?
11   A  Yes, sir.
12   Q  And what was that, sir?
13   A  Just I had basically a witness conference with the
14   Assistant U.S. Attorney Heaphy.  And I went back to the
15   block just to familiarize myself with the present -- the way
16   it looks.
17   Q  I see.  And I believe you indicated it was different in
18   the sense that one of the buildings was missing -- that 62
19   and 64 was missing?
20   A  That's correct.
21   Q  And there's a big space where 62 and 64 used to be; is
22   that correct?
23   A  Yes, sir.
24   Q  Do you remember when or do you know when the building --
25   this one building with two sides to it; is that correct?

---

Page 5

1    A  Correct.
2    Q  When was that building razed or demolished, sir?
3    A  I do not know.
4    Q  You have no information that it was done at any
5    particular time that you may have received?
6    A  No, sir.
7    Q  Now, let me show you -- I just have a new more exhibits
8    and then I'm going to sit down, sir.
9    MR. LASLEY:  May I approach?
10   THE COURT:  Yes.
11   BY MR. LASLEY:
12   Q  Let me show you what's marked as Handy Exhibits 127, 126
13   and 124.  See if you can identify the exhibits.
14   (Witness reviewed document.)
15   A  Defendant's Exhibit 127 is a photograph showing a shell
16   casing, a close-up of a shell casing on the sidewalk.
17   Q  That's 124?
18   A  That's Defendant's Exhibit 127.
19   Q  127.  And it shows the shell casing on the sidewalk?
20   A  Yes, sir.
21   Q  What's the next exhibit, sir?
22   A  Defendant's Exhibit 126.  It is a photograph showing an
23   indentation in the concrete of the step which appear to me
24   to have been where a bullet may have ricocheted off that
25   particular step.  That was my purpose for taking that

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.            CR 00-157                September 24, 2002
Kevin L. Gray, et al.                                                    Volume 108

---

**Page 150**

1      THE COURT:  Sustained.
2      MR. LASLEY:  I have nothing further questions of
3  this witness.
4      (Witness excused.)
5      THE COURT:  We'll take our recess at this time.
6  We'll see you back tomorrow morning at 9:30.  Please seal
7  your notes.  Don't talk about the case.  Don't read or
8  listen to anything about the case.  Have a nice evening.
9  I'll see you all at 9:30 tomorrow.
10      (Jury exited courtroom.)
11      THE COURT:  The government expects to go to
12  Phillips and then where are we going from there?
13      MR. HEAPHY:  Your Honor, we'll finish the
14  Demetrius Green murder and then go on to Phyllis Webster.
15  So perhaps if Your Honor wants to resolve Ms. Holt's motion,
16  we should do that now.  I do expect we'll reach her
17  tomorrow.
18      THE COURT:  What are the issues on that?  Is she
19  testifying about Demetrius Green
20      MS. JEFFRESS:  No, Your Honor.  She's testifying
21  about Lionel Nunn and her drug dealing with Lionel Nunn.
22      THE COURT:  Is it 404 or not?
23      MS. JEFFRESS:  Your Honor, our submission is that
24  Ms. Webster's conspiracy overlaps with the conspiracy that's
25  charged in this case and that's for the following reasons.

---

**Page 151**

1      Ms. Webster did supply Lionel Nunn with cocaine in
2  the beginning of their relationship and that was from '97 to
3  '98.  Ms. Holt is correct that she stopped supplying him
4  with cocaine at some point in 1998.  However, their
5  relationship shifted and Mr. Nunn supplied Ms. Webster with
6  drugs actually from beginning as far back as 1997 and
7  continuing into 1998, 1999 and even early 2000 which
8  obviously overlaps with the conspiracy that's charged in
9  this case.
10      She was receiving drugs from him at the same time
11  during which Mr. Nunn was supplying Kevin Gray with drugs
12  and Kevin Gray was conducting acts of violence for Mr. Nunn.
13      So we believe it is a separate but overlapping
14  conspiracy and that her testimony is relevant on that basis.
15      THE COURT:  All right.
16      MS. HOLT:  I think when, and that's why I put the
17  wording from your order, what you initially told the
18  government and what the government proffered was that all of
19  the evidence that they would provide was directly related to
20  this conspiracy.
21      What the evidence that is in the grand jury
22  testimony shows -- and I have actually set them out there
23  because I'm not asking you to rely upon my word.  It's
24  absolutely clear according to the government's case that my
25  client did not know Kevin Gray until November of 1998,

---

**Page 152**

1  taking their evidence at its face, and that Ms. Webster was
2  not selling drugs to my client.
3      What the government has always proffered thus far
4  is that the reason why this was relevant was that the drugs
5  that Ms. Webster was selling to my client were then being
6  resold to Kevin Gray.  That cannot have happened.
7      THE COURT:  But what they're proffering now is not
8  that.  It's that she was buying from your client.
9      MS. HOLT:  What they have proffered in their proof
10  is that there were two transactions.  One was a marijuana
11  transaction which she says is, herself in the grand jury, a
12  separate conspiracy not related to any of this.  And then
13  she also -- maybe I need to go back because is the
14  government saying that they no longer wish to offer the fact
15  that she was selling my client drugs because that's the -- I
16  tried to keep the thing separate.
17      THE COURT:  Clearly, they're going to do both, I
18  assume.
19      MS. HOLT:  Yeah.  And that's why I'm saying that
20  the fact that they're saying that in 1999 that she says that
21  on two occasions, one occasion he sold her marijuana and one
22  occasion that he sold her cocaine, that that makes the prior
23  sales, not which are from a separate conspiracy and which do
24  not overlap with this -- first of all, you have actually
25  three separate conspiracies here.

---

**Page 153**

1      Phyllis says in her testimony that she stopped
2  buying -- she stopped giving my client cocaine because he
3  was getting it from some place else.  And if his
4  statements were true, then wherever he's getting it from
5  that would be presumed to be wherever the government's
6  evidence alleges that he was giving it to Kevin Gray.
7  That's a separate conspiracy.
8      The conspiracy that she alleges that Mr. Nunn was
9  part of is that in '97 and '98 she sold him drugs and the
10  government has always told you they were going to hook
11  up the drugs from that conspiracy.  And what the government
12  now has, among the exhibits that they have given us, for
13  example, they want to show a seizure of a million dollars
14  from, not even from Ms. Webster but from somebody else who
15  is in that conspiracy, a Mr. Johnson who did not have any
16  dealings with my client and doesn't allege that he had any
17  dealings with my client.
18      In other words, this is a whole another huge
19  conspiracy.  Mr. Johnson is alleged to be the biggest
20  cocaine dealer in D.C.  He had dealings with Phyllis
21  Webster.  They, also, want to bring his other crimes
22  evidence into this case even though he had no relationship
23  with my client.  And there's no relationship between that
24  money and this case here.  It is pure propensity evidence
25  for the purpose of showing character.

---

United States District Court                         Dolores A. Byers, CSR RPR
For The District of Columbia                         Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

September 24, 2002
Volume 108

---

Page 154

1    But I think the big thing is that, if I recall
2 back to the arguments that we had, when we talked about
3 other crimes, period, the test and the government was
4 proffering that this was all inextricably intertwined. And
5 in my old memorandum, and we briefed this and talked it,
6 that our Court of Appeals says that they're not very
7 impressed with the inextricably intertwined test as it is.
8    And in this particular case these two things are
9 not inextricably intertwined. This is a separate
10 conspiracy, the Johnson/Webster cocaine conspiracy in which
11 they allege at a separate time that they sold -- not that
12 they, only she -- that she sold some drugs to my client.
13 Mr. Johnson, I understand, has testified under oath that he
14 doesn't like my client and never sold him any drugs.
15    She alleges that she sold some drugs at some
16 period before he met Mr. Gray. So in my view of what 404(b)
17 means and how this Court has interpreted it is that you
18 certainly have to have the notice. I'm not going to quibble
19 with you about the notice because I now know what they're
20 going to say. I wrote the motion.
21    But the thing is that now I think you have to
22 proceed to the analytical test. And the question is as
23 evidence that he is doing -- that someone else alleges that
24 at a different period in time he was selling drugs with
25 them. And I don't know. I have to look at the dates.

---

Page 155

1    The marijuana conspiracy is when almost everybody
2 in this case -- the marijuana sales she alleges -- almost
3 everybody in this case is already locked up. It's
4 September 17, 1999. I don't even know if you'd say it's
5 overlapping. Almost everybody in this case is already
6 locked up.
7    I'm not sure when this alleged cocaine transaction
8 is supposed to have taken place. But I don't think that you
9 can bootstrap -- in other words, it's the government's
10 argument, as I understand it -- and I probably am making it
11 even better than they made it -- that the only argument for
12 the admissibility of the cocaine transaction where Mr. Nunn
13 is allegedly selling to Ms. Webster is to show that he had
14 cocaine available for sale.
15    I don't know when that is. So I can't say whether
16 or not it's within the relevant period of time. But that
17 still, if that's what they want to prove, that's one issue.
18 I still object but that's not the same as wanting to prove
19 that in 1997 Mr. Nunn bought cocaine from her at a time when
20 he is not alleged to have been in this conspiracy and when
21 there is no flow through from that to this conspiracy.
22    THE COURT: Okay.
23    MS. HOLT: That's the prejudicial.
24    THE COURT: Do you want to respond?
25    MR. LASLEY: Just for the record --

---

Page 156

1    THE COURT: Let me deal with Ms. Holt first.
2    MS. JEFFRESS: We do intend, Your Honor, to
3 present evidence of the period during which Ms. Webster was
4 supplying Mr. Nunn. We believe it overlaps closely with his
5 role in the conspiracy in this case. We, also, believe it's
6 relevant to his ascension as a drug dealer and that he was
7 receiving cocaine from her and then started supplying her.
8 So we believe that all of Ms. Webster's testimony about her
9 direct drug dealing with Mr. Nunn is relevant to his role in
10 the conspiracy that's charged in our case.
11    We are not going far afield. I don't know what
12 Ms. Holt based her statement on that we intend to present
13 evidence of money forfeited from Mr. Johnson. We don't
14 intend to go far afield into her conspiracy but rather to
15 focus on her relationship, her direct drug deals in
16 relationship with Lionel Nunn.
17    THE COURT: The motion in limine is denied then.
18    All right. Mr. Lasley, what did you want to
19 raise?
20    MS. HOLT: Can I ask because maybe that's not what
21 they're intending but I think -- this is what I'm talking
22 about. The government tendered it. Maybe they're not
23 planning to use it as an exhibit but they tendered it. It's
24 the $1.5 million from Michael Johnson. That you gave us
25 this but you don't intend to use it?

---

Page 157

1    MS. JEFFRESS: I'll talk with Ms. Holt about that.
2 I think we are just mistaken as to what this is.
3    MR. LASLEY: Thank you very much, Your Honor. I
4 did receive today from the government D002-TH-500 which I
5 believe is the transcript of the plea of Mr. Handy and
6 00-017 before Your Honor. And I don't know if they're going
7 to this next or what. I'm just trying to get a
8 clarification.
9    The other point I was just trying to find, just
10 for the record, find out. I understand they're going with
11 Scorpio and not with Derrick Roach, just one more witness.
12    THE COURT: They haven't said.
13    MR. LASLEY: I thought they said Scorpio. I'm
14 just trying to find out if they're going with Derrick Roach
15 as well as I'll know whether to bring that material.
16    MR. HEAPHY: Mr. Lasley should bring all material
17 on all witnesses for Demetrius Green, Your Honor. And in
18 terms of the guilty pleas, there are several outstanding.
19 Mr. Rainer has a plea from '97, Mr. Handy from 2000.
20 Mr. Nunn has one from 2001. There are several upcoming
21 transcripts. I believe with respect to the Handy plea there
22 will also be an officer who will testify about his arrest on
23 that occasion. That's later on, Your Honor, towards the
24 very end of the case, chronologically. It won't be tomorrow
25 and we'll make sure Mr. Lasley has notice so he can bring

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

13

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            : CR Number 00-157
                                     :
            Government,              :
                                     :
        v.                           : Washington, D.C.
                                     : Wed., September 25, 2002
KEVIN L. GRAY, RODNEY MOORE,         : 9:49 a.m.
JOHN RAYNOR, CALVIN SMITH,           :
TIMOTHY HANDY and LIONEL NUNN,       :
                                     :
            Defendants.              :
                                     :
- - - - - - - - - - - - - - - -x

DAY 109 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822

For Defendant Gray:        FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804)  643-8111

Pages 1 through 144

FILED

THERESA M. SORENSEN,

MAY 2 0 2003

U.S. DISTRICT COURT
Theresa M. Sorensen, CVR-CM
Official Court Reporter

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

— U.S. v. KEVIN L. GRAY —
Cr.No. 00-157(01); Exhibit-13

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
    COBURN & SCHERTLER
    1150 18th Street, N.W.
    Suite 850
    Washington, D.C. 20036
    (202) 628-4199

    STEVEN J. McCOOL, ESQUIRE
    1776 K Street, N.W.
    Suite 300
    Washington, D.C. 20006
    (202) 393-7088

For Defendant Raynor:  G. GODWIN OYEWOLE, ESQUIRE
    601 Pennsylvania Avenue, N.W.
    9th Floor
    Washington, D.C. 20004
    (202) 347-7777
    THOMAS J. SAUNDERS, ESQUIRE
    10 N. Calvert Street
    Suite 713
    Baltimore, Maryland 21202
    (202) 550-4662 & (410) 547-9087

For Defendant Smith:  JOHN J. CARNEY, ESQUIRE
    CARNEY AND CARNEY
    601 Pennsylvania Avenue, N.W.
    Suite 900
    Washington, D.C. 20004
    (202) 434-8234
    JONATHAN RUBENS, ESQUIRE
    601 Pennsylvania Avenue, N.W.
    Suite 900
    Washington, D.C.
    (202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
    1730 K Street, N.W.
    Suite 304
    Washington, D.C. 20006
    (202) 508-3690
    ADGIE O'BRYANT, JR., ESQUIRE
    ANDERSON & O'BRYANT, P.C.
    1107 Seventh Street, N.W.
    Washington, D.C. 20001
    (202) 371-0012

        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

**Page 4**

```
 1              P R O C E E D I N G S
 2         THE DEPUTY CLERK:  This is the case of The United
 3    States v. Kevin L. Gray, Rodney Moore, John Raynor, Calvin
 4    Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5    2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
 7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
 8    Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
 9         MS. HOLT:  Yes.  I just wanted to also object to
10    the government eliciting from this witness -- I'm assuming
11    that they will, so I'm doing it in limine, and the objection
12    will be for the time of her testimony -- eliciting evidence
13    that Ms. Webster went to Florida with my client for the
14    purpose of meeting Mr. Singleton to see if they could get a
15    heroin connect, which also is totally unrelated to this
16    case, and that there was no transaction between the two of
17    them and they did not establish a connection.
18         THE COURT:  All right.
19         Bring in the jury.
20         MR. HEAPHY:  Your Honor, before the jury comes in,
21    I just wanted to make a couple representations about our
22    order.  We've reevaluated, Your Honor, in our continual
23    effort to streamline or presentation.  We're not going to
24    call at this point Mr. Phillips or Mr. Roach, the two
25    additional witnesses we had announced on the Green murder.
```

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:   VERONICE A. HOLT, ESQUIRE
    3003 Van Ness, N.W.
    #W919
    Washington, D.C. 20008
    (202) 244-2659

Court Reporter:    THERESA M. SORENSEN, CVR-CM
    Official Court Reporter
    Room 4800-H, U.S. Courthouse
    Washington, D.C. 20001
    (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

**Page 5**

```
 1    Obviously we would reserve our right to do so at a later
 2    point, but we don't intend to at this point, at least today.
 3    So we're going to go right to Phyllis Webster --
 4         THE COURT:  All right.
 5         MR. HEAPHY:  -- and move forward from there.
 6         THE COURT:  All right.
 7         MS. HOLT:  For the record, I take it the Court is
 8    denying my objection, but there is nothing on the record.
 9         THE COURT:  Correct.
10         MR. CARTER:  If I may, Your Honor, among the
11    Jencks material, the government has presented us transcripts
12    of two videotapes, one of November the 3rd, '98, and the
13    other of October 20th, '98.  Could I ascertain if they
14    intend to use those during their presentation of testimony
15    against Mr. Nunn?
16         MS. JEFFRESS:  We do intend to use those, Your
17    Honor, not with Phyllis Webster, but at a later point.
18         THE COURT:  Today?
19         MS. JEFFRESS:  It depends on how long we take with
20    Ms. Webster.  We could get there today.
21         MR. CARTER:  I would ask Your Honor, if the
22    government has an extra set, to let Your Honor review these
23    transcripts ahead of time.  What they are, Your Honor, as I
24    said, it's October '98 and November of '98.  It is a camera
25    that is mounted pursuant to a court order in the back room
```

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

Page 6

1  of an establishment called the Bethesda Jewelry Exchange.
2  It has to do with actually two conspiracies removed.
3       The information the government has provided is
4  that they started an investigation of two brothers that ran
5  two jewelry stores, one in Georgetown and one in Bethesda,
6  and how they used that as a fencing operation.
7       In the course of that -- that's Conspiracy 1 -- in
8  the course of that, Carlos Cardoza, who is one of the
9  decedents in our case, and Mr. Nunn come in and I believe
10  they are involved or they talk about people that are
11  involved in the conspiracy for which Ms. Webster, which I
12  would call Conspiracy 2, is involved with, the transmission
13  of cocaine and so forth. So it really doesn't have anything
14  to do with this case.
15      What it is, is a discussion about people buying
16  jewelry or being able to sell back jewelry once they buy it,
17  watches and rings, "Can you get a ring?" There's a
18  discussion of a digital scale and, "Can it be used to weigh
19  money?" And the jeweler says, "Yes, let me show you how it
20  can be used to weigh money," and so forth.
21      We've been in this trial more than six months and
22  there is no discussion of any of these six men ever having
23  jewelry, outlandish rings, outlandish necklaces or diamonds
24  or anything like that, so there just is no connection
25  whatsoever to this case with those two videotapes other than

Page 7

1  to prejudice these defendants because there's conversations
2  of eight-carat diamonds and five-carat diamond rings and
3  Rolex watches and how much they cost and their resell value,
4  and there's just none of that anywhere in this case, Your
5  Honor, and it is just not related.
6       I would ask Your Honor to review that, and I would
7  object to its entry completely, and although Your Honor has
8  ruled, I would also join Defendant Nunn's motion to exclude
9  the testimony of Phyllis Webster, but in particular, with
10  these two videotapes, it's just totally prejudicial, Your
11  Honor.
12      THE COURT: All right. Have you got a copy of
13  that transcript I can look at?
14      MR. HEAPHY: Yes, Your Honor. And if I could just
15  add, we're not seeking to introduce the entirety of those
16  two videotapes. They are both relatively lengthy. I can
17  focus counsel on the specific portions. It's a total of
18  maybe 15 minutes, like twelve minutes from one and three
19  minutes from the other.
20      THE COURT: Okay. Can you mark those on --
21      MR. HEAPHY: And I will mark those in the copy I
22  give to the Court.
23      THE COURT: All right.
24      MR. CARNEY: Your Honor, for the record, I join in
25  those motions and move for severance.

Page 8

1       THE COURT: Okay. Denied.
2       MS. HOLT: I simply want to make sure that I, with
3  respect to the videotapes, join my other 404(b) motions that
4  I have thus far made. I narrow my focus to some extent. I
5  don't object to the visual if the government wants to show
6  that my client new Carlos Cardoza. I do object to the video
7  -- to the audio because it is other crimes' evidence. And I
8  just need to correct something. It's not from the related
9  Phyllis -- when my client pled guilty, okay, he did not
10  plead guilty to laundering proceeds from that conspiracy; he
11  just pled guilty generally to laundering money which he
12  should have known was drug proceeds, and there is no
13  discussion on that tape that involves Phyllis Webster or any
14  of this. That's separate.
15      THE COURT: All right.
16      MR. LASLEY: I would like to join the motions this
17  morning.
18      THE COURT: I'm sorry?
19      MR. LASLEY: I would like to join the motion as
20  well since everybody is joining motions this morning.
21      THE COURT: All right.
22      MR. LASLEY: I assume my motion is being denied.
23      THE COURT: Well, the motions will be denied
24  except those as to the tapes. I will look at the transcript
25  and see about the tapes.

Page 9

1       MR. LASLEY: Thank you.
2       (Whereupon, the jury enters the courtroom at 9:56 a.m.)
3       THE COURT: All right. Good morning, ladies and
4  gentlemen.
5       The government may call your next witness.
6       MS. JEFFRESS: Thank you, Your Honor. We call
7  Phyllis Webster, who the marshals will bring in.
8       THE COURT: Okay.
9       PHYLLIS MARIE WEBSTER, GOVERNMENT'S WITNESS, SWORN
10          DIRECT EXAMINATION
11  BY MS. JEFFRESS:
12  Q.  Good morning, Ms. Webster.
13  A.  Good morning.
14  Q.  Could you please introduce yourself to the jury by
15  stating your full name?
16  A.  My name is Phyllis Marie Webster.
17  Q.  And could you spell your names for the court
18  reporter.
19  A.  P-h-y-l-l-i-s M-a-r-i-e W-e-b-s-t-e-r.
20  Q.  Ms. Webster, how old are you?
21  A.  Thirty-five.
22  Q.  And where were you born?
23  A.  Dover, Delaware.
24  Q.  How long did you live in Dover, Delaware?
25  A.  I don't think we lived there at all. My parents --

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

**Page 22**

1 the Sentence Departure Board and possibly see if I can get a
2 5K1 sentence departure.
3 Q.    And what would that allow -- what would happen if the
4 government wrote the sentencing -- is it a sentencing
5 committee?
6 A.    I think so, yes.
7 Q.    If the government wrote the Departure Committee and
8 the Departure Committee agreed to apply for a departure in
9 your case.
10 A.    The judge wouldn't have to sentence me by the
11 guidelines, he can go below the guidelines.
12 Q.    Okay.  That would allow the judge to depart and give
13 you a lesser sentence?
14 A.    Yes.
15 Q.    And has anyone made any promises about what will
16 happen at your sentencing?
17 A.    No.
18 Q.    Who is it who decides what sentence you receive?
19 A.    Judge Friedman.
20 Q.    And the trial that you testified in earlier this
21 year, was that in front of Judge Friedman?
22 A.    Yes.
23 Q.    And has the government -- has anyone in the
24 government made you any promises about what sentence the
25 government will ask for in your case?

---

**Page 23**

1 A.    No.
2 Q.    All right.
3        Let me move on, then, and ask you -- you
4 identified a few minutes ago Lionel Nunn?
5 A.    Yes.
6 Q.    How did you meet Lionel Nunn?
7 A.    Through a mutual friend of ours.  I call her Stink.
8 Her name is Katrina Holston, I believe.  And she called me
9 and asked for me to come over to her apartment several years
10 ago, and when I went there, she told me Lionel wanted to
11 meet me.
12 Q.    And was he there or did he come there to her
13 apartment?
14 A.    I don't remember if he was already there or if he
15 came after I arrived.  I don't remember that.
16 Q.    Did you meet him there at some point?
17 A.    Yes.
18 Q.    And it was that day?
19 A.    Yes.
20 Q.    And Katrina or Stink, how did you know her?
21 A.    Just from growing up.  I had known her for probably
22 -- since maybe about 1985, 1986.
23 Q.    Did you have any discussion with Mr. Nunn when you
24 met him then in her apartment?
25 A.    Yes.

---

**Page 24**

1 Q.    What was the discussion you had with him?
2 A.    He was interested in purchasing kilos of cocaine from
3 me, but because I didn't know him, I was kind of, you know,
4 leery of, you know, discussing, you know, anything with him
5 about drugs, so I decided to, you know, ask around town and
6 ask some questions about him and see what kind of guy he was
7 before I did any cocaine deals with him.
8 Q.    So did you, in fact, do that before agreeing to make
9 any deals with him?
10 A.    Yes.
11 Q.    At the time that you had this discussion with him,
12 were you selling large amounts of cocaine?
13 A.    Yes.
14 Q.    What -- tell us a little more about that.  What
15 amounts were you receiving and what amounts were you
16 selling?
17 A.    At that time, probably about anywhere from 25 to 50
18 kilo shipments, and I had two weeks in which I had to have
19 it sold and completed and send the money back.
20 Q.    Okay.  So just to be clear, you were receiving from
21 25 to 50 kilograms of cocaine --
22 A.    Yes.
23 Q.    -- at a time?  Was this powder cocaine?
24 A.    Yes.
25 Q.    And you were turning that around in about two weeks?

---

**Page 25**

1 A.    Yes.
2 Q.    And how often would you receive shipments of that
3 size?
4 A.    Maybe anywhere from two to four times a year.  Not
5 that often.
6 Q.    Okay.  What year, do you remember what year this was
7 that you met Mr. Nunn?
8 A.    I believe it was 1997.
9 Q.    So you said earlier that rather than agree to engage
10 in business with him when he asked, you first wanted to ask
11 some people about him and find out more about him; is that
12 right?
13 A.    Right.
14 Q.    And did you eventually then agree to do business with
15 him?
16 A.    Yes.
17 Q.    Tell us, after this first meeting that you had with
18 him in Katrina's apartment, when did you next see him, or
19 where did you next see him?  Why don't I ask that.
20 A.    I'm not 100 percent sure.  He was friends with my
21 hairstylist, the woman who did my hair, so sometimes I would
22 see him at the hair salons or on Georgia Avenue, you know,
23 in different areas, because I frequented up and down Georgia
24 Avenue and sometimes we'd bump into each other or see each
25 other driving, stuff like that.

---

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 26

1  Q.    Okay. Is this Georgia Avenue, Northwest?
2  A.    Yes.
3        (Whereupon, Government's Exhibit Number PW-3 was marked
4  for identification.)
5        MS. JEFFRESS: Could we see PW-3? This is not yet
6  admitted.
7  BY MS. JEFFRESS:
8  Q.    Do you see it on the screen in front of you?
9  A.    Yes, but it's not clear.
10 Q.    It's not all that clear. Could we perhaps highlight
11 the upper portion of that? Can you see it a little better
12 now?
13 A.    Yes.
14 Q.    Do you recognize what this is?
15 A.    A map of D.C., of Northwest it looks like.
16 Q.    And does this have the area of Georgia Avenue, upper
17 Georgia Avenue that you were talking about?
18 A.    Yes.
19       MS. JEFFRESS: I would like to move PW-3 into
20 evidence.
21       THE COURT: Received.
22       (Whereupon, Government's Exhibit Number PW-3, having
23 been previously marked for identification, was admitted into
24 evidence.)
25 BY MS. JEFFRESS:

---

Page 27

1  Q.    Okay. The jury can see it now. Could you point out
2  -- there's actually a pen on the side of your monitor which
3  will move these green arrows over here. Point out where
4  Georgia Avenue is on this map.
5  A.    Right here.
6  Q.    Running up right in the middle of the part that's
7  highlighted?
8  A.    Yes. Right here. All the way up. You said Georgia
9  Avenue, right?
10 Q.    That's right.
11 A.    Okay. Right here.
12 Q.    And you had mentioned that you used to see him at
13 hair salons?
14 A.    Yes, at, let me see, Natural Motions on Jefferson
15 Street -- I'm not sure if that's on here -- and down here on
16 Jefferson and Georgia, and then the salon where I used to
17 get my hair done, Hairport, was located in two places in one
18 year. They moved from 7709 Georgia Avenue down to Kennedy
19 Street.
20 Q.    Okay. I see you have the arrow near Kennedy Street
21 and Georgia Avenue. Is that one of the locations where the
22 salon was?
23 A.    Right.
24 Q.    And the 7700 location, where was that?
25 A.    I believe up here by the red dot.

---

Page 28

1  Q.    So that's right near the District line?
2  A.    And Eastern Avenue.
3  Q.    Okay. And this is the D.C.-Maryland border where it
4  turns -- the map turns to yellow; is that right?
5  A.    Right.
6  Q.    Okay. And who did you both know at the hair salons?
7  A.    Vicky Chambers and then eventually Lionel's
8  girlfriend Lauren started working when it moved back up to
9  -- all the way up Georgia Avenue. It turned into a salon
10 called Locs.
11 Q.    Okay. Did you know him before you knew his
12 girlfriend Lauren?
13 A.    Yes.
14 Q.    Did you know Lauren's last name?
15 A.    I believe it's Jefferson.
16 Q.    Okay. Now, after that first conversation in
17 Katrina's apartment, what was the nature of your next
18 several meetings with Mr. Nunn?
19 A.    We would just talk and a lot of times, he would ask,
20 you know, when I was going to be ready or if I had anything,
21 and we'd talk about prices, just stuff in general, people
22 around town and stuff like that, and then finally I must
23 have called him and let him know that I would be receiving a
24 shipment because we did eventually get together and do a
25 drug transaction.

---

Page 29

1  Q.    Now, tell us, then, about that first deal. Do you
2  remember approximately when that was?
3  A.    I believe it was around February of '97, and I had an
4  apartment that I used in Oakcrest Towers in Forestville,
5  Maryland, and that's where I would meet people at, and I
6  called him and he met me out there, and he brought me some
7  money, and I gave him, I think it was approximately between
8  maybe five or eight kilos. I don't know exactly the right
9  number. And I know he owed me some money because he came
10 back the very next day and brought the money back.
11       And that's when we kind of established a credit
12 thing, which I knew that he worked fast and he brought my
13 money back and everything was on time, so I kind of do a lot
14 of drug deals on consignment and I knew that I can -- he was
15 building up trust with me and I found out he was trustworthy
16 for any future dealings we would have.
17 Q.    Okay. This place where you made this delivery, you
18 said this was called Oakcrest Towers?
19 A.    Yes.
20 Q.    And did you have an apartment there?
21 A.    No. Someone else. I just used it.
22 Q.    Okay. And he came and met you there?
23 A.    Yes.
24 Q.    And you said it was somewhere between five and eight
25 kilograms?

---

8 (Pages 26 to 29)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 30

1   A.    Right, of cocaine.  Powder.
2   Q.    It was powder cocaine?
3   A.    Uh-huh.
4   Q.    Now, you said that he gave you some money, but paid
5   an additional portion the very next day?
6   A.    Right.
7   Q.    Do you remember how much he paid you up front and how
8   much he owed you?
9   A.    I don't remember -- all I -- the only thing I
10  remember about the deal, it was something about 80,000.  I
11  don't remember if he gave me 80,000 up front and owed me the
12  rest or if he brought me 80,000.  The only thing I really
13  remember about the deal, somehow it was 80,000 involved.
14        More than likely, since it was the first time, he
15  would have had to have given me at least half the money up
16  front and he could have paid the rest on consignment, but I
17  don't remember the exact amount.
18  Q.    And this is $80,000 that sticks in your mind?
19  A.    Yes.
20  Q.    Do you remember approximately what the price was that
21  you were charging per kilogram of cocaine back then?
22  A.    That I couldn't say.  It could have been anywhere
23  between 20 to 25,000.  It depends on what time of year it
24  was, because cocaine prices can fluctuate weekly, monthly.
25  That's just how it is, you know.  Depends on if it's a

---

Page 31

1   draught or anything.  So I don't have -- I couldn't tell you
2   an exact price.
3   Q.    Okay.  So the 80,000 which you recall either he paid
4   you or he owed you, that would have been for somewhere in
5   the neighborhood of four kilograms of cocaine; is that
6   right?
7   A.    Yes.
8   Q.    All right.  And after that, you said that he paid you
9   what he owed you the very next day?
10  A.    Yes.
11  Q.    Where did that take place?
12  A.    Oakcrest Towers.
13  Q.    Did he come again to that same apartment?
14  A.    Yes.
15  Q.    And what was the conversation that you had then when
16  he brought you the rest of your money that next day?
17  A.    The only thing I -- I remember it was kind of a
18  draught going on because I had gotten either -- around 45 to
19  50 kilos in, and the next day when he came back and he
20  wanted to get some more, I was already -- I was finished,
21  and that was probably the fastest I've ever gotten rid of
22  that amount of cocaine, and he wanted some more, but I was
23  already done, so I couldn't do anything for him.
24  Q.    So he wanted more the next day, but you had already
25  sold the rest of your shipment?

---

Page 32

1   A.    Right.
2   Q.    And did you say -- did you discuss further with him
3   any further deals at that point?
4   A.    No.  I didn't know when I would be receiving another
5   shipment.
6   Q.    Okay.  And how often were you receiving shipments at
7   this time?
8   A.    Maybe anywhere from -- mostly maybe two to three
9   times a year.  Not very often.  Might be once every three or
10  four months.
11  Q.    Okay.  And do you remember when it was that you next
12  did -- transacted business with him, with Mr. Nunn?
13  A.    I believe it was -- it was February -- probably
14  summer of '97.  Yeah.
15  Q.    And tell us about that, what was involved in that
16  deal.
17  A.    By this time, we had talked, you know, somewhat
18  frequently, we'd bump into each other a lot, and --
19  Q.    And where did you bump into each other during this
20  period?
21  A.    Just up and down Georgia Avenue.  We both spent a lot
22  of time on Georgia Avenue, so we just always seemed to bump
23  into each other or bump into each at hair salons and, you
24  know, stuff like that.
25  Q.    You've mentioned the hair salons.  Were there other

---

Page 33

1   places that both of you frequented in that area?
2   A.    He frequented Crisfield's and sometimes friends of
3   mine would like to stop by there and eat a lot.  I really
4   didn't like their food all that hot, but I would drive
5   people up there and stuff, and --
6   Q.    What's Crisfield's?
7   A.    It's a seafood restaurant.
8   Q.    Where is that located?
9   A.    On Georgia Avenue, but it's across the Silver Spring
10  line.  I don't know the exact address.
11  Q.    Okay.  It's in Silver Spring, Maryland?
12  A.    Right.
13  Q.    Off of Georgia or on Georgia?
14  A.    Yes.
15  Q.    Okay.  And anywhere else that you remember seeing
16  him?
17  A.    We -- well, I don't know if it was back then.  We
18  used to play pool, but I don't think it was back in '97.  I
19  didn't think that happened until maybe '98.
20  Q.    Okay.  Well, let's talk then about the deal that you
21  remember from approximately the summer of 1997.
22  A.    Right.
23  Q.    What were the -- what was the amount involved in that
24  deal?
25  A.    Between probably ten to 15 kilos.  I remember he --

---

9 (Pages 30 to 33)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

Page 34

1  Lionel used to kind of want me to give him maybe almost half
2  my shipment, and I couldn't do that because he -- for some
3  reason, he would think that I was getting cocaine from --
4         MS. HOLT:  Objection as to what he was thinking.
5         THE WITNESS:  Well, he -- let me see -- he assumed
6  that I was getting --
7         MS. HOLT:  Objection to what Mr. Nunn assumed.
8         THE WITNESS:  Okay.
9         THE COURT:  Go ahead.
10        THE WITNESS:  He wanted cocaine for prices that I
11 couldn't afford to give it to him for.
12 BY MS. JEFFRESS:
13 Q.    And what makes you say that?  What about your
14 discussion makes you say that he wanted it for prices you
15 couldn't afford to give it to him?
16 A.    Because the prices that he wanted to purchase it at
17 was almost the prices that I was getting it for, so I
18 wouldn't make a profit off of it with him.
19 Q.    All right.  And was he already trying to negotiate
20 you down at this point in your second deal with him?
21 A.    Yes.
22 Q.    Okay.  You also said he wanted up to half of your
23 shipment?
24 A.    Yes.
25 Q.    And why didn't you want to sell him that much?

Page 35

1  A.    Because I wouldn't see a profit off of it.  Basically
2  I probably would have seen maybe $500 to $1,000 a kilo from
3  him when I would have seen more from going to other
4  customers.
5  Q.    So were you -- was he paying lower prices than some
6  of your other customers?
7  A.    Yes.  He was getting more and he was putting up --
8  most of my customers really didn't put that much money up
9  and he would put up more money.
10 Q.    All right.  Now, you said that he wanted as much as
11 half your shipment, but that you didn't want to give him
12 that much.  Do you remember how much you did give him in
13 this second deal?
14 A.    I just remember it was approximately between 10 and
15 15 kilos.  I don't remember the exact amount.
16 Q.    All right.  And do you remember what prices you were
17 charging him?
18 A.    No, but all -- I know it was between 20 and 25.  I
19 haven't been below 20 in years, so it had to be between 20-
20 and 25,000.
21 Q.    Okay.  Twenty- and 25,000 per kilogram.
22 A.    Right.
23 Q.    And how did he pay for it in this transaction?
24 A.    I don't remember where we met at the first time, I
25 don't even remember where I gave him the -- but I know I

Page 36

1  received the rest of the payment that he owed me at a
2  friend's house called -- named Tula Price, which was in D.C.
3  off of 6th Street, Southeast.
4  Q.    So you remember receiving some payment from him at
5  her house?
6  A.    Yes.
7  Q.    Was that for this deal or was that for a later deal,
8  or do you remember?
9  A.    That was for that deal.
10 Q.    Okay.  So how much did he pay you or what percentage
11 did he pay you up front for that portion?
12 A.    I don't remember how much it was up front.
13 Q.    All right.  And what makes you remember specifically
14 receiving payment from him at Ms. Price's house?
15 A.    Because another codefendant of mine ended up showing
16 up at the same time he was there, which was Ben Ashe.
17 Q.    And when you say codefendant, is this someone else
18 who was charged in connection with your case before Judge
19 Friedman?
20 A.    Yes.
21 Q.    Now, you've mentioned the apartment that you had at
22 Oakcrest Towers, and then you've also mentioned receiving
23 payment from Mr. Nunn at Ms. Price's house?
24 A.    Yes.
25 Q.    Do you remember either making deliveries to him or

Page 37

1  receiving payment from him at any other locations?
2  A.    Tuckerman Street in Northwest.
3  Q.    Let's talk about that.  What was at Tuckerman Street,
4  Northwest?
5  A.    An apartment that Lionel either used or owned.  I
6  don't know.  I mean, it's an apartment that he used, and I
7  met him there at least twice.
8  Q.    Okay.  And do you remember where on Tuckerman it was?
9  A.    Not the exact address.  I believe it was off of 14th
10 and Tuckerman.
11        MS. JEFFRESS:  Okay.  Could we perhaps go to that
12 portion of the -- okay.  Actually, you know what?  We can
13 leave it on the screen, I think.
14 BY MS. JEFFRESS:
15 Q.    You mentioned 14th and Tuckerman?
16 A.    Yes.
17 Q.    Do you see 14th Street?  If you look at the very
18 bottom, you might be able to see 14th Street.
19 A.    Yes, I believe so.
20 Q.    And do you see Tuckerman?
21 A.    Yes.  Right here.  I see it.
22 Q.    Why don't you use the arrow so the jury will know.
23        Is that 14th and Tuckerman, the area you're
24 highlighting right here?
25 A.    I believe so.  I can't really see the numbers on

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

10 (Pages 34 to 37)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

**Page 42**

1  Q.    Did you need a partner?
2  A.    No.
3         MS. HOLT: Your Honor, could we have a time frame?
4  BY MS. JEFFRESS:
5  Q.    Do you remember how long it was that you were
6  supplying Mr. Nunn with cocaine?
7         THE COURT: Let's put a time frame on that
8  transaction, if we can.
9         MS. JEFFRESS: Oh, on the conversation.
10 BY MS. JEFFRESS:
11 Q.    Do you remember when the --
12        MS. JEFFRESS: I'm sorry, I misunderstood, Ms.
13 Holt.
14 BY MS. JEFFRESS:
15 Q.    Do you remember when the conversation was that you
16 had with Mr. Nunn about becoming partner?
17 A.    Ninety-seven.
18 Q.    And how do you remember it was '97? Do you remember
19 in connection with the events you've described when it was?
20 A.    I know it was before we took a trip down to Miami.
21 Q.    Okay. It was sometime in '97.
22 A.    Yes.
23 Q.    Now, how many times total did you supply Mr. Nunn
24 with cocaine?
25 A.    No more than three, possibly four.

---

**Page 43**

1  Q.    And was the payment always the same in that he would
2  always pay some cash up front and receive the rest on
3  consignment?
4  A.    Yes.
5  Q.    Was there a time when you remember that you stopped
6  supplying Mr. Nunn with cocaine?
7  A.    Yes, in '98.
8  Q.    And why do you remember that you had stopped by then?
9  A.    Because he always said my prices were too high and we
10 couldn't come to an agreement on a price that he was
11 comfortable with paying for the prices of the cocaine, of
12 each kilo, so he told me that he was getting -- he could get
13 better numbers, so it was really nothing I could do for him.
14 I couldn't sell to him at the prices that he wanted.
15 Q.    Okay. He told you what exactly?
16 A.    My prices were too high.
17 Q.    All right. Did he say he had -- did he say anything
18 about prices other people were charging?
19 A.    No. He just said my prices were too high and the
20 prices that he wanted me to give him for the cocaine, I just
21 couldn't do it. I wouldn't make a profit off of it. The
22 prices that he wanted to get it at was the prices I was
23 getting it at.
24 Q.    Okay. Now, during the period in which you supplied
25 Mr. Nunn with cocaine, where were you getting your cocaine

---

**Page 44**

1  from?
2  A.    Miami, Florida.
3  Q.    And from who specifically?
4  A.    Cornelius Singleton.
5  Q.    Is that the person against whom you testified in the
6  trial in Florida?
7  A.    Yes.
8  Q.    Now, did you ever discuss with Mr. Nunn heroin
9  business?
10 A.    Some. Not a lot, but some, yes.
11 Q.    You mentioned a --
12        MS. HOLT: I'm sorry, I didn't hear the answer.
13        THE COURT: She said some, not a lot, but some.
14        MS. HOLT: Thank you, Your Honor.
15 BY MS. JEFFRESS:
16 Q.    You mentioned a moment ago that you took a trip with
17 Mr. Nunn?
18 A.    Right.
19 Q.    Where did you take a trip together?
20 A.    To Miami.
21 Q.    What was the purpose of that trip to Miami?
22 A.    He wanted me to possibly talk my cocaine supplier
23 into seeing if he could purchase kilos of heroin from him.
24 Q.    All right. And is this the same supplier, Mr.
25 Singleton?

---

**Page 45**

1  A.    Yes.
2  Q.    And whose idea was it to make this trip to see Mr.
3  Singleton?
4  A.    All of ours -- me, Lionel and Mr. Singleton.
5  Q.    Okay. And who set up the trip?
6  A.    Me and Mr. Singleton.
7  Q.    All right. Do you remember when that was?
8  A.    I thought it was January of 1998, but I just found
9  out last week that it was December 21st of '97.
10 Q.    And how do you know it was that specific date?
11 A.    It was the day my godson got christened.
12 Q.    And were you able to find out the date of your
13 godson's christening?
14 A.    Yes.
15 Q.    All right. And that was December 21st, 1997?
16 A.    Yes.
17 Q.    So what happened after your godson's christening on
18 December 21st, 1997?
19 A.    We met -- I met Lionel and another gentleman at
20 National Airport and we just -- I don't remember what
21 airline we took; we just walked into the airport, asked for
22 tickets to Miami and we got a return flight the same day. I
23 believe we left around maybe -- between twelve and two
24 because I remember we were coming back around seven or eight
25 on a return flight.

---

12 (Pages 42 to 45)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 46

1   Q.    Who was this third person who went with you?
2   A.    It was a guy that Lionel knew. I didn't know him at
3   all, I've never seen him before, and he was brought down to
4   be a tester, to test the heroin when we got to Miami.
5   Q.    Okay. Do you remember his name?
6   A.    No.
7   Q.    Okay. And what was the plan if you had succeeded in
8   making a connection between Mr. Nunn and Mr. Singleton?
9   A.    Mr. Singleton -- basically it would have been my
10  responsibility. He would have sent the heroin with the
11  shipments of cocaine and I would have been responsible to
12  pay for it, and Mr. Nunn offered me -- at first he offered
13  me some money up front to maybe be partners, and then he
14  talked about giving me a profit off his -- once he made his
15  money off the heroin.
16  Q.    Okay. How much did he offer to pay you up front?
17  A.    A hundred-thousand dollars.
18  Q.    And what would that have paid for, that $100,000?
19  A.    That would have been for like a partnership.
20  Q.    Now, what happened? Did the three of you who went on
21  the plane, did the three of you meet up with Mr. Singleton
22  in Miami?
23  A.    Yes.
24  Q.    Where did you meet with him?
25  A.    At a hotel, but I don't remember which one.

---

Page 47

1   Q.    What happened at the hotel?
2   A.    We stayed downstairs for a while and played some
3   pool, and then we went up to the room. I think Mr.
4   Singleton possibly was waiting for somebody to bring the
5   testers over. I don't remember. I remember we stayed
6   downstairs in the lobby for a while and they had a little
7   restaurant area and stuff and we played pool. And then when
8   we went upstairs, I basically was just talking to Mr.
9   Singleton and he gave the other gentleman that came with Mr.
10  Nunn the samples. It was -- I don't even remember what they
11  were in. And the guy went into the bathroom and he was
12  shooting up, and then he gave Mr. Singleton and Mr. Nunn I
13  guess the results of what he -- if he thought it was any
14  good or not.
15  Q.    Okay. So he took the heroin with him in the
16  bathroom?
17  A.    Yes.
18  Q.    And after he used it, do you remember what he said
19  about the quality?
20  A.    He didn't really like any of them.
21  Q.    All right. So what happened as a result of that
22  tester and that deal?
23  A.    Nothing.
24  Q.    Why is that? Why didn't it work out?
25  A.    Because the way the tester said it really wasn't all

---

Page 48

1   that hot, it wouldn't have been worth Mr. Singleton to try
2   to purchase it and I doubt Mr. Nunn would have wanted to buy
3   it, so nothing ever happened. Mr. Singleton just said he
4   would try to get some more and let us know in the future.
5   Q.    Okay. So had Mr. Singleton sold this heroin that he
6   was testing before that, to your knowledge?
7   A.    Not that I know of. I don't think so.
8   Q.    And did anything further ever happen between Mr. Nunn
9   and Mr. Singleton, to your knowledge?
10  A.    Not to my knowledge.
11  Q.    When you were planning this trip, do you know whether
12  they ever had contact with each other or did you arrange the
13  contact?
14  A.    I don't think they had any contact with each other
15  other than through me.
16  Q.    Okay.
17        MS. HOLT: I didn't hear that answer.
18        THE COURT: She said she didn't think they had any
19  contact with each other other than through her.
20  BY MS. JEFFRESS:
21  Q.    Did Mr. Nunn ever tell you anything about selling
22  heroin?
23  A.    Just that he had it, and sometimes he would give me
24  testers --
25        MS. HOLT: Objection. Hearsay.

---

Page 49

1         THE COURT: Overruled.
2         THE WITNESS: He would give me testers to give out
3   to people in case they wanted to buy any or if I knew
4   anybody that might want to purchase any.
5   BY MS. JEFFRESS:
6   Q.    So he actually physically gave you some testers?
7   A.    Yes.
8   Q.    And what are testers? Just describe that for the
9   jury?
10  A.    Little just teeny amounts of heroin in little bags
11  that you can give people that they can -- I guess they can
12  take and give it to somebody to see how good it is and let
13  somebody use it and see how good it is.
14  Q.    And did you ever pass those along to possible
15  customers?
16  A.    Yes.
17  Q.    Did you ever transact business, heroin business with
18  Lionel Nunn as a result of that?
19  A.    Yes. Just once.
20  Q.    Tell us about that one time. Do you remember when
21  that was?
22  A.    The date, I'm not sure. It was either in ;97 or '98,
23  and I remember -- I don't even remember the person who
24  wanted it. I believe I do -- I believe it was Harry
25  Jackson, but I'm not sure. And he -- all I remember was the

---

13 (Pages 46 to 49)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 50

1    transaction was between maybe $3,500 to $5,000. It wasn't
2    -- it was a small amount of heroin; it wasn't anything big.
3    Q.    Okay. So someone you knew wanted some heroin?
4    A.    Right.
5    Q.    And what did you do when you found out that this
6    person wanted some heroin?
7    A.    I called Lionel, either paged him or called him on
8    his cell phone -- I'm not sure which one -- and got it from
9    him and gave him the money for it.
10   Q.    Do you remember where it was that you got this heroin
11   from him?
12   A.    No.
13   Q.    And you said you paid him somewhere between $3,500
14   and $5,000?
15   A.    Yes.
16   Q.    Okay. What did you do with the heroin you received
17   from him?
18   A.    Gave it to, I believe it was Harry Jackson.
19   Q.    Okay. You're just not certain of who you gave it to?
20   A.    Right.
21   Q.    Did you give that person the entire amount?
22   A.    Yes.
23   Q.    And did you ever do any other heroin business with
24   Mr. Nunn?
25   A.    No.

---

Page 51

1        MS. HOLT: May we approach for a moment?
2        THE COURT: Yes.
3        (Whereupon, a discussion was held at the bench on the
4    record.)
5        MS. HOLT: Just the record, the are all
6    transactions or alleged transactions that were not alleged
7    in the previous Jencks, and I would have objected to them in
8    limine had I been aware of them, and so my objection goes
9    with respect to that.
10       THE COURT: All right. It's overruled.
11       (End of discussion at the bench.)
12   BY MS. JEFFRESS:
13   Q.    Now let me ask you about marijuana deals. Did you
14   ever have any marijuana deals with Mr. Nunn?
15   A.    Yes.
16   Q.    And do you remember when you started engaging in
17   marijuana deals with him?
18   A.    Sometime in '98.
19   Q.    And how many times -- who supplied who with
20   marijuana?
21   A.    He gave me marijuana on three different -- three
22   different occasions.
23   Q.    Okay.
24   A.    Possibly four, but I only remember three.
25   Q.    Okay. Three or four?

---

Page 52

1    A.    Uh-huh.
2    Q.    Did he give it to you or sell it to you?
3    A.    He gave it to me on consignment and I brought the
4    money back.
5    Q.    Okay. Do you remember -- let's talk about the first
6    deal. Do you remember when the first time was that you
7    purchased marijuana from him?
8    A.    Sometime either late '98, maybe the beginning of '99,
9    and it was for approximately 20 pounds.
10   Q.    It was approximately 20 pounds of marijuana?
11   A.    Yes.
12   Q.    And what were his prices?
13   A.    Between 5- and 600.
14   Q.    Five- and six-hundred dollars?
15   A.    Yes.
16   Q.    For what?
17   A.    Per pound.
18   Q.    Okay. Was that a good price?
19   A.    Yes.
20   Q.    And do you remember where this first deal took place?
21   A.    Tuckerman, I believe. I'm not 100 percent sure, but
22   I think it was Tuckerman.
23   Q.    The apartment on Tuckerman that you described?
24   A.    Right.
25   Q.    Did you ever meet anyone or hear about anyone who Mr.

---

Page 53

1    Nunn knew at that building on Tuckerman?
2    A.    The manager, I believe.
3    Q.    And how did you know that he knew the manager?
4        MS. HOLT: Your Honor, objection.
5        THE COURT: Overruled.
6        MS. HOLT: That last question was complex, "meet
7    or hear." I need clarification.
8        THE COURT: Overruled.
9        THE WITNESS: He told me that the manager of the
10   building was either a friend of his or some -- he was close
11   to the manager of the building because he let me know when
12   we were talking about being partners that if the police or
13   anybody would ever come -- that's why he liked being in that
14   building, because she would be able to notify him if, you
15   know, anything was going on with the apartment.
16   BY MS. JEFFRESS:
17   Q.    Okay. This was a woman, then?
18   A.    Yes.
19   Q.    Did you ever meet her or see her, or did he just tell
20   you about her?
21   A.    He just told me about her.
22   Q.    All right. And you think that that was the location
23   where you got this first 20 pounds approximately of
24   marijuana from --
25   A.    Yes.

---

14 (Pages 50 to 53)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

**Page 54**

1  Q.    -- Mr. Nunn?
2  A.    Yes.
3  Q.    And did you have any additional -- you said you
4  thought you had maybe three or four total marijuana deals
5  with him?
6  A.    I had one in September of '99 when I met him in an
7  alley off of Kennedy Street and I received approximately 75
8  to 80 pounds of marijuana and I believe it was maybe three
9  kilos of cocaine, powder cocaine.
10  Q.    All right. Let's break that down. How much
11  marijuana?
12  A.    I believe it was between 75 and 80 pounds.
13  Q.    And how big is 75 to 80 pounds of marijuana
14  physically?
15  A.    It's a big duffel bag full of really -- about -- a
16  really big duffel bag full, and it's heavy.
17  Q.    And is that -- are you describing how big it is or
18  are you describing exactly what he gave you?
19  A.    They were wrapped in big square bundles and taped,
20  and I had to cut them open and bag it up.
21  Q.    The marijuana was wrapped that way?
22  A.    Yes. It was supposed to be in two-pound taped-up
23  bundles, but it ended up being a little more than two pounds
24  in each bundle.
25  Q.    Okay. And were the bundles in a duffle bag?

**Page 55**

1  A.    Yes.
2  Q.    All right. The size that you described? Show us
3  with your hands how big the duffle bag was.
4  A.    It's probably about this long. It was long. Pretty
5  long.
6  Q.    And you're stretching your arms out about as far as
7  they reach. That's maybe four, four and a half feet or so?
8  A.    Yes.
9  Q.    And where exactly did you receive that duffle bag of
10  marijuana from him?
11  A.    In an alley off of -- approximately somewhere off of
12  3rd and Kennedy. It was in an alley behind some apartments.
13  Q.    And this is 3rd and Kennedy Streets, Northwest?
14  A.    Yes.
15  Q.    Could we look at the map, PW-3, again and see if
16  that's -- if we can isolate that area. All right. Can you
17  see Kennedy Street?
18  A.    Yes.
19  Q.    And I don't know if 3rd Street is marked, but I think
20  2nd and 4th are marked. Can you find 3rd Street?
21  A.    I believe it would be somewhere in here.
22  Q.    Okay. Do you see how that's marked 2nd Street just
23  below your arrow?
24  A.    Right. So I guess it's over here, then.
25  Q.    Okay. So that would be 3rd and Kennedy you're

**Page 56**

1  pointing to right about now?
2  A.    Right.
3  Q.    Okay. And is that near where Kansas crosses Kennedy
4  Street, Kansas Avenue?
5  A.    I believe so, yes.
6  Q.    Okay. Do you see how this is Kansas Avenue up at the
7  top here --
8  A.    Right.
9  Q.    -- running diagonally! All right.
10        So what exactly happened in that alley?
11  A.    It was a gas station there -- I believe it was an
12  Amoco -- and usually I would meet him there and sometimes we
13  would talk, and he told me to follow him around the corner
14  and I did and we went in the alleyway and just popped the
15  trunks and threw the bag in the trunk and just drove out.
16  Q.    Okay. So you were driving?
17  A.    Yes.
18  Q.    Do you remember what you were driving?
19  A.    A Mercedes Benz.
20  Q.    What color was your Mercedes?
21  A.    Black.
22  Q.    Was this the one that was forfeited?
23  A.    Yes.
24  Q.    And do you remember what Mr. Nunn was driving?
25  A.    I'm not sure.

**Page 57**

1  Q.    Okay. Now, that -- you said that you popped the
2  trunks. Where did he have the marijuana?
3  A.    I believe in -- I'm not sure if he was driving a
4  truck or a car, so I'm not sure if he popped a trunk or
5  opened a door, but I had to pop the trunk in my car and
6  threw it in the trunk of my car.
7  Q.    Okay. And what did you do with the marijuana that
8  you bought from him?
9  A.    I distributed it to different people.
10  Q.    Who did you pass it on to?
11  A.    Gale Johnson, Byron McDade and -- I only knew him as
12  Russell. His name is Ronald something. He used to be the
13  owner of my restaurant. Ronald Williams, I believe.
14  Q.    Okay. Do you remember his --
15  A.    Gregory Williams. That's his name.
16  Q.    Gregory Williams --
17  A.    Yes.
18  Q.    -- is the third person? Okay. And did you pay him
19  for it at that time or did you pay him later?
20  A.    Lionel? Later.
21  Q.    Yes. When did you pay Mr. Nunn for that marijuana?
22  A.    It was probably a couple days later.
23  Q.    Okay. Did you have any other marijuana deals with
24  him after that one in September of 1999?
25  A.    One more either in December of '99 or January of

15 (Pages 54 to 57)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 58

1    2000. I'm not sure about the exact month.
2    Q.    And how much did you buy in that deal?
3    A.    I believe it was anywhere from 40 to 60 pounds. I'm
4    not sure.
5    Q.    Do you remember where the exchange was made on that
6    occasion?
7    A.    That one I don't.
8    Q.    Okay. And what about the payment? What was the
9    payment?
10   A.    I remember I paid him on a corner out in front of my
11   restaurant because I met him, he was driving his Durango,
12   and I met him and I gave him a box, I had everything in a
13   box, and I accidentally left a handgun in the bottom of the
14   box. That's why I remember the exchange.
15   Q.    And you gave him a box? What exactly was in the box?
16   A.    The money for the drug deal, the drug transaction.
17   Q.    And you said a handgun was in it, too?
18   A.    Yes.
19   Q.    Whose handgun?
20   A.    Mine.
21   Q.    Did you mean to leave the handgun in the box?
22   A.    No.
23   Q.    When did you realize that you had given him --
24   A.    Maybe a day or two later when I was looking for it
25   and I just -- it popped to me where it was at, and I called

---

Page 59

1    him and, you know, told him he had it and he said, you know,
2    yeah, and I just asked for it back, but I never got it back.
3    Q.    So he had it, but he never gave it back to you?
4    A.    Yes.
5    Q.    Okay. And you said something about -- was it just
6    marijuana that you purchased at that time or something else
7    as well?
8    A.    I believe he gave me either one or two kilos at that
9    time.
10   Q.    Of what?
11   A.    Cocaine.
12   Q.    Okay. Let me ask you about that in a minute.
13       (Whereupon, Government's Exhibit Number LN99-101 was
14   marked for identification.)
15   BY MS. JEFFRESS:
16   Q.    First I would like to show you a couple of pictures.
17   The first three are not yet in evidence. LN99-101. Do you
18   recognize what is in this photograph?
19   A.    That's my car and Lionel leaning in.
20   Q.    And is this a fair and accurate photograph of your
21   car?
22   A.    Yes.
23       MS. JEFFRESS: I move LN99-101 into evidence.
24       THE COURT: Received.
25       (Whereupon, Government's Exhibit Number LN99-101,

---

Page 60

1    having been previously marked for identification, were
2    admitted into evidence.)
3        MS. HOLT: Dash one-oh-what?
4        MS. JEFFRESS: Dash 101.
5    BY MS. JEFFRESS:
6    Q.    Okay. The jury can see it now, Ms. Webster. Where
7    was this photograph taken? Do you recognize the area?
8    A.    Georgia Avenue. I believe that's up near
9    Crisfield's. I'm not 100 percent sure, but I believe it is.
10   Q.    And Crisfield's is the seafood restaurant you were
11   talking about earlier?
12   A.    Yes.
13   Q.    And you used to frequent that as well as Mr. Nunn?
14       MS. HOLT: Objection. Leading.
15       THE COURT: Overruled.
16       THE WITNESS: I would go up there frequently to
17   take other people. I really didn't like to eat up there.
18   But a lot of girls from the hair salon ate up there
19   frequently and I would go up there and pick their food up
20   for them.
21   BY MS. JEFFRESS:
22   Q.    And did you see Mr. Nunn there in Crisfield's --
23   A.    Yes.
24   Q.    -- frequently?
25   A.    Usually outside, not usually inside.

---

Page 61

1    Q.    Usually outside the restaurant.
2    A.    Yes.
3    Q.    Okay. And where on Georgia Avenue is Crisfield's
4    again?
5    A.    I believe that's Silver Spring. It's past the D.C.
6    line, but it's before you get to the subway and stuff like
7    that. It's under like a little underpass. It's a radio
8    station up there; I think it's GAY 99 or something. It's
9    right before there -- it's two of them located up there near
10   each other, but that's the one on Georgia Avenue.
11   Q.    Okay. And it's just past the D.C. line?
12   A.    Yes.
13   Q.    And is Crisfield's one of the places that you
14   mentioned before where you frequently saw Mr. Nunn?
15   A.    Yes.
16   Q.    Now, you said that this is your car. Is this your
17   Mercedes, the car that's in the center of the photograph?
18   A.    Yes.
19   Q.    And who is that standing next to it?
20   A.    Mr. Nunn.
21   Q.    And that's just been highlighted. Are you in the
22   car, can you see?
23   A.    Yes.
24       (Whereupon, Government's Exhibit Number LN99-102 was
25   marked for identification.)

---

16 (Pages 58 to 61)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

Page 74

1      MS. JEFFRESS: Thank you, Your Honor.
2 BY MS. JEFFRESS:
3    Q.    Ms. Webster, you had mentioned earlier this morning
4 the transaction that you had with Mr. Nunn in which you paid
5 him with a box of cash that contained a gun?
6    A.    Yes.
7    Q.    And I believe that he had sold you marijuana on that
8 occasion; is that right?
9    A.    Yes.
10   Q.    Did he also sell you cocaine on that occasion in
11 which you paid him with the box of cash with the gun?
12   A.    Yes.
13   Q.    And how much cocaine was involved in that deal?
14   A.    Either -- maybe -- around two kilos.
15   Q.    And again, what was the price that he was charging at
16 that point?
17   A.    Usually his prices were between maybe 20,000 to 21.5.
18   Q.    Twenty-one thousand five-hundred dollars?
19   A.    Five-hundred, yes.
20   Q.    Now, other than the time --
21         MS. HOLT: Could I get a date?
22 BY MS. JEFFRESS:
23   Q.    Was that the deal that you testified earlier was
24 either in late '99 or early 2000?
25   A.    Yes, either December or -- I believe it was January,

Page 75

1 December or January -- '99 or January of 2000.
2    Q.    All right. So those were two separate times, two
3 separate occasions on which you received cocaine from Mr.
4 Nunn. Were there other occasions on which you received
5 cocaine, purchased cocaine from Mr. Nunn?
6    A.    One more time, but I couldn't give you the exact
7 date. I'm not sure when -- the date, you know, when we did
8 it. It was approximately either one or two kilos and -- but
9 I couldn't tell you the exact date.
10   Q.    Do you know whether it was before or after the
11 September transaction?
12   A.    It was after September.
13   Q.    It was after September '99?
14   A.    Yes.
15   Q.    All right. And again, what was the amount on that
16 occasion?
17   A.    Either one or two kilos. He never really gave me a
18 lot, just small amounts.
19   Q.    Okay. Could we then summarize approximately how --
20 what was the total amount of cocaine that you received from
21 Mr. Nunn in this later period, 1999, 2000?
22   A.    Approximately -- between probably seven and eight
23 kilos.
24   Q.    Seven and eight kilos total?
25   A.    Yeah.

Page 76

1    Q.    Okay. And the transactions that you described
2 earlier where you were supplying him with larger amounts of
3 cocaine, what was the total amount would you say that you
4 supplied him during that period, '97 through '98?
5    A.    Approximately -- I'd say somewhere maybe around 30,
6 35.
7    Q.    Thirty to 35 kilograms?
8    A.    Yes.
9         THE COURT: I'm sorry. What did you say?
10 BY MS. JEFFRESS:
11   Q.    Thirty to 35 kilograms of cocaine? Is that what you
12 --
13   A.    Yes.
14   Q.    -- stated?
15   A.    Somewhere around there.
16   Q.    And was the payment always the same that you
17 described earlier, that he would pay you part up front and
18 pay you the rest later, receive the rest on consignment?
19   A.    Yes.
20   Q.    Now, let me ask you some questions about your general
21 relationship with Mr. Nunn. You've talked about some places
22 where you used to see him frequently.
23   A.    Right.
24   Q.    Did he ever come to see you at your home?
25   A.    Maybe once or twice, yes.

Page 77

1    Q.    And where were you living at the time that he came to
2 your home to visit you?
3    A.    In Clinton, Maryland.
4    Q.    In Clinton, Maryland?
5    A.    Yes.
6    Q.    And why did he come -- do you remember when he came
7 to see you in Clinton the first time?
8    A.    One time -- I believe that was '98 -- my codefendant
9 Ben Ashe had a friend, Tyrone Bryant, who was importing
10 large amounts of marijuana, and I showed Mr. Nunn some of it
11 and he was interested in purchasing some.
12   Q.    He was interested in purchasing some of the
13 marijuana?
14   A.    Yes.
15   Q.    Do you know whether he did purchase it?
16   A.    No, he didn't.
17   Q.    He did not?
18         And was he at your home at any time after that?
19   A.    One other time, but I don't remember for what. I
20 don't know -- we might have been talking business, it might
21 have been socially. I don't remember for what.
22   Q.    Okay. And did you also socialize together?
23   A.    Yeah. More gambling. We gambled at pool halls and
24 shot dice sometimes at my restaurant.
25   Q.    All right. You shot dice sometimes together in your

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.                    CR 00-157                              September 25, 2002
Kevin L. Gray, et al                           AM Session                             Volume 109

Page 78

1    restaurant, you said?
2    A.    Yes, before I opened.
3    Q.    Okay.  You said before that you had opened it in July
4    of '99; is that right?
5    A.    Yes.
6    Q.    And when did you actually start working on that
7    business?  When did you take possession of the restaurant?
8    A.    Probably late '97, beginning of '98, we did a lot of
9    renovations.
10   Q.    All right.  And before you opened in July '99, were
11   you spending time in the restaurant?
12   A.    Yes, almost every day.
13   Q.    And what kinds of things did you do there after the
14   initial period when you started fixing it up?
15   A.    Oh, I threw a Thanksgiving -- I mean a Valentine's
16   Day dinner with a jazz show, I did a benefit for AIDS and I
17   threw some private parties.
18   Q.    So you threw parties and had social events in there?
19   A.    Yes.
20   Q.    And did Mr. Nunn ever come to those events?
21   A.    I don't believe so.
22   Q.    All right.  You mentioned that he did come and shoot
23   dice with you one time there?
24   A.    Yes.
25   Q.    Was anyone else there when you did that together?

Page 79

1    A.    I don't think so, no.
2    Q.    Just the two of you?
3    A.    Yes.
4    Q.    And what amounts of money were you playing for?
5    A.    Anywhere from a couple of hundred dollars a shot to
6    some thousands a shot, 1- or 2,000 dollars a shot.
7    Q.    What's the most money that you ever won from him?
8    Did you sometimes win?  Let me ask that.
9    A.    Yes.
10   Q.    What is the most amount of money that you ever won
11   from him?
12   A.    Twenty-thousand dollars.
13   Q.    And when was that that you won 20,000?
14   A.    It was -- had to be fairly early in '98 because I
15   didn't even have carpet down in the restaurant, and we
16   shot in the front of the restaurant where it had marble
17   floors at, and I believe that was kind of fairly early '98.
18   Q.    Okay.  And did you ever go to his house or his
19   family's house during the period in which you knew Mr. Nunn?
20   A.    Not his house.  The day we shot dice, we stopped past
21   a house on Kenyon Street which he said was his mother's.  I
22   don't know if it was or it wasn't; I just dropped him past
23   and he went in and got some money and came out, and then we
24   went up to the restaurant and gambled.
25   Q.    Was that before you started gambling or while you

Page 80

1    were in the middle of the game?
2    A.    Before.
3    Q.    Okay.  And do you remember where on Kenyon this house
4    was?
5    A.    Between Georgia and Sherman, I believe.  Between
6    Georgia Avenue and Sherman Avenue.
7    Q.    Do you remember anything about what it looked like?
8    A.    Just it was light blue.  That was it.
9    Q.    Okay.  Did you go inside or --
10   A.    No.
11   Q.    -- did you sit outside?
12         And the $20,000 that you won from him shooting
13   dice that day in your restaurant, did you get all that
14   money?  Did he pay you?
15   A.    No.  I think he brought maybe -- he brought about
16   10,000 with him and borrowed some of it back and lost it
17   back, then borrowed some back.  So he ended up owing me
18   another 10,000.
19   Q.    Did he pay you for it eventually?
20   A.    Yes.
21   Q.    Let me ask you about some other people, beginning
22   with Carlos Cardoza.  Did you know someone named Carlos
23   Cardoza?
24   A.    Yes.
25   Q.    How did you know him?

Page 81

1    A.    From back in the early '80s, he was good friends with
2    my ex-boyfriend and his cousins.  He dated one of his family
3    members, so I've known him since he was young.
4    Q.    All right.  And this ex-boyfriend, what was his name?
5    A.    Carlos Cooper.
6    Q.    And they were friends, you said?
7    A.    Yes.
8    Q.    And just to be clear, Carlos Cardoza dated someone in
9    Carlos Cooper's, your boyfriend's family?
10   A.    Yes.
11   Q.    Okay.  And did you know anyone else in his family,
12   Mr. Cardoza's family?
13   A.    His father.
14   Q.    How did you know his father?
15   A.    From gambling and just from going to like fights in
16   Vegas and just from around the, you know, the D.C. area.  He
17   was known.
18   Q.    He was known?
19   A.    Uh-huh.
20   Q.    Mr. Cardoza's father?
21   A.    Yes.
22   Q.    And what was your relationship like with Mr. Cardoza?
23   You knew him beginning in the early '80s, you said?
24   A.    Yes.  He would come over -- he hung mostly with
25   Carlos Cooper's first cousin, which is Harry Jackson.  They

21 (Pages 78 to 81)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 90

1   A.    I guess just somehow in the conversation, you know,
2   he asked me -- most -- well, he asked me basically how was
3   his, you know, character, how -- we call it, we say is he
4   strong, how is his heart, you know, whatever, and I was
5   like, "Nah, he's all right, you know, as long as we take
6   care -- I told him we were going to take care of him while
7   he was on the go and make sure he had money and stuff like
8   that, so he should be okay.
9   Q.    So Mr. Nunn was asking you whether you thought Mr.
10  Miles would be strong and so forth?
11  A.    Yes.
12  Q.    Now let me ask you about one more person. Do you
13  know -- did Mr. Nunn ever discuss with you someone named
14  Brian Tribble?
15  A.    Yes.
16  Q.    What did he tell you about Brian Tribble?
17        MS. HOLT: Objection. May we approach the bench?
18        THE COURT: Yes.
19        (Whereupon, a discussion was held at the bench on the
20  record.)
21        MS. HOLT: She's going to say that Mr. Nunn told
22  her that Brian Tribble put on a policeman's uniform and came
23  to his garage and robbed him of $100,000. It's a hearsay
24  statement for which there has absolutely never been any
25  other corroboration. It actually didn't come from -- well,

Page 91

1   I know she'll say it did, but, you know, it's something that
2   one of the other snitches said on one of the tapes.
3        THE COURT: Her testimony will be that Mr. Nunn
4   said it to her?
5        MS. JEFFRESS: Yes, that Mr. Nunn said it to her.
6        THE COURT: The objection is overruled.
7        (End of discussion at the bench.)
8   BY MS. JEFFRESS:
9   Q.    You can answer. What did Mr. Nunn tell you about
10  Brian Tribble?
11  A.    That he was at the apartment on Tuckerman going into
12  the garage part and --
13  Q.    This is the apartment on Tuckerman that Mr. Nunn had
14  showed you previously?
15  A.    Right.
16  Q.    What did he say about Mr. Tribble being there?
17  A.    He said that he was -- I guess he raised the garage
18  door, and he said as he was going in or went in, Brian
19  Tribble ran underneath of the garage door and had a police
20  hat on and I guess maybe a jacket or something, but he said
21  he knew he wasn't a police officer because he said he had
22  real dirty Timberlands on, and he pulled a gun on him and
23  robbed him for 300-and-some-thousand dollars worth of
24  cocaine and he asked me did I know where to find him at and
25  I told him no, and I told him I'd ask around for him.

Page 92

1   Q.    Okay. So Mr. Nunn was raising the garage door and
2   Mr. Tribble ran in?
3   A.    Yes. I think he -- he said he had got inside, and I
4   guess maybe as it was lowering or something -- I don't know
5   how he got in, but somehow Brian Tribble got in and pulled a
6   gun on him and stuck him up and robbed him for his cocaine.
7   Q.    So Mr. Nunn was describing to you how Mr. Tribble
8   robbed him of cocaine --
9   A.    Right.
10  Q.    -- in that manner? And where did he say the cocaine
11  was? Did he say that?
12  A.    In the garage off of Tuckerman, in the apartment
13  building.
14  Q.    Somewhere in the garage?
15  A.    He didn't tell me exactly where in the garage.
16  Q.    Okay. And how much cocaine was it?
17  A.    He told me around 15 -- I think he said 15 kilos, so
18  I guess that's around 300-and-something thousand depending
19  on how much he paid for it.
20  Q.    So what did Mr. Nunn say about -- after telling you
21  that? What did he say about Mr. Tribble?
22  A.    He wanted to find him and asked me did I know where
23  he was at or if I knew anybody that knew where he lived or
24  what area he hung in, and I told him no. And then he asked
25  me to look out -- I forgot what the distinct markings were,

Page 93

1   but he had mentioned something about the packaging of the
2   cocaine and asked me if I heard -- if I -- let some people
3   know around town if they see anybody selling it or anybody
4   that might have seen the packaging to let him know.
5   Q.    Okay. So the cocaine that Mr. Tribble had taken was
6   in a specific distinct kind of packaging?
7   A.    Yes.
8   Q.    And he described that for you?
9   A.    Yes, but I forgot what was -- you know, what made it
10  so distinctive that it would look different. I don't
11  remember what he -- how he described it, but he asked me,
12  you know, to ask around to see if anybody bought anything
13  that was wrapped a certain way, and I told him I hadn't
14  heard anything.
15  Q.    Okay. And he said -- he asked you whether you knew
16  anything about where Brian Tribble could be found; is that
17  right?
18  A.    Right.
19  Q.    Did you know anything about where Brian Tribble was?
20  A.    No.
21  Q.    Okay. And did he say anything about how Brian
22  Tribble could have pulled that off at that apartment
23  building?
24  A.    He told me he suspected the woman that he was
25  associated with that was the manager of the apartment

24 (Pages 90 to 93)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 94

1  building, he suspected she had something to do with it,
2  because he was saying nobody knew about the garage. I guess
3  -- I mean, I knew about it, but I don't know how Brian found
4  out about it unless maybe somebody else knew and he told. I
5  don't know. But he suspected the woman that was the
6  manager, that she had something to do with it.
7  Q.  Did Mr. Nunn behave any differently after this
8  robbery that he told you about?
9  A.  Not too much. He just started dressing differently.
10 He started wearing suits and he started carrying a handgun,
11 which I never had known him to do before.
12 Q.  Where did he carry the handgun? Did you actually see
13 it?
14 A.  Yes. In a ankle holster.
15 Q.  Now, did he tell you about any other losses sh he
16 sustained other than this robbery when Brian Tribble robbed
17 him?
18 A.  No, not that I can remember, no.
19 Q.  You had talked before about law enforcement seizures
20 that affected your business. Did Mr. Nunn ever talk to you
21 about law enforcement affecting his business at all?
22 A.  Yes. Once, when I was looking for him and I couldn't
23 reach him, I went up to the hair salon and asked his
24 girlfriend Lauren to call him, and he came up there and
25 talked to me and told me he changed all his numbers because

Page 95

1  of some -- a guy that got busted out in Greenbelt. It was
2  on the news about some drugs and weapons that was found in a
3  trunk of a car, and --
4      MR. CARNEY:  Objection. Hearsay.
5      THE COURT:  Overruled.
6  BY MS. JEFFRESS:
7  Q.  Mr. Nunn was telling you this?
8  A.  Yeah.
9  Q.  He was telling you that it was on the news that there
10 were drugs and weapons found in a car?
11 A.  Well, he told me that he lost some drugs -- I mean, I
12 saw that part on the news -- but some drugs in a car, and
13 they were confiscated in Greenbelt, and he said he had to
14 change his numbers and he was kind of worried about it.
15 Q.  And how did you connect that to what you had seen on
16 the news?
17 A.  It was -- it had just happened. I mean, it was just
18 on the news, and he -- and when I saw him, he said, "Yo, I
19 had to change my numbers, you know. You heard about what
20 happened out in Greenbelt?" And I said, "Yeah." And so he
21 was like, "Yeah. That was my stuff." And so that's how I
22 knew.
23 Q.  So Mr. Nunn made specific reference to what had been
24 on the news; is that right?
25 A.  Yes.

Page 96

1  Q.  And when he said he had to change his numbers, you
2  had said that you were trying to get in touch with him
3  through Lauren?
4  A.  Yes.
5  Q.  And how -- had you -- before that, did you have other
6  numbers for him?
7  A.  Paging numbers, but -- most of the time, he didn't
8  hardly ever call back unless you just have to call --
9  sometimes you have to call him for two, three, four days
10 before he would call back, or either I would just bump into
11 him at the salon, or either I'd just ask Lauren to page him
12 for me or just tell him that I was looking for him and tell
13 him to give me a call.
14 Q.  Okay. And that's how you arranged it on this
15 occasion -- you had gone through Lauren to try to find him?
16 A.  Yes.
17 Q.  Okay. Now, finally, let me show you --
18     MS. JEFFRESS:  Let me actually show Ms. Holt
19 Government's exhibits what will be WMA-1 through 25.
20     (Whereupon, Government's Exhibits Number WMA-1 through
21 WMA-25 were marked for identification.)
22     (Whereupon, a discussion was held at the bench on the
23 record.)
24     MS. HOLT:  You know, I don't in principle object
25 to her identifying his voice, but I have no idea what she is

Page 97

1  going to identify because I have not been given a copy of
2  this CD or any transcripts.
3     MS. JEFFRESS:  I believe Ms. Holt has the entire
4  wiretap, which includes seven calls that we intend to play.
5  Actually, we intend to have Maurice Andrews authenticate
6  both Mr. Nunn's and Mr. Gray's voice and authenticate the
7  transcript. This witness doesn't know Mr. Gray and won't
8  identify his voice; she's just going to identify Mr. Nunn's
9  voice, which we believe that Ms. Holt will challenge through
10 Mr. Andrews. So I was going to play one call and ask her
11 whether she can identify Mr. Nunn's voice -- she has already
12 heard the call -- and then ask her whether she heard six
13 other calls in which she identified Mr. Nunn's voice.
14     MS. HOLT:  Are you planning on playing the call for
15 the jury at this time? See, I don't have any objection if
16 she plays it to ask her -- and then says, "Is that Mr. Nunn
17 saying such and such a thing?" That way, it's clear. But I
18 do object to her playing the transcript -- playing this
19 right now without us even having seen a transcript or
20 knowing which tapes they are.
21     MS. JEFFRESS:  I'm going to play the call so the
22 jury can also hear the voice and hear the basis for her
23 identification. I was not planning on using the transcript
24 at this point.
25     THE COURT:  So the jury isn't going to have it,

25 (Pages 94 to 97)

---

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 25, 2002
Volume 109

---

Page 98

1    either.
2        MS. JEFFRESS:  No.
3        MS. HOLT:  What?
4        THE COURT:  The transcript.
5        MS. HOLT:  Yes.  Do you understand what I'm
6    saying, though?  I don't object to -- if she gives the
7    witness --
8        THE COURT:  Right.
9        MS. HOLT:  But I object to playing it before the
10   jury right now, to do that, because, you know, this witness
11   can't talk about the contents or whatever.  I haven't heard
12   -- I don't know what's on here.  It's coming as -- you know,
13   I know that there are calls -- we went over this earlier --
14   I know that there are calls on there upon which my client's
15   voice appears because that's what I asked you and they gave
16   you, but I just don't know what's on these disks that she's
17   getting ready to play in front of the jury, that's my
18   objection, because --
19       THE COURT:  The objection is overruled.
20       MS. HOLT:  Okay.
21       MR. CARTER:  If I may, Your Honor, I had no idea
22   they were going to play any phone calls involving my client.
23   What I have received from the government are three
24   transcripts from a wiretap of third-party consents.  That's
25   coming up.  That hasn't even come up yet.  I had no idea

Page 99

1    that this was going to be played, I had no advance notice
2    this was going to be played, I haven't been given copies of
3    the tapes, I have no copies of transcripts.  Your Honor, I
4    just completely object.  I don't -- I mean, Your Honor has
5    at least let them give us an inkling of what's coming at us
6    down the road, and I had no idea that this was coming and I
7    completely object to this, Your Honor.  I have no idea what
8    these are, when these were, or the content of these
9    conversations, Your Honor.
10       MS. JEFFRESS:  Mr. Carter also has all of the
11   calls that were produced long ago in connection with the
12   production of --
13       THE COURT:  I understand, but he was not given any
14   specific notice that these calls would be used today; --
15       MS. JEFFRESS:  -- is that correct?
16       THE COURT:  -- is that correct?
17       MS. JEFFRESS:  That's correct.
18       THE COURT:  All right.
19       MS. JEFFRESS:  We will produce the transcripts.
20       THE COURT:  Then you will have to do those after
21   lunch so they can at least hear them.  What else do you have
22   with this witness?
23       MS. JEFFRESS:  That's actually the last part of
24   her testimony that I have, so --
25       THE COURT:  Then we will reconvene at 1:30.

Page 100

1        MR. CARTER:  If I may, Your Honor, if I may at
2    this time, Your Honor, I would move for a mistrial and to
3    strike her entire testimony.  What Your Honor has heard --
4    and, I mean, we've made objections ahead of time; Your Honor
5    has overruled the objections and allowed this testimony to
6    come in -- we have heard testimony that this woman had
7    another case and the government well knows that Mr. Nunn was
8    a codefendant in the other case in front of Judge Friedman
9    in this court.  That's a completely separate conspiracy.
10   What we have testimony here is this lady has distributed a
11   significant amount of drugs to Mr. Nunn.  That's all part of
12   that conspiracy, that's not part of us, and she did that up
13   until 1998.  Then beginning in 1999, she is saying she
14   purchased marijuana from him, and then on two or three
15   occasions purchased cocaine; but once again, Your Honor,
16   that has nothing to do with my client or anything of this
17   conspiracy.  There has been no connection whatsoever.
18       I mean, if they want to say Kevin Gray drove the
19   tractor trailer or something, then we're hooked in here.
20   There is no hook.  All of this is just completely
21   prejudicial.  This is a completely separate conspiracy.
22   There is nothing to link my client.  I would move to strike
23   all this testimony and move for a mistrial.
24       THE COURT:  Denied.
25       MS. HOLT:  I have no objection to starting my

Page 101

1    cross right now, having our regular lunch; you can do it in
2    redirect.  I really don't object.  Rather than wasting time.
3        MS. JEFFRESS:  I can do that if the Court will
4    just let me say that I --
5        THE COURT:  That's all you have left?
6        MS. JEFFRESS:  That is all.
7        THE COURT:  All right.
8        MS. JEFFRESS:  If the Court would just let me end
9    by saying --
10       THE COURT:  All right.  Then I will explain to the
11   jury what we're going to do.
12       MS. JEFFRESS:  Okay.  Let me just check with my
13   colleagues to make sure that's all right.
14       (Brief pause in proceedings.)
15       MS. JEFFRESS:  Yes, that's fine.
16       THE COURT:  All right.  I will explain to the
17   jury.
18       (End of discussion at the bench.)
19       THE COURT:  The government has a tape, some tapes
20   they're going to play.  I'm going to let counsel go into
21   some matters about those over lunch, so I'm going to
22   interrupt the direct examination.  That's the last part of
23   the direct examination, and so we can keep on our regular
24   schedule, then Ms. Holt will go ahead and start the
25   cross-examination before lunch.  After lunch, we'll come

---

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

14

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 26, 2002
Volume 110

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          : CR Number 00-157
                                   :
            Government,            :
                                   :
        v.                         : Washington, D.C.
                                   : Thurs., September 26, 2002
KEVIN L. GRAY, RODNEY MOORE,       : 9:50 a.m.
JOHN RAYNOR, CALVIN SMITH,         :
TIMOTHY HANDY and LIONEL NUNN,     :
                                   :
            Defendants.            :
                                   :
- - - - - - - - - - - - - - - -x

DAY 110 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      TIMOTHY J. HEAPHY, ESQUIRE
                        MATTHEW G. OLSEN, ESQUIRE
                        AMY JEFFRESS, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEYS
                        U.S. ATTORNEY'S OFFICE
                        555-4th Street, N.W.
                        Washington, D.C.  20001
                        (202)  353-8822

For Defendant Gray:     FRANCIS DARRON CARTER, ESQUIRE
                        1730 Rhode Island Avenue, N.W.
                        Suite 717
                        Washington, D.C.  20036
                        (202)  393-4330

                        DAVID P. BAUGH, ESQUIRE
                        DAVID P. BAUGH, P.C.
                        223 South Cherry Street
                        P.O. Box 12137
                        Richmond, Virginia  23241
                        (804)  643-8111

Pages 1 through 103

FILED

THERESA M. SORENSEN,

MAY 20 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-14

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 26, 2002
Volume 110

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
    COBURN & SCHERTLER
    1150 18th Street, N.W.
    Suite 850
    Washington, D.C. 20036
    (202) 628-4199

    STEVEN J. McCOOL, ESQUIRE
    1776 K Street, N.W.
    Suite 300
    Washington, D.C. 20006
    (202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
    601 Pennsylvania Avenue, N.W.
    9th Floor
    Washington, D.C. 20004
    (202) 347-7777
    THOMAS J. SAUNDERS, ESQUIRE
    10 N. Calvert Street
    Suite 715
    Baltimore, Maryland 21202
    (202) 530-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
    CARNEY AND CARNEY
    601 Pennsylvania Avenue, N.W.
    Suite 900
    Washington, D.C. 20004
    (202) 434-8234
    JONATHAN RUBENS, ESQUIRE
    601 Pennsylvania Avenue, N.W.
    Suite 900
    Washington, D.C.
    (202) 487-3632

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
    1730 K Street, N.W.
    Suite 304
    Washington, D.C. 20006
    (202) 508-3690
    ADGIE O'BRYANT, JR., ESQUIRE
    ANDERSON & O'BRYANT, P.C.
    1107 Seventh Street, N.W.
    Washington, D.C. 20001
    (202) 371-0013

                THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
    3003 Van Ness, N.W.
    #W919
    Washington, D.C. 20008
    (202) 244-2659

Court Reporter:    THERESA M. SORENSEN, CVR-CM
    Official Court Reporter
    Room 4800-H, U.S. Courthouse
    Washington, D.C. 20001
    (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

                THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

```
 1              P R O C E E D I N G S
 2        THE DEPUTY CLERK:  This is the case of The United
 3   States v. Kevin L. Gray, Rodney Moore, John Raynor, Calvin
 4   Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5   2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6   United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
 7   McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens
 8   and Mr. O'Bryant and Ms. Holt for the defendants.  Mr.
 9   Lasley is not present.
10        THE COURT:  All right.
11        MS. HOLT:  Your Honor, I know from Madam Clerk
12   that my exhibit list is not in the courtroom this morning.
13   Can I just ask you the number for a couple of these things?
14        THE COURT:  Yes.
15        MS. HOLT:  Okay.  Do you have the number for the
16   timeline?
17        THE COURT:  Eighty-one.
18        MS. HOLT:  Okay.  The number for the stipulated
19   statement.
20        THE COURT:  Eighty.
21        MS. HOLT:  Eighty?  Okay.  And 81 is my last
22   number?
23        THE COURT:  Right.
24        MS. HOLT:  Thank you very much.
25        THE COURT:  Good morning, ladies and gentlemen.
```

---

**Page 5**

```
 1   When I read you the -- gave you the time schedule yesterday,
 2   I misstated the Wednesday and Thursday.  It's not next week,
 3   it's the following week, as you probably noticed when you
 4   got that schedule as you left the courtroom.
 5        As soon as we have the witness here, we will be
 6   ready to go forward today with the continued
 7   cross-examination by Ms. Holt.  The witness is on her way
 8   up.
 9        MS. HOLT:  While we are waiting for her, I could
10   come to the bench for a minute --
11        THE COURT:  Yes.
12        MS. HOLT:  -- with Ms. Jeffress.
13        (Whereupon, a discussion was held at the bench on the
14   record.)
15        MS. HOLT:  At the conclusion of her testimony, I
16   am going to be requesting the standard other crimes limiting
17   instruction --
18        THE COURT:  Right.
19        MS. HOLT:  -- with respect to her testimony of any
20   activities with Mr. Nunn before October of 1990.
21        THE COURT:  I think Mr. Carter has a motion, too,
22   so I will take both at the conclusion of her testimony.
23        MS. JEFFRESS:  No objection to that.
24        MS. HOLT:  Okay.  If I could just ask the
25   government so I can write -- to focus on what they want to
```

---

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

September 26, 2002
Volume 110

---

Page 46

1    THE COURT: Do you want to recross?
2    MS. HOLT: No. I'm just saying --
3    THE COURT: Okay. If you don't want to recross,
4  then we'll --
5    MS. HOLT: Okay. But I don't mind adding them to
6  the list. That's all stuff she said in direct after I made
7  the timeline.
8    MS. JEFFRESS: We can worry about that later.
9    MS. HOLT: Okay.
10   (End of discussion at the bench.)
11   THE COURT: All right. You can step down.
12   (Witness excused.)
13   THE COURT: Next witness.
14   While the witness is coming, I need to see counsel
15 back on one other matter.
16   (Whereupon, a discussion was held at the bench on the
17 record.)
18   THE COURT: I will take your motion first.
19   MS. HOLT: Yes. My motion is to strike the
20 evidence because she hasn't put any evidence that would
21 overlap with this conspiracy, either overlap or interact
22 with it based upon the allegations that I set forth in my
23 memorandum, the facts of which I will adopt here.
24   THE COURT: All right. That motion is denied.
25   Mr. Carter.

---

Page 47

1    MS. HOLT: Okay. I have a second motion that
2  would be for a limiting instruction.
3    THE COURT: Okay. Let me deal with Mr. Carter's
4  motion first.
5    MR. CARTER: I just move to strike her testimony,
6  Your Honor, as being beyond the time frame of this
7  conspiracy or having anything to do with this conspiracy.
8  If the government alleges this is within the course of the
9  conspiracy charged in this indictment, there has been no
10 testimony whatsoever to hook this up in any way, shape or
11 form with any of the allegations or any of the things in the
12 indictment itself, and so because it is propensity testimony
13 and is more prejudicial than probative, I would move to
14 strike her testimony and/or ask for a mistrial at this time.
15   THE COURT: Okay. That's denied.
16   MR. LASLEY: I would like to join Mr. Carter's
17 motion in that regard and just note for the record the
18 Mathis case, that in this instance, we're talking about
19 variant and multi conspiracies, and contrary to Judge
20 Henderson's opinion in the Mathis case, there is a
21 tremendous amount of prejudice bringing this matter and
22 these materials in here and talking about 25 kilos or
23 whatever they're talking about in this testimony, and for
24 those reasons, I would join those motions.
25   THE COURT: Okay. That's denied.

---

Page 48

1    MR. OYEWOLE: Your Honor, on behalf of Mr. Raynor,
2  we join in that motion to strike and move for a mistrial.
3  It's highly prejudicial and that testimony has nothing to do
4  with the cases you have against this defendant, especially
5  against Mr. Raynor; therefore we join in the motion as
6  proposed by Mr. Carter.
7    THE COURT: That's denied.
8    MR. CARNEY: Your Honor, I join in the motions.
9  In addition, the statements that were introduced are not
10 part of 801(d) in furtherance of any conspiracy with my
11 client. I move for severance again and also for mistrial.
12   THE COURT: That's denied.
13   MS. HOLT: Can I specifically just join -- not
14 rearguing, I just want to join Mr. Lasley's reliance on the
15 Mathis case because --
16   THE COURT: Yes.
17   MS. HOLT: -- I think it is the fundamental case
18 that's at issue here.
19   THE COURT: Okay.
20   MS. HOLT: Now on the issue of a limiting
21 instruction.
22   THE COURT: All right. And the government's
23 theory, which I agree with, is that it's not 404 evidence,
24 so there is no basis for a limiting instruction, so that
25 request is denied as well.

---

Page 49

1    MS. HOLT: Okay.
2    (End of discussion at the bench.)
3    RICHARD K. DIANA, GOVERNMENT'S WITNESS, SWORN
4    DIRECT EXAMINATION
5  BY MS. JEFFRESS:
6  Q.   Good morning, sir.
7  A.   Good morning.
8  Q.   Please introduce yourself to the jury by stating your
9  full name.
10 A.   Richard K. Diana.
11 Q.   And where do you work?
12 A.   I work in the Washington Field Office of the FBI.
13 Q.   What is your current job with the FBI?
14 A.   Currently I'm the principal firearms instructor for
15 the Washington Field Office.
16 Q.   And how long have you been working for the FBI?
17 A.   About 18 and a half years.
18   MS. HOLT: May we approach?
19   THE COURT: Yes.
20   (Whereupon, a discussion was held at the bench on the
21 record.)
22   MS. HOLT: I don't have a proffer as to this
23 witness' testimony, so I have no way of knowing whether I
24 move to move in limine to object to his testimony.
25   MS. JEFFRESS: This is the agent that we mentioned

---

13 (Pages 46 to 49)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

**15**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA,       :
                                :
        v.                      :      Criminal Case No.
                                :         00-105
LIONEL DEWITT NUNN,             :
                                :
        Defendant.              :
                                :
- - - - - - - - - - - - - - x

                    Washington, D.C.
                    July 3, 2001
                    12:17 p.m.

            Transcript of Hearing
    Before the Honorable Paul L. Friedman
        United States District Court Judge

APPEARANCES:

For the Plaintiff:        JOHN P. DOMINGUEZ, ESQ.
                          ASSISTANT U.S. ATTORNEY

For the Defendant:        HENRY ASBILL, ESQ.
                          L. BARRETT BOSS, ESQ.

Court Reporter:           Thomas C. Bitsko
                          Miller Reporting Co, Inc.
                          735 8th Street, S.E.
                          Washington, D.C., 20003
                          (202) 546-6666

FILED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

GOVERNMENT EXHIBIT
LN-3
Cr.# 00-157(RCL)

10          MR. DOMINGUEZ:  If the Government were to

11  proceed to trial in the offense of money laundering

12  conspiracy charged in Count 2 of the superseding

13  indictment, it would have to prove the following

14  elements beyond a reasonable doubt.

15          One, that the defendant or a coconspirator

16  acting in concert or individually in furtherance of

17  the conspiracy did:  1. conduct or attempted to

18  conduct a financial transaction; 2. knowing the

19  property involved in such financial transaction

20  represented the proceeds of some form of unlawful

21  activity; 3. which in fact involved drug

22  trafficking proceeds; and, 4. while acting with the

23  knowledge that the transaction was designed in

24  whole or in part to disguise the nature, locations,

25  source ownership or control of the proceeds of the

gm

21

1   suspected unlawful activity or that the transaction

2   was designed in whole or in part to avoid a

3   transaction reporting requirement.

4        If the case would have proceeded to trial,

5   the Government's evidence would prove beyond a

6   reasonable doubt that between January of 1998 and

7   March of 2000, Mr. Nunn initiated numerous

8   financial transactions involving funds that he knew

9   were the product of some form of unlawful activity

10  and which were in fact proceeds from illegal

11  distribution of drugs.  The transactions were

12  designed in whole or in part to conceal the nature,

13  source or ownership of the proceeds, or to avoid

14  the Government reporting requirements.

15       Mr. Nunn's wife, Lauren Jefferson,

16  assisted him in this endeavor by participating in

17  many of the financial transactions.  Although Mr.

18  Nunn never explicitly told Ms. Jefferson that the

19  transactions involved drug proceeds, given the

20  amount of money involved, Mr. Nunn's prior

21  conviction, and the circumstances surrounding the

22  financial transactions, Ms. Jefferson knew or

23  should have known that she was assisting Mr. Nunn

24  in concealing his ill-gotten gains.

25       The total value of the funds involved in

gm                                                                    22

1    the money laundering transactions is $296,413.19.

2              Thank you, Your Honor.

3              THE COURT:  Mr. Nunn, you've heard what

4    the Government just said happened in this case.  Is

5    the Government's summary of what happened accurate?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Is there anything you want to

8    differ with them on?  Anything you want to add or

9    subtract to what they said?

10             THE DEFENDANT:  No.

11             THE COURT:  You looked like you were about

12   to say something, Mr. Boss.

13             MR. BOSS:  No, Your Honor.

14             MR. ASBILL:  Just hoping his phone doesn't

15   go off.

16             [Laughter.]

17             MR. BOSS:  I apologize.

18             THE COURT:  So, Mr. Nunn, are you in fact

19   guilty of this offense?

20             THE DEFENDANT:  Yes.

21             THE COURT:  And are you pleading guilty

22   voluntarily and because you are guilty?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Do you have any questions you

25   want to ask me or Mr. Asbill or Mr. Boss before I

1    accept your plea?

2              THE DEFENDANT:  No.

3              THE COURT:  If there's anything you're not

4    clear about, now is the time to clear it up because

5    it's very unlikely that I would let you change your

6    mind and withdraw your plea after today.  Do you

7    understand that?

8              THE DEFENDANT:  Yes.  Well, there was one

9    thing I wanted, for the record, Mr. Dominguez to

10   put on the record about--

11             MR. BOSS:  Mr. Nunn just wants it to be

12   clear for the record he's not cooperating.  He'd

13   like Mr. Dominguez also to say that, for the

14   purpose of the record, just to be absolutely clear.

15             MR. DOMINGUEZ:  This agreement is not a

16   cooperation agreement.  Mr. Nunn is not obligated

17   under this plea agreement to cooperate with the

18   Government, to testify, to provide any information

19   whatsoever to the Government in aid of prosecution

20   of other individuals.

21             MR. BOSS:  Thank you.

22             THE DEFENDANT:  Thank you.

23             THE COURT:  Anything else, Mr. Nunn, you

24   want to ask me about or ask your lawyers about or

25   ask me to ask Mr. Dominguez about?

24

1          THE DEFENDANT:  No, that's it.

2          THE COURT:  Okay.

3          So you still want to enter your plea of

4    guilty?

5          THE DEFENDANT:  Yes.

6          THE COURT:  In that case, Mr. Nunn, I find

7    that you know of your right to a trial and have

8    chosen to waive that right.

9          And since your lawyers and I have

10   discussed with you the sentencing guidelines, and

11   you know what the maximum possible punishment is

12   for the offense to which you're pleading guilty, I

13   find that your plea is a knowing and voluntary plea

14   of guilty supported by an independent basis in fact

15   containing each of the essential elements of the

16   offense.  And I, therefore, accept your guilty plea

17   and will enter a judgment of guilty to Count 2 of

18   the indictment charging you with conspiracy to

19   launder money in violation of 18 U.S.C. Section

20   1956(h).

Unites States of America v.
Kevin L. Gray, et al.                    CR 00-157                    May 9, 2002
                                                                 P.M. Session/Day 38

Page 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .

            Plaintiff,             .    Docket No. CR 00-157

                                   .    Washington, D.C.
            v.                     .    Thursday, May 9, 2002
                                   .    1:39 p.m.
KEVIN L. GRAY, RODNEY MOORE,       .
JOHN RAYNOR, CALVIN SMITH,         .
TIMOTHY HANDY, and LIONEL NUNN,    .

            Defendants.            .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DAY 38 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE1, and a jury

APPEARANCES:

For the Plaintiff:          TIMOTHY J. HEAPHY, ESQ.
                            MATTHEW G. OLSEN, ESQ.
                            AMY JEFFRESS, ESQ.
                            Assistant United States Attorneys
                            555 4th Street, N.W.
                            Washington, D.C. 20001
For Defendant Gray:         FRANCIS D. CARTER, ESQ.
                            1730 Rhode Island Avenue, N.W.
                            Washington, D.C. 20036
                            DAVID P. BAUGH, ESQ.
                            Law Offices of David P. Baugh, PC
                            223 South Cherry Street
                            Richmond, Virginia 23241


Pages 1 through 160

Dennis A. Dinkel, RDR, CRR                    Phone: (202) 289-8661
                                    e-mail: dadinkel@directvinternet.com

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-15a

Unites States of America v.  
Kevin L. Gray, et al.

CR 00-157

May 9, 2002  
P.M. Session/Day 38

---

Page 2

APPEARANCES - Continued:  
For Defendant Moore:    BARRY COBURN, ESQ.  
                        Coburn and Schertler  
                        1150 18th Street, N.W.  
                        Washington, D.C. 20036  
                        STEVEN McCOOL, ESQ.  
                        Mallon and McCool, LLC  
                        16 South Calvert Street  
                        Baltimore, Maryland 21202  

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQ.  
                        601 Pennsylvania Avenue, N.W.  
                        Washington, D.C. 20004  

                        THOMAS SAUNDERS, ESQ.  
                        207 East Redwood Street  
                        Baltimore, Maryland 21202  

For Defendant Smith:    JOHN CARNEY, ESQ.  
                        Law Offices of Carney and Carney  
                        601 Pennsylvania Avenue, N.W.  
                        Washington, D.C. 20004  
                        JONATHAN RUBENS, ESQ.  
                        601 Pennsylvania Avenue, N.W.  
                        Washington, D.C. 20004  

For Defendant Handy:    MICHAEL LASLEY, ESQ.  
                        1730 K Street, N.W.  
                        Washington, D.C. 20004  
                        ADGIE O'BRYANT, JR., ESQ.  
                        Anderson and O'Bryant, PC  
                        2207 7th Street, N.W.  
                        Washington, D.C. 20001  

For Defendant Nunn:     VERONICE A. HOLT, ESQ.  
                        3003 Van Ness Street, N.W.  
                        Washington, D.C. 20008  

Court Reporter:         DENNIS A. DINKEL, RDR, CRR  
                        Official Court Reporter  
                        Room 6818, U.S. Courthouse  
                        Washington, D.C. 20001  
                        (202) 289-8661  

Proceedings reported by machine shorthand, transcript produced  
by computer-aided transcription

---

Page 3

PROCEEDINGS  
(1:39 p.m.)

1  
2  
3    THE COURT: Yes?  
4    MS. HOLT: Your Honor --  
5    THE COURT: Wait for defendants.  
6    MS. HOLT: Okay.  
7    One of the things is procedural that I could deal  
8 with.  
9    THE COURT: Okay.  
10    MS. HOLT: That is that the government has informed  
11 us that they will have an iron-fast policy by which we must  
12 receive our Jencks between 5:00 and 6:00 on Thursday. That is  
13 the only time that we can receive it. We must go to their  
14 office. That is not a workable proposition.  
15    Now I understand that the government has claimed all along  
16 that for security reasons, we have to wait until the Thursday  
17 before; but quite frankly, trying to make us get it within an  
18 hour of Court is mean-spirited.  
19    THE COURT: I'll deal with that at the end of the  
20 day. We don't want to keep the jury waiting.  
21    MS. HOLT: Now that the defendants are here, we need  
22 a ruling on my 404(b) motion with respect to Grenfield Place  
23 before the government opens.  
24    THE COURT: It's denied.  
25    MR. COBURN: The government added a chart they marked

---

Page 4

1 as Government's Exhibit OP-3. It is just a piece of  
2 demonstrative evidence that I'm sure will be coming into  
3 evidence. We don't object to their having added it this  
4 morning. It just has one -- there is one aspect of it that  
5 causes a potential problem, which is under item two, physical  
6 evidence, they list sub-item (c), controlled purchases and  
7 prior arrests.  
8    We're not too sure what the relevance of the prior arrests  
9 is, and we'd ask -- I guess by way of a motion in limine, just  
10 out of an abundance of caution, to have that particular phrase  
11 stricken before the chart is shown to the jury.  
12    THE COURT: What are you referring to there, prior  
13 arrests of who?  
14    MR. HEAPHY: Your Honor, there are several  
15 racketeering acts charged. Those were acts for which the  
16 defendants were previously arrested. There will simply be a  
17 reference to that going down the list of various forms of  
18 evidence the jury will hear over the course of the trial.  
19    I believe there will be explicit reference from police  
20 officers these defendants were charged in the acts. Those are  
21 charged racketeering acts in the indictment and, therefore, I  
22 don't believe the charge is prejudicial.  
23    THE COURT: The objection is overruled, and I'll  
24 allow the charts as shown.  
25    Bring in the jury.

---

Page 5

1    (Jury in at 1:42 p.m.)  
2    THE COURT: Good afternoon, ladies and gentlemen. At  
3 this time, the government will provide their opening statement,  
4 and that will probably take the remainder of the afternoon.  
5    When we come back on Monday, we'll hear from those defendants  
6 who wish to make an opening statement.  
7    Mr. Heaphy, you may proceed.  
8    MR. HEAPHY: Thank you, Your Honor.  
9    (Opening statement of the government.)  
10    MR. HEAPHY: Ladies and gentlemen, good afternoon.  
11 Between 1998 and 1999, these six men killed 31 people.  
12    On May 1, 1989, they killed Alvin Henson.  
13    On October 9, 1990 --  
14    MS. HOLT: I have an objection.  
15    THE COURT: Overruled.  
16    MR. HEAPHY: -- they murdered Anthony Dent.  
17    On May 24, 1991, they executed Darrell Henson.  
18    On July 25, 1992, they eliminated Marvin Goodman.  
19    On January 20, 1993, they took out Christopher Burton.  
20    On February 13, 1993, they shot and killed Scott Downing.  
21    July 12, 1993, they killed Henry Lloyd, Jr.  
22    July 25, 1993, they murdered Aaron Jackson.  
23    On January 3, 1994, they executed Eric Moore.  
24    On January 11, 1994, they shot and killed both Corey  
25 Royster and Andre Robinson.

---

2 (Pages 2 to 5)

16

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA   .   Criminal Case No. AW-00-0211

    v.             .

                  .   Greenbelt, Maryland

LIONEL NUNN,         .

         Defendant.  .  Tuesday, December 12, 2000
. . . . . . . . . . . . . .  3:20 p.m.



TRANSCRIPT OF REARRAIGNMENT AND GUILTY PLEA
BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
UNITED STATES DISTRICT JUDGE




<u>APPEARANCES:</u>

FOR THE GOVERNMENT:     JAN PAUL MILLER, ESQ.
                     Assistant United States Attorney
                     Room 400 U.S. Courthouse
                     6500 Cherrywood Lane
                     Greenbelt, Maryland 20770


FOR THE DEFENDANT:      HENRY W. ASBILL, ESQ.
                     WILLIAM B. MOFFITT, ESQ.
                     Asbill, Junkin, Moffitt & Boss
                     1615 New Hampshire Avenue, N.W.
                     Washington, D.C. 20009


OFFICIAL COURT REPORTER:   GLORIA I. WILLIAMS
                     Room 240 U.S. Courthouse  **FILED**
                     6500 Cherrywood Lane
                     Greenbelt, Maryland 20770 MAY 2 0 2003
                     (301) 345-4069

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

COMPUTER-AIDED TRANSCRIPTION OF STE

GOVERNMENT EXHIBIT

**LN-2**

Cr. # 00-157(RCL)

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-16

MR. MILLER:  Your Honor, there's a stipulation of

facts on page 2 of the plea agreement, which at this time I

move into evidence.  I know I have provided the original plea

1    agreement to your court clerk.

2            The stipulation is at page 2 and it states that our

3    office and Mr. Nunn understand, agree, and stipulate to the

4    following statement of facts which would have been proven at

5    trial had the case gone to trial.

6            On March 20, 2000 law enforcement officers executed a

7    search warrant at 13903 Grenfell Place, Bowie, Maryland, the

8    residence of Lionel Nunn and Lauren Jefferson.   Nunn and

9    Jefferson were at the residence at the time of the search.

10   During the course of the search agents seized a loaded Bryco-

11   Jennings .380 caliber handgun from a storage container located

12   in the attached one-car garage of the residence.   Agents also

13   seized a gun box and paperwork for a .45 caliber handgun from

14   the storage container.

15           Ten fingerprints were developed on the gun box and

16   related paperwork.   Further analysis revealed that eight of the

17   fingerprints belonged to Nunn.

18           Prior to March 20, 2000 Nunn had been convicted in

19   Circuit Court for Prince George's County, Maryland of

20   conspiracy to distribute a controlled substance, a crime

21   punishable by a term of imprisonment exceeding one year.

22   Nunn's right to possess the firearm has not been restored.   The

23   Bryco-Jennings .380 caliber handgun seized from Nunn's

24   residence was manufactured in California and was capable of

25   firing a bullet without modification.

1            THE COURT:  All right.  Mr. Nunn, this is the

2    stipulation that the government has just read as part of the

3    plea agreement?  Did you hear it?  You can just remain seated.

4    Did you hear that?

5            THE DEFENDANT:  Yes, I heard it.

6            THE COURT:  Do you agree that essentially is what

7    happened in this case?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Do you have any questions of me at this

10   point?  You'll be able to speak at any sentencing.  Do you have

11   any questions about your guilty plea at this time?

12           THE DEFENDANT:  No.

13           THE COURT:  Mr. Moffitt or Mr. Asbill, do you have any

14   questions?

15           MR. ASBILL:  No, sir.

16           THE COURT:  Any other area you wish me to inquire

17   into, Mr. Asbill?

18           MR. ASBILL:  No, sir.

19           THE COURT:  Government?

20           MR. MILLER:  No, Your Honor.

21           THE COURT:  All right.  Mr. Nunn, I certainly

22   understand your -- I don't know how to describe it -- I guess

23   your disappointment with how things have gone so far.  I

24   understand that.  I do.  And you have other difficulties in the

25   District of Columbia that are not decided, that are pending,

1   and I understand the stress.  Believe me.  Anyone in your

2   situation would be stressed.  And so, I think that probably may

3   explain some of your answers or what have you that you have

4   given today.  The Court does understand it.

5           But I have asked you appropriate questions.  You have

6   told me you want to plead guilty.  You have addressed my

7   questions.  I did watch you and that's why I'm making the

8   comments because you look a little irritated.  I guess that's

9   the best word to say.  You look a little irritated today.  But

10  everything isn't over yet.  And I do believe that you have made

11  a knowing and voluntary decision to plead guilty.  I do further

12  believe that there is an adequate factual basis that you all

13  have stipulated to to support that.  And I will accept your

14  request that you plead guilty.  I will accept your request to

15  plead guilty to the one count in this superseding indictment.

**17**

United States of America v.
Kevin L. Gray, et al.

CR 00-157

September 26, 2002
Volume 110

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,     :    Docket No. CR 00-157
                              :
         Plaintiff,           :    Washington, D.C.
                              :    September 26, 2002
v.                            :    2:02 p.m.
                              :
KEVIN L. GRAY, RODNEY MOORE,  :
JOHN RAYNOR, CALVIN SMITH,    :
TIMOTHY HANDY, LIONEL NUNN,   :
                              :
         Defendants.          :
                              :
- - - - - - - - - - - - - - - x

DAY 110 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:     TIMOTHY J. HEAPHY, ESQ.
                       MATTHEW G. OLSEN, ESQ.
                       AMY JEFFRESS, ESQ.
                       Assistant United States Attorneys
                       555 Fourth Street, Northwest
                       Washington, D.C. 20001

For Defendant Gray:    FRANCIS D. CARTER, ESQ.
                       1730 Rhode Island Avenue, Northwest
                       Suite 717
                       Washington, D.C. 20036
                       DAVID P. BAUGH, ESQ.
                       Law Offices of David P. Baugh, PC
                       223 South Cherry Street
                       Richmond, Virginia 23241

Pages 1 through 125
DOLORES A. BYERS, CSR, RPR
Official Court Reporter

FILED

MAY 2 0 2003

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
U.S. Official Court Reporter

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-17

United States of America  v.
Kevin L. Gray, et al.

CR 00-157

September 26, 2002
Volume 110

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
   Coburn and Schertler
   1150 18th Street, Northwest
   Washington, D.C. 20036

   STEVEN MC COOL, ESQ.
   Mallon and McCool, LLC
   16 South Calvert Street, Suite 1002
   Baltimore, Maryland 21202
For Defendant Raynor: G. GODWIN OYEWOLE, ESQ.
   601 Pennsylvania Avenue, Northwest
   Suite 900, South Building
   Washington, D.C. 20004

   THOMAS SAUNDERS, ESQ.
   207 East Redwood Street, Suite 205
   Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
   Law Offices of Carney and Carney
   601 Pennsylvania Avenue, Northwest
   Suite 900, South Building
   Washington, D.C. 20004

   JONATHAN RUBENS, ESQ.
   601 Pennsylvania Avenue, Northwest
   Suite 900, South Building
   Washington, D.C. 20004
For Defendant Handy:  MICHAEL LASLEY, ESQ.
   1730 K Street, Northwest, Suite 304
   Washington, D.C. 20006
   ADGIE O'BRYANT, JR., ESQ.
   Anderson and O'Bryant, PC
   1107 Seventh Street, Northwest
   Washington, D.C. 20001

For Defendant Nunn:   VERONICE A. HOLT, ESQ.
   3003 Van Ness Street, Northwest
   Suite W-919
   Washington, D.C. 20008

---

**Page 4**

C O N T E N T S (Continued)
E X H I B I T S (Continued)

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| Nos. SWLN-401A, SWLN-401B, SWLN-401C, SWLN-401D and SWLN-401E | | 48 |
| No. SWLN-106 | 50 | |
| No. SWLN-107 | 51 | |
| No. SWLN-403 | 52 | |
| Nos. SWLN-110, 111, 112 and 113 | 55 | |
| Nos. SWLN-404, 405 and 407 | 57 | |
| Nos. SWLN-406A and 406B | 60 | |
| No. SWLN-108 | 61 | |
| No. SWLN-109 | 62 | |
| Nos. SWLN-116, 117, 118, 119, 120, 121, 122, 123, 124 and 125 | 66 | |
| No. SWLN-409 | 69 | |
| No. SWLN-410 | 71 | |
| No. SWLN-425 | 72 | |
| No. SWLN-408 | 77 | |
| No. LN-2 | 90 | |
| No. LM-1 | 110 | |

---

**Page 3**

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| On behalf of the government: | | | | |
| Christopher Sakala | | | | |
| By Mr. Olsen | 6 | | | |
| By Ms. Holt | | 15 | | |
| By Mr. Olsen | | | 26 | |
| Alexander Miris | | | | |
| By Mr. Olsen | 33 | | | |
| By Ms. Holt | | 77 | | |
| By Mr. Olsen | | | 88 | |
| Lisa Miller | | | | |
| By Ms. Jeffress | 97 | | | |

E X H I B I T S

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| Nos. SWLN-127, 128 and 129 | | 13 |
| No. SWLN-426 | 14 | |
| No. SWLN-101 | 37 | |
| No. SWLN-103 | 38 | |
| No. SWLN-115 | 40 | |
| No. SWLN-126 | 41 | |
| No. SWLN-411 | 42 | |
| Nos. SWNL-412, 413, 414, 415 and 416 | 43 | 43 |
| No. SWLN-105 | 46 | |

---

**Page 5**

1   AFTERNOON SESSION
2       MS. HOLT:  The government -- we probably shouldn't
3   discuss this in front of the witness.
4       (Begin bench conference.)
5       MS. HOLT:  The government now has a transcript
6   that they want to give to the jury.  I object to a portion
7   of it that is inaccurate.  We've listened to it.  My client
8   says, "That depends upon what you use it for."  They have UI
9   there. It's a critical place.  All I ask them to do was to
10  hand write it in if they're going to give this to the jury.
11      MR. OLSEN:  I prepared this excerpt.  I couldn't
12  get the computer.  So I'm going to use the VCR and hand out
13  transcripts.  That's what I propose to do.
14      I showed Ms. Holt this section that I'm pointing
15  to, which is "Yeah but (ui)" for unintelligible, "use it
16  for." Ms. Holt and I listened to it a moment ago.  I can't
17  say exactly what it says.  It does sound like it says
18  something like it all depends on what you use it for.  The
19  detective can't -- he hasn't focused on that.  And I think
20  these are accurate as far as they go.
21      What I told Ms. Holt I would do is I would be
22  willing to ask the detective, once I play that part, what he
23  heard at that section.  I'm not really comfortable changing
24  the transcript without having him be able to say that's
25  exactly what I heard.  Unintelligible is a neutral part.

---

2 (Pages 2 to 5)

United States of America v.                    CR 00-157                September 26, 2002
Kevin L. Gray, et al.                                                          Volume 110

---

**Page 74**

1  form. And it's for one blue book containing two plastics
2  bottles which was the two bottles of quinine Hydrochloride
3  and the box itself.
4  Q  So were both the box and the quinine both submitted to
5  DEA for analysis?
6  A  Yes. Those were also submitted, too.
7      THE COURT: Would you hand him SWLN-404 and ask if
8  that's the drugs that he submitted with SWLN-405?
9      MR. OLSEN: Yes, Your Honor. I think one of us,
10 Agent Miris or I, misspoke the first time.
11     BY MR. OLSEN:
12 Q  404 is what?
13 A  404 is the pocket scale.
14 Q  And 407 is the --
15 A  The heroin.
16     THE COURT: Wait, wait, wait. I thought you just
17 changed those.
18     MR. OLSEN: Let me make absolutely clear we have
19 this right.
20     BY MR. OLSEN:
21 Q  Take both of those exhibits and tell us what each one of
22 is.
23 A  Okay. Exhibit LN-407 is approximately 3.5 grams of
24 heroin.
25     THE COURT: Okay. That's 407?

---

**Page 75**

1      THE WITNESS: Yes, sir.
2      THE COURT: And is that what you submitted with
3  your top half of your DEA-7, the exhibit SWLN-501?
4      THE WITNESS: Yes, Your Honor.
5      THE COURT: Where did the marijuana come from?
6      THE WITNESS: The marijuana was in the photograph
7  of the attic. When you walked into the closet, there was,
8  like, a little -- there was, like, another doorway, so to
9  speak, before you got into the attic itself and the
10 marijuana was in that little cut away.
11     THE COURT: Okay.
12     THE WITNESS: It was just sitting on a ledge.
13     THE COURT: Now where was the heroin again?
14     THE WITNESS: The heroin was in a hutch in the
15 master bedroom down below.
16     THE COURT: And where was the quinine again -- are
17 you going to show him 502? Well, you showed him 502.
18 You're going to show him -- the quinine was SWLN-406A and B?
19     MR. OLSEN: That's right, Your Honor.
20     THE COURT: And ask him if that's what he
21 submitted with the top half of his DEA-7?
22     MR. OLSEN: Yes, Your Honor.
23     THE COURT: Yes, Your Honor.
24     BY MR. OLSEN:
25 Q  The book that we're looking at, the fake book, was that

---

**Page 76**

1  submitted to the DEA-7 for analysis?
2  A  Yes, it was.
3  Q  And that's labeled what?
4  A  LN-406B.
5  Q  And then the quinine, was that also on the form.
6  A  The DEA-7.
7  Q  The DEA-7?
8  A  That is correct.
9  Q  And what's that labeled?
10 A  LN-406A.
11 Q  And then one other item which I have not shown you is
12 marked SWLN-408. Do you recognize that?
13 A  Yes, I do.
14 Q  And what is that?
15 A  That was the marijuana.
16 Q  And where was that recovered?
17 A  In the master bedroom in the closet up in the loft.
18 Q  Was that, also, submitted with the heroin, suspected
19 heroin?
20 A  Yes, it was.
21     MR. OLSEN: I offer that exhibit, SWLN-408, Your
22 Honor?
23     MS. HOLT: Let me see that. I can't tell which is
24 which with these numbers.
25     THE COURT: SWLN-408 is received. And then I'll

---

**Page 77**

1  reserve on 501 and 502 until the chemist testifies.
2      (Government Exhibit No. SWLN-408
3      was received into evidence.)
4      MR. OLSEN: Your Honor, no further questions.
5      THE COURT: Ms. Holt, you may cross-examine.
6      MS. HOLT: Thank you, Your Honor. Thank you very
7  much.
8      CROSS-EXAMINATION
9      BY MS. HOLT:
10 Q  Good afternoon. Is it Agent Miris?
11 A  You can call me Mr. Miris.
12 Q  Okay. You were with Customs since 1998?
13 A  Yes, ma'am.
14 Q  This is one of your first big cases; right?
15 A  No.
16 Q  When did you start this case?
17 A  This case?
18 Q  Yeah.
19 A  In 1998.
20 Q  So you had just gotten to the Customs Service and you
21 were assigned to work on this big case; right?
22 A  Yes.
23 Q  Okay. And the big case that you were assigned to work
24 on was an investigation of money laundering by drug
25 traffickers?

---

United States District Court                    Dolores A. Byers, CSR RPR
For The District of Columbia                        Official Court Reporter

Page 78

1  A  The investigation I was assigned to was a money
2  laundering case. That's correct.
3  Q  Okay. And at some point in your investigation -- you
4  were investigating Mr. Singleton or were you not involved in
5  that? Were you only involved in the Mutai end of this, the
6  Mutai brothers, the people who are over at the Bethesda
7  Jewelry Exchange?
8  A  Yes and --
9        MR. OLSEN: Objection, Your Honor. Scope.
10       THE COURT: Overruled. Go ahead.
11       THE WITNESS: Initially the investigation focused
12  on the Bethesda Jewelry Exchange and then from there that's
13  when it went on into this joint U.S. Customs/FBI
14  investigation.
15       BY MS. HOLT:
16  Q  Singleton, Phyllis Webster, et al.; right?
17  A  And others. Correct.
18  Q  Okay. You're not investigating the people in this room
19  other than Mr. Nunn; correct?
20  A  Mr. Nunn, yes.
21  Q  Other than Mr. Nunn you were not investigating the
22  people in this room; correct?
23  A  No, I wasn't.
24  Q  Okay. And you were not investigating Mr. Nunn's
25  activities in connection with any body in this room; right?

Page 79

1  A  Not that I know of. No.
2  Q  Okay. So the search warrant and everything that you got
3  was to assist in your investigation of the Webster/Singleton
4  and the money laundering; right?
5  A  Yes.
6  Q  Okay. And when you went out to search my client's
7  house, do you recall that Mr. Sparks, Daniel Sparks went
8  with you?
9  A  Yes. I believe he was on the search team
10  Q  Okay. And he was not a part of your regular task force;
11  right? He was assisting you on the search?
12  A  That is correct.
13  Q  Okay. And Agent Sparks was then there when you
14  recovered these large sums of money, et cetera; right?
15  A  I believe he was there. Yes.
16  Q  Okay. And when he was there to assist you, it's just
17  because you needed some extra agents; right?
18  A  That is correct. Again, it was a joint case.
19  Q  Okay. He wasn't joining your task force. He was
20  providing manpower is what I'm trying to ask you.
21  A  Yes.
22  Q  Okay. And so he goes out with you. You all go through
23  the house. You find these large sums of money; right?
24  A  Correct.
25  Q  Okay. Which you seize because you were doing a money

Page 80

1  laundering investigation; right? That's what you went to
2  look for; right?
3  A  What exactly are you asking?
4  Q  You're doing a money laundering investigation; right?
5  A  Correct.
6  Q  You went to look for money; right?
7  A  Among other things.
8  Q  Okay. Certainly those few seeds and stems that are in
9  that bag, the marijuana, that's not what you went to look
10  for; right?
11  A  That's what happened to be in the residence.
12  Q  Okay. How much was in there?
13  A  In the residence?
14  Q  Yeah.
15  A  What exactly --
16  Q  How much marijuana did you find?
17  A  I'd have to check my notes to see how much it was but it
18  wasn't much.
19  Q  It wasn't much; right?
20  A  No.
21  Q  Okay. Something you might find in, although not lawful,
22  you might find in many people's house; right?
23       MR. OLSEN: Objection. Relevance.
24       THE COURT: Sustained.
25       BY MS. HOLT:

Page 81

1  Q  Okay. Now I just want to ask you about a couple of
2  other things. Let me follow it up.
3        So you go in the house. You seize the items that
4  have been shown to the jury today. You bring a case or law
5  enforcement authorities bring a case in Maryland against
6  Mr. Nunn for the gun; right?
7  A  That is correct.
8  Q  Okay. And then Mr. Nunn is charged here with
9  Ms. Webster, et al., in the drug conspiracy; right?
10  A  Yes.
11  Q  Initially they were just charged in the drug conspiracy;
12  right?
13       MR. OLSEN: Objection. Scope.
14       THE COURT: Sustained.
15       MS. HOLT: May I approach?
16       THE COURT: Yes.
17       (Begin bench conference.)
18       MS. HOLT: I am just trying to establish, which is
19  my theory of the defense that I told the jury in opening
20  statement, that these items belong to that conspiracy.
21       THE COURT: He didn't testify about any
22  investigation other than his search here.
23       MS. HOLT: Okay.
24       (End bench conference.)
25       BY MS. HOLT:

United States of America v.                    CR 00-157                    September 26, 2002
Kevin L. Gray, et al.                                                       Volume 110

Page 82

1   Q  So after you seize these items and you -- I guess you
2   turned them over to the different places; right?  Some
3   things go to the FBI.  Some things go to the DEA; right?
4   A  Eventually, yes.
5   Q  Okay.  And then -- but they remain a part of your files
6   and your investigation; right?
7   A  That is correct.
8   Q  And then at some time later on in 2001, perhaps, does
9   Agent Sparks come to acquire these items from you?
10       MR. OLSEN:  Objection.  Relevance and scope.
11       THE COURT:  Overruled.
12       THE WITNESS:  I don't know if he did.
13       BY MS. HOLT:
14   Q  Well, they're your items.  You have the chain of custody
15   on them, don't you?
16   A  Yes, I do.
17   Q  Okay.  I mean, you didn't bring them to court with you
18   today, did you?
19   A  No, I didn't.
20   Q  Okay.  So at some point the Customs Service gave these
21   items to the FBI; right?
22   A  That's possible.
23   Q  Okay.  Well, don't you know it's more than possible.  I
24   mean, a stranger couldn't walk in and pick them up and take
25   them over there; right?

Page 83

1   A  No.
2   Q  You've got records; right?
3   A  Yes.
4   Q  Okay.  At some point the FBI, the Customs Service gave
5   these to the FBI; right?
6   A  That's correct.
7   Q  Okay.  And then you were asked to identify them here in
8   court today; right?
9   A  That's correct.
10   Q  Okay.  But all of these items were initially a part of
11   your investigation of money laundering; right?
12   A  Yes.
13   Q  Okay.  The only other thing I want to ask you about is
14   the gun.  You found the gun in the garage; right?
15   A  That's correct.
16   Q  You found it with its initial packaging; right?
17   A  The box, the ammunition, the paperwork, the case.  Yeah.
18   Q  Okay.  And there's a locked door between the garage and
19   the house; right?
20   A  Yes.
21   Q  Now, you also -- you were following Mr. Nunn; right?
22   A  Was I following Mr. Nunn?
23   Q  Right.  You said that you had surveillance; right?
24   A  Yes.
25   Q  Okay.  You wanted to know when Mr. Nunn would be home;

Page 84

1   right?
2   A  Yes.
3   Q  Preferably when he would be home asleep; right?
4   A  Not preferably that he would be asleep just that he
5   would be home knowing to identify -- I don't think I
6   understand your question.
7   Q  It's very easy.  For the safest time -- officer safety
8   and other rules that you learn as a law enforcement officer.
9   When you are executing a warrant on a house, it is usually
10   preferably to exercise the warrant at some time when you
11   think that the occupants are resting; right?
12   A  No.  That's not really true.
13   Q  You were never taught that?
14   A  No.
15   Q  Okay.  That you try to get -- knock on the door when
16   they are resting so that it's less likely to cause less
17   commotion and officer danger?
18   A  I'm a little bit unclear about when you mean they're
19   resting sleeping.  When they're actually sleeping as
20   compared to the middle of the night or just in the morning
21   hours?
22   Q  Morning hours.  Okay?
23   A  Morning hours.  Correct.
24   Q  Yeah.  I'm not trying to ask you are you executing the
25   warrant at some unlawful time.  I'm trying to ask you simply

Page 85

1   that for officer safety it has been really a good idea to go
2   to people's houses in the early morning hours; right?
3   A  That may be so.  Yeah.
4   Q  That's one of the things you get taught in law
5   enforcement school; right?
6   A  We get taught a lot of things but I don't specifically
7   remember somebody telling me the best time is in the early
8   morning hours.
9   Q  Okay.  But one of the things you did in this case is --
10   right.  Did you follow Mr. Nunn to the house that day?
11   That's what I'm trying to get at.
12   A  Me?
13   Q  Either you or somebody on your team?
14   A  Yes.  Probably somebody in the -- one of the
15   investigating agents.
16   Q  Okay.  So you had more than one car doing surveillance?
17   A  Probably.
18   Q  Okay.  And so when that team got to the house, they sat
19   on the house; right?
20   A  Are you talking about the night before the execution of
21   the warrant or during a typical surveillance day?
22   Q  I'm talking about this warrant if you can recall and can
23   tell me.
24   A  The night before that this warrant was executed I don't
25   remember if anybody actually drove by the house.

22 (Pages 82 to 85)

*18*

United States of America v.                    CR 00-157                    September 26, 2002
Kevin L. Gray, et al.                                                       Volume 110

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA,        :   Docket No. CR 00-157
                                 :
          Plaintiff,             :   Washington, D.C.
                                 :   September 26, 2002
v.                               :   2:02 p.m.
                                 :
KEVIN L. GRAY, RODNEY MOORE,     :
JOHN RAYNOR, CALVIN SMITH,       :
TIMOTHY HANDY, LIONEL NUNN,      :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - x
```

                   DAY 110 - PM SESSION
                   TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE ROYCE C. LAMBERTH
               UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:        TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 Fourth Street, Northwest
                          Washington, D.C. 20001


For Defendant Gray:       FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, Northwest
                          Suite 717
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241


                   Pages 1 through 125
                DOLORES A. BYERS, CSR, RPR
                   Official Court Reporter

**FILED**

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America v.
Kevin L. Gray, et al.

CR 00-157

September 26, 2002
Volume 110

---

Page 2

APPEARANCES (Continued):
For Defendant Moore: BARRY COBURN, ESQ.
  Coburn and Schertler
  1150 18th Street, Northwest
  Washington, D.C. 20036

  STEVEN MC COOL, ESQ.
  Mallon and McCool, LLC
  16 South Calvert Street, Suite 1002
  Baltimore, Maryland 21202
For Defendant Raymor: G. GODWIN OYEWOLE, ESQ.
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004

  THOMAS SAUNDERS, ESQ.
  207 East Redwood Street, Suite 205
  Baltimore, Maryland 21202

For Defendant Smith: JOHN CARNEY, ESQ.
  Law Offices of Carney and Carney
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004

  JONATHAN RUBENS, ESQ.
  601 Pennsylvania Avenue, Northwest
  Suite 900, South Building
  Washington, D.C. 20004
For Defendant Handy: MICHAEL LASLEY, ESQ.
  1730 K Street, Northwest, Suite 304
  Washington, D.C. 20006
  ADGIE O'BRYANT, JR., ESQ.
  Anderson and O'Bryant, PC
  1107 Seventh Street, Northwest
  Washington, D.C. 20001

For Defendant Nunn: VERONICE A. HOLT, ESQ.
  3003 Van Ness Street, Northwest
  Suite W-919
  Washington, D.C. 20008

Page 4

C O N T E N T S (Continued)
E X H I B I T S (Continued)

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| Nos. SWLN-401A, SWLN-401B, SWLN-401C, SWLN-401D and SWLN-401E | | 48 |
| No. SWLN-106 | 50 | |
| No. SWLN-107 | 51 | |
| No. SWLN-403 | 52 | |
| Nos. SWLN-110, 111, 112 and 113 | 55 | |
| Nos. SWLN-404, 405 and 407 | 57 | |
| Nos. SWLN-406A and 406B | 60 | |
| No. SWLN-108 | 61 | |
| No. SWLN-109 | 62 | |
| Nos. SWLN-116, 117, 118, 119, 120, 121, 122, 123, 124 and 125 | 66 | |
| No. SWLN-409 | 69 | |
| No. SWLN-410 | 71 | |
| No. SWLN-425 | 72 | |
| No. SWLN-408 | 77 | |
| No. LN-2 | 90 | |
| No. LM-1 | 110 | |

---

Page 3

C O N T E N T S

WITNESSES:          DIRECT   CROSS   REDIRECT   RECROSS
On behalf of the government:
Christopher Sakala
  By Mr. Olsen      6
  By Ms. Holt              15
  By Mr. Olsen                      26
Alexander Miris
  By Mr. Olsen      33
  By Ms. Holt              77
  By Mr. Olsen                      88
Lisa Miller
  By Ms. Jeffress          97

E X H I B I T S

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| Nos. SWLN-127, 128 and 129 | 13 | |
| No. SWLN-426 | 14 | |
| No. SWLN-101 | 37 | |
| No. SWLN-103 | 38 | |
| No. SWLN-115 | 40 | |
| No. SWLN-126 | 41 | |
| No. SWLN-411 | 42 | |
| Nos. SWNL-412, 413, 414, 415 and 416 | 43 | 43 |
| No. SWLN-105 | 46 | |

---

Page 5

```
 1              AFTERNOON SESSION
 2         MS. HOLT: The government -- we probably shouldn't
 3    discuss this in front of the witness.
 4         (Begin bench conference.)
 5         MS. HOLT: The government now has a transcript
 6    that they want to give to the jury. I object to a portion
 7    of it that is inaccurate. We've listened to it. My client
 8    says, "That depends upon what you use it for." They have UI
 9    there. It's a critical place. All I ask them to do was to
10    hand write it in if they're going to give this to the jury.
11         MR. OLSEN: I prepared this excerpt. I couldn't
12    get the computer. So I'm going to use the VCR and hand out
13    transcripts. That's what I propose to do.
14         I showed Ms. Holt this section that I'm pointing
15    to, which is "Yeah but (ui)" for unintelligible, "use it
16    for." Ms. Holt and I listened to it a moment ago. I can't
17    say exactly what it says. It does sound to me like it says
18    something like it all depends on what you use it for. The
19    detective can't -- he hasn't focused on that. And I think
20    these are accurate as far as they go.
21         What I told Ms. Holt I would do is I would be
22    willing to ask the detective, once I play that part, what he
23    heard at that section. I'm not really comfortable changing
24    the transcript without having him be able to say that's
25    exactly what I heard. Unintelligible is a neutral part.
```

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

September 26, 2002
Volume 110

Page 98

1  Q  Could you please introduce yourself to the jury by
2  stating your full name.
3  A  Yes. I'm Lisa Miller and I'm a special agent with the
4  FBI here in Washington, D.C., and I've a special agent with
5  the FBI for a little over twenty years.
6  Q  And where in the FBI do you work?
7  A  Currently I work on a criminal squad that handles asset
8  forfeiture investigations, financial investigations and
9  money laundering.
10  Q  Is there a number assigned to that squad?
11  A  Yes. It's C-1 for criminal squad one.
12  Q  And explain in a little more detail what types of
13  investigations you work on?
14  A  We work on really a wide variety of investigations where
15  often substantive squads, other squads in the office, maybe
16  a white collar squad, a bank fraud squad, a drug squad might
17  be investigating someone and they contact myself or my squad
18  to ask for assistance in the financial aspect of the
19  investigation. While the other agents may be focusing more
20  on the actual crime itself that's being investigated, they
21  ask for our help to kind of be involved in the financial
22  investigation.
23    So it could be straight out money laundering. It
24  could be drug cases. It could be, like I said, bank
25  robbery, bank embezzlement, bank fraud.

Page 99

1  Q  And how long have you been working on financial
2  investigations, doing this kind of work?
3  A  For over ten years now.
4  Q  Now, were you at some point in the past several years
5  assigned to a financial investigation of a person named
6  Lionel Nunn?
7  A  Yes.
8  Q  Could you describe just first generally what steps you
9  took in investigating Lionel Nunn and his finances?
10    MS. HOLT:  Can we approach?
11    THE COURT:  No.
12    MS. HOLT:  I object.
13    THE COURT:  Overruled.
14    THE WITNESS:  In the financial investigation
15  involving Lionel Nunn I attempted to identify assets that
16  might be owned by Lionel Nunn. I tried to identify income
17  for Lionel Nunn. Tried to determine if there were any bank
18  accounts, safe deposit boxes, real estate, homes, vehicles,
19  other high dollar items, credit cards, things of that
20  nature.
21    Once I was able to identify -- if I was able to
22  identify any of those types of things such as if I could
23  identify income, I would follow-up on it to determine the
24  length of time, the amount, how it was paid. If I
25  identified bank accounts, I would subpoena the bank records

Page 100

1  to determine the type of activity. Were they checking
2  accounts, savings accounts. Were there cash deposits. What
3  was the amount of expenditures, things of that nature.
4    BY MS. JEFFRESS:
5  Q  And how did you get started in doing this work? You
6  explained that your squad helps other ongoing investigations
7  and also conducts its own investigations; is that right?
8  A  That is correct.
9  Q  What was the situation here with Mr. Nunn?
10  A  In the case with Mr. Nunn, I was called to assist in the
11  financial aspect by the criminal squad investigating Lionel
12  Nunn.
13  Q  And do you remember which squad that was that was
14  investigating Mr. Nunn or which agents it was?
15  A  At the time that squad was called C-6. It was special
16  agent, I believe, Kevin Ashby, Rick Diana and several
17  others.
18  Q  And you've already stated generally the steps that you
19  took initially to identify assets and income and other
20  financial matters related to Lionel Nunn. What did you find
21  once you began your investigation?
22    MS. HOLT:  Objection to her testifying about being
23  qualified as an expert.
24    THE COURT:  Sustained.
25    MS. JEFFRESS:  Could we approach on that, Your

Page 101

1  Honor?
2    THE COURT:  Yes.
3    (Begin bench conference.)
4    THE COURT:  What are you going to do?
5    MS. JEFFRESS:  She's actually going to be
6  testifying as a fact witness. I can qualify her as an
7  expert because I think she will qualify. But she is going
8  to be testifying as a fact witness and what facts she found
9  in undertaking the financial investigation of Lionel Nunn.
10  She analyzed many exhibits. She analyzed the records of the
11  property that she has already testified about. So it's
12  facts. She is not offering opinions about --
13    THE COURT:  She's not going to make any opinions?
14    MS. JEFFRESS:  No.
15    MS. HOLT:  When you ask her what are your
16  findings, that's what raises the question. And so I think
17  the appropriate thing to do would be to ask her specific
18  questions about what assets, did she locate documents with
19  respect to -- because she hasn't even seen the assets.
20  Okay?
21    (End bench conference.)
22    BY MS. JEFFRESS:
23  Q  Special Agent Miller, let me just make clear what I'm
24  asking for. You talked about investigating to find out
25  whether Mr. Nunn had assets, income, bank accounts, safe

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.                    CR 00-157                    September 26, 2002
Kevin L. Gray, et al.                                                   Volume 110

Page 122

```
 1   was --
 2         MS. JEFFRESS:  He was monitoring the
 3   conversations, yes, and surveiling.
 4         He'll also testify about the wiretap.  And Jencks
 5   for Special Agent Fulmer as well as Special Agent Lockhart
 6   is being produced this afternoon.
 7         We will then move to Marvin Dixon who we are also
 8   producing Jencks for this afternoon.  And I don't think
 9   we'll finish -- I don't think we'll get further than that
10   but if we do the next murder in sequence is the murder of
11   Anthony Watkins.
12         THE COURT:  So the last Jencks you're providing is
13   through Dixon?
14         MR. HEAPHY:  Your Honor, I don't want to mislead
15   anybody on the Cardoza murder.  There may be more than just
16   a relative.  We have several witnesses under subpoena.
17   We're producing all materials on that murder.  Counsel
18   should be prepared that we'll focus on it.  I'm just not
19   certain at this point how many witnesses will actually
20   testify.
21         THE COURT:  But you're producing all the Jencks?
22         MR. HEAPHY:  Yes, Your Honor.
23         THE COURT:  And in response to her request about
24   work papers from this witness, what are you doing?
25         MS. JEFFRESS:  Your Honor, I'm not aware as to
```

Page 123

```
 1   whether there are any but I'll discuss it with Special Agent
 2   Miller and find out if there is any that I consider Jencks
 3   with Ms. Holt's permission.  Obviously I need to discuss
 4   that with her in order to find out.
 5         MS. HOLT:  Can we just ask her while she's here?
 6         THE COURT:  Yeah, you can after I leave.
 7         MS. HOLT:  The relatives of Carlos Cardoza, my
 8   concern here is solely whether or not the government --
 9   there have been a number of them that have been in the
10   courtroom.  And so I want to make sure that the government
11   is not planning to call one who was in the courtroom.  I
12   will recognize them if I see them.  I know that his aunt
13   Carmella Cardoza was here in the courtroom and I believe
14   that several of his other aunts.  And I just want to make
15   sure if government is mindful of this.
16         MS. JEFFRESS:  (Counsel noded head.)
17         THE COURT:  Who else wants to raise something?
18         MS. HOLT:  And so we're clear, with respect to the
19   wiretaps, is the government just planning to introduce the
20   evidence regarding the wiretap or are they planning to
21   introduce specific wiretaps?  I don't think we resolved that
22   the other day when the government had the disk with the
23   various conversations on it and I don't think we have a
24   transcript.
25         Mr. Carter offered and I also offered, give us a
```

Page 124

```
 1   copy of the disk.  We'll even make them for our
 2   co-defendants.  But it's an exhibit now.  And we're supposed
 3   to get copies of all exhibits.  We were told that it's too
 4   big of a burden to make one copy of the disk.
 5         MS. JEFFRESS:  We're going to try to work with
 6   counsel on that, Your Honor.  I think we can do that.
 7         MR. LASLEY:  I take it this is going -- next week
 8   is going to be a Dog free week next week?
 9         THE COURT:  Yes.  We've had enough of you,
10   Mr. Lasley.
11         MR. COBURN:  Your Honor, just in terms of the
12   overall timing of the government's case.  I know Your Honor
13   spoke to the government about that yesterday.  Initially the
14   Court was thinking that it might wrap in the beginning of
15   October.
16         THE COURT:  They're telling me longer and I'm
17   telling them shorter.  And we're continuing to discuss that.
18   They assured me they were shortening things and I told them
19   I haven't seen the evidence of it.
20         MR. CARTER:  Your Honor, if we could just have a
21   continuing objection to the testimony of Special Agent Lisa
22   Miller particularly the information about 1998 which we
23   believe is outside the scope of the conspiracy.  We move to
24   strike her testimony.  So if we could just have that
25   continuing.
```

Page 125

```
 1         THE COURT:  Yes, you may.
 2         MR. LASLEY:  May we have a continuing objection?
 3         THE COURT:  Sure.
 4         MR. CARTER:  Does Your Honor want to meet with us
 5   today?
 6         THE COURT:  Just for a few minutes.  I'll wait
 7   until the courtroom is cleared and I'll come back in a few
 8   minutes.
 9         MS. HOLT:  I'll do that in writing.  It's an
10   objection to the introduction of the jail search information
11   as the proceeds of a Messiah violation.  I will put that in
12   writing, Your Honor.
13         THE COURT:  I'll see you all at 9:30 on Monday.  I
14   will come back and meet with defense counsel ex parte in
15   camera off the record after the courtroom has been cleared.
16         (Whereupon, at 5:07 p.m., the trial in the
17   above-entitled matter adjourned to reconvene September 30,
18   2002, at 9:30 a.m.)
19         - - - - -
20         CERTIFICATE OF COURT REPORTER
21         I hereby certify that the foregoing is a correct
22   transcript in the proceedings in the above-entitled matter.
23
24
              DOLORES A. BYERS, CSR, RPR
25            OFFICIAL COURT REPORTER
```

United States District Court                                      Dolores A. Byers, CSR RPR
For The District of Columbia                                  Official Court Reporter

19

# CASH DEPO   TS and CASH EXPI   DITURES
# INVOLVING LIONEL NUNN

| RECORDS or RECEIPTS | AMOUNT OF CASH | TIME FRAME | SUBTOTAL |
|---|---|---|---|
| Bank of America Custom Savings Acct # 1011 | $31,043.80 | 4/15/98 – 3/17/00 | |
| Bank of America Regular Savings Acct # 0887 | $2,542.00 | 4/7/99 – 3/17/00 | |
| Bank of America Checking Acct # 8439 | $61,070.00 | 4/15/98 – 3/9/00 | |
| Cashier's Check purchased at Crestar for BMW | $5,000.00 | 4/9/99 | |
| Cashier's Check purchased at Bank of America | $4,500.00 | 4/9/99 | |
| Crestar Acct # 8650331231 | $8,132.00 | 1/13/99 – 4/14/99 | |
| **TOTAL CASH DEPOSITED ALL ACCOUNTS ABOVE** | | 1/98 – 3/00 | **$112,287.80** |
| Cash Receipts Grenfell Place | $3,139.65 | 1998 | |
| Cash Receipts Grenfell Place & 1 from Durango | $15,739.44 | 1999 | |
| Cash Receipts Grenfell Place & 6 from Durango & B&R Limo | $2,467.97 | 2000 | |
| **TOTAL CASH RECEIPTS RECOVERED** | | 1/98 – 3/00 | **$21,347.06** |
| Money Orders purchased with Cash from Grenfell search | $67,673.86 | 1998 - 2000 | |
| Money Orders from P.G County Office of Child Support (copy of 2 found in Nunn's Wallet at arrest) | $6,612.00 | 11/3/99 –3/9/00 | |
| **TOTAL CASH SPENT ON MONEY ORDERS** | | 1/98 – 3/00 | **$74,285.86** |
| Repairs to BMW 528I in name of Lauren Jefferson @ VOB | $4,444.18 | 10/1/99 | |
| Furniture purchased at Top Drawer with Cash | 20,827.59 | 9/21/98 – 6/16/99 | |
| Purchase of HealthRider @ Montgomery Mall | $1,679.98 | 1/5/98 | |
| 1998 red Dodge Durango DC: 200-KRW VIN: 1B4HS28Y1WF112196 | $22,875.00 | 4/9/99 | |
| Purchase of Motorcycle $9,547.55 @ Powersport & $668.78 assecories | $10,216.31 | 8/21/99 | |
| Total Spent to Purchase Lottery Tickets from Grenfell Pl | $19,608.00 | 9/22/99 – 3/15/00 | |
| CD at Bank of America | $3,000.00 | 3/1/00 | |
| **TOTAL MISC. CASH PURCHASES** | | | **$82,651.06** |
| **TOTAL CASH FLOW** | | 1/98 – 3/17/00 | **$290,571.78** |

GOVERNMENT EXHIBIT

**LM-1**

Cr. # 00-157(RCL)

0018246

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-19a

# LIQUID ASSETS of LIONEL NUNN 2000
## in APPRAISED VALUE

| ASSET | VALUE | TOTAL VALUE | IDENTIFIED & DATE |
|---|---|---|---|
| Jewelry found in search of 13903 Grenfell Place, Bowie, MD | | $155,650.00 | Recovered 3/20/00 |
| U.S Currency found in search of Grenfell Place 3/20/00 | | $342,909.00 | Recovered 3/20/00 |
| U.S Currency found in Crestar Safe Deposit Box in name of Wanda Edwards | | $54,980.00 | Recovered 3/20/00 |
| Two Bank of America Savings Accounts seized in Lauren Jefferson's name | $4,185.45 | | Recovered 3/20/00 |
| Bank of America CD in Lauren Jefferson's name | $2,187.71 | | Recovered 3/20/00 |
| Bank of America Checking #8439 in Lauren Jefferson's name | $2,021.00 | | Not seized 1/11/00 |
| Total of Four (4) Bank of America Accounts | | $3,394.16 | |
| **TOTAL LIQUID ASSETS MARCH 2000** | | **$561,933.16** | |

# LEGITIMATE SOURCES of INCOME
# BASED UPON IRS INFORMATION

| NAME | TAX YEAR 1998 | SOURCE OF INCOME | TAX YEAR 1999 | SOURCE OF INCOME |
|---|---|---|---|---|
| Lionel Nunn, aka Jeffrey Ginyard | $11,400 | Gambling Winnings Excalibur Las Vegas | $172 | Dividend from America's Utility Fund |
| Lionel Nunn, aka Jeffrey Ginyard | $76 | Dividend from America's Utility Fund | | |
| TOTAL INCOME FOR LIONEL NUNN, aka JEFFREY GINYARD | $11,476 | | $172 | |
| Lauren Paige Jefferson | $10,111 | Alani Hair Design wages | $20,437 | Wages earned as Hair Stylist |
| Lauren Paige Jefferson | $25 | Interest Income | $99 | Interest Income |
| TOTAL INCOME FOR LAUREN PAIGE JEFFERSON | $10,136 | | $20,536 | |
| TOTAL COMBINED 1998 & 1999 INCOME FOR LIONEL NUNN AND LAUREN PAIGE JEFFERSON | | $42,320 | | |

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-19c

GOVERNMENT EXHIBIT
LM-3
Cr.# 00-157(RCL)

0018248

# SEIZURES OF   ROPERTY FROM L   NEL NUNN
# IN APPRAISED VALUE AT TIME OF SEIZURE

| PROPERTY | SEIZED VALUE | DATE SEIZED | REGISTERED OWNER | STATUS |
|---|---|---|---|---|
| 1998 Maroon Dodge Durango DC: 200-KRW VIN: 1B4HS28Y1WF112196 | $22,875.00 | 3/20/00 | Lynn Colbert | Forfeited |
| 1998 Black BMW 528i MD: GEG-643 VIN: WDBDD6321WGT96524 | $35,075.00 | 3/20/00 | Lauren Jefferson | Forfeited |
| $342,909 CASH (Grenfell Place) | $342,909.00 | 3/20/00 | | Forfeited |
| $54,980 CASH (Safe Deposit Box) | $54,980.00 | 3/21/00 | Wanda Edwards (box holder) | Contested by Wanda Edwards- Forfeited Civil Court, DC |
| Black Fur Coat | $3,500.00 | 3/20/00 | | Forfeited |
| JENNING's .380 Semi-Automatic Pistol serial #329536, loaded with magazine | $175.00 | 3/20/00 | | Forfeited |
| Money Counting Machine & Scale | $1,500.00 | 3/20/00 | | Forfeited |
| 10 Bracelets; 7 Assorted Jewelry items; 11 Assorted Watches; 1 Ladies Rolex Presidential; 1 Mens Diamond Ring; 1 Mens Piaget Watch; 1 Corum Watch; & Jaeger Le Coutre Watch | $155,650.00 | 3/20/00 | | Forfeited |
| 2 Bank of America Savings Accouts #0887 & 1011 | $4,183.67 | 3/24/00 | Lauren Jefferson | Forfeited |
| Bank of America Certificate of Deposit | $2,187.71 | 3/24/00 | Lauren Jefferson | Forfeited |
| **TOTAL VALUE OF SEIZED PROPERTY** | **$627,900.38** | | | |

GOVERNMENT EXHIBIT

**LM-4**

Cr. # 00-157(RCL)

0018249

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-19d

20

| **CERTIFICATION OF LACK OF RECORD** | Date 3/6/01 |
|---|---|

TO WHOM IT MAY CONCERN:

I certify that a search has been made under my direction of the Internal Revenue Service National Computer System and that no tax form, as described below, was found to have been filed in the name of the person indicated.

This certification applies to tax forms received through the period of time covered by the Order.

NAME OF PERSON

    Lionel Nunn

TAXPAYER IDENTIFICATION NUMBER

    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

ADDRESS


KIND OF TAX FORM

    Form 1040 (U.S. Individual Income Tax Return)

TAX PERIOD

1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, and 1999.

I have signed this certification and affixed to it the seal of this office on the date shown at the top of this page.


Name:    Albert D. Adams, Jr.

Title:    Disclosure Officer

Signature: *Joan Mc Clain (acting)*

FILED

MAY 20 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-20

LN-800

0013072

**21**

# DEA LABORATORY ANALYSIS OF DRUG EVIDENCE

| Exhibit No. for Drugs | Exhibit No. for DEA-7 | Date of Recovery | Site/Circumstances of Recovery | Lab No. | Result of Analysis (Summary) |
|---|---|---|---|---|---|
| (Drugs Missing) | D93-CS-501 | 06/10/93 | Calvin Smith/ Dennis Robinson arrest | FG-165 | 18 ziplocks (1.617 grams) heroin |
| D96-KG1-401 | D96-KG1-501 | 04/10/96 | Undercover buy, Dennis Robinson/ Kevin Gray | W4870 | 60.32 grams cocaine base |
| D96-KG1-402 | D96-KG1-502 | 06/04/96 | Undercover buy, Dennis Robinson | W5066 | no controlled drug detected |
| RB-428a-e | RB-501 | 06/05/96 | Rodman Lee's van (Ricardo Bailey murder) | 55502 | 1,968 grams cocaine and 2,118 grams cocaine base (gross weight of multiple packages) |
| JJ-402 | JJ-501 | 08/20/96 | Joseph Jones murder | GS-169 | 14 ziplocks (.82 grams) heroin and one ziplock (.87 grams) cocaine powder |
| DL-403 | DL-501 | 11/25/96 | Diane Luther murder | GW-356 | 26.5 grams cocaine and 25.9 grams heroin (gross weight of multiple packages) |
| **EC-402** | **EC-501** | 11/25/96 | Ervon Clyburn murder | GV-341 | no controlled substance |
| D97-JR-401 | D97-JR-501 | 02/08/97 | John Raynor arrest | GX-195 | one ziplock (.055 grams) heroin |
| DG-403 | DG-501 | 12/07/97 | Demetrius Green murder | HH-146 | two ziplocks (3.9 grams) marijuana |
| RS-407 | RS-504 | 01/02/98 | Timothy Handy arrest | HH-968 | 49 ziplocks (4.3 grams) cocaine base |
| RF-403a-d | RF-501 | 01/03/98 | Rodney Faison murder | HJ-938 | 3 ziplocks FILED no controlled substance |
| RTF-409a | RTF-502 | 06/20/98 | Ricky Fletcher murder | H0-702 | 30 ziplocks (3.3 grams) cocaine base |

MAY 2 0 2003

NANCY MAYER WHITTINGTON CLERK
U.S. DISTRICT COURT

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-21

JW-502

## DEA LABORATORY ANALYSIS OF DRUG EVIDENCE

| | | | | | |
|---|---|---|---|---|---|
| SW-HT-402, 403, 406 | SW-HT-501 | 07/29/98 | Halley Terrace search warrant | W7106 | 258.9 grams cocaine base (gross weight of multiple packages) |
| D98-KG-401 | D98-KG-501 | 11/13/98 | Walter Douglas buy from Kevin Gray | W7298 | 29.7 grams cocaine base |
| D99-CHS-401 | D99-CHS-501 | 02/16/99 | Undercover buy from Charles Shuler | W7423 | 29 ziplocks (2.5 grams) heroin |
| SW-LP-410 | SW-LP-501 | 07/02/99 | Lexington Place search warrant | W7808 | 44.4 grams heroin |
| SW-NP-401 | SW-NP-501 | 10/21/99 | Naylor Plaza search warrant | W8134 | 37.8 grams marijuana |
| SW-NP-402 | SW-NP-502 | 10/21/99 | Naylor Plaza search warrant | W8057 | 10.0 grams heroin |
| D00-TH-402 | D00-TH-502 | 01/14/00 | Timothy Handy arrest | IE-813 | 13 ziplocks (.77 grams) heroin |
| D00-TH-401 | D00-TH-501 | 01/14/00 | Timothy Handy arrest | IE-817 | 2 ziplocks (.13 grams) heroin |
| SW-LN-407  SW-LN-408 | SW-LN-501 | 03/20/00 | Greenfell Place search warrant | W8463  W8464 | 2.3 grams heroin  0.10 grams marijuana |
| SW-LN-406a-b | SW-LN-502 | 03/20/00 | Greenfell Place search warrant | W8465  W8466 | heroin residue from false book  no controlled substance (Mannitol) |

**22**

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :   CR Number 00-157
                                   :
              Government,           :
                                   :
         v.                         :   Washington, D.C.
                                   :   Tuesday, July 23, 2002
KEVIN L. GRAY, RODNEY MOORE,        :   9:37 a.m.
JOHN RAYNOR, CALVIN SMITH,          :
TIMOTHY HANDY and LIONEL NUNN,      :
                                   :
              Defendants.           :
                                   :
- - - - - - - - - - - - - - - -x

DAY 77 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822

 For Defendant Gray:       FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           SARA DAVIS, ESQUIRE
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804)  643-8111

                   Pages 1 through 121

**FILED**

MAY 2 0 2003

THERESA M. SORENSEN, CLERK
U.S. DISTRICT COURT

OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-22

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
                       COBURN & SCHERTLER
                       1130 18th Street, N.W.
                       Suite 850
                       Washington, D.C. 20036
                       (202) 628-4199

                       STEVEN J. McCOOL, ESQUIRE
                       1776 K Street, N.W.
                       Suite 300
                       Washington, D.C. 20006
                       (202) 393-7088

For Defendant Raynor:  G. GODWIN OYEWOLE, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       9th Floor
                       Washington, D.C. 20004
                       (202) 347-7777
                       THOMAS J. SAUNDERS, ESQUIRE
                       10 N. Calvert Street
                       Suite 715
                       Baltimore, Maryland 21202
                       (202) 330-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
                       CARNEY AND CARNEY
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C. 20004
                       (202) 434-8234
                       JONATHAN RUBENS, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C.
                       (202) 487-2633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
                       1730 K Street, N.W.
                       Suite 304
                       Washington, D.C. 20006
                       (202) 508-3690
                       ADGIE O'BRYANT, JR., ESQUIRE
                       ANDERSON & O'BRYANT, P.C.
                       1107 Seventh Street, N.W.
                       Washington, D.C. 20001
                       (202) 371-0013

                       THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

**Page 3**

APPEARANCES (Continued)
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
                       3003 Van Ness, N.W.
                       #W919
                       Washington, D.C. 20008
                       (202) 244-2659

Court Reporter:        THERESA M. SORENSEN, CVR-CM
                       Official Court Reporter
                       Room 4800-H, U.S. Courthouse
                       Washington, D.C. 20001
                       (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

                       THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

**Page 4**

```
 1               P R O C E E D I N G S
 2         THE DEPUTY CLERK:  This is the case of The United
 3   States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
 4   Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5   2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6   United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
 7   McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
 8   Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
 9         THE COURT:  Good morning, ladies and gentlemen.
10         Mr. McGrath, I remind you you are still under
11   oath.  Mr. Olsen, you may proceed.
12         MR. OLSEN:  Thank you, Your Honor.  Good morning.
13         TIMOTHY D. McGRATH, GOVERNMENT'S WITNESS
14               PREVIOUSLY SWORN
15          DIRECT EXAMINATION (Continued)
16   BY MR. OLSEN:
17   Q.    Good morning, Agent McGrath.
18   A.    Good morning, sir.
19   Q.    Agent, when we broke yesterday afternoon, I was
20   asking you some questions about the evidence that was
21   recovered from two of Rodman Lee's vehicles.  Do you recall
22   me asking you about that?
23   A.    Yes, sir.
24   Q.    And those two vehicles were -- can you describe those
25   two vehicles for us again?
```

**Page 5**

```
 1   A.    A white Nissan Quest and a green Jeep Cherokee.
 2   Q.    Earlier yesterday afternoon when you were testifying,
 3   I asked you some questions about the trash runs that you
 4   conducted at Rodman Lee's residences; do you remember that?
 5   A.    Yes.
 6   Q.    And you mentioned that you had recovered what you
 7   termed as an owe sheet; is that right?
 8   A.    That's correct.
 9   Q.    And have you brought that evidence with you here
10   today, both the drug evidence and the owe sheet?
11   A.    Yes, sir, I have.
12   Q.    Let me show you first of all two exhibits.
13         MR. OLSEN:  May I approach, Your Honor?
14         THE COURT:  Yes.
15    (Whereupon, Government's Exhibit No. RB-427 and RB-427A
16   were marked for identification.)
17   BY MR. OLSEN:
18   Q.    I am showing you two exhibits, Agent McGrath.  They
19   are marked RB-427 and RB-427A.  I would like to begin with
20   RB-427 and just tell us if you recognize that.
21   A.    Yes, sir, I recognize it.
22   Q.    What is it?
23   A.    It is the owe sheet or document I took from Rodman
24   Lee's trash on May 11th of '96.
25   Q.    All right.  And how do you recognize it as the owe
```

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

---

Page 6

1  sheet that you took out of the trash on that date?
2  A.    Besides the fact I recognize the sheet, I look at my
3  initials I know were on it.  There they are.  My initials
4  are on the upper left-hand corner with my -- TDM are my
5  initials, and it's dated 5/11/96, which is also borne out on
6  the copy here.
7  Q.    And when you say the copy, are you looking at 427A?
8  A.    Yes, with explanation.  Four-twenty-seven-A is a
9  copy, a clean copy of 427.  This was a white piece of paper
10 when it was taken out of the trash.  It was subsequently
11 sent to the Federal Bureau of Investigations in an attempt
12 to get a fingerprint off of it.  We didn't get any prints
13 off it, but this is a clean copy of that exhibit, of 427.
14 Q.    Prior to it being fingerprinted, it was copied; is
15 that right?
16 A.    Correct.
17 Q.    All right.  And looking at the clean copy, since
18 that's one you can read, do you also see your initials on
19 that copy?
20 A.    Yes, sir, I do.
21 Q.    All right.  And describe for us what's on the owe
22 sheet, what sort of information is on the owe sheet as far
23 as you can tell just looking at it.
24 A.    Looking at it with a little experience working drugs,
25 essentially again it's an accounts receivable document.

---

Page 7

1  There's nothing fancy about it.  But on the left, he's got
2  -- Rodman Lee has various initials who are his customers,
3  and on the right, he's got a running tally of how much those
4  individuals owe him.
5  Q.    Let me actually display it on the presenter.
6          First of all, I'm going to show RB-427, which you
7  described as the copy that had been fingerprinted; is that
8  right?
9  A.    Yes, sir.
10 Q.    All right.  And just for the record, if you would
11 look here where it says, "Sealed By," is that your name,
12 S.A. McGrath?
13 A.    It is.
14 Q.    All right.  And "Acquired By S.A. McGrath"?
15 A.    Yes.
16 Q.    All right.
17          Now looking at the clean copy of that same
18 exhibit, which is marked RB-427A, again, you described it as
19 basically an accounts receivable in your experience as a
20 narcotics investigator; is that right?
21 A.    Yes, sir.
22 Q.    All right.  And there are no names on this; is that
23 fair to say?
24 A.    That's accurate, yes, all initials, except for where
25 it says "me," which, you know, I think that's -- you know,

---

Page 8

1  actually I don't know what it is, but where it says "me,"
2  that's the only word on it.
3  Q.    And then down the left-hand side, if you could just
4  use your arrow, where does it say, as far as you can tell,
5  "m-e"?
6  A.    "M-e" is right here.
7  Q.    And then going down the side?
8  A.    "F, K, T, C, H," it appears to be a "P," and then the
9  initials "FK," and then, down at the bottom, "M."
10 Q.    And some more numbers and some totals, sums, added
11 up?
12 A.    In the far right-hand column, there's a summation of
13 those numbers, and it's a little bit confusing and we didn't
14 know exactly what it always said until we talked to a
15 witness.  He enlightened us.  But the bottom line was Rodman
16 Lee had somewhere between 362,750 and 480,250 owed to him
17 when he was arrested, or, excuse me, on May 11th, '96.  What
18 happened between May 11th and May 31st, I have no idea.
19 Q.    Now, if we could, let's move to the recovery of the
20 --
21          THE COURT:  Those having been displayed to the
22 jury, --
23          MR. OLSEN:  I'm sorry.
24          THE COURT:  -- they are both received.
25          MR. OLSEN:  Thank you, Your Honor.

---

Page 9

1          (Whereupon, Government's Exhibit No. 427 and 427A were
2  received in evidence.)
3  BY MR. OLSEN:
4  Q.    Let me ask you now, if we could, Agent McGrath, to
5  move to the recovery of the evidence from the Nissan Quest
6  van.
7          You indicated yesterday -- you talked a little bit
8  about the search of the van itself and the two secret
9  compartments you located on the van; is that right?
10 A.    Yes, sir.
11 Q.    All right.  If we could, let's look at RB-142, which
12 is in evidence.  What does this picture describe?
13 A.    That's the hidden compartment that has been busted
14 into in the white Nissan Quest, the compartment behind the
15 dashboard.
16 Q.    And can you see, sir, evidence in that compartment as
17 you look at it?
18 A.    Yes, sir.  There's the kilogram of cocaine in the
19 compartment.
20          (Whereupon, Government's Exhibit No. RB-428B was marked
21 for identification.)
22 BY MR. OLSEN:
23 Q.    I want to show you now, Agent McGrath, an exhibit.
24 It's marked RB-428B and ask you first do you recognize that
25 exhibit.

---

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America  v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

Page 10

1   A.   Yes.
2   Q.   And what is that?
3   A.   It's the cocaine and the crack cocaine that came out
4   of the hidden compartment that's in the screen.
5   Q.   And you say cocaine and crack cocaine. Are there two
6   separate items within that one heat-sealed envelope?
7   A.   Yes.
8   Q.   All right. Describe each one, if you could, and how
9   the DEA distinguishes between the two in terms of handling
10  that evidence.
11  A.   Exhibit 24 was the box on the table containing four
12  separate bags, various. When the chemist -- this gets
13  submitted to the chemist. He breaks it down into what are
14  sub-exhibits. This sub-exhibit is the cocaine and the crack
15  cocaine that came out of the hidden compartment in the white
16  Nissan Quest, and the way I know that is I have it actually
17  written on our evidence bag here, "White Nissan Quest glove
18  box."
19        The hydrochloride in this -- this white -- this
20  cocaine you see here, this chunky stuff, is actually cocaine
21  powder hydrochloride which originally was packaged, that
22  kilogram right there I'm pointing out on the arrow. It
23  comes to that, obviously the chemist has to open it to get
24  to it to analyze and test it. Once he analyzes and tests
25  it, he can't put it back together, and ultimately what you

Page 11

1   get is what you see here.
2        The other stuff, the crack -- and I recall, it's,
3   as I recall, without the 7 in front of me, was -- do you
4   have the 7, sir?
5   Q.   I do.
6   A.   Okay.
7   Q.   Now, you've just asked for a 7. Can you give a
8   little bit more explanation of what that is?
9   A.   Yes. I'm sorry. Excuse me. A DEA-7 is a standard
10  form that DEA agents prepare whenever they submit narcotics,
11  any kind of narcotics to a DEA lab. In this town, actually
12  the FBI and the Metropolitan Police Department prepare the
13  same form.
14        (Whereupon, Government's Exhibit No. RB-501 was marked
15  for identification.)
16  BY MR. OLSEN:
17  Q.   Let me show you what's marked as RB-501. Is that the
18  analysis form that was prepared in connection with the drugs
19  you recovered in this case?
20  A.   Yes, it is.
21  Q.   And did you actually fill out the top half of that
22  form?
23  A.   That's correct. I filled out the part down to Block
24  21.
25  Q.   And the other part of the form, where is that

Page 12

1   prepared?
2   A.   The chemist prepares that at the lab.
3   Q.   Based on what?
4   A.   Based on his analysis of the drugs.
5   Q.   And does that exhibit there, Agent McGrath, include
6   an analysis of all of the drugs in this particular -- that
7   you recovered from the Nissan Quest van?
8   A.   Yes, it does.
9        MR. OLSEN: Your Honor, I offer RB-501.
10       MR. BAUGH: Excuse me, Your Honor. I have an
11  objection.
12       THE COURT: We will hold it until the chemist
13  testifies.
14       MR. OLSEN: Yes, Your Honor.
15  BY MR. OLSEN:
16  Q.   Using that, you asked if you could refer to that.
17  Does that describe the weights of the various items that
18  were recovered?
19  A.   Yes, sir, it does.
20  Q.   All right. And go ahead and describe, then, what's
21  in --
22  A.   What I was going to say before, I remembered it being
23  about 250 grams of crack cocaine. As I look at the form,
24  it's actually 246.8. It's almost a quarter kilo of crack
25  cocaine that was also actually behind that kilogram you see

Page 13

1   there. This bag contains all the drugs out of that hidden
2   compartment.
3        MR. BAUGH: Objection, Your Honor. May we
4   approach?
5        THE COURT: Yes.
6        MR. BAUGH: Thank you.
7        (Whereupon, a discussion was held at the bench on the
8   record.)
9        MR. BAUGH: Your Honor, so I can preserve any
10  objection, I'm going to object to this officer -- this agent
11  publicizing the analysis, including the conclusions of the
12  -- whoever did the tests, and his designation of crack and
13  powder, the differentiation on the report. I think until
14  the chemist testifies, this man can't do it.
15       THE COURT: Overruled.
16       MR. BAUGH: Thank you.
17       THE COURT: I can strike it if the chemist doesn't
18  match.
19       (End of discussion at the bench.)
20  BY MR. OLSEN:
21  Q.   So again, Agent McGrath, looking at the drugs that I
22  just gave you, what is in that particular package?
23  A.   Cocaine, hydrochloride or powder, and crack cocaine
24  from the hidden compartment behind the glove box in the
25  white Nissan Quest.

4 (Pages 10 to 13)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

---

**Page 14**

1  Q.    And how much powder cocaine is in that particular
2  exhibit?
3  A.    That's 2402, it's 989 grams, just shy of a kilogram,
4  would be a thousand.
5  Q.    And how much crack cocaine?
6  A.    246.8.
7  Q.    All right.
8        MR. OLSEN:  Your Honor, I offer RB-428B.
9        THE COURT:  Received.
10       MR. BAUGH:  Subject to the same objection.
11       THE COURT:  Subject to the chemist, right, it's
12 received.
13    (Whereupon, Government's Exhibit No. RB-428B was
14 received in evidence.)
15 BY MR. OLSEN:
16 Q.    And on the monitor now, Agent McGrath, am I just
17 publishing for the jury that same exhibit, RB-428B?
18 A.    Yes. That's the front of the bag I was just holding
19 up. That's our evidence seal that's on the front of all our
20 bags.
21 Q.    Let's look at another photograph also in evidence
22 marked RB-141. What is depicted in this photograph, Agent?
23 A.    That's the other compartment in the white Nissan
24 Quest which was on the floorboard. It covers the whole
25 floorboard. A Foot Locker bag containing money and a scale,

---

**Page 15**

1  and then the crack and the cocaine also in there. In the
2  picture, you can only see the kilogram brick of cocaine
3  right there.
4     (Whereupon, Government's Exhibit No. RB-428A was marked
5  for identification.)
6  BY MR. OLSEN:
7  Q.    I am going to show you now another exhibit. It's
8  marked RB-428A. Do you recognize that?
9  A.    Yes, I do.
10 Q.    What is that?
11 A.    It's a portion of the drugs seized from the floor
12 compartment.
13 Q.    What is it? Is that powder cocaine or crack cocaine?
14 A.    That's actually crack cocaine base that was tannish
15 in color and almost looks like, as we speak today, six years
16 later, it almost looks like brown sugar. I don't know the
17 chemical reason why crack breaks down. I think it's got
18 something to do with the diluents in the baking soda, but I
19 honestly don't know. But this is the crack broken down.
20 Q.    How much is in that exhibit, how much crack cocaine?
21 A.    It's 24 -- the chemist designated to 24.01, which is
22 991.3 grams of crack or basically a kilo of crack.
23       MR. OLSEN:  Your Honor, I offer RB-428A.
24       THE COURT:  Received, again subject to the
25 chemist's testimony.

---

**Page 16**

1     (Whereupon, Government's Exhibit No. RB-428A was
2  received in evidence.)
3  BY MR. OLSEN:
4  Q.    Again, this is different obviously in appearance than
5  the white powder cocaine that you just identified a moment
6  ago.
7  A.    Yes.
8  Q.    And is that consistent with your experience with,
9  over time, what happens to crack cocaine versus powder
10 cocaine?
11 A.    No, honestly I didn't know it did that until you and
12 I opened the exhibits a couple of months ago.
13 Q.    All of the crack cocaine that's in these exhibits, in
14 the box that was recovered from the van, does that all have
15 the same brownish appearance as opposed to --
16 A.    Almost all of it. The exhibit I just had before it
17 is a little cleaner, but --
18    (Whereupon, Government's Exhibit No. RB-428C was marked
19 for identification.)
20 BY MR. OLSEN:
21 Q.    Let me now show you what is marked RB-428C. I am
22 going to hand this to you, Agent McGrath. If you could just
23 tell us if you recognize it and what it is.
24 A.    Again, it's a -- I do recognize it. Again, it's
25 another bag I sealed of evidence -- again, my writing on

---

**Page 17**

1  here -- from the white Nissan Quest, floor compartment. The
2  chemist designated it 24.05, 24.06 for his purposes. It's
3  Government Exhibit RB-428C, and again, it's crack cocaine or
4  cocaine base seized from the floor compartment of the Quest.
5  Q.    And does that exhibit contain all crack cocaine as
6  opposed to powder cocaine?
7  A.    Yes, sir, it does.
8  Q.    And how much is in each one of those three exhibits
9  inside that bag?
10 A.    It's two exhibits inside the bag, 24.05 and 24.06.
11 24.05 is 186.4 gram broke down; 24.06 is 202.3 grams.
12 Q.    If I could just -- I'm going to point to on there --
13 does that also include 24.04?
14 A.    Yes. I'm sorry, sir. Excuse me. 24.04 is in here
15 also; it's just not labelled on our bag. And 24.04 is 491.4
16 grams or just shy of a half kilo of crack cocaine.
17 Q.    And that was all recovered from what part of the van?
18 A.    The floor compartment of the Nissan Quest also.
19       MR. OLSEN:  May I offer at this point RB-428C,
20 Your Honor?
21       MR. BAUGH:  Same objection.
22       THE COURT:  Received subject to the chemist.
23    (Whereupon, Government's Exhibit No. RB-428C was
24 received in evidence.)
25 BY MR. OLSEN:

---

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

July 23, 2002
Volume 77

Page 18

1  Q.   And again, these three exhibits, 428A, C -- the three
2  exhibits inside RB-428C, do those all have that same
3  brownish appearance?
4  A.   Yes, sir, they do.
5     (Whereupon, Government's Exhibit No. RB-428D was marked
6  for identification.)
7  BY MR. OLSEN:
8  Q.   I am now going to show you the last drug exhibit from
9  this, RB-428D. That's RB-428D. Agent McGrath, can you tell
10  us if you recognize that?
11  A.   Yes, I do.
12  Q.   And what is that?
13  A.   It's the last sub-exhibit seized from, again, the
14  white Nissan Quest floor compartment. It's 979 grams of
15  cocaine hydrochloride. It has to be, by process of
16  elimination, that exhibit on the screen because that's the
17  only kilogram that came out of the floor compartment of
18  cocaine hydrochloride.
19  Q.   Which is?
20  A.   And that's this exhibit right here. Obviously with
21  the wrapping tape off and -- but you get a good feel for
22  actually the brick form of how the cocaine looks. This one
23  stayed together a little bit better, and it's actually
24  compressed by whoever pressed it.
25  Q.   That's somewhat broken up into chunks; is that fair

Page 20

1  form.
2  Q.   Either in powder form or crack cocaine.
3  A.   Yes, sir.
4  Q.   I will show you a couple more exhibits. In the
5  photograph, you're able to see, which is RB-141, a certain
6  type of packaging; is that right?
7  A.   Yes.
8  Q.   All right. And I think you testified yesterday it's
9  a Foot Locker bag of some kind?
10  A.   The packaging on the drugs?
11  Q.   What we're able to see in that photograph?
12  A.   Well, the Foot Locker bag is just a standard retail
13  bag.
14  Q.   And what was in the Foot Locker bag?
15  A.   I believe the amount of money was $2,630, and there
16  was a digital scale in there also.
17  Q.   All right. In addition, can you see any other drug
18  packaging in that photograph?
19  A.   Yes.
20  Q.   And could you just point to where that is?
21  A.   This right here is, before the chemist gets to them,
22  that's what the kilogram brick looked like we seized.
23  Q.   What happened to all the packaging of the drugs?
24  A.   When it goes to the lab, goes to the lab in that form
25  you see on the screen there, the chemist -- we always

Page 19

1  to say?
2  A.   Yes. Well, it stayed together pretty good. It's,
3  you know, three fairly substantial chunks, yes.
4  Q.   When it was recovered, was it one compressed brick or
5  was it also broken up into chunks at that --
6  A.   It's one compressed brick with wrapping and, as I
7  recall, there was actually tape and wrapping on the outside.
8     MR. OLSEN: Your Honor, at this time, I offer
9  RB-428D.
10     THE COURT: Received.
11     MR. BAUGH: Subject to the same objection.
12     (Whereupon, Government's Exhibit No. RB-428D was
13  received in evidence.)
14     MR. OLSEN: I am just publishing now for the jury
15  RB-428D.
16  BY MR. OLSEN:
17  Q.   What then, Agent McGrath, is the total amount of
18  drugs broken down by crack and powder cocaine that was
19  recovered -- that you recovered from the Nissan Quest van?
20  A.   The total amount broken down?
21  Q.   The total amount all together.
22  A.   I would need a calculator. I think I testified
23  yesterday it was just shy of five kilograms. If you do the
24  math, I think it's 4.1 and change maybe, or thereabouts.
25  But it's approximately 4.1 kilograms of cocaine in some

Page 21

1  request that it be analyzed for fingerprints, so the chemist
2  takes the packaging off, sends the packaging off to the FBI
3  lab for fingerprint analysis, and then eventually the
4  packaging comes back to the lab.
5  Q.   And is the packaging then kept separate from the
6  actual drug exhibits?
7  A.   Yes, sir, it is.
8     (Whereupon, Government's Exhibit No. RB-428E was marked
9  for identification.)
10  BY MR. OLSEN:
11  Q.   Let me just show you RB-428E. I am showing you
12  RB-428E. Do you recognize that?
13  A.   Yes, I do.
14  Q.   And what is that?
15  A.   This is the packaging that was around all the drug
16  exhibits in various forms -- I mean tape and paper and, you
17  know, whatever else is in there.
18     MR. OLSEN: I offer RB-428E, Your Honor.
19     THE COURT: Received.
20     (Whereupon, Government's Exhibit No. RB-428E was
21  received in evidence.)
22  BY MR. OLSEN:
23  Q.   And you mentioned, Agent McGrath, that inside the
24  Foot Locker bag, there was a scale of some kind.
25  A.   Yes, sir.

United States District Court
For The District of Columbia

Theresa M. Sorensen, CVR-CM
Official Court Reporter

**23**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              .
                                       .    Docket No. CR 00-157
          Plaintiff,                   .
                                       .    Washington, D.C.
          v.                           .    October 30, 2002
                                       .    1:30 p.m.
KEVIN L. GRAY, RODNEY MOORE,           .
JOHN RAYNOR, CALVIN SMITH,             .
TIMOTHY HANDY, and LIONEL NUNN,        .
                                       .
          Defendants.                  .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DAY 127 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Plaintiff:           TIMOTHY J. HEAPHY, ESQ.
                             MATTHEW G. OLSEN, ESQ.
                             AMY JEFFRESS, ESQ.
                             Assistant United States Attorneys
                             555 4th Street, N.W.
                             Washington, D.C. 20001
For Defendant Gray:          FRANCIS D. CARTER, ESQ.
                             1730 Rhode Island Avenue, N.W.
                             Washington, D.C. 20036
                             DAVID P. BAUGH, ESQ.
                             Law Offices of David P. Baugh, PC
                             223 South Cherry Street
                             Richmond, Virginia 23241

**FILED**

Pages 1 through 166

MAY 2 0 2003

Dennis A. Dinkel, RDR, CRR
Official Court Reporter

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

October 30, 2002
P.M. Session/Day 127

---

Page 2

APPEARANCES - Continued:
For Defendant Moore:    BARRY COBURN, ESQ.
                        Coburn and Schertler
                        1150 18th Street, N.W.
                        Washington, D.C. 20036
                        STEVEN McCOOL, ESQ.
                        Mallon and McCool, LLC
                        16 South Calvert Street
                        Baltimore, Maryland 21202

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQ.
                        601 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20004

                        THOMAS SAUNDERS, ESQ.
                        207 East Redwood Street
                        Baltimore, Maryland 21202

For Defendant Smith:    JOHN CARNEY, ESQ.
                        Law Offices of Carney and Carney
                        601 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20004
                        JONATHAN RUBENS, ESQ.
                        601 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20004
For Defendant Handy:    MICHAEL LASLEY, ESQ.
                        1730 K Street, N.W.
                        Washington, D.C. 20004
                        ADGIE O'BRYANT, JR., ESQ.
                        Anderson and O'Bryant, PC
                        2207 7th Street, N.W.
                        Washington, D.C. 20001

For Defendant Nunn:     VERONICE A. HOLT, ESQ.
                        3003 Van Ness Street, N.W.
                        Washington, D.C. 20008

Court Reporter:         DENNIS A. DINKEL, RDR, CRR
                        Official Court Reporter
                        Room 6818, U.S. Courthouse
                        Washington, D.C. 20001
                        (202) 289-8661

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

                        Dennis A. Dinkel, RDR, CRR
                        Official Court Reporter

---

Page 3

1    AFTERNOON SESSION - (1:30 p.m.)
2    (Daniel Sparks resumed the stand.)
3    MR. SAUNDERS: Your Honor, may counsel approach on
4    something?
5    (Bench conference on the record.)
6    MR. SAUNDERS: Your Honor, we are working with the
7    government on a possible stipulation with regard to some
8    juvenile records. We have acquired the juvenile records. We
9    request permission of the Court to examine them, looking for
10   particular dates. There are three pages. Two were having to
11   do with docket entries, and one a commitment order of a judge
12   with restrictions.
13   We are requesting permission to share those three pages
14   with the government so that we can come to some agreement about
15   a stipulation. Without the Court's permission, we are not
16   going to do that.
17   THE COURT: These are your own clients?
18   MR. SAUNDERS: Yes. We intend to make copies of
19   those three pages to give to the government.
20   THE COURT: All right.
21   MR. OYEWOLE: While we are here, I need to ask a
22   question. Marvin Best, is he on the premises today?
23   MR. OLSEN: Marvin Best. Not that I'm aware of.
24   MR. OYEWOLE: The reason I'm asking is when I was
25   speaking to Mr. Raynor, someone called me to me. And very

---

Page 4

1    quickly I turned around, and it reminds me of Marvin Best. I
2    didn't say anything to him. He didn't say anything to me. He
3    called my name.
4    It looks like Marvin Best. I just wanted to put that on
5    the record. I didn't say anything that was going to get a
6    reaction at all.
7    MR. OLSEN: I don't think he's here.
8    I have a request with respect to Mr. Baugh. Not with
9    respect to Mr. Oyewole.
10   MR. BAUGH: I ate in the cafeteria.
11   MR. OLSEN: I have an objection with respect to
12   Mr. Baugh's examining of the witness, Agent Sparks.
13   THE COURT: Leave out the sarcasm.
14   MR. BAUGH: Yes, Your Honor. That was sarcasm.
15   MR. OLSEN: I ask the Court to require Mr. Baugh to
16   stay behind the podium examining this witness.
17   THE COURT: I ask you to stay there today.
18   MR. BAUGH: All right.
19   (End of bench conference.)
20   (Jury in at 1:37 p.m.)
21   FURTHER REDIRECT EXAMINATION - CONTINUED
22   BY MR. BAUGH:
23   Q. Mr. Sparks, did you or did you not know that Mr. Watkins
24   reached in the back of the van for something before he was
25   shot? Did you know that or not?

---

Page 5

1    MR. OLSEN: Objection, scope.
2    THE COURT: Sustained.
3    BY MR. BAUGH:
4    Q. Sir, before we broke for lunch, I believe you were asked
5    questions about whether or not Ms. Parks corroborated Mr. Veal;
6    am I correct?
7    A. Yes.
8    Q. Did Mr. Veal tell you that Mr. Watkins was reaching back
9    there for something?
10   A. No.
11   Q. All right. Now, I also asked you if you knew that, if you
12   knew that Mr. Watkins was reaching back there. And I believe,
13   before lunch, you told me you did not know that; am I correct?
14   MR. OLSEN: Same objection as to scope.
15   THE COURT: I thought the question before lunch was
16   whether he knew the witness said that.
17   MR. BAUGH: Well, I was going to lay a predicate and
18   ask him whether or not, prior to my asking him -- he said he
19   didn't know it. And then I believe I asked him -- I was
20   starting to go through the transcript to show he did yesterday.
21   BY MR. BAUGH:
22   Q. The question was, prior to me pulling out this transcript,
23   I asked you did you know that. And did you tell us that you
24   did not know that, that Mr. Watkins was reaching back for
25   something?

---

Dennis A. Dinkel, RDR, CRR                    Phone: (202) 289-8661
E-mail: dadinkel@directvinternet.com

Unites States of America v.                    CR 00-157                          October 30, 2002
Kevin L. Gray, et al.                                                          P.M. Session/Day 127

---

Page 22

1  questioning.
2          MS. HOLT:  I was free to question him about Watkins.
3  I wasn't going to duplicate all the stuff that was said.  I
4  just want to get this one point.
5          THE COURT:  You may get that one point.
6          MS. HOLT:  Thank you, Your Honor.
7      (End of bench conference.)
8  BY MS. HOLT:
9  Q.  Okay.  Now if you can listen to me, and this is a
10  yes-or-no question.
11      Did you not, in response to Mr. Baugh's questions, say the
12  wiretaps corroborate Mr. Veal's version of the Watkins murder?
13  A.  Yes.
14          MS. HOLT:  Thank you.
15          THE COURT:  All right.
16          MR. OLSEN:  No questions.
17          THE COURT:  You can step down.
18          THE WITNESS:  Thanks.
19      (Witness excused.)
20          THE COURT:  Next witness?
21          MS. HOLT:  May I approach?
22          THE COURT:  Yes.  Can I see Mr. Olsen and Mr. Baugh
23  at the bench, too?
24      (Bench conference on the record.)
25          MS. HOLT:  My client didn't get a chance to go to the

---

Page 23

1  lavatory.  This witness is going to start with matters not
2  related to my trial.
3          MR. BAUGH:  She can't be heard.
4          MS. HOLT:  He has no objection -- my client has no
5  objection if, while he starts -- I know the last topic on there
6  is my client's gun.  Until we get there, if he can run to the
7  lavatory for a minute?
8          MR. LASLEY:  Your Honor, in reference to the chart, I
9  would note an objection to the use of the chart in reference
10  to -- the DG-403 chart in terms of the two Ziploc grams from
11  Demetrius Green.
12      There was an exhibit -- I forgot the exhibit number.  I
13  don't know -- I don't remember exactly the exhibit number.  I
14  had shown this to the crime scene officer, which appears to be
15  a photo of a bag that was seized in evidence in this matter
16  that is not included in this chart.
17      And the chart is inaccurate and misleading, because there
18  was a bag seized and made part of the evidence in reference to
19  the Green matter that is not shown on this chart.  So we object
20  to the chart -- unless the government wants to -- a -- I don't
21  know if this was analyzed, but it was part of the items seized.
22          MS. JEFFRESS:  Your Honor, we do have marijuana
23  evidence from the Demetrius Green murder which we admitted into
24  evidence.  I don't know what's on the picture or whether or not
25  it was recovered.

---

Page 24

1      If Mr. Lasley wants to move it in, he can do that in his
2  case.  We didn't move it in.  Unless that's the same one.  I
3  don't think it is.  The one on the chart is two Ziplocs.
4          MR. LASLEY:  I'm simply suggesting that the chart is
5  inaccurate if this is items seized in the Green matter.
6          THE COURT:  It has not been introduced in evidence
7  from the Green matter.
8          MR. LASLEY:  The items -- the items introduced, I
9  think, was the two Ziplocs.
10          THE COURT:  Right.
11          MR. LASLEY:  What I'm saying is this --
12          THE COURT:  That objection is overruled.
13          MR. BAUGH:  While we're up here, I have an issue.
14      Thank you.  Your Honor, because of the way the case is
15  developing, when we started this trial, I was under the
16  impression Rodman Lee was going to testify for the United
17  States.
18      There's a whole lot of drugs that they're introducing in
19  this case that was found in a secret compartment in Rodman
20  Lee's car.  There is no indication of foreseeability.  There is
21  no indication of possession.  There is no indication that it
22  was part of any conspiracy between my client and Rodman Lee,
23  because Rodman Lee also had his own thing going.
24      I would object to the introduction of the drugs at this
25  time, because that amount of drugs is highly prejudicial.  When

---

Page 25

1  they first came in, as I said earlier, I thought there was
2  going to be more connection.  However, based upon the
3  representations of the United States the last few nights, I get
4  the impression Mr. Lee is not going to testify.
5      So we would make the objection we should have made, and we
6  would have made had we known who was going to be appearing for
7  the government.  And we ask it be included until such time as a
8  proper nexus is laid.
9          THE COURT:  Denied.
10          MR. CARNEY:  Your Honor, can I make my objection, or
11  do you want me to do this later?
12          THE COURT:  Uh-huh.
13          MR. CARNEY:  I object to the chart on several grounds
14  with respect to the first one having to do with my client.  I
15  note there is no DEA-86 chemist worksheet.  It has a lot of
16  information --
17          THE COURT:  Let's do that after we get through.  Were
18  more records found?
19          MS. JEFFRESS:  Yes, there were.
20          THE COURT:  Let's do that after we get through with
21  the witness.
22          MS. JEFFRESS:  Thank you, Your Honor.
23      (End of bench conference.)
24          MS. JEFFRESS:  Your Honor, we're recalling Mr. Gerry
25  Walker to the stand.

---

Dennis A. Dinkel, RDR, CRR                                              Phone: (202) 289-8661
                          E-mail: dadinkel@directvinternet.com

**24**

Read instructions on reverse before completing

**U.S. Department of Justice**
**Drug Enforcement Administration**

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|
| ☐ Purchase   ☒ Seizure   ☐ Free Sample ☐ Lab. Seizure   ☐ Money Flashed   ☐ Compliance Sample (Non-Criminal) ☐ Other (Specify) | | GD-95-0160 | N/A | WGC1L |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Washington, DC | 6/5/96 | BAILEY, RRick et al |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| N/A | ☐ Case No. OR ☐ Seizure No.   No. N/A | 6/6/96 | 32 |

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. APPROX. GROSS QUANTITY Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 24 | 96068713 | Cocaine HCL and crack | 4 bags from Nissan Quest. | | 5.2506 kg | 0 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?   ☒☒ NO (Included above)   ☐ YES (If Yes, enter exhibit no. and describe original container fully)

**REMARKS:**

Exhibit 24 was obtained by SA McGrath on 6/5/96 from a hidden compartment in the glovebox and a hidden compartment in the floor of a white, Nissan Quest (DC 789 264). S/A McGrath processed the exhibit and placed Exhibit 24 in a locked vault at the WDO.   On 6/6/96, S/A McGrath removed Exhibit 24 from the vault and transferred custody to the DEA Mid Atlantic Lab.

\*FINGERPRINT ANALYSIS REQUESTED\*

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Timothy McGrath, SA   Timothy McGrath | Larry Loveless GS   Larry Loveless |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. No. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. TITLE |
|---|---|---|
| 1 Box | Timothy D. McGrath SA | SA |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 6/6/96 | 24. TITLE EC |

**LABORATORY ANALYSIS/COMPARISON REPORT**

25. ANALYSIS SUMMARY AND REMARKS

Employee no longer employed by DEA Mid-Atlantic Laboratory

THE ATTACHMENT - LAB NO. 55502

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-24

Employee no longer employed by DEA Mid-Atlantic Laboratory

18136

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| | | GOVERNMENT EXHIBIT **RB-501** Cr. # 00-157(RCL) | | | | | |

FILED
MAY 20 2003
NANCY MAYER WHITTINGTON
U.S. DISTRICT COURT

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| Vedoster Ingram   Vedoster Ingram | Forensic Chemist | 7/11/96 |
| 37. APPROVED BY   Paul De Zan | 38. TITLE | 39. LAB. LOCATION |
| Paul De Zan   7-15-96 | Laboratory Director | Wash., D.C. |

DEA Form - 7 (Apr. 1990)      Previous edition dated 10/87 is OBSOLETE.      2 - Division File

REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

CONTINUATION PAGE

## LABORATORY ANALYSIS/COMPARISON REPORT

5. ANALYSIS SUMMARY AND REMARKS

| xh. | Gross Wt. | Amt. Rec'd | Analysis Summary |
|---|---|---|---|
| 4.01 | 5,253 g | 991.3 g | One (1) colorless plastic "GRIPPER ZIPPER" ziplock bag with tan chunks found to contain Cocaine Base and Sodium Bicarbonate (N.C.D.). |
| 4.02 | | 989.0 g | One (1) brick-shaped clear plastic wrapping/ purple plastic wrap/brown paper wrap/with a tan brick found to contain Cocaine Hydrochloride. |
| 4.03 | | 246.8 g | One (1) colorless plastic "GRIPPER ZIPPER" sandwich bag with tan chunks found to contain Cocaine Base. |
| 4.04 | | 491.4 g | One (1) large colorless plastic "GRIPPER ZIPPER" ziplock bag with light-brown chunks found to contain Cocaine Base and Sodium Bicarbonate (N.C.D.). |
| 4.05 | | 186.4 g | One (1) large colorless plastic "GRIPPER ZIPPER" ziplock bag with dark-brown chunks found to contain Cocaine Base and Sodium Bicarbonate (N.C.D.). |
| 4.06 | | 202.3 g | One (1) small colorless plastic ziplock bag with light-brown wafers found to contain Cocaine Base and Sodium Bicarbonate (N.C.D.). |
| 4.07 | | 979.0 g | One (1) brick-shaped clear plastic wrapping/ purple plastic wrap/brown tape, plastic lining/ tan brick found to contain Cocaine Hydrochloride and Lactose (N.C.D.). |

0018137

| 1. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 4.01 | 55502 | Cocaine Base | 59 | % | | 584.9 g | 982.0 g |
| 4.02 | 55502 | Cocaine Hydrochloride | 81 | % | | 801.1 g | 988.3 g |
| 4.03 | 55502 | Cocaine Base | 56 | % | | 138.2 g | 245.1 g |
| 4.04 | 55502 | Cocaine Base | 54 | % | | 265.4 g | 487.2 g |
| 4.05 | 55502 | Cocaine Base | 54 | % | | 100.7 g | 184.8 g |
| 4.06 | 55502 | Cocaine Base | 64 | % | | 129.5 g | 200.5 g |
| 4.07 | 55502 | Cocaine Hydrochloride | 80 | % | | 783.2 g | 978.1 g |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 1. ANALYST (Signature) Vedóster Ingram | 35. TITLE Forensic Chemist | 36. DATE COMPLETED 7/11/96 |
|---|---|---|
| 7. APPROVED BY Paul De Zan | 38. TITLE Laboratory Director | 39. LAB. LOCATION Washington, DC |

United States of America v.                    CR 00-157                           July 22, 2002
Kevin L. Gray, et al.                                                              Volume 76

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                               :
UNITED STATES OF AMERICA,      :     Docket No. CR 00-157
                               :
        Plaintiff,             :     Washington, D.C.
                               :     July 22, 2002
v.                             :     1:12 p.m.
                               :
KEVIN L. GRAY, RODNEY MOORE,   :
JOHN RAYNOR, CALVIN SMITH,     :
TIMOTHY HANDY, LIONEL NUNN,    :
                               :
        Defendants.            :
                               :
- - - - - - - - - - - - - - - x

DAY 76 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:        TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 Fourth Street, Northwest
                          Washington, D.C. 20001

For Defendant Gray:       FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, Northwest
                          Suite 717
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241

Pages 1 through 176
DOLORES A. BYERS, CSR, RPR
Official Court Reporter


FILED

MAY 2 0 2003

United States District Court
For The District of Columbia

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-25

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America  v.              CR 00-157                  July 22, 2002
Kevin L. Gray, et al.                                                   Volume 76

## Page 2

APPEARANCES (Continued):
For Defendant Moore:  BARRY COBURN, ESQ.
    Coburn and Schertler
    1150 18th Street, Northwest
    Washington, D.C. 20036

    STEVEN MC COOL, ESQ.
    Mallon and McCool, LLC
    16 South Calvert Street, Suite 1002
    Baltimore, Maryland 21202
For Defendant Raynor: G. GODWIN OYEWOLE, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    THOMAS SAUNDERS, ESQ.
    207 East Redwood Street, Suite 205
    Baltimore, Maryland 21202

For Defendant Smith:  JOHN CARNEY, ESQ.
    Law Offices of Carney and Carney
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    JONATHAN RUBENS, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004
For Defendant Handy:  MICHAEL LASLEY, ESQ.
    1730 K Street, Northwest, Suite 304
    Washington, D.C. 20006
    ADGIE O'BRYANT, JR., ESQ.
    Anderson and O'Bryant, PC
    1107 Seventh Street, Northwest
    Washington, D.C. 20001

For Defendant Nunn:   VERONICA A. HOLT, ESQ.
    3003 Van Ness Street, Northwest
    Suite W-919
    Washington, D.C. 20008

## Page 3

### C O N T E N T S

WITNESSES:        DIRECT CROSS REDIRECT RECROSS
On behalf of the government:
Grant Greenwalt
  By Mr. Olsen      7
  By Mr. Carter        78
James Holder
  By Mr. Olsen     82
Timothy McGarth
  By Mr. Olsen   105

### E X H I B I T S

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. RB-302A | 11 | 12 |
| No. RB-302B | 12 | 12 |
| No. RB-302 | 14 | 14 |
| No. RB-148 | 16 | 16 |
| No. RB-149 | 17 | 17 |
| No. RB-101 | 18 | 20 |
| No. RB-103 | 21 | 21 |
| No. RB-102 | 22 | 22 |
| No. RB-109 | 24 | 24 |
| No. RB-110 | 25 | 26 |
| No. RB-111 | 26 | 27 |
| No. RB-112 | 27 | 28 |
| No. RB-115 | 28 | 28 |

## Page 4

### E X H I B I T S (Continued)

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. RB-116 | 29 | 30 |
| No. RB-118 | 30 | 31 |
| Nos. RB-401A through RB-401J | 32 | 32 |
| Nos. RB-402A through RB-402F | 35 | 36 |
| Nos. RB-403A and RB-403B | 37 | 38 |
| Nos. RB-404A through RB-404L | 40 | 41 |
| No. RB-407 | 45 | 46 |
| No. RB-408 | 47 | 48 |
| No. RB-153 | 50 | 50 |
| No. RB-154 | 51 | 51 |
| No. RB-155 | 52 | 52 |
| No. RB-156 | 52 | 53 |
| No. RB-434 | 53 | 54 |
| No. RB-135 | 56 | 56 |
| No. RB-136 | 56 | 57 |
| No. RB-145 | 57 | 57 |
| No. RB-138 | 58 | 58 |
| No. RB-137 | 59 | 59 |
| No. RB-139 | 60 | 60 |
| No. RB-410 | 61 | 62 |
| Nos. RB-405A, RB-405B and RB-405C | 63 | 100 |
| Nos. RB-406A and RB-406B | 66 | 92 |
| No. RB-119 | 69 | 69 |

## Page 5

### E X H I B I T S (Continued)

| GOVERNMENT | MARKED | REC'D |
|---|---|---|
| No. RB-126 | 70 | 70 |
| No. RB-127 | 70 | 71 |
| No. RB-127A | 71 | 72 |
| No. RB-433 | 72 | 72 |
| No. RB-415 | 73 | 74 |
| No. RB-511 | 74 | 75 |
| No. RB-510 | 75 | 76 |
| No. RB-304A | 87 | 87 |
| No. RB-304 | 88 | 89 |
| No. RB-130 | 91 | 91 |
| No. RB-131 | 91 | 92 |
| No. RB-303A | 93 | 93 |
| No. RB-303 | 94 | 95 |
| No. RB-122 | 96 | 96 |
| No. RB-128 | 97 | 97 |
| No. RB-129 | 97 | 98 |
| No. RB-305A | 100 | 101 |
| No. RB-305 | 101 | 102 |
| No. RB-132 | 102 | 103 |
| No. RB-133 | 103 | 104 |
| No. RB-134 | 104 | 104 |
| No. RB-100 | 119 | 119 |
| No. RB-400 | 134 | 135 |

2 (Pages 2 to 5)

United States of America  v.
Kevin L. Gray, et al.

CR 00-157

July 22, 2002
Volume 76

Page 106

1  A  Yes, sir.
2  Q  Prior to joining the Drug Enforcement Administration,
3  how were you employed?
4  A  I was employed as a U.S. Marshal, Deputy U.S. Marshal in
5  this courthouse for approximately five and a half years.
6  Q  And prior to that did you have any law enforcement
7  experience?
8  A  No, sir.  That was my first law enforcement job.
9  Q  Now you said your current assignment was to a particular
10  task force; is that right?
11  A  That's correct.
12  Q  How long have you been on that task force?
13  A  It's essentially evolved into what it is now from what
14  it was seven years ago or eight years ago.  The same task
15  force minus the P.G. County guys.  In that time frame I've
16  also had one other assignment in one of our general
17  enforcement groups.
18  Q  Let me refer you then, Agent McGarth, back in 1996.
19  During that time in the first half of 1996 were you assigned
20  to a task force then?
21  A  Yes, sir, I was.
22  Q  Did the task force have a particular name or
23  designation?
24  A  Back then it was the metropolitan area task force also,
25  again, just then DEA agents and metropolitan police

Page 107

1  detectives.
2  Q  Tell us a little bit about that task force?  How many
3  people were on the task force?
4  A  At the time we had probably seven or so DEA agents and
5  five or six metropolitan police detectives assigned to the
6  group.
7  Q  What's the reason why you had a task force that combined
8  both agents from the Drug Enforcement Administration as well
9  as detectives from the local police department?
10  A  It was a combination of reasons.  But certainly one of
11  the foremost was the local experience and the ability to use
12  the federal guys to go outside the jurisdiction and that was
13  one of the primary purposes of it.
14  Q  Did the task force back then in 1996 have a particular
15  mission?
16  A  Yeah, we did.  Actually the mission back then came down
17  from your top management.  We were strictly tasked to work
18  mid-level drug trafficking individuals in the Washington,
19  D.C., area.  Sometimes Maryland also but primarily just the
20  District.  And we were instructed to prosecute those people
21  in the District.  The task force has since evolved now that
22  we use all three jurisdictions around here which include the
23  Eastern District of Virginia.  It's the District of Maryland
24  but we prosecute the cases in Greenbelt.
25  Q  How do you define mid-level drug dealer?  When you say

Page 108

1  the mission was to focus on mid-level drug dealers in the
2  District of Columbia.
3  A  We always try to start our cases back then -- and most
4  of it was informant driven.  By that I mean somebody
5  would -- you'd ask somebody who the biggest drug trafficker
6  you know were and they would tell you.  And our goal was to
7  start the cases at an individual that was capable of selling
8  62 grams of cocaine or crack cocaine which is about a
9  sixteenth of a kilgram or an ounce of heroin.
10  Q  Why starting at that level rather than a lower amount?
11  A  Well, that's just what we were tasked with doing in.
12  Q  And what was the mission from there, starting from that
13  point?
14  A  It was a combination of things.  But, generally, DEA
15  management pushes you to work up.  By that I mean if we're
16  working an individual in Washington who is selling us 62
17  grams of cocaine or crack cocaine, that individual is
18  probably being supplied by a guy who is selling him kilogram
19  quantities of cocaine.  And he's taking the cocaine,
20  breaking it up, cooking it, selling it locally and he has
21  probably got a source of supply in New York, Florida or Los
22  Angeles.  And our goal was to start at that level and move
23  up.
24  Q  And what would you say would be the mid-level then in
25  that sort of scenario?

Page 109

1  A  Mid-level, the guys that could sell 62 and 125 grams
2  quantities of cocaine or crack or, like I said, ounces of
3  heroin.
4  Q  Let me ask you this, Agent McGarth.  In the first half
5  of 1996 were you focusing on any particular individual as a
6  target of your investigation?
7  A  Yes, sir, we were.
8  Q  Who was that that you were focusing on?
9  A  An individual by the name of Rodman David Lee.  His
10  street name was China or China Man.  He was actually an
11  Oriental American who grew up in Southeast but he was of
12  Chinese decent.
13  Q  And from the information you had, when you focused on
14  him, where did he fall in the hierarchy that you've just
15  described?
16  A  He would certainly be above what I just described as a
17  mid-level, Washington, D.C., metropolitan area trafficker.
18  He was capable of buying and selling multi-kilograms of
19  cocaine.
20  Q  Let me show you a photograph that's in evidence marked
21  RL-1.
22       Do you recognize that individual?
23  A  Yes, sir, I do.
24  Q  And who is that?
25  A  That's Rodman Lee or China Man.

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

United States of America v.
Kevin L. Gray, et al.

CR 00-157

July 22, 2002
Volume 76

---

Page 110

1   Q  Tell us, Agent McGarth, explain to the ladies and
2   gentlemen of the jury some of the investigative steps that
3   you were involved in taking in the first half of 1996 with
4   regard to Rodman Lee?
5   A  In the early half of '96 after he had been identified --
6   can I back up?
7   Q  Sure.
8   A  I'll back up a little bit to the middle of 1995 actually
9   when I came to DEA.  At that time there was an agent in the
10  group, my old partner, named Bob Valentine.  We had a
11  Dominican informant who knew an individual by the name of
12  Rick.  It turns out to be Rick Bailey.  I'm not sure he knew
13  his last name at the time.
14       But that's how we first found out about Rodman
15  Lee.  During an undercover operation Agent Valentine met
16  Mr. Bailey in an undercover capacity posing as a --
17       MR. COBURN:  Objection.  May we approach?
18       THE COURT:  Yes.
19       (Begin bench conference.)
20       MR. COBURN:  Your Honor, I know this is what the
21  government characterizes as background but as far as I can
22  tell it's all hearsay.
23       MR. OLSEN:  It's simply being offered to explain
24  the investigative steps he took.  What I ask for some leeway
25  in that I can proffer to the Court that he's going to talk

---

Page 111

1   Ricardo Bailey and his role as an informant which is
2   important later on to the motivation for the murder in terms
3   of our theory of what actually happened.
4        Also, there's no prejudice because he's not going,
5   to the extent it is hearsay, he's not going to talk about
6   any of the defendants or even any connection to the
7   defendants.  It's simply about the relationship between
8   Bailey and Rodman Lee.
9        MR. COBURN:  Well, the connection to defendants, I
10  think, gets built later.  This is the motivation for the
11  murder right here.
12       THE COURT:  I'll allow it.
13       (End bench conference.)
14       BY MR. OLSEN:
15  Q  Agent McGarth, you may continue as to the connection
16  between the person you were working with Bob Valentine and
17  the person you knew as Rick or Ricardo Bailey.
18  A  Okay.  Just so chronologically it flows.
19       The introduction from the Dominican to Agent
20  Valentine and Mr. Bailey occurred approximately -- the first
21  meeting was June 28 of '95, Agent Valentine possessing as a
22  drug supplier from New York.  Bailey indicated he wanted to
23  purchase a couple of kilograms of crack cocaine -- I'm
24  sorry -- cocaine hydrochloride.
25  Q  Let me stop you.  The difference is, between cocaine

---

Page 112

1   hydrochloride and crack cocaine?
2   A  Hydrochloride is in its powder form.  Crack cocaine is
3   in its base form.
4        Those initial meetings led to the identification
5   of Rodman Lee as Rick Bailey's other supplier.  That's how
6   we first were able to identify Rodman Lee which was in the
7   fall of '96 or so.  And we were able to do that through some
8   surveillance at Rick Bailey's apartment complex.
9   Q  Just as a matter of correction, you said fall of '96?
10  A  I'm sorry.  Correction.  Fall of '95.  Excuse me, sir.
11  Q  Once you were able to identify Rodman Lee as the source
12  of supply for Ricardo Bailey, did you take other steps to
13  further investigate Rodman Lee?
14  A  Yeah.  The investigation kind of took off a little
15  quicker beginning in earlier '96.  And the steps we were
16  taking -- we did not have a confidential source that could
17  purchase drugs from Mr. Lee.  So we did the normal standard
18  steps you take without a confidential source including
19  surveillance, pin registers.  We started what we call trash
20  runs or trash rips which means we started, another term is
21  dumpster dive.  We started taking his trash to see what was
22  in it.  Those and other standard police investigative steps.
23  Q  Let's take those one at a time.  You mentioned the trash
24  runs.  Describe those, what you did in a little bit more
25  peculiarity?

---

Page 113

1   A  Yeah.  We did, geez, between four or five of us, we did
2   probably 20 to 30 of them.  Essentially what they were is
3   you establish surveillance on the house very late at night.
4   You try to ensure that the occupants of the dwelling are
5   asleep.  And then you go up and you take the trash and look
6   through it to see what, if anything, of evidentiary value is
7   in it.
8   Q  And the trash that you were looking at, was that trash
9   that was inside the house or outside the house?
10  A  It's outside.  Off the grounds of the property.
11  Q  And to do that did you need any particular court
12  approval or any sort of order to do that?
13  A  No, sir.
14  Q  Did you ever find anything that you considered to be of
15  evidentiary value in the trash?
16  A  Some of the best evidence in the whole case came out of
17  the trash.  We seized about 23 kilograms wrappers of cocaine
18  hydrochloride residue.  Some of those, I believe two of
19  those kilogram wrappers had Rodman Lee's fingerprints on
20  them.  We seized baking soda which is common in converting
21  cocaine hydrochloride to crack cocaine.  We seized various
22  financial documents and instruments.
23       He had a pension for luxury automobiles.  He owned
24  an Acura, NSX.  Actually seven or 800 series of Mercedes.
25  I'm not sure.  I'm not a big car guy.  The top of the line

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR RPR
Official Court Reporter

26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :

        v.          :Criminal NO. **00-157**(01)(RCL)
                               NEXT: TRIAL: On-Going.
KEVIN L. GRAY, et al.          :
       Defendants.

### MR. GRAY'S PROPOSED DEFENSE INSTRUCTION NUMBER ONE

    In Counts One, Two and Three, the government has charged certain actions which they allege are a part of a Narcotics Conspiracy, a Continuing Criminal Enterprise and a Racketeering Influence Corrupt Organization Conspiracy. But, several of those actions took place before KEVIN L. GRAY's eighteenth birthday and when he was a juvenile. Mr. Gray, or any other person charged in this indictment, can only be held liable as an adult for membership in a conspiracy for acts committed after a member of that conspiracy reached eighteen. Mr. Gray, or any other person charged in this indictment, can only be convicted of any crime based upon adult actions. The Federal Juvenile Delinquency Act considers violations of the law by a person younger than eighteen acts of delinquency rather than crimes.

    You can, however, review any action taken by Mr. Gray before his eighteenth birthday to help assess his actions taken after that time. You may find that actions taken by Mr. Gray before his eighteenth birthday help you to determine, beyond a reasonable doubt, whether Mr. Gray, or any other person charged

in this indictment, had knowledge that there was a conspiracy, when the person joined the conspiracy, the scope of the conspiracy the person agreed to and the foreseeability of the acts of co-conspirators.

Respectfully submitted,

_____
Francis D. Carter, Esq.
Bar Number 164376
Co-Counsel for Mr. Gray
1730 Rhode Island Avenue, N.W.
Suite 717
Washington, D.C. 20036-3115
(202) 393-4330

_____
David P. Baugh, Esq.
Virginia Bar No. 22528
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111

_____
SARA G. DAVIS, ESQ.
Va Bar No. 43463
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111

-2-

27

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

May 8, 2002
P.M. Session/Day 37

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .

           Plaintiff,          .    Docket No. CR 00-157
                    .
                    .    Washington, D.C.
           v.          .    Wednesday, May 8, 2002
                    .    2:06 p.m.
KEVIN L. GRAY, RODNEY MOORE,          .
JOHN RAYNOR, CALVIN SMITH,          .
TIMOTHY HANDY, and Lionel Nunn,          .
                    .
           Defendants.          .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DAY 37 P.M. SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Plaintiff:          TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 4th Street, N.W.
                          Washington, D.C. 20001
For Defendant Gray:          FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, N.W.
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241

**FILED**

Pages 1 through 108

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Dennis A. Dinkel, RDR, CRR

Phone: (202) 289-8661
e-mail: dadinkel@directvinternet.com

Unites States of America v.
Kevin L. Gray, et al.

CR 00-157

May 8, 2002
P.M. Session/Day 37

---

Page 2

APPEARANCES - Continued:
For Defendant Moore:     BARRY COBURN, ESQ.
                         Coburn and Schertler
                         1150 18th Street, N.W.
                         Washington, D.C. 20036
                         STEVEN McCOOL, ESQ.
                         Mallon and McCool, LLC
                         16 South Calvert Street
                         Baltimore, Maryland 21202

For Defendant Raynor:    G. GODWIN OYEWOLE, ESQ.
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004

                         THOMAS SAUNDERS, ESQ.
                         207 East Redwood Street
                         Baltimore, Maryland 21202

For Defendant Smith:     JOHN CARNEY, ESQ.
                         Law Offices of Carney and Carney
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004
                         JONATHAN RUBENS, ESQ.
                         601 Pennsylvania Avenue, N.W.
                         Washington, D.C. 20004
For Defendant Handy:     MICHAEL LASLEY, ESQ.
                         1730 K Street, N.W.
                         Washington, D.C. 20004
                         ADGIE O'BRYANT, JR., ESQ.
                         Anderson and O'Bryant, PC
                         2207 7th Street, N.W.
                         Washington, D.C. 20001

For Defendant Nase:      VERONICE A. HOLT, ESQ.
                         3003 Van Ness Street, N.W.
                         Washington, D.C. 20008

Court Reporter:          DENNIS A. DINKEL, RDR, CRR
                         Official Court Reporter
                         Room 6818, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 289-8661

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

---

Page 3

1           PROCEEDINGS
2              (2:06 p.m.)
3        THE COURT:  The first note from the jury is a
4    complaint about the food.
5        MR. McCOOL:  Government issue, make sure you tell
6    them that.
7        (Laughter.)
8        THE COURT:  Off the record.
9        (Discussion off the record.)
10       MR. CARTER:  Your Honor, were you going to give
11   defense instruction number one as part of the preliminary
12   instructions?
13       THE COURT:  Yes.  Yes.  Because it tied to the
14   indictment.  I thought I was going to read it after the
15   indictment.  I still have to read again the instruction that
16   the indictment is not evidence and I was going to read those
17   two.  But I don't think we're going to get all the way through
18   the indictment today.
19       (Jury in at 2:27 p.m.)
20       THE COURT:  Ladies and gentlemen, at the time I broke
21   for lunch, I had read you the first 70 overt acts of count 1 of
22   the indictment and I'll continue reading the other overt acts
23   in count 1 of the indictment.
24       Number 71 is that on or about August 20, 1996 in the
25   District of Columbia Kevin L. Gray, Rodney L. Moore, Bryan

---

Page 4

1    Bostick and other coconspirators not indicted herein met, and
2    Rodney L. Morre and Kevin L. Gray directed Bryan Bostick to
3    murder Joseph A. Jones because Rodney L. Moore feared that
4    Jones intended to rob him of illegal drugs and or money.
5        72.  On or about August 20, 1996 in the 700 block of 7th
6    Street, Northeast in the District of Columbia Bryan Bostick,
7    acting at the direction of Kevin L. Gray and Rodney L. Moore
8    and while armed with a firearm shot and killed Joseph A. Jones.
9        73.  On or about September 11, 1996, in the 1300 block of
10   12th Street, Northwest in the District of Columbia Deon Oliver
11   possessed a loaded Jennings .9 millimeter firearm.
12       74.  On or about October 5, 1996, in the 2700 block of
13   Robinson Place, Southeast, in the District of Columbia, Kevin
14   L. Gray possessed with the intent to distribute a mixture and
15   substance containing approximately 2 grams of cocaine base also
16   known as crack cocaine.
17       75.  On or about November 24, 1996 in the District of
18   Columbia, Rodney L. Moore met with Franklin Seegers and
19   solicited Franklin Seegers to murder Diane Luther because
20   Luther had decided to discontinue selling illegal drugs for the
21   organization and because Rodney L. Moore suspected Luther was
22   cooperating with law enforcement.
23       76.  On or about November 24, 1996, in the 1900 block of
24   Maryland Avenue, Northeast in the District of Columbia,
25   Franklin Seegers acting at the direction of Rodney L. Moore and

---

Page 5

1    while armed with a firearm shot and killed Diane Luther and
2    shot Lincoln Hunter with the intent to murder him.
3        77.  On or about November 25, 1996, in the District of
4    Columbia Rodney L. Moore, Derrick Moore, also known as DJ, and
5    a coconspirator not indicted herein met, and Rodney L. Moore
6    solicited the coconspirator not indicted herein to murder Ervon
7    Clyburn because Rodney L. Moore suspected Clyburn had
8    cooperated or would cooperate with law enforcement in the
9    investigation of the murder of Diane Luther.
10       78.  On or about November 25, 1996 in the area of the 600
11   block of H Street, Northeast in the District of Columbia, John
12   Raynor, also known as Buck, identified Ervon Clyburn to a
13   coconspirator not indicted herein so that the coconspirator not
14   indicted herein could shoot and Ervon Clyburn.
15       79.  On or about November 25, 1996 in the 700 block of H
16   Street, Northeast in the District of Columbia at the direction
17   of Rodney L. Moore and with the assistance of John Raynor, also
18   known as Buck, a coconspirator not indicted herein, while armed
19   with a .357 revolver shot and killed Ervon Clyburn.
20       80.  On or about November 25, 1996 in the District Rodney
21   L. Moore paid a coconspirator not indicted herein crack cocaine
22   and money for killing Ervon Clyburn.
23       81.  In or about November and December 1996, following the
24   November 25, 1996 murder of Ervon Clyburn, Roy Johnson acting
25   at the direction of Rodney L. Moore paid a coconspirator not

---

Dennis A. Dinkel, RDR, CRR

Phone: (202) 289-8661
e-mail: dadinkel@directvinternet.com

28

United States of America v.                CR 00-157                      May 20, 2002
Kevin L. Gray, et al.                                                     Volume 43

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA,        :    Docket No. CR 00-157
                                 :
          Plaintiff,             :    Washington, D.C.
                                 :    May 20, 2002
v.                               :    2:05 p.m.
                                 :
KEVIN L. GRAY, RODNEY MOORE,     :
JOHN RAYNOR, CALVIN SMITH,       :
TIMOTHY HANDY, LIONEL NUNN,      :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - x

DAY 43 - PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:        TIMOTHY J. HEAPHY, ESQ.
                          MATTHEW G. OLSEN, ESQ.
                          AMY JEFFRESS, ESQ.
                          Assistant United States Attorneys
                          555 Fourth Street, Northwest
                          Washington, D.C. 20001

For Defendant Gray:       FRANCIS D. CARTER, ESQ.
                          1730 Rhode Island Avenue, Northwest
                          Suite 717
                          Washington, D.C. 20036
                          DAVID P. BAUGH, ESQ.
                          Law Offices of David P. Baugh, PC
                          223 South Cherry Street
                          Richmond, Virginia 23241

FILED

Pages 1 through 157
DOLORES A. BYERS, CSR, RPR          MAY 2 0 2003
Official Court Reporter

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America v.
Kevin L. Gray, et al.

CR 00-157

May 20, 2002
Volume 43

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore: BARRY COBURN, ESQ.
    Coburn and Schertler
    1150 18th Street, Northwest
    Washington, D.C. 20036

    STEVEN MC COOL, ESQ.
    Mallon and McCool, LLC
    16 South Calvert Street, Suite 1002
    Baltimore, Maryland 21202
For Defendant Raynor: G. GODWIN OYEWOLE, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    THOMAS SAUNDERS, ESQ.
    207 East Redwood Street, Suite 205
    Baltimore, Maryland 21202

For Defendant Smith: JOHN CARNEY, ESQ.
    Law Offices of Carney and Carney
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004

    JONATHAN RUBENS, ESQ.
    601 Pennsylvania Avenue, Northwest
    Suite 900, South Building
    Washington, D.C. 20004
For Defendant Handy: MICHAEL LASLEY, ESQ.
    1730 K Street, Northwest, Suite 304
    Washington, D.C. 20006
    ADGIE O'BRYANT, JR., ESQ.
    Anderson and O'Bryant, PC
    1107 Seventh Street, Northwest
    Washington, D.C. 20001

For Defendant Nunn: VERONICE A. HOLT, ESQ.
    3003 Van Ness Street, Northwest
    Suite W-919
    Washington, D.C. 20008

---

**Page 3**

CONTENTS

WITNESSES:    DIRECT CROSS REDIRECT RECROSS
On behalf of the government:
Willie Jefferson
  By Mr. Olsen    4
  By Mr. Carter        13
  By Mr. Olsen                44
Raymond Sanders
  By Mr. Heaphy    57

EXHIBITS

| GOVERNMENT | MARKED | REC'D |
| --- | --- | --- |
| No. AH-401 | | 13 |
| No. JM-501 | | 56 |
| No. RS-3 | | 59 |
| No. MA-1 | | 67 |
| No. FH-1 | | 67 |
| No. KNG-1 | | 78 |
| No. RE-1 | | 82 |
| No. RS-4 | | 99 |
| No. RS-5 | | 111 |
| No. RS-7 | | 112 |
| No. A-15 | | 113 |
| No. DR-1 | | 125 |

---

**Page 4**

1    P R O C E E D I N G S
2    (Jury entered courtroom.)
3    THE COURT: The government may call your next
4  witness.
5    MR. OLSEN: Thank you, Your Honor. At this time
6  the government calls Detective Willie Jefferson to the
7  stand.
8    WILLIE JEFFERSON, GOVERNMENT WITNESS, SWORN
9    DIRECT EXAMINATION
10    BY MR. OLSEN
11  Q  Good afternoon, Detective.
12  A  Good afternoon, sir.
13  Q  Could you begin by introducing yourself to the jury and
14  spelling your name for the court reporter, please?
15  A  My name is Willie Jefferson. It's J-e-f-f-e-r-s-o-n.
16  First name is Willie, W-i-l-l-i-e.
17  Q  Where do you work?
18  A  I work with the Metropolitan Police Department.
19  Assigned to the violent crime unit, the homicide branch.
20  Q  What's your current rank?
21  A  I am a D-1.
22  Q  What does that mean?
23  A  That means I'm top detective. First class. I am at the
24  highest grade a detective can go on the Metropolitan Police
25  Department.

---

**Page 5**

1  Q  How long have you been with the Metropolitan Police
2  Department altogether?
3  A  I got sworn in in 1967, August the 28th.
4  Q  And how long have you been a detective?
5  A  I became a detective in 1970.
6  Q  And how long have you been a D-1 or the top rank of
7  detective?
8  A  About 1990.
9  Q  And over the course of your career, have you
10  investigated homicides or murders?
11  A  Yes, sir. I have investigated all types of deaths. I'm
12  basically what you call a death investigator.
13  Q  How long have you been a homicide or death investigator?
14  A  I first went to homicide in 1971. I couldn't stand it,
15  and they sent me to the robbery squad in '72. I went back
16  to the homicide, I believe it was '85 or '86. And I have
17  been there every since.
18  Q  Can you give us some idea of how many deaths or
19  homicides you've investigated over the course of your
20  career?
21  A  I wouldn't be stretching it if I said over 500.
22  Q  Detective, I want to ask you about a particular
23  homicide, the homicide of Alvin Henson, which occurred on
24  May 1st, 1989, at 3145 Robinson Street, Southeast. Were you
25  assigned to investigate that particular murder?

---

United States District Court
For The District of Columbia

Dolores A. Byers, CSR, RPR
Official Court Reporter

United States of America  v.
Kevin L. Gray, et al.

CR 00-157

May 20, 2002
Volume 43

---

**Page 54**

1  they get the next witness, Your Honor?
2       THE COURT:  Yes.
3       (Begin bench conference.)
4       MR. OLSEN:  One other thing I want to do.  I have
5  some medical records I want to introduce.
6       MR. CARTER:  After he introduces the medical
7  records, I believe that will be the end of the testimony
8  about the Alvin Henson homicide.  I want to repeat the
9  defense instruction number one about juvenile activities not
10 being convicted because this is during that period of time,
11 Your Honor.
12      MR. OLSEN:  I'm not sure if it's appropriate to
13 every time after every one of these incidents.  I don't
14 recall what the instruction says.
15      MR. CARTER:  It's the same thing you would do if
16 it was other crimes evidence or if it was impeachment by
17 prior conviction, and that's what I'm asking to do.  That
18 they be reminded right at this time.  I'm doing it at the
19 end of this segment.  We're going now into another segment
20 of the trial now.
21      MR. OLSEN:  It seems to me the Court gave this
22 instruction once.  To give it now it would be irrelevant, to
23 give it again when there is testimony about Calvin Smith's
24 juvenile conduct.  It elevates that particular instruction.
25 Emphasis on it that's sort of out of proportion to -- it's

---

**Page 55**

1  the weight that it should carry to the jury.  I think it's
2  inappropriate to give every time there's evidence about a
3  particular juvenile conduct.
4       MR. CARTER:  The difficulty is it has bifurcated
5  this testimony about my client as a juvenile.  They're going
6  into another aspect and at some point time his alleged
7  escape from Oak Hill, if all of this run together.  I would
8  have waited until the end of all that testimony.  Because
9  they have chosen to do this.  I'm saying that now right
10 after this segment is now I need this instruction.
11      THE COURT:  I'll give it now, but I'm going to say
12 I'm not going to repeat it throughout the trial.  So I'm not
13 going to give it during Oak Hill.
14      MR. HEAPHY:  I have one breach matter for
15 Mr. Sanders.  An in limine motion to preclude any
16 questioning of his active residence.
17      THE COURT:  Where he lives now?
18      MR. HEAPHY:  Yes.  I will develop he is in the
19 program.  But in terms of specific programs where he lives.
20      MR. CARTER:  I think as long as we can ask about
21 the witness protection program without targeting his exact
22 location, that's not a problem.
23      THE COURT:  Let's do those medical records first
24 and then we'll -- I have an instruction for the jury as it
25 relates to Alvin Henson.

---

**Page 56**

1       MR. OLSEN:  Yes, Your Honor.
2       Your Honor, at this time I propose to offer
3  JM-501, the medical records of Joseph Melton.  They're dated
4  August 1, 2001.
5       THE COURT:  You said they were authenticated.
6       MR. OLSEN:  They are authenticated and pursuant to
7  Federal Rule 902, business records of D.C. General Hospital.
8       MR. CARTER:  Federal rules of evidence.
9       MR. OLSEN:  Federal rules of evidence 902.
10      THE COURT:  They're received.
11          (Government Exhibit No. JM-501 was
12              received into evidence.)
13      (End bench conference.)
14      THE COURT:  Part of a narcotics conspiracy, a
15 continuing criminal enterprise and a racketeer influenced
16 and corrupt organization conspiracy.  Mr. Gray or any other
17 person charged in the indictment can only be held liable as
18 an adult for membership in a conspiracy for acts committed
19 after a member of that conspiracy after he reached 18.
20 Mr. Gray or any other person charged in the indictment can
21 only be convicted of any crime based upon adult actions.
22 The Federal Juvenile Delinquency Act considers violations of
23 the law by persons younger than 18 acts of delinquency other
24 than crimes.
25      You can however review any action taken by

---

**Page 57**

1  Mr. Gray before his 18th birthday to help assess his actions
2  taken after that time.  You may find that actions taken
3  before Mr. Gray before his 18th birthday help to you
4  determine beyond a reasonable doubt whether Mr. Gray or any
5  other person charged in this indictment had knowledge that
6  there was a conspiracy when the person joined the
7  conspiracy, the scope of the conspiracy, the person agreed
8  to and the foreseeability of the acts of co-conspirators.
9       I won't read you that instruction every time we
10 admit evidence of acts that took place before 18.  I read it
11 to you with my preliminary instructions.  I will read it
12 again in connection with the final instructions, but I just
13 remind you as you listen to evidence of any acts that occur
14 before someone's 18th birthday to keep that instruction in
15 mind.  I'm not going to reread it every time we have
16 testimony like that, but you can keep it in mind.
17      The government may call your next witness.
18      MR. HEAPHY:  Thank you, Your Honor.  That witness
19 is Raymond Sanders.
20      RAYMOND SANDERS, GOVERNMENT WITNESS, SWORN
21          DIRECT EXAMINATION
22      BY MR. HEAPHY:
23 Q  Mr. Sanders, good afternoon.
24 A  Good afternoon.
25 Q  Tell us your name?

---

15 (Pages 54 to 57)

United States District Court
For The District of Columbia

Dolores A. Byers, CSR, RPR
Official Court Reporter

29

## JURY INSTRUCTION NO. 40

### EVIDENCE OF DEFENDANT'S ACTIVITIES WHILE A JUVENILE

You have evidence about events that occurred when one or more of the defendants was a juvenile. Evidence of a defendant's activities while he was under the age of eighteen has been admitted for the limited purpose of enabling you to decide when, if ever, that defendant became a member of the conspiracy. However, in order to convict a defendant of the conspiracy charged in Count One, or the RICO conspiracy charged in Count Three, about which I will instruct you in a moment, the government must prove beyond a reasonable doubt that the defendant continued to be a member of the conspiracy after he turned eighteen years old, or that he became a member of the conspiracy at some point after he turned eighteen years old. If that is proved beyond a reasonable doubt, you may consider both the defendant's pre-18-years act and his post-18-years acts on the conspiracy count. By contrast, if a defendant did not at any time participate in the conspiracy as an adult, but only as a juvenile, you must find him not guilty of the conspiracy charge.



FILED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

47

U.S. v. KEVIN L. GRAY
Cr.No. 00-157(01); Exhibit-29

30

United States of America v.                    CR 00-157                    November 26, 2002
Kevin L. Gray, et al                                                        Volume 143

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          : CR Number 00-157
                                   :
          Government,              :
                                   :
     v.                            : Washington, D.C.
                                   : Tuesday, November 26, 2002
KEVIN L. GRAY, RODNEY MOORE,       : 9:07 a.m.
JOHN RAYNOR, CALVIN SMITH,         :
TIMOTHY HANDY and LIONEL NUNN,     :
                                   :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - -x


DAY 143 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        TIMOTHY J. HEAPHY, ESQUIRE
                           MATTHEW G. OLSEN, ESQUIRE
                           AMY JEFFRESS, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           (202)  353-8822


For Defendant Gray:        FRANCIS DARRON CARTER, ESQUIRE
                           1730 Rhode Island Avenue, N.W.
                           Suite 717
                           Washington, D.C.  20036
                           (202)  393-4330

                           DAVID P. BAUGH, ESQUIRE
                           DAVID P. BAUGH, P.C.
                           223 South Cherry Street
                           P.O. Box 12137
                           Richmond, Virginia  23241
                           (804)  643-8111

Pages 1 through 106

FILED

MAY 2 0 2003

THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America v.                      CR 00-157                      November 26, 2002
Kevin L. Gray, et al                                                            Volume 143

---

Page 2

APPEARANCES (Continued):
For Defendant Moore:    BARRY COBURN, ESQUIRE
                        COBURN & SCHERTLER
                        1150 18th Street, N.W.
                        Suite 850
                        Washington, D.C. 20036
                        (202) 628-4199

                        STEVEN J. McCOOL, ESQUIRE
                        1776 K Street, N.W.
                        Suite 300
                        Washington, D.C. 20006
                        (202) 393-7088

For Defendant Raynor:   G. GODWIN OYEWOLE, ESQUIRE
                        601 Pennsylvania Avenue, N.W.
                        9th Floor
                        Washington, D.C. 20004
                        (202) 347-7777

                        THOMAS J. SAUNDERS, ESQUIRE
                        10 N. Calvert Street
                        Suite 715
                        Baltimore, Maryland 21202
                        (202) 530-4662 & (410) 547-9087

For Defendant Smith:    JOHN J. CARNEY, ESQUIRE
                        CARNEY AND CARNEY
                        601 Pennsylvania Avenue, N.W.
                        Suite 900
                        Washington, D.C. 20001
                        (202) 434-8234

For Defendant Handy:    MICHAEL LASLEY, ESQUIRE
                        1730 K Street, N.W.
                        Suite 304
                        Washington, D.C. 20006
                        (202) 208-2690
                        ADGIE O'BRYANT, JR., ESQUIRE
                        ANDERSON & O'BRYANT, P.C.
                        1107 Seventh Street, N.W.
                        Washington, D.C. 20001
                        (202) 371-0013

                        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 3

APPEARANCES (Continued):
For Defendant Nunn:     VERONICE A. HOLT, ESQUIRE
                        3003 Van Ness, N.W.
                        #W919
                        Washington, D.C. 20008
                        (202) 244-2659

Court Reporter:         THERESA M. SORENSEN, CVR-CM
                        Official Court Reporter
                        Room 4800-H, U.S. Courthouse
                        Washington, D.C. 20001
                        (202) 273-0745

Proceedings reported by stenomask recording,
transcript produced by transcription.

                        THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

Page 4

P R O C E E D I N G S

1
2    THE DEPUTY CLERK:  This is the case of The United
3    States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
4    Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
5    2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Lasley,
8    Mr. O'Bryant and Ms. Holt for the defendants.
9        MR. HEAPHY:  Your Honor, could I just put
10   something on the record before we start?  There are a few
11   cases that I -- I called your law clerk this morning on this
12   unanimity issue with respect to the 1958 count.  There's
13   Shad v. Arizona, Supreme Court case at 501 U.S. 624; and two
14   D.C. Circuit cases, United States v. Chaote, 254 F3d 204 and
15   United States v. Harris, 959 F2d 246.  We believe they
16   support our argument that there should not be -- does not
17   need to be a unanimity instruction with respect to the
18   alternate theories under 1958(a), and your law clerk, Your
19   Honor, has those cites as well.  I e-mailed them to counsel
20   this morning.
21       THE COURT:  All right.
22       MS. HOLT:  I will give the Court -- I have another
23   draft -- I put the special unanimity instruction in there
24   and I am sure that once he is finished -- because I'm sure
25   that Mr. Carter is not addressing this right now.

---

Page 5

1        THE COURT:  Right.
2        MS. HOLT:  You know, he will address it.  I have I
3    think everything that's agreed upon, except that I only have
4    redrafted theories of the case from myself, Mr. Raynor.
5    That's it.  Okay.
6        MR. CARTER:  Excuse me, Your Honor.  When we were
7    talking on Friday about counts, I raised with you the
8    difficulty between an overt act, Overt Act 203 in Count 1,
9    which says Mr. Watkins -- because the organization owed Mr.
10   Watkins money, and Racketeering Act 60, which says Mr.
11   Watkins owed the money to the organization.  My argument was
12   that one of the two or both have to be dismissed because
13   they are contradictory.
14       Because I am in argument now, could I decide --
15   could I find out whether the government has elected or
16   whether the Court has ruled on that issue, please.
17       THE COURT:  What was the government's position?
18       MS. JEFFRESS:  Your Honor, we don't actually see
19   the need to strike either of those statements based on the
20   evidence, but if the Court would require us to elect, we
21   could take a position, but our position would be that they
22   can both stay as is in the indictment.
23       THE COURT:  How would that be?
24       MS. JEFFRESS:  The testimony was just that it was
25   over money, so the testimony is not specific.

---

United States of America v.                CR 00-157                          November 26, 2002
Kevin L. Gray, et al                                                          Volume 143

---

Page 6

1    THE COURT: Well, what happens if they convict of
2 both?
3    MS. JEFFRESS: I think that that's consistent with
4 the evidence, which was that it was over money. I mean, if
5 the Court believes that's a problem, what we would do is
6 strike the explanation in the racketeering act and leave it
7 the way it is in the overt act, which I believe was the
8 statement that Watkins owed money to the organization.
9    MS. HOLT: I'm having a little trouble hearing.
10    MR. CARTER: The difficulty, of course, Your
11 Honor, is that they can't strike language from the
12 racketeering act. Either you strike the racketeering act or
13 you strike the overt act. You can't amend an indictment.
14 And so they must elect, is our position, and failure to
15 elect, our motion to the Court is both should be struck.
16    MS. JEFFRESS: That is certainly not the case,
17 Your Honor.
18    THE COURT: All right. The motion is denied and
19 they will both stay.
20    MR. CARTER: Will Your Honor give a unanimity
21 instruction, then, on this issue?
22    THE COURT: No.
23    MR. CARTER: Thank you.
24    (Whereupon, the jury enters the courtroom at 9:13 a.m.)
25    THE COURT: All right. Mr. Carter, you may

---

Page 7

1 proceed.
2    MR. CARTER: Thank you.
3    CLOSING ARGUMENT BY COUNSEL
4    ON BEHALF OF DEFENDANT GRAY (Continued)
5    MR. CARTER: Good morning, ladies and gentlemen.
6    Before I begin again, I would like to give you a
7 little guidance on this 150-page indictment you are going to
8 receive. We would suggest that you can divide it really
9 into two portions, the first three counts and then
10 everything else.
11    The first count is a narcotics conspiracy, and you
12 will find that there are over 200 overt acts, and they
13 basically track the evidence in the case from the beginning,
14 1989, all the way to 1999.
15    The second count is continuing criminal
16 enterprise. That pretty much subsumes the overt acts out of
17 Count 1.
18    The third one is RICO, racketeering influenced
19 corrupt organization conspiracy. You will find there just
20 about every act that is mentioned in Count 1 of the overt
21 acts is once again repeated as a racketeering act. So the
22 first three repeat pretty much the whole course of the case.
23    What you will find thereafter, after Count 3, are
24 what they call substantive counts, so there will be
25 individual counts, sometimes more than one count dealing

---

Page 8

1 with a specific incident, okay? So you will find the exact
2 same -- generally you will find the exact same incident in
3 each of those sectors, Count 1, Count 2, Count 3, and then
4 there will be a substantive count that will be separate
5 later on. That's just a minor guide for you with regard to
6 the indictment.
7    You recall yesterday that I started off by saying
8 this entire investigation really was about narcotics. Well,
9 I didn't finish that thought, and to carry that to
10 conclusion, it is our belief, it is our argument, that when
11 that didn't produce, when that didn't show that they had a
12 major organization, a lot of narcotics, major weight, they
13 then shifted emphasis. They then go back and dig up a 1989
14 case against my client, okay. It didn't work once; let's
15 throw it in again. Let's put up the evidence, let's see if
16 we can convince another jury, okay?
17    So there you start the pattern of all of these
18 people who want to buy their freedom, who want to buy their
19 way out of jail, and, "Oh, yeah, I was there. Oh, yeah, he
20 talked to me about that. Oh, yeah, I know about that,"
21 because, of course, the more you know, the more helpful you
22 are; the more helpful you are, we understand the better the
23 deal gets to be for you, okay? So that is our overall
24 opinion of what has gone on here, okay?
25    I would next like to lump, if you don't mind, a

---

Page 9

1 series of events all surrounding a gentleman by the name of
2 Shawn Burton. Quite frankly, ladies and gentlemen, the
3 defense believes that the characters that David Runyon put
4 in his novels were minor when you compare them to some of
5 the people you see here in this case.
6    Regardless, the events that involve Shawn Burton
7 start off on December 30th, 1992 with the shooting of Larry
8 Wilkerson. It's followed with the January 3rd, 1993,
9 shooting of Shawn Burton near the woods at the bottom of the
10 hill on Robinson Place. It concerns his brother on January
11 20th, who is killed, and then subsequently, in 1993, on
12 September 9th, 1993, Mr. Burton himself is shot out in
13 Maryland. All of these events we believe are related, all
14 of these can be coupled together.
15    First, with regard to the shooting of Larry
16 Wilkerson. You will remember the testimony was that Larry
17 Wilkerson and Jermaine Vick, Pappy, asked this woman, a
18 woman who lives on Robinson Place, for a lift. She had a
19 station wagon and she was standing there, she was standing
20 next to the curb. Her car was parked next to the curb as
21 she talked to somebody, she asked her for a lift to
22 another part of town and the woman said no.
23    An argument ensued. Arthur Richardson came over
24 to defend this lady, and Larry Wilkerson and Arthur
25 Richardson get into it. During the course of this argument,

---

United States District Court              theresams@erols.com              Theresa M. Sorensen, CVR-CM
For The District of Columbia                 202-273-0745                        Official Court Reporter

RECEIVED

MAY 2 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT