UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA          :

        v.          :Criminal N0. **00-157**(01)(RCL)
                             NEXT: SENTENCING: To be set.

KEVIN L. GRAY, et al.          :
        Defendants.

## MR. GRAY'S THIRD MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, FOR DISMISSAL OF COUNTS: NEWLY DISCOVERED EVIDENCE FROM A BRADY VIOLATION

Kevin L. Gray, through counsel, pursuant to Federal Rule of Criminal Procedure 33,[1]

moves this Court for a third time for a New Trial. This pleading is based on newly

discovered evidence, which should have been disclosed under the long-recognized obligation

of the government to provide the defense with exculpatory evidence. Brady v. Maryland, 373

U.S. 83, 83 S.Ct. 1194 (1963).[2] The focus of this Motion is the shooting death of Marvin

---

[1]

    F.R.Cr.P. 33 reads, in relevant part:
    (a) **Defendant's Motion.** Upon the defendant's motion, the court may
vacate any judgment and grant a new trial if the interest of justice so
requires. ...
    (b) **Time to File.**
    (1) **Newly Discovered Evidence.** Any motion for a new trial grounded on
newly discovered evidence must be filed within 3 years after the verdict or
finding of guilt...

[2]

    The prosecution's failure to disclose evidence favorable to an accused "violates
due process where the evidence is material to either the guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution." Id. 373 U.S. t 87, 83 S.Ct.
1194.

2048

Goodman on July 26, 1992, and the suppression of exculpatory evidence by the government regarding who actually shot Mr. Goodman.

From the time undersigned entered his appearance for Mr. Gray on November 14, 2000, through the trial which began on March 1, 2002, and ended with a hung jury after the penalty phase on March 13, 2003, the government dumped over 4,000 pages of documents on the defense. Absent from that paper pile was information which is central to this pleading and would have been material to the defense of Mr. Gray at trial in relation to the shooting death of Marvin Goodman. James Samuels, an eye witness to the shooting of Marvin Goodman in 1992, spoke to a Special Agent of the Federal Bureau of Investigation, who at the time was a part of a unit composed of members from the Metropolitan Police Department, the U.S. Marshals Service, and U.S. Treasury agents, among others, styled: the Safe Streets Joint Task Force. Despite the standing obligation of the prosecutors to release this information, in a timely manner, to the defense and a series of defense demands, the information was not revealed until recently in a severed trial of Larry Wilkerson. The information was material and Mr. Gray was prejudiced by the withholding of this information.

## I.    COUNTS SUBJECT TO DISMISSAL.

### A.    COUNT ONE: NARCOTICS CONSPIRACY, 21 U.S.Code §846:

          *            *            *            *

### D. OVERT ACTS:* * * * No. 13 and 14:

13.    In or about June and July 1992, in the District of Columbia, **KEVIN L. GRAY, RODNEY L. MOORE, aka Rasoo, LARRY**

**WILKERSON,** and co-conspirators not indicted herein searched for Marvin Goodman with the intent to kill him, because Goodman had stolen a quantity of heroin from a stash house in the 2800 block of Robinson Place, S.E.

14.    On or about July 26, 1992, in an alley behind the 1300 block of Congress Place, S.E., in the District of Columbia, **KEVIN L. GRAY, RODNEY L. MOORE, aka Rasoo, LARRY WILKERSON,** and other co-conspirators both known and unknown to the Grand Jury, while armed with a firearm, shot and killed Marvin Goodman, because Goodman had stolen a quantity of heroin from a stash house in the 2800 block of Robinson Place, S.E.

B.    **COUNT THREE: <u>CONSPIRACY TO PARTICIPATE IN RACKETEER INFLUENCED CORRUPT ORGANIZATION,</u>** 18 U.S.Code §1962(d):
*         *         *         *

Paragraph D. <u>The Pattern of Racketeering Activity</u>, Sub-paragraph 23. The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the enterprise consisted of the following acts:
*         *         *         *

<u>Racketeering Act 24</u>
<u>Conspiracy to Murder and July 26, 1992,</u>
<u>Murder of Marvin Goodman</u>

The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 24:

(a)    From on or about sometime in 1992 to July 26, 1992, in the District of Columbia, **KEVIN L. GRAY, RODNEY MOORE, aka Rasoo, LARRY WILKERSON,** Lewis Simpson, a co-conspirator now deceased, and co-conspirators not indicted herein did unlawfully, knowingly and willfully combine, conspire, confederate, and agree together to murder Marvin Goodman, in violation of 22 D.C. Code §§ 2401, 2403, 3202.

I. Object of the Conspiracy

It was the primary object of the conspiracy for the defendants and co-conspirators not indicted herein, to murder Marvin Goodman, because Goodman had stolen heroin from a stash location which was inside of an apartment in the 2800 block of Robinson Place, S.E. controlled by **KEVIN L. GRAY** and **RODNEY L. MOORE, aka Rasoo.**

-3-

II. Overt Acts

In furtherance of the conspiracy and in order to effect the object thereto, the defendants and co-conspirators not indicted herein, in various combinations, directly and indirectly, committed overt acts including, but not limited to, the following overt acts alleged in Count 1, which overt acts are realleged and incorporated herein by reference as though fully set forth in this Count: Overt Acts: 13, 14.

(Conspiracy to Commit Murder, in violation of Title 22, D.C. Code, Section 105(a))

(b)    On or about July 26, 1992, in the District of Columbia, **KEVIN L. GRAY, RODNEY L. MOORE, aka Rasoo,** and **LARRY WILKERSON,** while armed with a firearm, purposely and with deliberate and premeditated malice, killed Marvin Goodman, by shooting him with a firearm on or about July 26, 1992, thereby causing injuries from which Marvin Goodman, died on or about July 26, 1992, in violation of 22 D.C. Code Sections 2401, 3202 and 105.

C.    **COUNT NINE: <u>CONTINUING CRIMINAL ENTERPRISE MURDER OF MARVIN GOODMAN</u>, Continuing Criminal Enterprise Murder and Aiding and Abetting**, in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

On or about July 26, 1992, in the District of Columbia, **KEVIN L. GRAY, RODNEY L. MOORE, aka Rasoo,** and **LARRY WILKERSON,** while engaging in and working in furtherance of a Continuing Criminal Enterprise, as set forth more fully in Count Two of this indictment, which is realleged and incorporated herein by reference, pursuant to Title 21, United States Code, Section 848(a), unlawfully, knowingly, intentionally and with deliberate and premeditated malice, killed, and counseled, commanded, induced, procured and caused the intentional killing of, Marvin Goodman, and such killing resulted.

II.    <u>**THE BRADY VIOLATION.**</u>

As previously indicated, the government over the course of our case has dropped over 4,000 pages of discovery documents on Mr. Gray. We cannot quantify the total number of pages of discovery released because the government has never released everything relevant

and material to this indictment to counsel for Mr. Gray. After this Court, in an Order dated

October 5, 2001, ordered that the defendants be severed into groups for trial, the prosecutors

began to treat the cases of others not tried simultaneously with Mr. Gray as if they were

totally separate and apart. We find this most curious since our trial contained a vast number

of activities by, statements of, and evidence against others not at counsel table.

Mr. Gray has not received from the government any of the additional discovery

materials which may, or may not, have been released to others originally indicted with Mr.

Gray. With the exception of a one paragraph letter from the government, no Brady material

has been forthcoming in relation to the shooting death of Marvin Goodman.

## A.    DEFENSE EFFORTS.

On November 22, 2000, undersigned wrote Assistant U.S. Attorney Timothy

J. Heaphy a rather exhaustive letter asking for matters we felt are discoverable. In that letter,

the defense asked, among other things, for the following:

> 7.    Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny,
> including United States v. Agurs, 427 U.S. 97 (1976), and Giglio v. United
> States, 405 U.S. 150 (1972), all exculpatory or impeachment material in the
> government's possession, custody, or control, or otherwise known to the
> government, including without limitations:
>
> *          *          *          *          *
>
> d.    Copies of all documents, statements, and other evidence, including but
> not limited to written summary of any oral evidence and statements, now in
> possession of the government or which may become known to the government,
> or which through due diligence may be learned by the government, which is
> exculpatory in nature or favorable to defendant or which may lead to material
> which exculpatory in nature or favorable to defendant, or which tends to
> negate or mitigate the guilt of defendant, as to the offenses charged, or which
> would tend to reduce the punishment thereof.  Include the names, addresses,

-5-

and telephone numbers of any persons who know or may know of any such favorable or exculpatory material or who may lead to persons or material which may be favorable or exculpatory. Also include any written or recorded statements or the substance or oral statements by any person which are inconsistent with testimony or expected testimony any government witness will give at trial an any other evidence which otherwise reflects upon the credibility, competency, bias or motive or may otherwise tend to impeach any of the government's witnesses.

**EXHIBIT-A,** attached, November 22, 2000 letter from Francis D. Carter, Esq. to Timothy Heaphy, Esq., pp. 3-5.

The defense, under the general discovery regime, has the right to all relevant information, even if it was not exculpatory.[3] But, now we find there was material "helpful" to Mr. Gray's defense and it was never disclosed to us.

After a reasonable amount of time had elapsed on December 29, 2000, we wrote asking when, or if, the government intended to reply to our November 22, 2000 letter with informal, specific and targeted discovery answers. See, **EXHIBIT-B**, attached, Letter to Timothy J. Heaphy, Esq. from Francis D. Carter, Esq., December 29, 2000.

Finally, on January 11, 2001, the government responded, in relevant part:

We are mindful of our obligation to produce <u>Brady</u> information. **We have already produced information which could be classified as exculpatory, relative to some of the specific charges in the indictment.** We understand that our duty to disclose <u>Brady</u> information is continuing, and that **we must produce such information when we become aware of it**. We believe we

---

[3]  <u>United States v. Marshall</u>, 132 F.3d 63, 67 (D.C.Cir.1998)("The rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence. In other words, it is just as important to the preparation of the defense to know its potential pitfalls as it is to know its strengths (citation omitted)").

have satisfied our obligation to produce <u>Brady</u> information, and we will endeavor to continue to produce such information as it comes to our attention (emphasis added).

**EXHIBIT-C,** attached, Letter to Francis D. Carter, Esq. from Timothy J. Heaphy, Esq., January 11, 2000 [sic], p. 3.

On February 2, 2001, in a correspondence styled: Discovery Letter #5, the defense sought more definite information about the shooting of Marvin Goodman. That rather lengthy letter, in relevant part, asked in paragraphs 14 and 15:

> In Count 1, Overt Act #13, name the co-conspirators not indicted but referred to in this act. Where and when did they search? Was a vehicle used in the search? If so, provide the make, model, year, color and the license plate.

> In Count 1, Overt Act #14, name the co-conspirators not indicted but referred to in this act. Who did the actual shooting of Marvin Goodman. Was anyone arrested and charged with the shooting of Marvin Goodman? If so, give the court, the case number, the person(s) named, and the outcome. What weapon was used in this shooting. Do you have this weapon? Who has it and where is it kept?

On February 19, 2001, the government responded to several outstanding discovery letters. Their response, relevant to the above, was:

> <u>February 2, 2001 Letter</u> - We have received your 40-page letter seeking additional information about the various overt acts listed in the indictment...We do not believe that you are entitled to bill of particulars...Accordingly, we will not respond to the specific questions you propound which seek more detailed information about the overt acts described in the indictment.
> Letter to Francis D. Carter, Esq from Timothy J. Heaphy, Esq., February 19, 2001, p. 4.

On September 13, 2001, we filed *Mr. Gray's Motion for a Bill of Particulars.* By Memorandum Opinion and Order dated February 6, 2002, this Court, among other things,

DENIED our Motion.

Over the course of this case the defense sent 108 numbered informal discovery letters to the prosecution; this does not include ten discovery letters separately addressed to another team of prosecutors charged with the defense of Mr. Gray's cell search. From those correspondence, the government forced the defense to file ten Motions to Compel Discovery. It cannot be said that the defense was lax in its pursuit of legitimate discovery material.

**B.    GOVERNMENT OBFUSCATION.**

Agreeing with the government's Opposition, this Court, in a 74-page Memorandum and Order dated February 7, 2002, among other things, denied *Mr. Gray's Motion to Join, and in Response to Government's Opposition to, Defendants' Motion for Disclosure of Brady/Giglio Information* filed September 19, 2001.

In what may ostensibly be viewed as a limp attempt at compliance with the requirements to release exculpatory information to the defense, the prosecution wrote a single paragraph in one letter concerning the shooting of Marvin Goodman. See, **EXHIBIT-D**, attached, March 4, 2002 Letter from the prosecutors to Barry Coburn, Esq. (co-counsel for Rodney Moore, a co-defendant who was tried with Mr. Gray) with copies sent to Francis D. Carter, Esq. and Sebastian Graber, Esq. (co-counsel for Larry Wilkerson, who had a separate trial). The letter talked about statements from Thomas Sims (a narcotics dealer and government cooperator). Sims said he saw Mr. Gray tell Marvin Goodman to get into a car with Jermaine Vick and Larry Wilkerson moments before Goodman was shot. First, this

-8-

version was not used by the government at trial, leading the reader to the conclusion that the

prosecutors had "some" evidence which made them believe this version was not credible.

Second, this version is hardly "exculpatory." Under the "facts" as alleged by Thomas Sims,

Mr. Gray would still be guilty as an aider and abettor to First Degree Murder by ushering

Marvin Goodman into a car which then went into the alley where shots were heard a short

time later. Finally, the release of this non-information was done THREE DAYS after jury

selection had started in Mr. Gray's trial. The government had this information months, if not

years, before and held it until the defense was on a daily basis furiously reviewing a rather

large number of juror questionnaires, each of which was more than 60 pages. Thus, the

timing was suspect, at the very least.

## C. **DILATORY RELEASE.**

The government NEVER released the exculpatory information to counsel for Mr.

Gray relating to the shooting death of Marvin Goodman. On information and belief, the

government waited until after Mr. Gray's trial and after the trial of Group II to release

exculpatory information to counsel for Larry Wilkerson. The release of this information

enabled Mr. Wilkerson to present the testimony of James Samuels. See, **EXHIBIT-E**,

attached, Transcript of *U.S. v. Larry Wilkerson*, Criminal No. **00-157(15),** August 30, 2004,

A.M. Session, pp. 54-133.

Mr. Samuels knew Marvin Goodman from the days when they both went to go-go's

beginning in the 1970s. *Id.* at p. 56. On July 26, 1992, Samuels had just finished visiting his

friend, Marcia, when he saw Goodman in the Congress Park area of S.E. He wondered why he was in that area since it was reported that Goodman had recently robbed a oil joint[4] in the area owned by Butch and Margaret, known as the Thunderdorm. *Id.* at pp. 74, 85-86, 122-124. Mr. Samuels saw two men, known to him as Kenny and Catman (two dope sellers, *Id.*, p. 85), alight from a car and shoot Marvin Goodman in the alley near parked cars. *Id.* pp. 64, 81, 83, 88.

In 1992, he was providing information to Special Agent John Hosinski of the Federal Bureau of Investigation about another murder. In the course of those discussions, he provided this information to SA Hosinski. *Id.*, pp. 89-90, 125.

III.    **WHY A NEW TRIAL SHOULD BE GRANTED.**

In order for this Court to conclude there is a Brady violation, we have to demonstrate three factors: (a) The evidence must be favorable to the accused, either because it is exculpatory or, because it is impeaching; (b) the evidence must have been suppressed by the government, either willfully or inadvertently; and (c) Mr. Gray must have been prejudiced.[5]

A.    **EXCULPATING/IMPEACHING NATURE OF THE MATERIAL.**

The information kept from the defense was material[6] and vital[7] to the defense.

---

[4]

An "oil joint" is commonly known as a crack house or a place where people can buy and use drugs including, among other things, heroin and crack cocaine.

[5]

Strickler v. Greene, 527 U.S. 263, 281-282, 119 S.Ct. 1936 (1999).

[6]

"When analyzing materiality, a court should focus first on the indictment which

The obligation to turn over exculpatory information covers impeaching evidence as well as exculpatory evidence.[8] The government's case mainly was presented through witnesses who were not present but had reached an agreement to cooperate with law enforcement in exchange for concessions on the sentences for their own criminality.[9] To prove the shooting death of Marvin Goodman, the prosecutors presented Jermaine Vick, Maurice Reid and Maurice Andrews, none of whom were present for the actual shooting. In contrast, James Samuels was, by his testimony, present for the actual shooting and provided details consistent with another, non-cooperating witness. Mr. Samuels also gave specific names and explained how he knew who the shooters were. His testimony was both exculpatory in relation to the government's theory and impeachment of the "Kevin-Gray-told-me" versions of the government cooperators' testimony.

---

sets out the issues to which the defendant's theory of the case must respond." United States v. George, 786 F.Supp. 56, 58 (D.D.C.1992)(Lamberth,J.), *citing* United States v. Poindexter, 727 F.Supp. 1470, 1473 (D.D.C.1989), *rev'd on other grounds,* 951 F.2d 369 (D.C.Cir.1991).

[7]

    United States v. Secord, 726 F.Supp. 845, 846 (D.D.C.1989)(Robinson, C.J.)("Implicit in both the constitutional and the statutory standards is the concept of logical relevance. Obviously, any item should be turned over which bears on an element of the charges to be tried in the Defendant's favor, or is truly germane to some aspect of a reasonable defense.").

[8]

    United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375 (1985).

[9]

    There is one exception to this characterization: Ms. Frances Frierson, who we discuss in the PREJUDICE section, III.C., *infra,* p.14.

-11-

hwo

## B.    GOVERNMENT SUPPRESSION.

The government tried our case as if we were inextricably entwined with everyone in the indictment. Yet, when it came to the release of germane documents and discovery material, the prosecutors isolated Mr. Gray from those who actually did not go to trial with him. Under this scenario, the government succeeded in dumping gobs of irrelevant and unconnected misdeeds by others into our trial while withholding material in the possession of its agents with which Mr. Gray could have used to undermine the credibility of either prosecutorial witnesses or other government evidence in his efforts to defend himself before his own jury. To this day, the defense for Mr. Gray is not aware of exactly what discovery and/or *Brady* material has been disclosed to those in Group II or all that was given to counsel for Larry Wilkerson. The release of any information in connection with a crime should have been delivered to all defendants charged with the crime, regardless of when their trial was to take place.

Further, James Samuels testified that he provided the information in connection with the shooting death of Marvin Goodman to SA John Hosinski of the Federal Bureau of Investigation. SA Hosinski testified in rebuttal for the government in the case of *U.S. v. Larry Wilkerson* that Mr. Samuels provided him with information about the Marvin Goodman shooting in 1992.[10] SA Hosinski was, in 1992, assigned to the Safe Streets Joint

---

[10]    SA Hosinski testified in rebuttal for the government on August 31, 2004, in the A.M. Session. Although he testified that Mr. Samuels gave him the name of another person who was "involved" in the shooting of Marvin Goodman, the FBI Agent

Task Force, which continues to be in charge of the instant investigation. Prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police."[11]

Interestingly, there is evidence which could lead to a conclusion of willful misleading by the government. In the letter of January 11, 2001, AUSA Timothy Heaphy, Esq. said, among other things:

> We are mindful of our obligation to produce <u>Brady</u> information....We believe we have satisfied our obligation to produce <u>Brady</u> information, and we will endeavor to continue to produce such information as it comes to our attention. <u>See</u>, **EXHIBIT-C,** attached, p. 3.

Once the defense received assurances from prosecutors that they had released all <u>Brady</u> material germane to the shooting of Marvin Goodman, we relied on those representations as evidence of proper efforts by the government (and its agents) to locate any and all <u>Brady</u> material in its logical storage location, i.e. law enforcement files or, among other obvious locations, the files of the Safe Streets Joint Task Force. The United States Supreme Court has said:

> Our decisions lend no support to the notion that defendants must scavenge for

---

confirmed he was provided with the information by Mr. Samuels in 1992, and created documents which were preserved in law enforcement files on this investigation. Regardless, the material did <u>NOT</u> name Kevin Gray nor Larry Wilkerson as the shooters, as the government charged in the indictment. Thus, the material and FBI notes should have been released to the defense under the *Brady* exculpatory and/or impeaching categories.

[11]
  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S.Ct. 1555 (1995).

hints of undisclosed <u>Brady</u> material when the prosecution represents that all such material has been disclosed.
<u>Banks v. Dretke</u>, 124 S.Ct. 1256, 1275 (2004).

Whether willful or inadvertent, the information was secreted from Mr. Gray.[12]

## C.    MR. GRAY SUFFERED PREJUDICE FROM THE SUPPRESSION.

This is exculpatory information which could have affected the outcome of this trial.[13]

We believe that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[14]

The prosecutorial cooperators (Jermaine Vick, Maurice Reid and Maurice Andrews) did not offer a description of the events. Rather, their "he say" testimony was confined to: the shooters ran into the alley and shot Marvin Goodman.

"<u>Kyles v. Whitley</u> instructed that the materiality standard for <u>Brady</u> claims is met when 'favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"[15] For a determination on materiality, you

---

12

"A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." <u>Banks v. Dretke, supra</u>, 124 S.Ct. at 1275.

13

<u>Strickler v. Greene, supra</u>, 527 U.S. at 281, 119 S.Ct. 1936 (1999).

14

<u>United States v. Bagley, supra</u>, at 682; <u>Kyles v. Whitley, supra</u>, 514 U.S. at 433-434, 115 S.Ct. 1555 (1995).

15

<u>Banks v. Dretke, supra</u>, 124 S.Ct. at 1276 <i>quoting</i> <u>Kyles v. Whitley</u>, 514 U.S. at 435, 115 S.Ct. 1555.

have to compare the testimony of James Samuels, whose information was suppressed from Mr. Gray, with Frances K. Frierson, a non-involved government witness who testified at Mr. Gray's trial that she saw the events leading up to the shooting of the Marvin Goodman. See, **EXHIBIT-F**, attached, Transcript of *U.S. v. Gray, et al.*, Criminal No. 00-157, June 3, 2002, A.M. Session.

Both saw events in an area near Smith Place, S.E. on July 26, 1992. Ms. Frierson saw Goodman seated on a wall listening to some device with headphones. **EXHIBIT-F**, p. 144. James Samuels said, on that day, he saw Marvin Goodman with the headphones of his Walkman (his trademark) on before he was shot. **EXHIBIT-E**, p. 68. Ms. Frierson saw Goodman walk into an alley off Smith Place, S.E. **EXHIBIT-F**, p. 144. James Samuels saw Marvin Goodman walk into an alley where he was shot. Samuels was in a position to see the shooting; Ms. Frierson was not, from her vantage point. After the man with headphones, who we now know was Marvin Goodman, got up from the wall and walked into the nearby alley, Ms. Frierson saw a small car drive up, two men jump out and then go into the alley. **EXHIBIT-F**, pp. 145, 147. James Samuels said, after Marvin Goodman walked into the alley, he saw a man, he knows as Kenny Hill, and another, he knows as Catman, get out of a small car, perhaps a Honda Accord, and run into the alley. **EXHIBIT-E**, pp. 81, 83. Thereafter, Ms. Frierson heard several shots from the alley and later the car drove off. **EXHIBIT-F**, pp. 145, 150. James Samuels saw Kenny Hill run up behind Marvin Goodman and Catman ran around and both shot him. **EXHIBIT-E**, pp. 81, 87-88.

Mr. Samuels went on to say he had provided this information to FBI Special Agent John Hosinski in 1992. **EXHIBIT-E**, pp. 89, 125. Further, he thought Marvin Goodman was crazy to be in that area since he recently robbed Butch and Margaret's nearby crack house where Kenny Hill and Catman had a supply of dope for sale. **EXHIBIT-E,** pp. 85, 120-121, 122, 124.

Because the suppressed testimony of James Samuels tracks the testimony of the non-involved witness and inculpates two other persons for the shooting of Marvin Goodman, Mr. Gray was prejudiced by not having the information which would have lead the defense to James Samuels. None of the cooperators who testified for the government saw anything, instead their testimony relied solely on "what Kevin said" for their rendition. Juxtaposing Samuels and Frierson against the cooperators, the defense would have succeeded in discrediting the purchased testimony of the cooperators. Further, there was nothing in the account of Ms. Frierson which physically would have identified Mr. Gray as one of the two shooters. There was no forensic evidence, other scientific evidence, or physical evidence which linked Mr. Gray to the shooting of Marvin Goodman. The government solely relied upon the testimony of its three cooperators to press for the convictions of Mr. Gray for the shooting of Marvin Goodman  and during their arguments for the death penalty.

The defense pounded heavily and repeatedly at the testimony of Jermaine Vick, Maurice Reid and Maurice Andrews, the government's cooperators. We used all inferences

-16-

available to discredit them.[16] Yet, the government's either intentional or inadvertent failure to disclose the <u>Brady</u> information which would have lead the defense to James Samuels prevented the defense of Mr. Gray from explaining to the jury WHY they could not believe the government's cooperators. If there was no logical alternative to detail what actually happened on July 26, 1992, in that alley off Smith Place, S.E., then the sheer numbers of the bought testimony of the government cooperators pushed the deliberation process towards the prosecution. It mattered not that we demonstrated over and again that the cooperators were given the time and opportunity by either direct governmental action or indirect placement by jail authorities to meet, talk and compare notes before their testimony. If we did not show the jury (and we could not without the testimony of James Samuels) what actually happened, we would not (and did not) prevail. The government's willful or inadvertent non-disclosure blocked us from a fair opportunity to defeat the charges against us.

Mr. Gray was prejudiced by the non-disclosure.

"A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."[17] But what we have shown clearly is that "there is a reasonable probability" that the result in the

---

[16]

"Jurors suspect [informants'] motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable ..." Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996) *quoted by* <u>Banks v. Dretke</u>, <u>supra</u>, 124 S.Ct. at 1278.

[17]

<u>Kyles v. Whitley</u>, <u>supra</u>, 514 U.S. at 434-435, 115 S.Ct. 1555.

-17-

counts previously listed would have been different.[18]

WHEREFORE, the foregoing being considered, Mr. Gray prays that this Court GRANT this Motion and order a New Trial on the counts previously enumerated, or, in the alternative, dismiss them.

Respectfully submitted,

FRANCIS D. CARTER, ESQ.
D.C. Bar Number 164376
Counsel for Kevin L. Gray
1730 Rhode Island Avenue, N.W.
Suite 717
Washington, D.C. 20036-3115
(202) 393-4330

DAVID P. BAUGH, ESQ.
Virginia Bar No. 22528
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111

---

[18]

"The adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitely, supra, 514 U.S. at 434.

SARA G. DAVIS HARMON, ESQ.
Va Bar No. 43463
Co-Counsel for Mr. Gray
Box P.O. Box 12137
Richmond, Virginia 23241
(804) 643-8111

## CERTIFICATE OF SERVICE

This is to certify that a copy of Mr. Gray's Third Motion for a New Trial or,

in the alternative, for Dismissal of Counts: Newly Discovered Evidence from a Brady

Violation was mailed, postage prepaid, this 28th day of September, 2004, to the offices of:

Amy Jeffress, Esq.
Assistant U.S. Attorneys
555 Fourth Street, N.W.
Third Floor
Washington, D.C. 20530.

Barry Coburn, Esq.
Coburn & Schertler
1150 18th Street, N.W.
Suite 850
Washington, D.C. 20036
(Counsel for Rodney Moore)

Steve J. McCool, Esq.
Mallon & McCool, LLC
1776 K Street, N.W.
Suite 300
Washington, D.,C. 20036
(Counsel for Rodney Moore)

G. Godwin Oyewole, Esq.
601 Pennsylvania Avenue, N.W.
Ninth Floor
Washington, D.C. 20004
(Counsel for John Raynor)

Tom Saunders, Esq.
10 N. Calvert Street
Suite 715
Baltimore, MD 21202-1882
(Counsel for John Raynor)

-19-

John Carney, Esq.
Carney & Carney
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C. 20004
(Counsel for Calvin Smith)

Joseph E. Beshouri, Esq.
419 Seventh Street, N.W.
Suite 201
Washington, D.C. 20004
(Counsel for Kenneth Simmons)

Lexi Negin Christ, Esq.
419 Seventh Street, N.W.
Suite 201
Washington, D.C. 20004
(Counsel for Kenneth Simmons)

Sabastian K.D. Graber, Esq.
P.O. Drawer 189
Wolftown, VA 22748
(Counsel for Larry Wilkerson)

Christopher Leibig, Esq.
Leibig, Mosely & Dillard, P.C.
209 Commerce Street, 2nd Flr
Alexandria, VA 22314
(Counsel for Larry Wilkerson)

Michael Lasley, Esq.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(Counsel for Timothy Handy)

Adgie O'Bryant, Esq.
1107 Seventh Street, N.W.
Washington, D.C. 20001-3609
(Counsel for Timothy Handy)

John K. Zwerling, Esq.
Law Offices of John K. Zwerling
108 N. Alfred Street
Alexandria, Virginia 22314
(Counsel for Lionel Nunn)

David Carey Woll, Esq.
Woll & Woll, P.A.
11501 Georgia Avenue
Suite 201
Wheaton, MD 20902
(Counsel for James Alfred)

Matthew Wartel, Esq.
Bynum & Jenkins, PLLC
300 N. Lee Street
Suite 475
Alexandria, VA 22314
(Counsel for Ronald Alfred)

Idus J. Daniel, Jr., Esq.
Daniel & Jamison, LLP
639 I Street, N.E.
Washington, D.C. 20002
(Counsel for Ronald Alfred)

Manuel J. Retureta, Esq.
601 Pennsylvania Avenue, N.W.
Suite 900
South Building, PMB-256
Washington, D.C. 20004
(Counsel for Franklin Seegars)

Jon W. Norris, Esq.
641 Indiana Avenue, N.W.
        Second Floor
Washington, D.C. 20004
(Counsel for Franklin Seegars)

Kenneth D. Auerbach, Esq.
Metropolitan Building
Suite 704
8720 Georgia Avenue
Silver Spring, MD 20910
(Counsel for Deon Oliver)

Joseph J. Bernard, Esq.
5425 Connecticut Ave.,N.W.
Suite 318
Washington, D.C. 20015
(Counsel for Deon Oliver)

Frances D'Antuono, Esq.
218 Seventh Street, S.E.
Washington, D.C. 20003
(Counsel for Keith McGill)

Francis D. Carter, Esq.

LAW OFFICE OF
**FRANCIS D. CARTER**
1730 RHODE ISLAND AVENUE, N.W.
SUITE 717
WASHINGTON, D.C. 20036

Telephone: (202) 393-4330

Fax: (202) 393-5657

November 22, 2000

Timothy Heaphy, Esq.
Assistant U.S. Attorney
555 Fourth Street, N.W.
Tenth Floor
Washington, D.C. 20001

**FILED**

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Re: <u>United States v. Kevin Gray</u>

Dear Tim:

Defendant Kevin Gray (the "defendant") hereby formalizes the request for discovery and inspection pursuant to Rule 16, Fed.R.Crim.P., the Fifth and Sixth Amendments to the Constitution, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giles v. Maryland</u>, 386 U.S. 66 (1967), <u>United States v. Agurs</u>, 427 U.S. 97 (1976), and Rule 304 of the Criminal Rules for the District of Columbia.

The materials described below are to be furnished promptly so that defendant can file appropriate motions with the Court as soon as possible. If you do not intend to make available any of the requested materials, you need to advise me immediately so that we can discuss your intended production and, if necessary, seek a ruling from the Court.

As you know, the government is to preserve and maintain all relevant notes, reports and recordings prepared by or for the government agents or prosecutors, as well as any document, paper, tangible object, tape recording or other potential item of evidence which is now or may hereafter come within the government's possession, the production of which is requested in this letter.

The term "government" as used in these requests includes, in addition to the Office of the United States Attorney (the "USAO"), all branches, departments and agencies of the United States Government, including but not limited to the United States Department of Justice, the United States Attorney's Office for all districts, the Federal Bureau of Investigation, the Internal Revenue Service, and the Drug Enforcement Administration, among others. Thus, if information or documents covered by these requests is not in the possession of the USAO, but is otherwise in the possession of the government, these request call upon the USAO to obtain and produce such information or documents. <u>See United States v. Poindexter</u>, 727 F.Supp. 1470, 1478 (D.D.C. 1989).

U.S. v. KEVIN L. GRAY
Cr. No. 00-157(01);Exhibit A

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 2

## Discovery and Inspection

Defendant hereby requests the USAO to provide the following:

1.    Any written or recorded statements by defendant, or copies thereof.    Fed. R. Crim.P. 16(a)(1)(A).    This request encompasses statements made by defendant to third parties, who then made a statement to the government in which the defendant's remarks were repeated or reported.    See, United States v. Thevis, 84 F.D.R.47, 55 (N.D. Ga. 1979).    This request also encompasses any statements made by any agent of defendant to government officers or attorneys that the government considers to be statements made by defendant.

2.    The substance of any oral statements which the government intends to offer in evidence at trial which were made by defendant, whether before or after the indictment, in response to interrogation by any person then known to be a government agent or representative of the government.    Fed.R.Crim.P. 16(a)(1)(A).

3.    The identity of the agents, representatives or prosecutors present at the time any oral statements referred to in Request No. 2 was made.

4.    All books, papers, documents, photographs, audio or video recordings or other tangible objects, or copies or portions thereof (hereinafter referred to as "documents"), which were obtained from or belong to defendant.    Fed.Crim.P. 16(a)(1)(C).    This request includes any documents that were obtained from or were the property of any employee, agent, or professional consultant (e.g., attorney, tax preparer, accountant, auditor) of defendant.

5.    All documents which the government intends to use at trial as evidence in its case in chief.    Fed.R.Crim.P. 16(a)(1)(C). This includes not only those items which will be marked and offered into evidence, but all of those documents that will be relied on or referred to in any way by any witness called by the government during its case in chief.    United States v. Turkish 458 F.Supp 874, 882 (S.D.N.Y. 1978).

6.    All documents which are materials to the preparation of the defense, Fed.R.Crim.P. 16(a)(1)(C).    The requested documents will play a significant role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, and formulating impeachment and rebuttal.    See, e.g., United States v. Felt, 491 F.Supp. 179, 186 (D.D.C. 1979), United States v. Secord, 726 F. Supp. 845, 850 (D.D.C. 1989).    These documents include but

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 3

are not limited to:

      a.    Copies of all documents referred to, directly or indirectly, in the indictment.

      b.    All documents containing or reflecting statements of any kind that were signed or made, or were purported to have been signed or made, by defendant.

      c.    All documents prepared in connection with any statement or representation which the government will contend at trial was false or fraudulent as alleged in the indictment.

      d.    Each and every document related to the defendant, or to any entity related to the defendant, which the government contends contains false or misleading statements or misrepresentations.

      e.    Any and all checks or other evidence of payments, benefits, or things of value alleged to have been offered to or received by defendant in connection with any activities of the defendant, as alleged or otherwise referenced in the indictment.

      f.    Any correspondence, memoranda, notes papers or other documents alleged to have been made, reviewed or received by defendant, by any entity related to the defendant, or by any other person, entity, government official, agent or agency in connection with any activities of the defendant, as alleged or referenced in the indictments.

      g.    Any correspondence, telephone logs, messages sheets, memorandum, diaries, calendars, transcripts, tape recordings, video cassettes or the like which reflects meetings or conversations alleged to have occurred in connection with or furtherance of any activities of the defendant, as alleged or referenced in the indictment.

      h.    All correspondence, memoranda, or other documents prepared by or for the government, including any agents, officials or employees of the government, which relate to the truthfulness or accuracy of any statements or representations made by the defendant to the government.

      i.    All documents which evidence any of the false or fraudulent statements or representatives alleged or referenced in the indictment.

      7.    Pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and



Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 4

its progeny, including <u>United States v. Argurs</u>, 427 U.S. 97 (1976), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), all exculpatory or impeachment material in the government's possession, custody, or control, or otherwise known to the government, including without limitations:

        a.    Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including but not limited to relevant "rap sheets," of each witness the government intends to call at trial.

        b.    Any and all records and information evidencing prior or subsequent criminal acts, bad acts, or possible misconduct of any witness the government intends to call at trial.  This request encompasses any alleged by others of criminals acts, bad acts, or possible misconduct of government witnesses.

        c.    Any  and  all  consideration  or  promises  of consideration given by any law enforcement officials, including prosecutors  or  agents,  police,  informers,  or  by  any  other government official, representative or agent, to or on behalf of any witness the government intends to call at trial, or to any member  of  the  immediate  family  of  any  such  witness.    Such "considerations" refer to anything which arguably could be of value or use to a witness, including but not limited to formal or informal, direct or indirect, leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative or other matter involving the state or federal government, any authority, or other parties, including the conditions of confinement or incarceration; civil, criminal, or tax immunity grants; relief for forfeiture, payment of money, reward or fees, witness fees and special witness fees, provisions of food, clothing,  transportation,  legal  services  or  other  benefits; placement in a "witness protection" program, letters to anyone informing the recipient of the witness' cooperation or informer status;  recommendations  concerning  licensing,  certification  or registration; promises to take affirmative action to help the status of the witness in a professional, business or employment, or promises not to jeopardize such status; aid or efforts in securing or maintaining the business or employment of a witness, or promises not to jeopardize such status; and anything else which arguably could reveal an interest, motive or bias in the witness favor of the prosecution or against the defendant or act as an inducement to testify or to color the testimony.

        d.    Copies  of  all  documents,  statements,  and  other evidence, including but not limited to written summary of any oral

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 5

evidence and statements, now in possession of the government or
which may become known to the government, or which through due
diligence may be learned by the government, which is exculpatory in
nature or favorable to defendant or which may lead to material
which exculpatory in nature or favorable to defendant, or which
tends to negate or mitigate the guilt of defendant, as to the
offenses charged, or which would tend to reduce the punishment
thereof.    Include the names, addresses, and telephone numbers of
any persons who know or may know of any such favorable or
exculpatory material or who may lead to persons or material which
may be favorable or exculpatory.    Also include any written or
recorded statements or the substance or oral statements by any
person which are inconsistent with testimony or expected testimony
any government witness will give at trial an any other evidence
which otherwise reflects upon the credibility, competency, bias or
motive or may otherwise tend to impeach any of the government's
witnesses.

        e.    With respect to each witness the government intends
to call at trial, or any member of the immediate family of such
witness, copies of any indictments, complaints or information
brought against such person by the federal, or any state or local
government,    any    disciplinary,    licensing,    tax,    customs,    or
immigration proceeding brought by the federal, or any state or
local government, and set forth what counts or actions have been
the    subject    of    guilty    pleas,    convictions,    dismissals,    or
understandings to dismiss at a future date; the date or dates on
which pleas of guilty, if any, took place; and the names of the
judges, or hearing officers before whom such pleas were taken.    If
the government does not have copies of all indictments, complaints,
or proceedings, state the dates and places of arrests, hearings,
indictments,    and    information,    the    charges    brought,    and    the
disposition of those charges or matters so far as it is known to
the government.

        f.    With respect to each witness the government intends
to call at trial, or any member of the immediate family of such
witness, a written summary of any charges or tax proceeding which
could be brought by the federal, or any state or local government,
but which have not or will not be brought because the witness is
cooperating with or has cooperated with the government, or for any
other reason.    Include copies of any memoranda of understanding
between the government and its witnesses, whether by way of a
letter to the attorney for a witness or otherwise.

        g.    Any material not otherwise listed which reflects or
evidences the motivation cf any witness the government intends to
call at trial either to cooperate with the government or to express

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 6


any bias or hostility against defendant.

      h.   The existence and identification of each occasion on which a witness the government intends to all at trial has testified before any court, grand jury, or other tribunal or body, or has officially narrated in relation to defendant or to the investigation of or facts related to this case.

      i.   A list of all judicial proceeding any criminal cases involving (as a witness, indicted co-conspirator, aider or abettor, or defendant) any person who is potential prosecution witness at the trial in this action.

      j.   Any statement or document, including but not limited to grand jury testimony and federal, state and local tax returns, made or executed by any potential government witness at the trial in this action, which the government knows, or through reasonable diligence should have reason to know, is false.

      k.   A copy of any medical and psychiatric report known to the government or which reasonably can be known to the government concerning any witness the government intends to call at trial which may arguably affect the witness' credibility, ability to perceive or relate or recall events.

      l.   Any documents and other evidence regarding drug and alcohol usage and/or dependency by any individual the government intends to use as a witness at trail such as records relating to treatment of such individual in any federal, state or military drug or detoxification program.

      m.   Any written or oral statement, whether or not reduced to writing, made by any potential government witness, which in any way contradicts or is inconsistent with or different from other oral or written statements he had made.

      n.   Any written or oral statement, whether or not reduced to writing, made by any potential government witness or not, which in any way contradicts or is inconsistent with or different from other oral or written statements made by a government witness.

      o.   Any failure by a potential witness to at any time recall a meeting, conservation or telephone communication with defendant regarding any matter alleged in this indictment or any matter as to which said potential witness may testify (notwithstanding that said failed recollection may subsequently have been refreshed either in whole or in part).

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 7

        p.   Any respect prepared by the prosecution or by any other government official or agent for permission to grant immunity or leniency for any witness, whether or not such request was granted.

        q.   Any and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the government's evidence.

        r.   Any exculpatory information given before the grand jury.

        s.   The same records and information requested in items (a) through (r) with respect to each non-witness declarant whose statements are offered in evidence.

        t.   The names and addresses of any persons whom the prosecution, its agents or representatives believe to have relevant knowledge and/or information with reference to the charges contained in the indictment but whom the prosecution does not propose to call as witnesses at trail.

    8.   A list of any documents used, obtained or written in connection with the investigation of this matter that the government destroyed, for whatever reason, including but not limited to rough notes or interviews, reports, memoranda, subpoenaed documents, and other documents.

    9.   As a predicate to motions pursuant to Rule 12, Federal Rules Of Criminal Procedure, whether any Title III interception occurred in this case, and whether or not any leads were derived from Title III interceptions, we also request all relevant applications for court orders pertaining to electronic or video or telescopically enhanced surveillance or "pen register" operations, or to the affixing of any instrument to record the telephone number of any incoming or outgoing calls in connection with this case. We also request all court orders, interim reports by the government to the court, logs, tapes, transcripts, applications for or orders extending dates for notification of such surveillance, all papers submitted to the court concerning sealing of surveillance tapes or records. If surveillance was accomplished without court order, so state, including dates, times, places, etc. of such surveillance. We also request all tapes and transcriptions of all tapes of any and all one-party "consent" aural acquisitions related to this case.

    10.  Pursuant to 12 U.S.C. 3401 _et seq._, all documents and

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 8

records obtained from financial institutions.

11.  As a predicate to Rule 41 motions:

a.   Any and all forms, affidavits, or other documents
which purport to grant consent to search any individual, person or
premises which relate in any manner to this case and which are in
the possession, custody or control of the government, the existence
of which is known or through the exercise of due diligence may
become known to the government.

b.   Whether any of the government's evidence relevant to
the investigation, indictment or prosecution of defendant was
obtained by a search and seizure of any person or place, with or
without prior judicial authorization, and a description of all such
evidence.

c.   Whether any of the government's evidence relevant to
the investigation, indictment or prosecution of defendant was
obtained through the use of a beeper or other tracking device or a
mail cover and a description of all such evidence.

12.  Any and all photographs which were made in conjunction
with case or which relate in any manner to this case which are in
the possession, custody or control of the government.

13.  As a predicate to other pre-trial motions:

a.   Whether any persons were present during grand jury
proceedings other than the grand jurors, witnesses, court
reporters, Assistant United States Attorneys, and Special
Attorneys, including attorneys in the Department of Justice or
States Attorneys or States Attorney General Offices.

b.   Whether any grand jury materials, including grand
jury transcripts or any documents or information produced to the
grand jury, were disclosed or released to any person other that the
grand jurors, witnesses, court reporters, Assistant United States
Attorneys, and Special Attorneys, including attorneys in the
Department of Justice or States Attorneys or States Attorney
General Offices.

c.   The impanelment and adjournment dates of the grand
jury that heard evidence concerning this case.

d.   The instructions provided to the grand jury before
the indictment was returned.

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 9

   e. The record (*i.e.*, transcript) of return of the indictment.

   f. The time and date of return of the indictment and the number of grand jurors present.

   g. The dates that those members of the grand jury were present during the presentation of evidence and the dates on which those grand jurors were not present during the presentation of evidence.

   h. Whether the USAO received any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury, from grand juries other than the grand jury that returned this indictment; and if so, copies of any orders authorizing such disclosure.

 14. Pursuant to Rule 1006, Fed.R.Evid., whether the government will seek to offer any chart, summary, or calculation in evidence, and production of any such chart, summary, or calculation, as well as all writings, recordings, photographs, or other information on which such charts, summaries, or calculations are based.

 15. Pursuant to the provisions of Fed.R.Evid. 104, Fed.R.Crim.P. 12(d) and defendant's right to effective representation by counsel and a fair trial, disclosure of (i) any evidence which may be discoverable under Fed.R.Crim.P. 16, and (ii) whether the government intends which may be discoverable under Fed.R.Crim.P. 16, and (ii) whether the government the government intends to offer in its case as a statement by defendant any of the following:

   a. Any statement as to which defendant manifests his adoption or belief in its truths, Fed.R.Evid. 801 (d)(2)(B).

   b. Any statement made by another person which was purportedly authorized by defendant, or is deemed to be an admission of defendant, Fed.R.Evid. 801(d)(2)(C).

   c. Any statement by an agent or servant of defendant concerning a matter within the scope of his/her agency or employment made during the existence of such a relationship, Fed.R.Evid. 801(d)(2)(D).

   d. Any statement by another person which the government will seek to attribute to defendant as a statement by a coconspirator. Fed.R.Evid. 801(d)(2)(E); United States v. Madeoy,

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 10

652 F.Supp. 371, 375 (D.D.C. 1987); <u>United States v. Knoefal</u>, 566
F.Supp. 698, 707 (N.D.N.Y. 1983).

       e.   Pursuant to the Fifth and Sixth Amendments to the
United States Constitution, Fed.R.Crim.P. 16(a)(1)(C), the Rules
403 and 404(b), Fed.R.Evid., disclosure of all evidence of other or
similar crimes, wrongs, or acts allegedly committed by defendant,
upon which the government intends to rely to prove motive, scheme,
opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident.

    16.  A list of the names and addresses of all witnesses that
the government intends to call in its case in chief.  There are no
allegations of threats or violence in this case by defendant.  The
witnesses are, therefore, in no danger or jeopardy.  In addition,
given the volume of records that must be reviewed in order to
properly prepare for the examination of each witness the government
may call in this case, a list of prospective  witnesses is vital to
the defendant's ability to prepare his defense adequately and to
the expeditious and orderly conduct of the trial.  Accordingly, a
witness list if appropriate in this case.  <u>United State v. Cannone</u>,
528 F. 2d. 296 (2d Cir. 1975); <u>United States v. Madeoy</u>, 652 F.Supp.
371, 375-76 (D.D.C. 1987); and <u>United v. Poindexter</u>, 727 F.Supp.
1470, 1483 (D.D.C. 1989).  The government is specifically requested
to disclose  the name and address of any witness from whom the
government will seek to elicit "expert" testimony within the
meaning of the Federal Rules of Evidence, including any reports,
studies or other data upon which such expert is expected to rely.

    17.  Disclosure at this time of all statements or reports in
the government's possession made by government witnesses or
prospective government witnesses, pursuant to 18 U.S.C. § 3500
(Jencks Act) and Rule 26.2, Fed.R.Crim.P.  <u>United States v.
Percevault</u>, 490 F.2d 126, 132 (2d. Cir.1974); <u>United States v.
Poindexter</u>, 727 F.Supp. 1470 (D.D.C. 1989).

    18.  Copies of any charts, summaries, releases, transcripts
(or tapes)of the proceedings or documents distributed to or
displayed before the press corp on Friday, November 17, 2000, when
the United States Attorney for the District of Columbia, and others
held a press conference in this case to announce the superceding
indictment.

    Each of these requests is of a continuing nature and calls for
supplementation of any answer as soon as the government discovers
additional responsive evidence, information or material.  In
addition, each request in each paragraph of this letter is
specifically sought under the authority of <u>Brady v. Maryland</u>,

Letter to Timothy Heaphy, Esq.
Assistant U.S. Attorney
November 22, 2000
Page 11

<u>supra</u>, and its progeny, as well as applicable rules of discovery.

I trust it is your general agreement that <u>Brady</u> material is to be made available to the accused when and as it becomes evident to the government that information or material in its possession falls within the ambit of the rule. <u>See</u>, <u>United States v. Feola</u>, 651 F.Supp. 1068, 1136 (S.D.N.Y. 1987). If I am in any respect mischaracterizing USAO's position in this regard, and the government harbors any notions that production of <u>Brady</u> can be delayed to trial or to a point closer to trial, please advise me immediately so that we can discuss the issue and, if necessary, the time for disclosure can be resolved by the Court.

I, of course, reserve the right to supplement these requests in the future as necessary and appropriate.

In closing, let me make it clear that the purpose of this letter is to obtain some refinement of your production, since a "scavenger hunt" approach through mounds of documents serves no legitimate interest, but is simply calculated to drag out this prosecution interminably -- and unnecessarily. I am more than ready to work with the USAO on a meaningful course of discovery calculated to produce promptly the materials identified in this request. Hopefully, we can arrive at a more acceptable understanding of your production responsibilities in this regard with guidance and assistance from the Court.

Very truly yours,

Francis D. Carter, Esq.

LAW OFFICE OF
**FRANCIS D. CARTER**
1730 RHODE ISLAND AVENUE, N.W.
SUITE 717
WASHINGTON, D.C. 20036

Telephone: (202) 393-4330                                    Fax (202) 393-5657

FILED

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

December 29, 2000

Timothy Heaphy, Esq.
Assistant U.S. Attorney
555 Fourth Street, N.W.          **BY FACSIMILE AND**
Tenth Floor                      **REGULAR MAIL**
Washington, D.C. 20001

                    Re: U.S. v. Kevin Gray

Dear Tim:

    On Friday, December 22, 2000, I received some discovery
material which relates to the Superceding Indictment which the
Grand Jury returned on November 17.

    Regardless, I have not received your responses to my discovery
letter of November 22, 2000. If you need another copy of that
correspondence, please let me know. You said that you intended in
January, 2001, to take this matter to the U.S. Attorney for
consideration under the U.S. Attorney General's Protocols for death
eligible cases. I cannot be close to ready for such a presentation
without the information I seek well in advance of such a meeting to
allow me to prepare our presentation to the U.S. Attorney.

    As you are no doubt aware, the defense must make specific
requests for discoverable information in order to later seek
enforcement from the Court. Thus, I wrote the letter of November
22, 2000. It is completely insufficient to for you to reply that I
have a bunch of stuff or that what I seek may be found somewhere in
the piles of papers I may, or may not, have received. You must
respond specifically to our specific questions.

    I await your response.

                              Very truly yours,

                              Francis D. Carter, Esq.

┌─────────────────────────────────────┐
│     U.S. v. KEVIN L. GRAY           │
│  Cr. No. 00-157(01);Exhibit B       │
└─────────────────────────────────────┘



U.S. Department of Justice

United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20001*

**FILED**

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

January 11, 2000

Francis D. Carter, Esq.
1730 Rhode Island Avenue, N.W.
Suite 717
Washington, DC 20036

Re: <u>United States v. Kevin Gray, Crim. No. 00-157-1 (RCL)</u>

**By Fax and First Class Mail**

Dear Mr. Carter,

We are in receipt of your November 22 and December 29, 2000 letters requesting additional discovery materials in the case pending against your client, Kevin Gray.

You indicated in your most recent letter that you have received the discovery material which relates to the superseding indictment returned against your client in November of 2000. I understand that you have also obtained discovery material which was previously produced to your predecessor counsel, Maria Mendoza, Esq., and Jeffrey O'Toole, Esq. We have now produced over 4000 pages of documents and numerous audiotapes, all of which relates to the specific charges in the indictment pending against your client.

We assume that you are in possession of all of the material which has been produced in discovery thus far. If you do not share that belief, please let us know. In those various discovery productions, we believe we have produced much of what you specifically request in your November 22, 2000 letter, if such information exists at all.

There are several items which you have requested which we have not yet produced, but which will be forthcoming. We are not prepared to produce certain other materials which you have requested. We have endeavored to put forth our position on those specific discovery requests in this letter.

I.    <u>Defendant's Statements</u>

You have requested all "written or recorded statements" by your client, subject to Fed. R. Crim. P. 16(a)(1)(A). Letter of November 22, 2000 at 2 (hereinafter "Letter"). You have also requested the substance of oral statements in response to interrogation by law enforcement, as

well as the identity of law enforcement personnel to whom those statements were made. Id. We have produced all such information in the prior discovery productions in this case. We are unaware of any additional recorded or oral statements by your client to law enforcement.

You have also requested "statements made by defendant to third parties, who then made a statement to the government in which the defendant's remarks were repeated or reported." Letter at 2. We will not produce statements your client made to third parties, as such production would endanger those third parties and other potential witnesses in this case. Production of statements made by your client to third parties would amount to production of a de facto witness list - something which you formally requested in your letter (p. 10). We are not required to produce a list of witnesses and will not this far in advance of trial. Weatherford v. Bursey, 429 U.S. 545, 559 (1977). We will also not honor your request for "any statement by another person which the government will seek to attribute to defendant as a statement by a coconspirator," Letter at 9, as production of such statements would similarly compromise witness security. United States v. Davis, 90 F.3d 490, (D.C. Cir. 1996), cert. denied, 519 U.S. 1128 (1997); United States v. Roberts, 811 F.2d 257, 258-259 (4th Cir. 1987) (en banc).

II.    Documentary and Physical Evidence

You have requested all "documents, photographs, audio and video recordings, or other tangible objects" which were obtained from or belong to your client. Letter at 2. You have further requested production of all documents which we intend to use in our case in chief, as well as "all photographs which were made in conjunction with case or which relate in any manner to this case . . . ." Letter at 2, 8. We have produced many such documents, including detailed information about vehicles and other various items of personal property which were seized from your client and his co-conspirators. We will soon produce a large number of photographs, which will include photographs of items seized from your client, as well as photographs taken during the execution of numerous search warrants and at the scenes of all of the homicides charged in the indictment.

We have not yet produced copies of certain financial records, telephone records, and other documents which were obtained pursuant to grand jury subpoenas and which we may offer as evidence at trial. We continue to gather and evaluate such documents, as the investigation of the activities of the charged conspiracy continues. We have not yet made specific determinations as to which of those documents will be offered as evidence at trial. As those determinations are made, we will produce such documents to you. Such production will be well in advance of trial.

III.    Brady/Giglio Information

You have requested production of all "exculpatory and impeachment material," citing Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). Letter at 3-4. You specifically request information regarding prior criminal records and other bad acts of individuals who may be called as witnesses against your client, as well as information

2

about benefits conferred upon such individuals. Letter at 4. You have also requested information about prior testimony, false or inconsistent statements, medical history and drug usage of such individuals. Letter at 4-6. In addition to the names of potential government witnesses, you have requested the names of individuals whom we do not intend to call at trial. Letter at 7.

We are mindful of our obligation to produce <u>Brady</u> information. We have already produced information which could be classified as exculpatory, relative to some of the specific charges in the indictment. We understand that our duty to disclose <u>Brady</u> information is continuing, and that we must produce such information when we become aware of it. We believe we have satisfied our obligation to produce <u>Brady</u> information, and we will endeavor to continue to produce such information as it comes to our attention.

We are also aware of our obligation to produce <u>Giglio</u> information. We will produce information about benefits conferred upon witnesses before those witnesses testify at trial. We will not, however, disclose that information this far in advance of trial. Production of <u>Giglio</u> information at this stage would, of course, identify those witnesses. As discussed above, we believe strongly that premature identification of potential witnesses would compromise the safety of those witnesses. The relevance of information about benefits conferred upon witnesses is the impact such information may have upon a jury's evaluation of the witness' credibility. <u>Giglio</u>, 405 U.S. at 155. The United States will comply with its <u>Giglio</u> obligations and disclose such information when the trial of this matter commences - in enough time for counsel's use of such information for the purpose identified by the Supreme Court.

We will not produce the names of all individuals who we have contacted during the lengthy investigation of your client's criminal activity, but whom we do not intend to call as trial witnesses. Rule 16 does not require the production of such information. The only basis for production of the names and statements of witnesses who will not testify at trial is that created by <u>Brady v. Maryland</u>. We have already disclosed the names and statements of certain individuals who provided information which is inconsistent with other evidence we will offer at trial. We will not produce the names or statements of witnesses who we do not intend to call at trial but who have not provided <u>Brady</u> information. <u>United States v. Williams-Davis</u>, 90 F.3d 490, 512-514 (D.C. Cir. 1996), <u>cert</u>. <u>denied</u>, 519 U.S. 1128 (1997).

Finally, you have requested pretrial disclosure of Jencks information. Letter at 10. We will, of course, comply with our obligation to produce prior statements of witnesses at the time of their direct testimony in the ultimate trial of this matter. 18 U.S.C. § 3500(a). For the reasons stated above, however, we will not produce Jencks information this far in advance of trial. <u>See</u> <u>Davis</u>, 90 F.3d at 513; <u>United States v. Tarantino</u>, 846 F.2d 1384, 1414 (D.C. Cir. 1988) ("Federal Rule of Criminal Procedure 16(a)(2) prohibits discovery of statements by government witnesses or prospective witnesses except as provided in the Jencks Act, 18 U.S.C. § 3500").

3

IV.   Title III Information and Surveillance Audio and Videotapes

You have requested information about "any Title III interception [which] occurred in this case." Letter at 7. As you are undoubtedly aware, there were two court-authorized interceptions from which we may seek to introduce evidence at trial. We have produced tapes of all of the conversations intercepted pursuant to the court-authorized wiretap of your client's cellular telephone in May and June of 1999. We have also produced approximately 3000 conversations intercepted pursuant to the second wiretap in April, May and June of 1999, some of which involve your client. We have also produced all of the documents which led to judicial authorization of both of those wiretaps.

You have requested "interim reports by the government" regarding Title III interceptions. Letter at 7. We will not produce those interim reports, as they are merely summaries of the tapes, daily logs, and other material otherwise produced. We do not believe that the periodic reports are necessary in order for you to evaluate our compliance with the statutory requirements of 18 U.S.C. § 2510, et seq. See United States v. Crozzoli, 698, F. Supp. 430, 438 (E.D.N.Y. 1988), United States v. Orozco, et al., 108 F.R.D. 313, 315, aff'd 630 F.Supp. 1418, 1538 (S.D.Cal. 1986).

You have requested information concerning "one-party 'consent' aural acquisitions." Letter at 7. Such "acquisitions" do exist, and they will be produced as soon as they are gathered. We will also produce all audio and video recordings which we intend to use at trial, including several consensually monitored telephone conversations and conversations recorded by individuals wearing recording equipment on their person during various events and conversations.

V.   Grand Jury Information

You have requested information regarding matters occurring before the grand jury which returned the indictment now pending against your client. Specifically, you have asked whether any persons were present during grand jury proceedings other than those authorized by statute. Letter at 8. You have asked whether any grand jury materials were disclosed to individuals not authorized by statute. Id. You have also asked "whether the USAO received any grand jury materials . . . from grand juries other than the grand jury that returned this indictment." Letter at 9. The answer to each of those specific questions is no. No persons were present for any grand jury proceeding besides AUSAs, witnesses, court reporters, or grand jurors. No grand jury material was disclosed to third parties to whom such disclosure is not permitted by law.

You have also asked for information regarding "the impanelment and adjournment dates" of the grand jury, "instructions provided to the grand jury before the indictment was returned," a transcript of "the return of the indictment," the time, date and number of grand jurors present for that return, specific information about dates of attendance of the various grand jurors. Letter at 9. We will not disclose that information, because we believe such disclosure without court authorization would violate Fed. R. Crim. P. 6(e).

4



## VI.   Summary Charts

You have requested the production of "any chart, summary, or calculation in evidence."
Letter at 9. We do anticipate the preparation and use of summary charts, and we have produced
some of such material. We expect to prepare additional summary charts for use at trial. We will
disclose to you well in advance of trial any summary charts or related materials which we intend
to use at trial.

## VII.   Other Crimes Evidence

You have requested production of information which we will offer as other crimes
evidence, pursuant to Fed. R. Evid. 404 (b). We have already produced discovery material
regarding uncharged criminal acts about which we will seek to introduce evidence at trial. Should
other such uncharged acts come to our attention, we will produce similar information regarding
those acts. We are aware that Rule 404(b) requires advance notice to you of our intent to use
evidence of uncharged criminal acts, and we do anticipate filing such a notice in this case. That
notice will, of course, include details of the specific uncharged criminal acts about which we will
attempt to offer evidence.

## VIII.   Expert Witnesses

You have requested the production of "the name and address of any witness from whom
the government will seek to elicit 'expert' testimony . . . , including any reports, studies, or other
data upon which such expert is expected to rely." Letter at 10. We have already produced some
reports and other material produced by experts, and we anticipate the preparation and production
of additional such material. We will comply fully with the requirements of Fed. R. Crim. P
16(a)(1)(E), which defines our disclosure requirements with regard to expert witnesses.

## IX.   Information Released to Media

You have requested copies of "any charts, summaries, releases, transcripts (or tapes) of
the proceedings or documents distributed to or displayed before the press corp on Friday,
November 17, 2000, when the United States Attorney . . . held a press conference in this case to
announce the superseding indictment." Letter at 10. We are producing copies of the material
distributed or displayed during the press conference with this letter.

We believe that we have responded to all of your specific requests, either in one of our discovery productions or in this letter. If you do not believe that we have so responded, please let us know. We share your desire to achieve a "meaningful course of discovery," and we are hopeful that we can achieve that goal without involving the Court. Please contact either of us if you want to discuss discovery or any other matter relating to the case against your client.

Sincerely,

Timothy J. Heaphy
Assistant United States Attorney

Matthew G. Olsen
Assistant United States Attorney

Attachments

6



**U.S. Department of Justice**

United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

March 4, 2002

**FILED**

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Barry Coburn, Esq.
Coburn & Schertler
1150 18th Street, NW
Suite 850
Washington, DC 20036

Re:  <u>United States v. Rodney Moore</u>, Crim. No. 00-157 (RCL)

Dear Mr. Coburn:

In the course of preparing for the upcoming trial of this matter, we have obtained some information which we are disclosing to you pursuant to our obligation under <u>Brady v. Maryland</u>. In connection with the murder of Marvin Goodman, a witness named Thomas Sims told law enforcement agents that he saw Kevin Gray, Jermaine Vick, and Larry Wilkerson drive up to him and Marvin Goodman.   After Gray told Goodman to get in the car, Goodman got in and Sims saw them drove into an alley from which Sims heard gunshots several minutes later.  Thomas Sims is currently at CTF and is represented by William Brennan (tel. 301-952-0100).

If you have any questions about this matter, please contact any one of us.

Sincerely,

*Tim H——/DAJ*

Timothy J. Heaphy
Assistant United States Attorney

*Matt Olm / DAJ*

Matthew G. Olsen
Assistant United States Attorney

*Amy Jff*

Amy Jeffress
Assistant United States Attorney

cc:  Francis D. Carter
     Sebastian Graber

```
  U.S. v. KEVIN L. GRAY
Cr. No. 00-157(01);Exhibit D
```

United States of America v.                          CR 00-157                     August 30, 2004
Larry Wilkerson                                      Gray III                      Volume 24

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
 3    UNITED STATES OF AMERICA          .
                        Plaintiff,      .
 4                                      . Docket No. CR-00-157-15
                                        .
 5    LARRY WILKERSON,                  . Washington, D.C.
                                        . August 30, 2004
 6
                        Defendant.      .
 7    . . . . . . . . . . . . . . .
                    Day 24 - AM SESSION
 8                 TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE CHIEF JUDGE THOMAS HOGAN
 9              UNITED STATES DISTRICT JUDGE
10    APPEARANCES:
11    For the Government:   United States Attorney's Office
                            Glenn L. Kirschner, Esquire
12                          Rachel Carlson-Lieber, Esquire
                            555 4th Street, Northwest
13                          Washington, D.C. 20001
                            202.928.2029
14
      For the Defendants:   Sebastian K.D. Graber, Esquire
15                          Post Office Drawer 189
                            Wolftown, Virginia 22748
16                          540.948.5503
17                          Leibig, Moseley & Bannett
                            Christopher Leibig, Esquire
18                          Andrea Moseley, Esquire
                            108 North Alfred Street, #101
19                          Alexandria, Virginia 22314
                            703.683.4310
20
      Court Reporter:   Cathryn J. Jones, RPR
21                       Official Court Reporter
                         Room 4808A, US District Court
22                       333 Constitution Ave., NW
                         Washington, D.C. 20001
23
24    Proceedings recorded by machine shorthand, transcript
      produced by computer-aided transcription.
25
```

FILED

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States of America v.　　　　　　CR 00-157　　　　　　August 30, 2004
Larry Wilkerson　　　　　　　　　　　Gray III　　　　　　　　　　Volume 24

Page 54

1  releasing the writ is for me to provide a letter to
2  the marshal service. I'll do that over the lunch
3  hour.
4       THE COURT: All right.
5       [Thereupon, Jury enters courtroom at 11:55
6  a.m.].
7       Thereupon,
8            JAMES SAMUELS
9  having been called as a witness for and on behalf of
10  the Government, Defense, Plaintiff and having been
11  first duly sworn by the Deputy Clerk, was examined and
12  testified, as follows:
13       THE WITNESS: Yes, sir.
14            DIRECT EXAMINATION
15       BY MS. MOSELEY:
16       Q    Sir, will you please state your name and
17  spell your last name for the court reporter?
18       A    James Maurice Samuels, S-A-M-U-E-L-S.
19       Q    Thank you. And where are you currently
20  housed?
21       A    Right now I'm housed at D.C. jail.
22       Q    And just prior to your arrival at the D.C.
23  jail, where were you housed?
24       A    At camp 35 in Troutville, Virginia.
25       Q    When did arrive at the D.C. jail?

Page 55

1       A    Friday evening.
2       Q    This last Friday, just a couple of days
3  ago?
4       A    Yes, about five o'clock.
5       Q    Thank you. Does it concern you that you've
6  been moved to the D.C. jail?
7       A    Does is concern me?
8       Q    Yes?
9       A    To the fullest capacity it concerns me.
10       Q    So are you happy to be here?
11       A    No, I'm not.
12       Q    Why are you not happy to be here?
13       A    Because I don't like that nasty jail. That
14  jail is filthy.
15       Q    Are there some incredible differences
16  between the D.C. jail and the jail that I brought you
17  here from?
18       A    Yes.
19       Q    Are you a lifelong resident of Washington,
20  D.C.?
21       A    Been here all my life.
22       Q    How many years is that, sir.
23       A    I'll be 40 years old on September the 13th.
24       Q    Have you always been a part of the
25  Washington, D.C. area?

Page 56

1       A    Yes, ma'am.
2       Q    What neighborhood are you associated with,
3  what neighborhood did you grow up in?
4       A    I grew up in Ward 6, Ward 8. And for a
5  little while my parents stayed on Capitol Hill.
6       Q    I'm going to show you a photograph, sir,
7  not to display to the jury. It's been previously
8  admitted. Can you tell me if you know that person?
9       A    Yes, I know him very well.
10       Q    Who is that?
11       A    That's Marvin Goodman.
12       Q    And did it come to your attention that he
13  was killed on a particular evening?
14       A    Yes.
15       Q    When was that?
16       A    He was killed on July the 26th, 1992.
17       Q    Do you remember that as you sit here today?
18       A    I remember it clear as day.
19       Q    Sir, how did you know Marvin Goodman?
20       A    Marvin and I, we used to go to the go-gos
21  together back in the '70s, like '76, '77. I've been
22  knowing Marvin a long time.
23       Q    How old was Marvin, if you remember, in
24  relation to you, same age, older, younger?
25       A    He was a little older than I.

Page 57

1       Q    And you said you were 41, sir?
2       A    I'll be 40 this year.
3       Q    You'll be 40 this year. Who was Marvin
4  Goodman?
5       A    He was a friend of mine. I mean I knew
6  him, you know.
7       Q    What was Marvin Goodman like?
8       A    It depends, which Marvin you're talking
9  about because --
10       Q    Tell me about both of them?
11       A    Well, you had the subtle Marvin, I mean
12  nice, cool guy. Then you had the Marvin who smoked
13  PCP that changed on you. He would change.
14       Q    And although you named two different kinds
15  of Marvins, you were always a friend?
16       A    I mean he was Marvin to me. I was used to
17  him. He was Marvin.
18       Q    Where did you see Marvin when you would see
19  him? Can you tell me the neighborhoods?
20       A    Say that again, please?
21       Q    Did you see Marvin in any particular
22  neighborhood?
23       A    I mean I would see Marvin in -- I might see
24  him in Valley Green where he was living. Might see
25  Marvin over Congress Park by the Thunderdorm, by this

United States District Court　　　washcathryn@aol.com　　　Cathryn Jones, RPR
For the District of Columbia　　　　202-289-8333　　　　　Official Court Reporter

United States of America v.                CR 00-157                August 30, 2004
Larry Wilkerson                            Gray III                  Volume 24

---

Page 58

1  young ladies's house named Margaret.
2      Q    All right.  I'm going to ask you about the
3  Thunderdorm here in a minute.  Where else did you see
4  Marvin?
5      A    I would see him sometime -- he did a lot of
6  walking.  Marvin did a lot of walking.  See him on
7  Wheeler Road, you might see Marvin down 51.  Marvin
8  did a lot of walking.
9      Q    Okay.
10         Now, I'm going to show you a photograph, and
11  tell me if you recognize this person?
12     A    Yeah, that's Kevin Gray.  I know him.
13     Q    This has been previously admitted as KG
14  100, displayed to the jury.
15         THE COURT:  All right.
16         BY MS. MOSELEY:
17     Q    Sir, how do you know this individual?
18     A    I know Kevin's great, great -- I know his
19  great uncle Linwood.  I know -- I believe Maypole.  I
20  know Maypole, that's his uncle or his dad, I think.
21     Q    Okay?
22     A    I know Kevin for a long time.
23     Q    Did you tell me you knew the name of this
24  person?  Who is this?
25     A    His name Kevin Gray, that's what I know him

---

Page 59

1  by.
2      Q    Where did you -- where and when -- can you
3  give me a time frame, where and did you used to see
4  Kevin Gray, starting about what year?
5      A    Man, I been seeing Kevin since like '80,
6  something like '79, '80.  I've been seeing him a
7  little while.
8      Q    What neighborhoods would you see him in?
9      A    Robinson Place mostly.
10     Q    Okay.
11     A    Congress Park, see him go through there
12  sometimes.  But his sole area was Robinson Place, 15th
13  Place around about Johnson Junior High School.
14     Q    And describe if there is one, did you have
15  a relationship of any kind with him?
16     A    Hi and bye.  He was cool.  He never
17  threatened me or did anything to him.
18     Q    Were you cool with him as well?
19     A    Yeah, he was all right.  He never did
20  nothing to me.
21     Q    Business associates?
22     A    No, no, no.  No business associates.
23     Q    Thank you.  Sir, will you have a look at
24  that photograph?  Do you recognize who that is?
25     A    No, I don't know that dude.

---

Page 60

1      Q    Have you ever met this person?
2      A    No, I've never met him.
3      Q    I believe this has been previously admitted
4  as LW 100.
5          MS. MOSELEY:  I move the introduction of
6  LW-100-D, LW-100 --
7          MR. KIRSCHNER:  I guess not for this
8  witness, but generally we don't have an opposition to
9  that coming into evidence.
10         THE COURT:  He doesn't recognize him, that's
11  clear.  I'll admitted if there's no objection.
12         BY MS. MOSELEY:
13     Q    I'll ask you, without showing you the
14  picture, do you know who this individual is sitting
15  here with the yellow tie?
16     A    I don't know that dude.  No, I don't.
17     Q    Have you ever seen him before?
18     A    Nah, I never seen him over in Southeast.
19  No, I haven't.
20     Q    And back in the neighborhoods that you
21  described that you were in, did you ever come into
22  contact with this individual?
23     A    No, I never ran across that dude.  I'd be
24  lying if I said I did.
25     Q    Sir, you mentioned an area of Congress

---

Page 61

1  Street and Savannah Street.  I'm going to show you
2  what I'll move in a moment as an exhibit.  Sir, do you
3  recognize that as the rear of 1393 Congress Street, an
4  aerial view?
5      A    Yeah, I recall where that's at.
6      Q    Are you familiar with that neighborhood?
7      A    Yes, ma'am.
8      Q    Does that appear roughly as it would back
9  in 1992?
10     A    Yes, pretty much.  Yeah.
11         MS. MOSELEY:  Your Honor, I move for the
12  admission of the exhibit marked DJS, for James
13  Samuels, dash MG, for Marvin Goodman, dash one.
14         MR. KIRSCHNER:  No objection.
15         THE COURT:  All right.  DJS-MG-1, is
16  admitted, the photo of Congress Heights area.
17         (Thereupon, Defendant's Exhibit No. DJS-MG-1
18         admitted into evidence.)
19         BY MS. MOSELEY:
20     Q    If you could display that.  Sir, looking at
21  that photograph, do you see what you had just
22  previously testified as the Thunderdome?  Where is
23  that located?
24     A    Say that again.
25     Q    You just brought up when I was asking you

---

16 (Pages 58 to 61)

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

Page 62

1 questions, something you called the Thunderdorm?
2    A    The Thunderdorm, Butch and Margaret's
3 house.
4    ·Q    The Thunderdorm.  Where is that if it is in
5 this picture?
6    A    Can I use this?
7    THE COURT:  Yes, sir.
8    THE WITNESS:  If you would come down
9 Congress Street, you make a left and go down to this
10 first parking lot right here.  And you turn up in
11 here.  This is a staircase right here.  Right here
12 this is a staircase.  You go up these stairs and you
13 go to the right a little.  And her apartment was down
14 up under the staircase because Little Raymond's mother
15 lived over the top of her.
16    BY MS. MOSELEY:
17    Q    Who is Little Raymond?
18    A    That was one of Kevin's associates.
19    Q    Did you know him to have a street name or
20 do you know his last name?
21    A    By Little Raymond, that's what I know him
22 by, Little Raymond.
23    Q    Did he wear a bald head?
24    A    Yes, he did.
25    MS. MOSELEY:  May I approach the witness?

Page 63

1    THE COURT:  Sure.
2    BY MS. MOSELEY:
3    Q    Sir, could you please mark with this pin
4 with your initials where the Thunderdorm
5    A    [Witness complies.]
6    Q    Do you recall as I've already asked you
7 when Marvin Goodman was killed?
8    A    I recall that day clear as day.
9    Q    I'm directing your attention back to that ·
10 time.  Where were you?
11    THE COURT:  We got to try to get the marks
12 off there.  Can you do that with your pin.  Thank you.
13 Thank you.
14    BY MS. MOSELEY:
15    Q    Directing your attention to the night that
16 Marvin Goodman was killed, do you see a location on
17 this aerial where you were that evening?
18    A    Yes, ma'am.
19    Q    Can you just point that out, please?
20    A    [Witness complies.]
21    Q    And is that the grassy area or the
22 staircase outside?
23    A    At the time cause they done remodeled it
24 from the photograph that I've seen lately.  Back then,
25 it wasn't any grass or fences.  The gates that they

Page 64

1 have up now, they weren't there.
2    Q    Okay.
3    A    And it's a staircase -- a staircase that I
4 just showed you.  It's one staircase that stops, then
5 it continues on down into the parking lot.  Which is
6 this part right here where the cars are.
7    Q    Okay?
8    A    I was like right along in here.
9    Q    What is significant about what you're
10 pointing out?
11    A    Say that again?
12    Q    What is significant about what you're
13 pointing out?  Why did you point out that staircase?
14    A    Because that's where I was standing at.
15    Q    When?
16    A    When Marvin was killed.
17    Q    So did you see Marvin Goodman killed that
18 night?
19    A    Yes, I did.
20    Q    Did you watch that?
21    A    Yes, I did.
22    Q    I'm showing you what is mark as defendant's
23 DJS dash MG dash two.  Sir, can you please look at
24 this sketch and tell me if you recognize this sketch
25 and what it is?

Page 65

1    A    Yes, I recognize it.
2    Q    What is it?
3    A    This is the apartments where Butch and
4 Margaret lived.  Marcia lived on this end up here.
5 These are the staircases right here.
6    Q    Okay.
7    A    This is the grass going up that way.
8    Q    When you say the staircase, is that the
9 same staircase you previously testified to you were
10 standing at the night Marvin Goodman was killed?
11    A    Yes, ma'am.  But it's two parts to this
12 staircase.  They had one part deleted, but it's like
13 right along in here they have a sidewalk, and that's
14 not true.  There wasn't no sidewalk along in here.
15    Q    Okay.
16    MS. MOSELEY:  May I approach the witness?
17    THE COURT:  All right.
18    BY MS. MOSELEY:
19    Q    Sir, could you place your initials where
20 you were standing when you saw Marvin Goodman killed?
21    A    [Witness complies.].
22    Q    Thank you.  Looking at this picture, if you
23 could display it to the jury, please.
24    THE COURT:  That's been admitted into
25 evidence previously?

17 (Pages 62 to 65)

United States District Court
For the District of Columbia
washcathryn@aol.com
202-289-8333
Cathryn Jones, RPR
Official Court Reporter

United States of America v.         CR 00-157            August 30, 2004
Larry Wilkerson                Gray III                Volume 24

---

Page 66

1   MR. KIRSCHNER:  I think a different version
2  of it has, so we have no objection.
3       THE COURT:  All right.
4       MS. MOSELEY:  I move into evidence then
5  Defendant's JS-MG-2.
6       THE COURT:  Very well.
7       (Thereupon, Defendant's Exhibit No. DJS-MG-2
8       admitted into evidence.)
9       BY MS. MOSELEY:
10  Q    Sir, am I pointing out where you just
11 placed your initials where you were standing?
12  A    Yes, ma'am.
13  Q    And is this where you were standing when
14 Marvin Goodman was killed?
15  A    Yes, ma'am.
16  Q    Do you see on this photograph where Marvin
17 Goodman was standing when you observed that?
18  A    Say that again.
19  Q    Do you see on this sketch rather where
20 Marvin was standing when he was killed?
21  A    He was coming -- he came from 'round this
22 area here, Smith Place, and was coming down.
23  Q    Was he on foot?
24  A    He was on foot.
25  Q    Okay.

---

Page 67

1   A    With his Walkman on as usual.
2   Q    You said with his Walkman on as usual.  Why
3  do you say that?
4   A    Because that was one of Marvin's
5  trademarks, his Walkman.  He kept a Walkman.
6   Q    Is that something with headphones?
7   A    Yes.
8   Q    Attached to what?
9   A    A radio or tape recorder.
10  Q    Where did Marvin stand as you watched him
11 being killed?
12  A    It's a telegram pole right here.
13  Q    A what?
14  A    A telegram pole.
15  Q    Okay?
16  A    On here that say Pepco pole.  We call it
17 the telegram pole.  And he was coming down.  And one
18 of the guys who had got out of the car had went around
19 and was behind him.  And one was up in front of him.
20  Q    Okay.
21       I'll walk through that here with you in a
22 minute.  Can you please point to where Mr. Goodman was
23 standing with your arrow when he was killed?
24  A    He was right along in here.  Right along
25 there.

---

Page 68

1   Q    Now, you began telling the jury something
2  about a car.  Can you first tell me what do you know
3  about that car?  Do you remember what it looks like?
4   A    It was a Honda Accord.  It's -- back then
5  they had a odd beige-like champagne color.  It was a
6  off color beige.
7   Q    Is this the car that you're talking about?
8   A    Yes, it was a Honda Accord hatchback, two
9  door.
10  Q    Where did that car came from?
11  A    It came from down 14th, down this way.  I
12 turned up in the parking lot.  And it backed in right
13 here.
14  Q    What are you calling 14th?
15  A    Savannah Street.
16  Q    Sir, I'm just going to show you quickly, do
17 you see Savannah Street on there aerial photograph?
18  A    Yeah.  It came from this direction here,
19 and it turned up in the parking lot.  And then it
20 backed up on the other side over here.
21  Q    And during this time, where are you
22 standing?
23  A    I was standing right here because the
24 individual that went and called the guys, I overheard
25 him when he said he was going to call them and tell

---

Page 69

1  them that Marvin was in the area.
2   Q    Bringing your attention back to the sketch,
3  you said the car was entering from the 1400 block of
4  Savannah Street, Southeast?
5   A    That's the way the car came, yes, ma'am.
6   Q    And then did it make a left-hand turn?
7   A    It made a left-hand turn into the parking
8  lot.
9   Q    Where did the alley -- is that the alley
10 that it made a left-hand turn into?
11  A    Yes, ma'am.
12  Q    Where did the car first go?
13  A    It pulled up and then it backed in over
14 here.  Because at the time, these apartments right
15 here were vacant.  It had a little hill, all this was
16 vacant with a little fence around it at the top.
17  Q    Now, can you show me approximately on that
18 photograph where the car backed in?
19  A    Say that again.
20  Q    Where did the car back in?
21  A    Pulled up and it backed in right along in
22 this area right here.
23  Q    Take the display off for the jury.  I'm
24 showing you what's been marked as Defendant's Exhibit
25 D dash JS dash MG dash five.  Does that appear to be

---

18 (Pages 66 to 69)

United States of America v.                  CR 00-157                    August 30, 2004
Larry Wilkerson                              Gray III                     Volume 24

---

Page 70

1  what is depicted in the sketch?  A more modern
2  photograph of that?
3      A    Yeah, because back then these trash cans
4  weren't there.  These fences weren't there.
5      Q    Do you see the Pepco pole that you were
6  referring to in that photograph?
7      A    Yes, ma'am.
8      Q    Is it in the same place it was in 1992?
9      A    It looks to be the same place.
10        MS. MOSELEY:  I'd move for the admission of
11  Defendant's JS-MG-5.
12        MR. KIRSCHNER:  No objection.
13        THE COURT:  All right.  That's admitted.
14  DJS-MG-5, photo of the area from a ground view.
15        [Thereupon, Defendant's Exhibit No. DJS-MG-5
16  admitted into evidence.]
17        MS. MOSELEY:  May I approach the witness?
18        THE COURT:  Sure.  Mr. Samuels, is that
19  photograph looking from like Savannah Street?
20        THE WITNESS:  To me, it's like from 14th
21  Street across because this is Savannah Street going
22  down here.  And 14th is back over on the side.
23        THE COURT:  Let counsel look at that.  I
24  just want to make sure I have it in my mind.
25        BY MS. MOSELEY:

---

Page 71

1      Q    Sir, with this pin can you please put a P
2  by what you're calling the Pepco pole that you recall
3  from 1992?
4      A    All of them?
5      Q    The one that you were speaking about when I
6  asked you earlier?
7        THE COURT:  The one you identified I think
8  as where Mr. Goodman was coming down by.
9        THE WITNESS:  [Witness complies.]
10        BY MS. MOSELEY:
11      Q    And then would you please, if you see it on
12  this picture, put your initials where you were
13  standing that evening?
14      A    [Witness complies.].
15      Q    Could you draw a circle around that so it's
16  more apparent?
17      A    [Witness complies.].
18      Q    Where you were standing?  Thank you.
19        MS. MOSELEY:  Move for the admission of
20  Defendant's JS-MG-5.
21        BY MS. MOSELEY:
22      Q    Sir, is this very faint set of initials
23  where you said you were standing?
24      A    Yes, ma'am.
25      Q    Where my pin is pointing?

---

Page 72

1      A    Yes, ma'am.
2      Q    With a circle around it?
3      A    Yes, ma'am.
4      Q    Thank you.
5        THE COURT:  He also had Pepco pole marked.
6        BY MS. MOSELEY:
7      Q    And then I asked you to point to or put a P
8  by the Pepco pole and you said which ones, all of
9  them.  I'm going to now ask you which pole did you see
10  in what's been previously admitted as DJS-MG-2?
11      A    This pole.
12      Q    This pole.  Which pole then in this
13  photograph are you referring to?  Is it this one or
14  this one or this one or that one?
15      A    This one that's in like the center right
16  there.
17      Q    This one?
18      A    No, ma'am, go up.
19      Q    This one?
20      A    Yes, ma'am.  It's that one.
21      Q    On this photograph, are you able to see
22  what you describe as the Thunderdorm?
23      A    Not really.  Move it over a little bit.
24  Well, okay.  You can't see it right from -- 'cause
25  right here this is where Little Raymond's mother --

---

Page 73

1  baby's mother lived.  Straight up under there is where
2  the Thunderdorm was, Butch and Margaret's residence.
3      Q    Are those the stairs that were behind you
4  that you were saying that you saw?
5      A    Yes, that's the staircase I was telling you
6  about.
7      Q    I'm showing you what's been previously
8  marked as Defendant's DJS-MG-3.  Sir, can you see what
9  you're calling the Thunderdorm in that photograph?
10      A    It's behind the street right here.  If you
11  go up these staircases --
12      Q    This street?
13      A    Yes, ma'am.
14      Q    Okay.
15      A    It's a little walkway, and then you make a
16  little left and go down 'cause the residence is going
17  down in the apartment.
18      Q    And on exhibit DJS-MG-5, is this oil house
19  off to the left of this photograph?
20      A    Yes, ma'am, it's off to the left.
21        MS. MOSELEY:  Move for the admission of
22  Defendant's JS-MG-3.
23        MR. KIRSCHNER:  No objection.
24        THE COURT:  Three is admitted showing the
25  apartment.

---

19 (Pages 70 to 73)

United States of America v.                    CR 00-157                    August 30, 2004
Larry Wilkerson                                Gray III                     Volume 24

---

Page 74

1    [Thereupon, Defendant's Exhibit No. DJS-MG-3
2    admitted into evidence.]
3    BY MS. MOSELEY:
4    Q    Again, for the jury, please show the jury
5    where what you're calling the Thunderdorm is?
6    A    It would be off to the right in this
7    photograph after you go up these steps.
8    Q    Is that behind this tree?
9    A    Yeah, behind the tree and go down the
10   staircases.
11   Q    Is it any particular window, this one, that
12   one, or this one?
13   A    Nah, none of them windows at the top belong
14   to it. It's downstairs.
15   Q    Downstairs?
16   A    Yes, ma'am.
17   Q    Now, I'm going to ask you what in the world
18   is the Thunderdorm?
19   A    That was the nickname that was given to
20   Butch and Margaret's residence. It was a crack house.
21   A crack house rather, excuse me. Crack, anything,
22   anything went in there.
23   Q    Okay.
24       What do you mean by that?
25   A    I mean oil joint.

---

Page 75

1    Q    Tell the jury what an oil joint is?
2    A    Excuse me?
3    Q    What is an oil joint?
4    A    It's a shooting gallery where heroin
5    addicts go to inject heroin.
6    Q    Can you buy drugs in an oil joint?
7    A    You can buy drugs and anything else in an
8    oil joint.
9    Q    All right. Are prostitution activities
10   taking place?
11   A    Everything goes on, that's why it's called
12   the Thunderdorm.
13   Q    And Butch and Margaret, are those
14   individuals who you believed owned that place?
15   A    It was their residence, yes.
16   Q    Did you ever see Marvin Goodman going to
17   the oil joint?
18   A    Plenty of times I seen Marvin go in there.
19   Q    Drawing your attention to what's been
20   marked as Defendant's JS-MG-4. Sir, do you recognize
21   that?
22   A    I recognize that.
23   Q    And what do you see in that picture?
24   A    See where Marvin was laying at. I see an
25   old Dodge van that use to be parked there.

---

Page 76

1    Q    This van?
2    A    Yes, ma'am.
3    Q    Was this van a regular van that was parked
4    in that parking lot?
5    A    Yes, ma'am. That old 200 SX was always
6    parked beside there all the time.
7    Q    Was this van present the night that Marvin
8    Goodman was shot?
9    A    Yes, it was.
10   Q    Was there -- do you recognize approximately
11   as best as you can recall -- let me just ask you, was
12   this 12 years ago roughly speaking?
13   A    Yeah.
14   Q    All right. In this area in front of the
15   vehicles, can you -- do you recognize where Marvin
16   Goodman was shot?
17   A    I recognize it.
18   Q    May I approach the witness?
19       THE COURT: Yes. Sure.
20       BY MS. MOSELEY:
21   Q    Sir, could you please place both of your
22   initials and MG where best you can recall that Marvin
23   Goodman was standing when he was shot?
24   A    [Witness complies.].
25   Q    Circle around it, please?

---

Page 77

1    A    [Witness complies.].
2    Q    Do you see, by the way, on this photograph
3    where you were standing?
4    A    Yes, ma'am.
5    Q    Okay.
6       Tell me, am I correct, were you standing
7    over this way or over this way?
8    A    Nah, I was standing like right along in the
9    middle of these cars.
10   Q    In this area?
11   A    Down.
12   Q    Down?
13   A    Yeah, at the bottom of the staircase.
14   Q    Did you say that there wasn't grass there
15   before?
16   A    No, there wasn't no grass there then.
17   Q    And if this car wasn't in the way, is there
18   a staircase that leads down to the parking lot?
19   A    Yes, ma'am.
20   Q    And you were standing generally in that
21   area?
22   A    Yes, ma'am.
23   Q    If this car wasn't blocking, is this the
24   stairway I just asked you about?
25   A    This was the staircase.

---

United States District Court              washcathryn@aol.com              Cathryn Jones, RPR
For the District of Columbia                 202-289-8333                  Official Court Reporter

United States of America v.                  CR 00-157                       August 30, 2004
Larry Wilkerson                              Gray III                        Volume 24

Page 78

1   Q    Am I pointing correctly to the place where
2   you were standing?
3       A    You got to come over a little bit.
4   Q    To the right, sir?
5       A    Come down.  Yeah, like right along in here.
6   Q    In this area?
7       A    Yeah.
8   Q    How far is this from this?
9       A    How far is it?
10  Q    Yes, sir, as best as you can recall?  You
11  can use the courtroom as a measuring stick if you need
12  to.
13      A    Probably just, probably just beyond that
14  door.
15  Q    Which door, sir?
16      A    The double doors.  You can see clearly from
17  where I was standing to where it happened.
18      MS. MOSELEY:  Let the record reflect that
19  he's identified from the witness stand to the double
20  doors which I believe are the entrance and exit doors.
21      THE WITNESS:  It might be just a little
22  further.  I don't have any geometry class or anything.
23      THE COURT:  That's the doors going outside,
24  the wooden doors back there?
25      THE WITNESS:  Yes, sir.  If we was using

Page 79

1   geometry, on a 180 degree angle, I would subtract like
2   about 120.
3       THE COURT:  Okay.  For the record, that's
4   about 52 feet.  Approximately 50 feet from the witness
5   stand.
6       BY MS. MOSELEY:
7   Q    I don't want to ask you to do geometry
8   because you might lose me, sir.  I just want to ask
9   you, what were you doing out there on July the 26th,
10  1992?
11      A    I was down there with Marcia.
12  Q    Who's Marcia?
13      A    A young lady I used to deal with at the
14  time.
15  Q    Do you see Marcia's residence on this
16  photograph?
17      A    Not on this one, no, ma'am.
18  Q    Have any of the photographs I've showed you
19  depicted where Marcia lived?
20      A    Yes, ma'am.
21  Q    If I can display to the jury, it's been
22  previously marked as Defendant's JS-MG-5.  Do you see
23  Marcia's address on this?
24      A    I see the building.
25  Q    Where?

Page 80

1       A    It's at the end back here.
2   Q    Back over there?
3       A    Yeah.  On that other one that you had you
4   could see it better.
5   Q    Thank you.  Just one second.  Not this one,
6   sir?
7       A    No, ma'am.
8   Q    Well, suffice it to say at the end of this
9   building; is that correct?
10      A    Yeah at the end of that building.
11  Q    Now, I'm just going to ask you, you know,
12  were you sober that evening, were you using drugs,
13  were you drinking?
14      A    I was sober.  I was very sober.  I had just
15  woke up matter of fact.
16  Q    Where had you just come from?
17      A    I had just come out of Marcia's house.
18  Q    All right.  Now, I'm going to orient you
19  back to the diagram that I showed you earlier,
20  previously marked as Defendant's JS-MG-2 for the jury.
21      A    What you want me to do?
22  Q    I'm going to ask you, if you can just
23  describe after the car parked, show me again where did
24  the car park?
25      A    The car parked right along in here.

Page 81

1   Q    Okay.
2   Q    Did it -- how did it pull into the space, if
3   you recall?
4       A    It backed in.
5   Q    With the face -- with the front of the car
6   pointing --
7       A    With the rear of the car facing this way
8   and the front of the car facing towards us.
9   Q    Did you recognize that car for any reason?
10      A    Yeah, I recognized it.
11  Q    How many people were in the car?
12      A    It was two individuals in the car at the
13  time.
14  Q    Describe for the jury what happened when
15  you saw the car parked?
16      A    One of the individuals got out of the car.
17  Q    Do you remember which side of the car,
18  passenger or driver?
19      A    Catman got out of the driver's side.
20  Q    Okay.
21      A    Kenny got out of the passenger's side.
22  Q    And when you say Catman, do you know who
23  Catman is?
24      A    I know who he is.
25  Q    I'll ask you to tell me is that Catman?

United States District Court            washcathryn@aol.com              Cathryn Jones, RPR
For the District of Columbia                202-289-8333                 Official Court Reporter

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

---

Page 82

1   A    Nah.
2   Q    If I can display what's been previously
3   admitted as KG 100. Who is that?
4   A    That's Kevin Gray.
5   Q    Is that who you saw get out of the car?
6   A    No, no.
7   Q    Do you know him to be called Catman?
8   A    No.
9   Q    Do you know who Catman is?
10  A    Yes, I know Catman.
11  Q    Is Catman a nickname?
12  A    That's his nickname, yeah.
13  Q    Do you know Catman's real name?
14  A    Ma'am?
15  Q    Do you know Catman's real name?
16  A    No, ma'am, unfortunately I don't.
17  Q    Do you know what neighborhood he's from?
18  A    He's from up by Wheeler Road.
19  Q    Okay. Where is Wheeler Road?
20  A    Where is Wheeler Road? It's in ward eight.
21  Q    Can you tell me the name of the
22  neighborhood aside from ward eight?
23  A    Walher Place. You have Valley Green over
24  there.
25  Q    What quadrant of the city was that in?

---

Page 83

1   A    Say that again.
2   Q    What quadrant of the city is that in, do
3   you know?
4   A    That's ward eight.
5   Q    That's Southeast?
6   A    That's Southeast. I'm trying to think of
7   that -- I can't think of the name. The Washington
8   Highland Union Street, all that back up in there.
9   Q    Okay.
10  A    I can't recall the name of the circle.
11  Q    Is that the neighborhood you know Catman to
12  be from or associated with?
13  A    Yes, ma'am, Wahler Place and all that.
14  Q    You named someone called Kenny?
15  A    Yeah, Kenny.
16  Q    Do you know any more information about that
17  person's name or nickname?
18  A    I know him by Kenny Hill. That's what I
19  know him by.
20  Q    Where did Kenny Hill -- did he get out of
21  that car that night?
22  A    Yes, he got out.
23  Q    Which side, if you remember?
24  A    He got out of the passenger's side 'cause
25  Catman was driving the car.

---

Page 84

1   Q    Did you recognize those individuals right
2   away?
3   A    Of course I recognized them.
4   Q    How do you know who they are?
5   A    'Cause they had narcotics in Butch and
6   Margaret's house. They was selling drugs for them in
7   that house.
8   Q    Okay.
9        And how long had you known Catman or Kenny
10  Hill would you say?
11  A    I've known them for quite a while.
12  Q    Is that within a one-year range or do you
13  mean more like ten years?
14  A    Probably like five, six, seven, if not ten.
15  Q    What is the rough estimate, your estimate
16  of the age Catman?
17  A    Back then or now?
18  Q    Back then?
19  A    Back then he should have been about, about
20  22, 23.
21  Q    Do you have any idea where Catman is today,
22  firsthand knowledge?
23  A    No, ma'am.
24  Q    What about Kenny Hill, what was his
25  approximately age back then?

---

Page 85

1   A    Kenny was about 35.
2   Q    He was older than Catman?
3   A    Yeah.
4   Q    What neighborhood, if you know, is Kenny
5   Hill associated with?
6   A    All around Wheeler Road, Wahler Place.
7   Q    Same as Catman?
8   A    Yes.
9   Q    Did you observe those two men to be close
10  to one another? Can you describe, if you know, the
11  relationship between Catman and Kenny Hill?
12  A    What's their relationship?
13  Q    If you know?
14  A    From my knowledge, they was business
15  partners.
16  Q    When you say business partners, do you mean
17  illegal or legal?
18  A    I guess you can put it in both terms.
19  Q    When you saw them that night, did have you
20  any reason to suspect that they were up to anything,
21  personal knowledge of anything that they were going to
22  do, good or bad?
23  A    I mean it was known that Marvin had flipped
24  out and robbed Butch and Margaret house. At the time,
25  Kevin didn't have any drugs in there. And to my

---

22 (Pages 82 to 85)

United States District Court
For the District of Columbia

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

---

Page 86

1  knowledge, he had no heroin in there. And Kenny and
2  Catman did. And Marvin went through the window of
3  Butch and Margaret house on the other side on Congress
4  --
5      MR. KIRSCHNER: Objection, foundation.
6      THE COURT: You have to be able to say how
7  he knows that so it's not hearsay.
8      BY MS. MOSELEY:
9  Q   Sir, if you didn't personally observe that,
10  we're going to --
11  A   No, I didn't observe.
12      THE COURT: We'll strike that comment about
13  how he got in the house.
14      BY MS. MOSELEY:
15  Q   So the people who drove up that evening and
16  parked the car, Catman and Kenny Hill, what did they
17  do once they parked the car and got out of the car?
18  A   Catman started up the alley and then Kenny.
19  Kenny proceeded on through the alley.
20  Q   All right. When you say Catman started up
21  the alley, do you mean to say that he walked up this
22  direction?
23  A   Yeah, he walked up this direction and kind
24  of stopped.
25  Q   Where did Kenny Hill walk?

---

Page 87

1  A   Kenny Hill walked on through.
2  Q   All the way pass?
3  A   Yeah, he walked all the way pass.
4  Q   Up through an alley that shoots off this
5  picture?
6  A   To Alabama Avenue.
7  Q   Alabama Avenue. Sir, does Alabama Avenue
8  run -- if it were in this photograph, run this way?
9  A   Yes, ma'am.
10  Q   Across the alley?
11  A   Yes, ma'am.
12  Q   Now, what did you see happen once those two
13  men walked that path? Where was Mr. Goodman?
14  A   Of my knowledge, from what I've been told,
15  he was around --
16      MR. KIRSCHNER: Objection.
17      THE COURT: Sustained.
18      BY MS. MOSELEY:
19  Q   It's complicated, but only what you
20  specifically saw yourself. Where did you see Marvin
21  standing that night?
22  A   When I saw Marvin coming around the corner,
23  after while, that's when I saw Kenny behind him and
24  Catman started walking towards them.
25  Q   And what did you see happen?

---

Page 88

1  A   That's when they started shooting.
2  Q   When you say "they," who do you mean?
3  A   Kenny and Catman started shooting.
4  Q   What did you do when they started shooting?
5  A   What was I suppose to do?
6  Q   What did you do?
7  A   I left.
8  Q   Did you hang around to talk to the police?
9  A   Nah, I didn't have time for that, nah.
10  Q   Did you call the police and say I have
11  information?
12  A   No, ma'am.
13  Q   Why did you leave the scene?
14  A   Why did I leave the scene?
15  Q   Uh-huh?
16  A   I guess I suppose to be a static like
17  Marvin?
18  Q   Did you want to be involved in what was
19  happening that evening?
20  A   No, I did not.
21  Q   Were you eager to say that you saw what you
22  saw?
23  A   No, I was not.
24  Q   Did there come a time back in 1992 when you
25  did speak with Mr. Hosinski?

---

Page 89

1  A   Yes, ma'am.
2  Q   How long after the incident, if you
3  remember, how did that come about that you spoke with
4  a Mr. Hosinski?
5      MR. KIRSCHNER: Objection to this line of
6  questioning, whether he made other statements.
7      MS. MOSELEY: I was asking if he spoke with
8  a --
9      THE COURT: I'll let her ask.
10      BY MS. MOSELEY:
11  Q   It wouldn't be proper for you to say what
12  you said, but I'm just asking whether or not you spoke
13  with a police officer about what you saw?
14  A   I spoke with an FBI agent, not a police
15  officer.
16  Q   I'm going to ask you about that in a
17  minute. But in 1992, back when the incident occurred,
18  did you speak with a Metropolitan Police Department --
19  A   No, ma'am. No, ma'am.
20  Q   Just recently, since you brought it up, did
21  you speak with an FBI agent?
22  A   Yes, I did.
23  Q   When did you do that?
24  A   I think it was a little while after it
25  happened. I spoke with them concerning something that

---

United States District Court
For the District of Columbia

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.                 CR 00-157                      August 30, 2004
Larry Wilkerson                             Gray III                       Volume 24

Page 90

1  happened.  And it was two incidents.
2      Q    I'm going to -- let me ask you, did you
3  speak with someone from the government a month ago?
4      A    Yes.  Some guys from -- I think they were
5  from the prosecutor's office, called down there asking
6  me questions about me talking with John.
7      Q    Okay.
8          Was that in 2004?
9      A    Yes, ma'am, this year.
10     Q    I'm going to ask you to put that aside and
11 I'm going to take you back to 1992.  Did you speak
12 with someone from the government, either MPD or any
13 other person, about the incident?
14     A    To my knowledge, I spoke with Mr. Hosinski.
15     Q    I'm going to ask you about that.  How did
16 that come about?
17     A    At the time, I was helping Mr. Hosinski
18 with a situation.
19     Q    Okay.
20     A    And I had known about another murder that
21 had took place along with this one.
22     Q    Okay.
23     A    And I was talking to him and giving some
24 information.
25     Q    About who killed Marvin Goodman?

Page 91

1      A    Yeah, but what he wrote down, he put the
2  wrong people with the wrong case.
3          MR. KIRSCHNER:  Objection.
4          THE COURT:  I'll sustain that.  Strike that.
5          BY MS. MOSELEY:
6      Q    You can't say what --
7      A    Okay.  Okay.
8      Q    But did you tell them what you knew at that
9  time?
10     A    Yeah, I told him what I knew.
11     Q    Did you tell him the truth about what you
12 knew?
13     A    I told the truth.
14     Q    Did you speak with him again after that?
15     A    Now, we never talked again after as far as
16 about that case, nah.
17     Q    Sir, I'm going to ask you then, in around
18 2004 about a month ago, did you speak with someone
19 else about this case?
20     A    What you talking about?
21     Q    From the government?
22     A    What, the gentleman sitting there with the
23 computer?
24     Q    No, sir.  I'll ask you about.
25     A    Nah, I can't remember.  I believe one of

Page 92

1  these guys here called me.  I can't say.  I can't
2  recall their name.
3      Q    Was it on the telephone?
4      A    It was on the telephone.
5      Q    Where were you when you were contacted by
6  someone from the government?
7      A    I was in camp 25.
8          MS. MOSELEY:  Court's indulgence.
9          THE COURT:  Ladies and gentlemen, we'll take
10 a short break.  We've been going all morning.  We'll
11 take about a ten minute recess and come back with the
12 testimony.  Thank you.  Remember the admonition about
13 not talking about case, please.
14         [Thereupon, Jury exits courtroom at 11:35
15 a.m.]
16         THE COURT:  All right.  We'll take a short
17 break.
18         [Thereupon, recess taken at 11:36 a.m.,
19 resuming at 11:55 a.m.]
20         [Thereupon, Jury enters courtroom at 11:56
21 a.m.].
22         THE COURT:  All right.  Ready to resume with
23 the direct testimony of Mr. Samuels.
24         BY MS. MOSELEY:
25     Q    Mr. Samuels, just before the break I

Page 93

1  believe I was asking you about conversations you had
2  had with -- what I think you testified as
3  conversations with the government in 1992,
4  conversations with someone from the government in the
5  year 2004?
6      A    Yes, ma'am.
7      Q    You remember me asking you about that?
8      A    Yes, ma'am.
9      Q    In the year 2004, do you as you sit here
10 remember who spoke with you?
11     A    I can't recall the gentleman's name.
12     Q    Did you speak with him or did you refuse to
13 him?
14     A    I spoke with him.
15     Q    Did you tell him what you knew what you're
16 telling the court here today?
17     A    Yeah, basically.  Yes, I did.
18     Q    What about in 1992, you described speaking
19 with Detective Hosinski.  What were the circumstances
20 under which you spoke with him?
21     A    I told him that --
22     Q    Not exactly what you said.  Can you
23 describe why you were speaking with him and for what
24 purpose?
25     A    At the time, I was helping him with

24 (Pages 90 to 93)

United States District Court              washcathryn@aol.com              Cathryn Jones, RPR
For the District of Columbia                 202-289-8333                 Official Court Reporter

United States of America v.                CR 00-157                    August 30, 2004
Larry Wilkerson                            Gray III                     Volume 24

---

Page 94

1  something.
2      Q      Something unrelated to Marvin Goodman?
3      A      Yeah, unrelated to Marvin Goodman.
4      Q      Did the information that you knew about
5  Marvin Goodman come up during that conversation?
6      A      Per se a little.
7      Q      Sir, it's obvious you are incarcerated.
8  I'm going to ask you to tell the jury about your
9  history, what is it you're incarcerated for?
10     A      I'm incarcerated for grand larceny from
11  1995, violation of probation,
12     Q      It's a violation of probation based on the
13  grand larceny?
14     A      Yes, ma'am.
15     Q      Would you just summary what is your
16  criminal -- what's your criminal connection, what's
17  your history?
18     A      I don't have no assaults.  I don't harm
19  people.  Everything I've ever done, it always harm me.
20     Q      What kinds of crimes did you do?
21     A      I use to take vehicles from car dealers.  I
22  didn't take cars from people that live in society.  I
23  took them from car dealers, brand new cars.  I'm not
24  gon' take no car from anybody have to go to work every
25  day.

---

Page 95

1      Q      And do you any felony convictions on your
2  record?
3      A      Yes, ma'am.
4      Q      What are they?
5      A      For grand larceny.  I think they gave me a
6  forgery.  It's not even a half a page full of
7  convictions.  I have arrests, but my convictions is
8  totally different.
9      Q      And, sir, you described knowing a few
10  individuals and various neighborhoods to include
11  Robinson Place.  And before I get into that, I just
12  want to ask you, have you ever spoken with the man in
13  the beard over here?
14     A      Yes, ma'am.
15     Q      When and where did you speak to him?
16     A      He came to Barbatop correctional unit.  I
17  believe that was in June.
18     Q      Did you speak to him one time or more than
19  one time?
20     A      I spoke with him one time.
21     Q      Did you speak with me prior to today?
22     A      No, ma'am -- Saturday was the first time I
23  ever saw you.
24     Q      This weekend?
25     A      Yes, ma'am.

---

Page 96

1      Q      Have you spoken to anybody in relation to
2  Mr. Wilkerson other than those two times?
3      A      No, ma'am.
4      Q      And did I tell you what to say here today?
5      A      How can you?  No.
6      Q      You're telling the truth about what you saw
7  back then?
8      A      Yes, ma'am.
9      Q      Not for the jury.  If I can show you -- can
10  you read what's on the bottom of that picture?
11     A      It says Larry Wilkerson.
12     Q      Do you recognize that person?
13     A      I don't know that guy.  I don't know him.
14     Q      But you do know this person?
15     A      I know Kevin, yes.
16     Q      Do you owe him any debt or favor?
17     A      I don't owe him nothing.  He don't -- nah,
18  I don't owe him nothing.
19     Q      Did you speak with him today or at any
20  other time about your testimony?
21     A      No, ma'am.
22     Q      And for the jury previously admitted as
23  MG-100, I believe.  Who is this again?
24     A      That's Marvin.
25     Q      Do you owe him a debt or any loyalty?

---

Page 97

1      A      No, I don't owe Marvin nothing.  I mean
2  nah, he was a friend of mine who was murdered.
3      Q      Okay.
4      A      That's all.
5      Q      Okay.
6             Do you know a man by the name of Moe Brown,
7  you recognize that name?
8      A      I recognize that name.
9      Q      Where do you know him from?
10     A      Robinson Place, 15th Place.
11     Q      Who do you associate him with?
12     A      Kevin Gray.
13     Q      Do you know a man named did you say Little
14  Raymond?
15     A      Yeah, I know Little Raymond.
16     Q      And who do you associate him with?
17     A      Kevin Gray.
18     Q      And do you know a man named Jermaine Vick
19  or Pappy?
20     A      Pappy.
21     Q      You know his as Pappy?
22     A      Um-hum.
23     Q      Did you have any reason to know him back in
24  1992 or any other time?
25     A      Yeah, you can say that.

---

25 (Pages 94 to 97)

United States of America v.                  CR 00-157                   August 30, 2004
Larry Wilkerson                              Gray III                    Volume 24

---

Page 98

1    Q    Who did you associate him with back then?
2    A    I associated him with Kevin Gray, but at
3  the same token it was an individual that lived next
4  door to me by the name of the Lewis Simms. Simms, I
5  believe that's Lewis' last name. He supposedly been
6  his cousin. And --
7    Q    Do you think that guy was his cousin?
8    A    That's what they say. I never knew Pappy
9  until Lewis was an adult.
10   Q    What about a man named Rodney Moore?
11   A    Yeah, Kevin's right-hand man. I know
12 Rodney.
13   Q    Did you ever know someone named Bink?
14   A    Kevin's brother, Bink.
15   Q    And who is again?
16   A    Who Bink?
17   Q    Uh-huh?
18   A    That's Kevin Gray's brother to my
19 knowledge. That's what he supposed to be.
20   Q    And then what time period did you know
21 these individuals or did you see them around Robinson
22 Place?
23   A    I mean what you mean what time frame? What
24 year?
25   Q    If you can remember, if there's a time you

---

Page 99

1  associate?
2    A    I mean back in like '86, '87.
3    Q    Late 80s, early '90s?
4    A    Yes, ma'am.
5    Q    And then have I offered you anything for
6  your testimony here today?
7    A    I'm not getting nothing from this from
8  nobody, so can't nobody say that. No, ma'am.
9        MS. MOSELEY: That's all I have.
10       THE COURT: Thank you. Is the government
11 ready to go now?
12       MR. KIRSCHNER: Yes, Your Honor, we'll get
13 started.
14             CROSS-EXAMINATION
15       BY MR. KIRSCHNER:
16   Q    Mr. Samuels, good afternoon, I guess.
17   A    Good afternoon, sir.
18   Q    My name is Glenn Kirschner, I'm one of the
19 prosecutors in the case?
20   A    Yes, sir.
21   Q    And does that name ring a bell? Do you
22 remember having a conversation with me on the
23 telephone when you were confined down in Virginia?
24   A    I can't quite remember your name, but I
25 remember speaking to -- I think it was you and two

---

Page 100

1  other guys.
2    Q    Me and Agent Dan Sparks, perhaps?
3    A    Yeah, I remember Mr. sparks. Yeah.
4    Q    So you remember having -- actually had a
5  series of phone conversations?
6    A    Yeah, I talked to you one day and you
7  called back the next day.
8    Q    Now, let me go back a little bit through
9  your familiarity with the Robinson Place area. Okay?
10   A    Yes, sir.
11   Q    And let's look at, if we could, Ms. Lieber
12 A-5 which has already been admitted into evidence. Do
13 you see that photograph there on your computer screen?
14   A    Yes, sir.
15   Q    And is it fair to say you've testified
16 about I guess Robinson Place right up and down here,
17 correct?
18   A    Yeah, that's part of Robinson Place.
19   Q    Okay. Johnson Junior High over here?
20   A    Yes, ma'am -- yes, sir, excuse me.
21   Q    And then you talked about 15th Place a
22 little bit right there, right?
23   A    Yeah.
24   Q    And this is actually Robinson Street that
25 cuts up, right?

---

Page 101

1    A    Yeah, that's part of it.
2    Q    Fair to say you're familiar with that whole
3  area, right?
4    A    Yes, sir.
5    Q    What years was it that you were spending
6  time out and about in that area? About when did it
7  start and about when did it end?
8    A    I been over there all my life.
9    Q    So you're familiar with all the folks over
10 there?
11   A    Yes, sir.
12   Q    Okay.
13       And just you say all your life, but just
14 like is it from -- did you grow up in that area?
15   A    Basically you can say that, yeah.
16   Q    And where did you live, were you out in the
17 community?
18   A    I lived in Savannah Terrace up on top of
19 the hill.
20   Q    On the top of the hill?
21   A    But I roamed all that area.
22   Q    Savannah -- what was your address on
23 Savannah Terrace?
24   A    2235 Savannah Terrace.
25   Q    It's fair to say you were familiar with the

---

26 (Pages 98 to 101)

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

---

Page 102

1   1800 block of Savannah Terrace?
2       A    All that.  Shipley Terrace.
3       Q    What years did you live in the 2300 block?
4       A    2300 block.
5       Q    What years did you live in the 2200 block
6   of Savannah Terrace?
7       A    My grandmother moved in there in 1967.
8   That's the year my grandmother moved in Savannah
9   Terrace.
10      Q    Sixty-seven.  And you were born in --
11      A    Sixty-four, so I was three years old.
12      Q    And when did you move away from Savannah
13  Terrace?
14      A    I first moved away from Savannah Terrace
15  when I was -- I wouldn't even call it move away, but
16  started residing in Temple Hills in 1983.  The year my
17  mom passed.
18      Q    And then would you come back to that area?
19      A    I went there every day.
20      Q    Every day?
21      A    Every day.
22      Q    Until you were how old?
23      A    I left there '95, '94 somewhere along
24  there.  '94, stopped hanging around, stopped going
25  over there.

---

Page 103

1       Q    So from 1967 when you were just this high?
2       A    Yes, sir.
3       Q    Through 1994, this was basically an area
4   that you were familiar with, that you spent time in,
5   that you kind of knew everybody around the way, right?
6       A    Yes, sir.
7       Q    And you said you knew Kevin Gray, correct?
8       A    I know his great uncle.
9       Q    You knew his Uncle Linwood?
10      A    Linwood.
11      Q    And you knew there was a time when Kevin
12  Gray spent a lot of time on Robinson Place?
13      A    Yes.
14      Q    Did he also spend a lot of time around
15  Johnson and 15th and that whole area?
16      A    Who?
17      Q    Kevin?
18      A    Yeah, I mean you might see Kevin over in
19  Congress Park, you might see him up Savannah Terrace.
20  But we knew that his landmark was Robinson Place.
21      Q    And his brother Bink used to be out there
22  all the time?
23      A    Yeah, Bink.
24      Q    And Rodney Moore?
25      A    Yes.

---

Page 104

1       Q    And what about DJ, did you know DJ?
2       A    Nah.
3       Q    Rodney's brother?
4       A    Who?
5       Q    Rodney Moore's brother?
6       A    Oh, you're talking about Derrick?
7       Q    Derrick Moore, you knew him?
8       A    Yeah, I know Derrick.
9       Q    He was out in that area a lot?
10      A    I use to see him over in Northeast too,
11  over on E Street.
12      Q    Yeah, and Rodney Moore actually had a
13  family home over on -- over in Northeast, right?
14      A    I don't know.  I know Woofus and all of
15  them.  I don't know --
16      Q    How do you know Woofus?
17      A    You be surprised, but anyway, I know
18  Woofus.
19      Q    How do you know Woofus?
20      A    I know him.
21      Q    I'm asking you, how do you know him, sir?
22      A    I know him from association, seeing him
23  over in crap games and stuff over in Northeast.  All
24  that.
25      Q    While we're at it, let me just ask --

---

Page 105

1           MR. KIRSCHNER:  May I approach the witness,
2   Your Honor?
3           THE COURT:  Yes, sir.
4           BY MR. KIRSCHNER:
5       Q    See if we can do this real quick, all
6   right, run through some of these people.  If I hold
7   this like this, sir, can you see?  All right, you know
8   Kevin up here, right?
9       A    Kevin, I know Rodney.
10      Q    You know Moe Brown, you know Pappy?
11      A    Pappy.
12      Q    You know Buck, John Raynor?
13      A    I don't know.
14      Q    No?  Okay. You have to all speak up and
15  keep your voice up. okay?  So you say -- you say you
16  don't really know Buck, John Raynor?
17      A    I don't know him by Buck.
18      Q    Do you know his face, though, does it look
19  familiar?
20      A    I seen him.
21      Q    Who did you see him with, who did he hang
22  with?
23      A    I seen him around Robinson Place.
24      Q    And who did he hangout out with on Robinson
25  Place?

---

27 (Pages 102 to 105)

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

Page 106

1   A   Kevin mostly.
2   Q   You know Omar?
3   A   No.
4   Q   You know Fat Frank, you said?
5   A   I know Frank.
6   Q   And you know Dennis?
7   A   I seen him around.
8   Q   And who did he hang with?
9   A   I seen him on Robinson Place a few times.
10  Q   Did he hang with Kevin then?
11  A   If you said.  He used to be up there by the
12  swimming pool.
13      Q   And when you say the swimming pool, you
14  mean which swimming pool?
15      A   The swimming pool on the top of Robinson
16  Place.
17      Q   Right, so back where the parking lots are?
18      A   Yeah.  Where Raymond had another --
19      Q   Raymond, that's bald head Raymond?
20      A   Yeah, bald head.
21      Q   Do you Brian Bostick?
22      A   No, I don't know that person.
23      Q   You know Derrick?
24      A   I know Derrick, yeah.
25      Q   How about Roy Johnson?

Page 107

1   A   I seen Roy.  I don't know him like that.
2   Q   Did you know he was some kin to Rodney?
3   A   Nah.
4   Q   Who did you see him with?
5   A   I seen him around Robinson Place a few
6   times with House.
7       Q   House is?
8       A   That's one of the guys' nicknames.  House
9   and Maurice.
10      Q   House is Michael Reid, right?
11      A   I don't know his real name.  I know him by
12  House.
13      Q   You know that House is Maurice Reid's --
14      A   Brother.
15      Q   Little brother?
16      A   I don't know how it go.  I don't know if
17  they little brother or big brother.
18      Q   Do you know Kenny Simmons, Garma Goo?
19      A   Nah, I seen him before, but I don't know
20  him.
21      Q   Who did you see him with?
22      A   I seen him around Robinson a few times.  I
23  know Gold, Chain Boo.
24      Q   We'll get there.  Kenny Simmons, did you
25  know that he was some kin to Rodney?

Page 108

1   A   No, I did not.
2   Q   But you would see him around Robinson
3   Place?
4   A   Yeah, I seen him a few times.
5   Q   Do you remember who with?  Who he would
6   spend his time with when he was over there?
7   A   Probably no telling.  They had a hell of a
8   click, so no telling who you see.
9       Q   But when you see him, you kind of associate
10  him with the rest of these guys?
11      A   Yes.
12      Q   Woofus?
13      A   Yeah, that's Woofus.
14      Q   How do you know Woofus?
15      A   I know Fat Boy because my stepfather use to
16  have a house on 6th and E.
17      Q   Northeast?
18      A   Yeah, Northeast.  And the little store
19  that's on the corner, that was our house, the first
20  house right there.
21      Q   And did you know that Rodney's grandmother
22  had that house right around the same area?
23      A   Yeah, around the corner.  I know that.
24      Q   So you would see Woofus up around that
25  area?

Page 109

1   A   Yeah, I used to see him in crap games and
2   everything.
3   Q   And you know he was a big time drug dealer
4   back in the day, right?
5   A   Yes.
6   Q   Calvin Smith, Asay?
7   A   I seen him before.
8   Q   You would see him around Robinson Place?
9   A   I seen him around Robinson, Congress Park,
10  I seen him over by Trent Place.  I seen him a couple
11  of times.
12      Q   Is it fair to say you associate him with
13  Kevin and them?
14      A   Yeah, pretty much.
15      Q   And Larry Wilkerson?
16      A   I don't know him.  I never seen him around
17  Robinson period.  I don't know that dude.
18      Q   Timothy Handy, Dog?
19      A   I don't know him either.
20      Q   How about Lionel Nunn nicknamed Brotherman?
21      A   No, I can't remember.
22      Q   Now, a few minutes ago you pointed out Boo?
23      A   I know Boo.
24      Q   You kind of jumped ahead and said I know
25  Boo, I know Gold Chain.

28 (Pages 106 to 109)

United States District Court
For the District of Columbia

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

Page 110

1   A   I know Gold Chain.
2   Q   How do you know Boo?
3   A   I went to school with Boo.  We went to
4   Kramer and Anacostia together.
5   Q   And you guys were kind of close, friendly?
6   A   Yeah, I know Boo real good.
7   Q   How about his brother?
8   A   Yeah, I know his brother.
9   Q   What's his nickname?
10  A   I always called him James.  I don't know
11  his nickname.
12  Q   So you were close -- were you close with
13  James Alfred, too?
14  A   No.
15  Q   Or just Ronald Alfred?
16  A   Just Ronald.  I call him Boo.  He had Fresh
17  Gear?
18  Q   Did you ever go in Fresh Gear?
19  A   I used to shoot crap in the back.
20  Q   Gambling in the back?
21  A   Yeah.
22  Q   With Boo?
23  A   I just said I used to shoot craps there.
24  Q   How about Franklin Seegers, did you know
25  him?

Page 111

1   A   I seen him before.  I don't know him
2   personally.
3   Q   Where did you see him?
4   A   I used to see him uptown.
5   Q   Did you see him with anybody else?
6   A   Nah, I just see him uptown a couple of
7   times.
8   Q   Do you know Albert?
9   A   I don't know him.
10  Q   Do you know that's Woofus' son?
11  A   No.
12  Q   And how about Keith McGill?
13  A   Nah, I don't know him.
14  Q   You never saw him?
15  A   No.
16  Q   So you know most of these people?
17  A   Yeah.
18  Q   You're pretty tight with some of them, at
19  least Boo?
20  A   Yeah, I know Boo real good.
21  Q   Can we see RS-1, please.  I don't think
22  we've seen a picture of Raymond Sanders.  You call him
23  Little Raymond?
24  A   That's what I call him, Little Raymond.
25  Q   And you associated him with Kevin Gray and

Page 112

1   Rodney and all of them, too?
2   A   Yeah, that's Raymond.
3   Q   That's Raymond?
4   A   That's Raymond.
5   Q   Okay.
6       And did you know that he was selling heroin
7   for --
8   A   Yeah, I knew all that.
9   Q   Who was he selling it for, do you know?
10  A   He was selling heroin for Rodney and Kevin.
11  I knew all that.
12  Q   And you said you know -- Court's
13  indulgence?
14  A   House.
15  Q   You said you knew Pappy?
16  A   Yeah, I know him by Pappy.  I don't know
17  him by Vick, whatever his name is.
18  Q   He was associated with Kevin Gray and
19  Rodney them?
20  A   Yes.
21  Q   And he used to -- do you know if he used to
22  hustle for them?
23  A   My knowledge.
24  Q   Yes?
25  A   Yeah.

Page 113

1   Q   And he used to be around Robinson Place all
2   the time, correct?
3   A   Yes, he did.  He used to be up my way too,
4   Savannah Terrace.
5   Q   Okay.
6       Let's look at -- if I could trouble the
7   defense with the exhibits they've produced.  Now, I'm
8   going to show you, Mr. Samuels, some of the exhibits
9   that the defense showed you.  I'm going to start with
10  DJS-MG-5.  You see that on your screen there?
11  A   Yes, sir.
12  Q   And I think, correct me if I'm wrong, looks
13  like you put a mark or your initials right here; is
14  that right?
15  A   Yes, sir.
16  Q   And that's by the telephone pole down off
17  coming to the left of the photograph?
18  A   Well, it depends on how you're looking at
19  it because the telephone pole is not in the area where
20  I put my sign, where I was standing at.  The telephone
21  pole is like off.
22  Q   What you mean the telephone pole is off?
23  A   It's like in the area where I'm standing
24  at, it's like back up.
25  Q   So were you standing back up up this way,

29 (Pages 110 to 113)

United States District Court
For the District of Columbia

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.                  CR 00-157                    August 30, 2004
Larry Wilkerson                              Gray III                        Volume 24

---

Page 114

1  back up these steps here?
2      A    Nah, nah.  Where my initials are at, that's
3  where I was standing at.
4      Q    I'm going to ask you to take your pen
5  there, just so we're all clear, and put it on the
6  screen where you were standing?
7      A    [Witness complies.]  Right there where my
8  initials are at.
9      Q    So were you in the parking lot or in the
10 grass or on the steps?
11     A    I was like right on the edge, on the edge
12 by the steps and the curb.  It wasn't no grass back
13 then.
14     Q    But you were kind of like by the bottom of
15 these steps kind of going into the street there?  Or
16 the parking lot I should say.
17     A    Yeah, going up, yeah.  Right in there.
18     Q    And then you said that Marvin got killed up
19 here by this Pepco pole up here?
20     A    Right up here.  Yes, he did.
21     Q    Okay.
22     A    And if you go stand there, you can see
23 straight up there.
24     Q    Okay.
25          And so this is about, this is about the view

---

Page 115

1  you had, looking from here up to the Pepco pole, up
2  top?
3      A    Uh-huh.
4      Q    Yes?
5      A    Yes, sir.
6      Q    If you say uh-huh, the court reporter is
7  not sure what to put, okay?
8      A    Yeah, I gotcha.
9      Q    What was the date that Marvin Goodman got
10 killed?
11     A    They said it was the 26th.
12     Q    Of?
13     A    July, 1992.
14     Q    When you say they say what do you mean?
15     A    That's what they say.  That's what some
16 people say.
17     Q    That's what the defense said?
18     A    Say that again.
19     Q    Who said it was July 29?
20     A    That's what was on the photograph.
21     Q    You did not know the date?
22     A    I didn't really know the date.  It wasn't
23 my job to keep the date.
24     Q    And you said Marvin came from up around --
25 you said after the shooting you weren't staying around

---

Page 116

1  to talk to the police?
2      A    Nah.
3      Q    So you took off?
4      A    Yeah.
5      Q    And this is DJS-MG-1.  And you correct me
6  if I'm wrong, but you said you were down -- is this
7  corner here.  Maybe I can zoom in.  Is this corner
8  right here the same corner we were looking out of the
9  parking lot you were kind of at the bottom of the
10 steps and one step in the parking lot?
11     A    I never told you I had one foot in the
12 parking lot.
13     Q    I'm not trying to -- I'm just trying to --
14 you were said you were up a little bit, back a little
15 bit.  I'm not trying to put words in your mouth.  Go
16 ahead and tell us how you standing.
17     A    I was standing right here next to the
18 staircase.
19     Q    And the Pepco pole where Marvin got shot
20 would have been up here?
21     A    Nah, the Pepco pole should be right here,
22 man.
23     Q    And it looks like a little shadow leading
24 to where the Pepco pole goes in the ground, if you can
25 tell?

---

Page 117

1      A    That's where the pole is.
2      Q    Okay.  You said Marvin -- correct me if I'm
3  wrong.  You said Marvin came from Smith Place from the
4  street here?
5      A    Yeah, when they shot him.
6      Q    When they shot him.  You said he was
7  wearing his headphones?
8      A    He was wearing his headphones.
9      Q    And you said you think you were about how
10 far away as best you recall from?
11     A    I mean, I can't exactly give you the
12 precise measurement.
13     Q    I understand you weren't out there with a
14 tape measure, but as best you can recall?
15     A    I would say about from just beyond that
16 door.  'Cause it depends on the way that you angling.
17 I guess about fifty feet.
18     Q    When you say beyond the door, you mean on
19 the other side of the wooden doors?
20     A    Just beyond the wooden doors.  Depends on
21 how you looking at it, angle that it's on.
22     Q    What time of day or not was this?
23     A    This was in the evening.  I can't give you
24 a precise time, but it was in the evening right before
25 dark.

---

30 (Pages 114 to 117)

United States of America v.                     CR 00-157                          August 30, 2004
Larry Wilkerson                                 Gray III                                    Volume 24

| Page 118 |
|---|
| 1   Q   Right before dark? |
| 2   A   'Cause you have the off seaon and on |
| 3  season. |
| 4   Q   This would have been July? |
| 5   A   Yeah. |
| 6   Q   Just before it got dark? |
| 7   A   Yeah. |
| 8   Q   I don't want to put times in your mouth, |
| 9  but 7 p.m., 8 p.m.? |
| 10   A   Can't give you precise time. |
| 11   Q   But it was still light? |
| 12   A   It was still light turning in to evening. |
| 13   Q   Got it. Now you said that a car pulled in |
| 14  off of, was it off of Savannah Terrace? |
| 15   A   Yes, sir. |
| 16   Q   And I'm going to put back up Savannah |
| 17  Street DJS-MG-1. And you said the car came from this |
| 18  way here? |
| 19   A   I didn't -- I don't know if it came from |
| 20  Congress Park. I said it came down Savannah Street |
| 21  and made a left to the parking lot. |
| 22   Q   I thought you said it came this way. What |
| 23  you said it came up Savannah Street? |
| 24   A   It came down Savannah Street and made a |
| 25  left in the parking lot. |

| Page 120 |
|---|
| 1  way earlier. And everybody knew where he was going to |
| 2  get some boat. Everybody knew where he was going. |
| 3   Q   You're assuming that. Marvin didn't come |
| 4  down and say I'm going up here to get some boat? |
| 5   A   It ain't assuming. I knew Marvin. I knew |
| 6  him well. I knew whenever he went in that direction |
| 7  what he was going for. |
| 8   Q   So based on what you knew about Marvin you |
| 9  figured he's going up to get some boat? |
| 10   A   That's Marvin, man. That's Marvin. |
| 11   Q   So he went up and you say this way. What |
| 12  is tihs an alley here? |
| 13   A   Tha'ts like a little alley right there that |
| 14  crosses, that goes out to Alabama Avenue. |
| 15   Q   Okay. So just so I'm clear, was it earlier |
| 16  in the day before the shooting that you saw him going |
| 17  up this alley? |
| 18   A   That's how they knew he was in the |
| 19  neighborhood. |
| 20   Q   Who's they? |
| 21   A   Kenny and Catman. That's how they find out |
| 22  he was in the neighborhood 'cause he had walked |
| 23  through and everybody was like he's gone crazy. |
| 24   Q   Has who gone crazy? |
| 25   A   Marvin. |

| Page 119 |
|---|
| 1   Q   Again, I'm not trying to mischaracterize up |
| 2  or down. You see the way I'm tracing my pin, is that |
| 3  the way it came? |
| 4   A   Yeah, that's the way it came. It came from |
| 5  that direction. |
| 6   Q   And you said it kind of turned into the |
| 7  parking lot? |
| 8   A   Turned into the parking lot. |
| 9   Q   Where did it go once it was in the parking |
| 10  lot? |
| 11   A   It pulled up and backed over on this side |
| 12  over here. |
| 13   Q   Did it park? |
| 14   A   Yeah, he parked right there. |
| 15   Q   And two people got out? |
| 16   A   Two individuals got out. |
| 17   Q   Was Marvin already up here with his Walkman |
| 18  on at that time? |
| 19   A   Nah, Marvin hadn't came around the corner. |
| 20   Q   So the car parked and the guy did they get |
| 21  out at the same time? |
| 22   A   Yeah, Catman and Kenny got out the car. |
| 23   Q   Where did they go? |
| 24   A   Catman kind of loitered around in here. |
| 25  Kenny went on up. 'Cause Marvin had went across this |

| Page 121 |
|---|
| 1   Q   Why would that signal to you because Marvin |
| 2  gone crazy because he's walking up the alley here? |
| 3   A   'Cause it was indicated and well known that |
| 4  he had robbed Butch and Margaret. And the baby |
| 5  identified who he was. |
| 6   Q   A baby identified who he was? |
| 7   A   Butch and Margaret daughter told who he was |
| 8  Boobie. |
| 9   Q   How old was Boobie? Boobie is that what |
| 10  you said? |
| 11   A   Boobie, she was about three, three or four |
| 12  at the time. Somewhere along in there. |
| 13   Q   So a three or four year old identified -- |
| 14   A   Yeah, she said Uncle Marvin, why you |
| 15  robbing my mommy and my daddy? He came in the window |
| 16  and went out her window. |
| 17   Q   Did you see this? |
| 18   A   Nah, I didn't see it but the baby told us. |
| 19   Q   The baby, the three or four year old baby |
| 20  told you about the robbery? |
| 21   A   Yeah, she said my Uncle Marvin did it. |
| 22   Q   Okay. So you actually heard the baby say |
| 23  -- |
| 24   A   I heard the baby say that. She was a very |
| 25  intelligent baby. Margaret was a ex-school teacher so |

                                                                31 (Pages 118 to 121)

United States of America v.
Larry Wilkerson

CR 00-157
Gray III

August 30, 2004
Volume 24

---

Page 122

1  --
2      Q    When you were asked about -- Court's
3  indulgence.  I think you were asked about Butch and
4  Margaret and I think what you said was at the time
5  Kevin Gray didn't have any drugs or heroin in here?
6      A    He didn't have any drugs in there.
7      Q    You weren't asked about Kevin Gray.  You
8  just kind of jumped out and said that, right?
9      A    Say that again.
10     Q    They didn't ask you about Kevin Gray.  They
11 asked you about Butch and Margaret.
12     A    Well, I was explaining the situation but
13 you objected so I never got to tell what was going on.
14     Q    But you answered that question with at the
15 time Kevin Gray didn't have any drugs or heroin in
16 there.
17     A    That's what I said, because he didn't at
18 the time.
19     Q    Were you somebody who would be Butch and
20 Margaret's apartment often?
21     A    I used to go in there to get Marcia out of
22 there.  I used to go in there.
23     Q    Okay.  All right.  After the baby said that
24 it was Marvin Goodman who had done this robbery of
25 Butch and Margaret's --

---

Page 123

1      A    She said Uncle Marvin.
2      Q    You said he had seen him walking up the
3  alley?
4      A    Yeah, a couple of days later he come
5  walking across 14th Place and go walking up the alley.
6  I spoke to him and everything.
7      Q    When did you speak to him?
8      A    When he was going up towards to get the
9  boat.  I mean I everybody knew Marvin, man.  You know
10 what I'm say.
11     Q    Where were when you spoke to him?
12     A    I was standing right there.
13     Q    Where?
14     A    Right there.  I was standing right there.
15     Q    So he came all the way up this way and went
16 up the alley?
17     A    He came across 14th 'cause the way that he
18 always come and went on up the alley.  He stopped for
19 a little minute.  And everybody was like man, you
20 crazy, man.  He went on up the alley, man.
21     Q    He went up the alley and when did you next
22 see him?
23     A    Next time I saw him he was bending this
24 corner right here coming down.
25     Q    When he came down from Smith Place bending

---

Page 124

1  the corner with the Walkman on, did you say that
2  Catman and Kenny man?
3      A    Catman.
4      Q    Catman and where was Kenny?
5      A    Kenny was coming from behind him.  Kenny
6  ran behind him and Catman was running up to him, man.
7  He didn't have time to move or nothing.  Happened so
8  fast.
9      Q    So Catman had gotten up behind somehow on
10 Smith Place?
11     A    No.
12     Q    No.
13     A    I said Kenny.
14     Q    Explain.  You said they pulled in there.
15 Catman and Kenny Man get out.  And Marvin comes
16 walking down from Smith Place?
17     A    No, I didn't say that.
18     Q    Go ahead.
19     A    I said --
20     Q    I'm just trying to get it straight here.
21     A    I said Catman paused right along in here.
22 Kenny went on up through this way.  When I saw Marvin
23 again, Marvin was bending the corner off of Smith
24 Place to come down the alley.  Kenny was behind him.
25 Catman was running up to him and they ran down on him

---

Page 125

1  and had the man out.
2      Q    Now you indicated that back in 1992 you
3  talked with FBI agent Hosinski?
4      A    Mr. Hosinski.  John, right.
5      Q    About the murder?
6      A    About some murders.  Murders.
7      Q    Including the Marvin Goodman murder?
8      A    Yeah.
9      Q    And were you locked up or were you out in
10 the community when you were talking to him?
11     A    I think I was out if I can remember.
12     Q    And you told him you knew about the Marvin
13 Goodman murder correct?
14     A    Uh-huh.
15         MS. MOSELEY:  At this point I object.  May
16 we approach?
17         THE COURT:  Sure.
18         [Bench conference.]
19         MS. MOSELEY:  I was not allowed to go into
20 any hearsay statements.  I'm making the standing
21 objection to any hearsay he's trying to elicit.
22         MR. KIRSCHNER:  Prior inconsistent statement
23 of this witness.
24         MS. MOSELEY:  You can confront him with it.
25 I understand that.

---

32 (Pages 122 to 125)

United States District Court
For the District of Columbia

washcathryn@aol.com
202-289-8333

Cathryn Jones, RPR
Official Court Reporter

United States of America v.            CR 00-157                        August 30, 2004
Larry Wilkerson                     Gray III                            Volume 24

Page 126

1      MR. KIRSCHNER:  This is a 302.  We'll call
2  Agent Hosinski as soon as he denies there.
3      THE COURT:  Go ahead.
4      [Open court.]
5  BY MR. KIRSCHNER:
6    Q    If I told you were interviewed by Agent
7  Hosinski on August 20th, 1992.  Does that sound about
8  right?  Do you remember if it was summer?
9    A    Probably was.
10    Q    You think you were out so would you have
11  gone to his office or would he have come to meet you?
12  Do you know?
13    A    I met John down at the field office by
14  South Capitol.  Came and met me certain places.
15    Q    So you had a number of conversations with
16  him?
17    A    Yeah.
18    Q    When you say the field office, was that the
19  Washington field office of the FBI?
20    A    Yeah the one by MacArthur.  FORT McNair, I
21  believe that's the Army base right there.
22    Q    You talked to him about the Marvin Goodman
23  murder?
24    A    I talked to him about several murders.
25    Q    Including Marvin Goodman?

Page 127

1    A    Right.
2    Q    In fact, you told Agent Hosinski that
3  Thomas Woodland aka Tommy Woodland was involved in the
4  homicide of Marvin Goodman on July 26th, 1992?
5    A    No.  He misinterpret what was being said to
6  him and put it wrong.
7    Q    And, in fact, you told him that the
8  homicide occurred around 13th and Congress Street,
9  Southeast?  Marvin Goodman murder, right?
10    A    Yes.
11    Q    You told him that Woodland was involved in
12  not only killing in Marvin Goodman but killing a
13  female on the night of August 19th, 1992 at 23rd and
14  Alabama Avenue, southeast?  Do you remember that?
15    A    I told him that.
16    Q    You told him that, too?
17    A    I told him that.
18    Q    You told him that in fact in connection the
19  female being shot that she was driving her vehicle at
20  the time, that she was not seriously wounded.  And you
21  believed the vehicle had be taken to MPD to Seventh
22  District, right?
23    A    I think they took it up there.
24    Q    So that's what you told him?
25    A    That's what I told him.

Page 128

1    Q    You also told him that Thomas Woodland
2  drives a blue Lincoln with Virginia plate HBI 659?
3    A    That was Lincoln I think that he was
4  driving at the time.
5    Q    That Thomas Woodland drove at the time,
6  yes?
7    A    Uh-huh.
8    Q    Have you to say yes or no?
9    A    I said yes.
10    Q    You also said the vehicle was parked at
11  24th and Savannah Street on August 20th, 1992?
12    A    Savannah Street?
13    Q    Savannah Street.
14    A    Can't recall.
15    But does that sound, right?  I mean as you
16  were talking with --
17    A    I think it was like 23rd Street.
18    Q    As you were talking to Agent Hosinski on
19  August 20th you said and by the way right now, August
20  20th, the Lincoln is parked at 24th and Savannah --
21    A    It probably was at that time, yeah.
22    Q    And that was Thomas Woodland's car, right?
23    A    The car he was driving.
24    Q    And you also said that Tommy Woodland stays
25  at 2835 Robinson Place, Southeast, correct?

Page 129

1    A    I believe that's the address down there.
2    Q    You also said Tommy has a cousin by the
3  name of Tony Woodland?
4    A    Yeah, Bobby.
5    Q    What's his nickname?
6    A    Tommy, yeah.
7    Q    Did you say some other name?  What was the
8  other nickname?
9    A    Bobby.
10    Q    That was Tony Woodland's nickname?
11    A    Yes.
12    Q    And you said the two of them are leaders in
13  the Savannah Terrace group, right?
14    A    Yeah, they part of it.
15    Q    You also said you heard that Tony Woodland
16  killed a man in June 1992 while the man was sitting in
17  a white Acura Legend at Barry Farms?
18    A    Yeah, I heard that.
19    Q    And you told Agent Hosinski that?
20    A    Yes, I told him that.
21    Q    You also told him that Tony Woodland stays
22  at 4005 First Street, Southeast -- I'm sorry,
23  Southwest?
24    A    Yeah, I think that's the address.
25    Q    And you also said that you believe an

33 (Pages 126 to 129)

United States of America v.                CR 00-157                    August 30, 2004
Larry Wilkerson                             Gray III                             Volume 24

Page 130

1  individual known as Wayne E is the most violent
2  enforcer in Washington, D.C.?
3      A    Wayne who?
4      Q    Wayne E in quotes and then the letter E.
5      A    Nah, Wayne E, Wayne P, Wayne Perry.
6      Q    You provided, with that exception you
7  provided all that information to Agent Hosinski back
8  in 1992?
9      A    Yes.
10      Q    Including telling him that Thomas Woodland
11  was the one who killed Marvin Goodman?
12      A    I didn't tell him that.  I was telling him
13  somewhere else and he apparently mixed it up.  I
14  didn't him that they killed Marvin.
15      Q    Did you tell him that Catman and Kenny man
16  killed Mr. goodman?
17      A    Yes, I told him that.
18      Q    But he mistakenly put Thomas Woodland?
19      A    It got mixed up some type of way.
20      Q    And you're actually some kin to Thomas
21  Woodland, arent' you?
22      A    That's my brother.  My little brother.
23      Q    You were giving Agent Hosinski all of this
24  information about your brother, correct?
25      A    Yeah.

Page 131

1      Q    But you're saying now your brother didn't
2  do the Marvin Goodman murder?
3      A    He didn't do it.
4      Q    And you never told Agent Hosinski that your
5  brother Thomas Woodland killed Marvin Goodman?
6      A    No, I didn't.
7      MR. KIRSCHNER:  This might be a good
8  breaking point.
9      THE COURT:  Ladies and gentlemen, let's take
10  a luncheon break until 1:45.  Remember the admonition.
11  Don't talk about the case.  We'll see you back at 1:45
12  to conclude the testimony of Mr. Samuels.
13      [Thereupon, Jury exits courtroom at 12:33
14  p.m.]
15      THE COURT:  Mr. Beane?
16      MR. BEANE:  Your Honor, at 1:45 I have a
17  matter before Judge Walton that will lasts about 15
18  minutes.
19      THE COURT:  All right.  I think Mr. Samuels
20  might be all right without you.  The issue is mister,
21  getting to the next witness really.
22      MR. BEANE:  Mr. Mitchell has already
23  indicated he does not want me to be present during his
24  testimony.
25      THE COURT:  The other potential witness does

Page 132

1  not waive his Fifth you say?
2      MR. BEANE:  Yes.
3      THE COURT:  Why don't you go down to Judge
4  Walton and take care of that and have you back up here
5  as soon as you finish.  When Mr. Samuels finishes you
6  can be excused.  I'll get, is it Dennis Mitchell.
7  I'll get the other witness out, Mr. Mitchell, and make
8  sure he's okay.  That's fine.  Thank you for helping
9  this morning.
10      MR. BEANE:  Thank you.
11      THE COURT:  1:45 thank you.
12      [Thereupon, luncheon recess taken at 12:35
13  p.m.]
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

1              CERTIFICATE
2      I, Cathryn J. Jones, an Official Court
3  Reporter for the United States District Court of the
4  District of Columbia, do hereby certify that I
5  reported, by machine shorthand, the proceedings had
6  and testimony adduced in the above case.
7      I further certify that the forgoing 132
8  pages constitute the official transcript of said
9  proceedings as transcribed from my machine shorthand
10  notes.
11      In witness whereof, I have hereto subscribed
12  my name, this the 31st day of August, 2004.
13
14
                   --------------------------
15              Cathryn J. Jones, RPR
                Official Court Reporter
16
17
18
19
20
21
22
23
24
25

                                        34 (Pages 130 to 133)

United States of America v.       CR 00-157              June 3, 2002
Kevin L. Gray, et al           AM Session              Volume 51

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,    :  CR Number 00-157
                         :
         Government,      :
                         :
        v.               :  Washington, D.C.
                         :  Monday June 3, 2002
KEVIN L. GRAY, RODNEY MOORE,  :  9:43 a.m.
JOHN RAYNOR, CALVIN SMITH,   :
TIMOTHY HANDY and LIONEL NUNN, :
                         :
        Defendants.     :
                         :
- - - - - - - - - - - - - - - -x

FILED

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT


DAY 51 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:     TIMOTHY J. HEAPHY, ESQUIRE
                       MATTHEW G. OLSEN, ESQUIRE
                       AMY JEFFRESS, ESQUIRE
                       ASSISTANT UNITED STATES ATTORNEYS
                       U.S. ATTORNEY'S OFFICE
                       555-4th Street, N.W.
                       Washington, D.C.  20001
                       (202)  353-8822

For Defendant Gray:     FRANCIS DARRON CARTER, ESQUIRE
                       1730 Rhode Island Avenue, N.W.
                       Suite 717
                       Washington, D.C.  20036
                       (202)  393-4330

                       DAVID P. BAUGH, ESQUIRE
                       DAVID P. BAUGH, P.C.
                       SARA DAVIS, ESQUIRE
                       223 South Cherry Street
                       P.O. Box 12137
                       Richmond, Virginia  23241
                       (804)  643-8111


                       Pages 1 through 163


                             THERESA M. SORENSEN,
OFFICIAL COURT REPORTER



United States of America  v.                    CR 00-157                          June 3, 2002
Kevin L. Gray, et al                            AM Session                         Volume 51

---

**Page 2**

APPEARANCES (Continued):
For Defendant Moore:   BARRY COBURN, ESQUIRE
                       COBURN & SCHERTLER
                       1150 18th Street, N.W.
                       Suite 850
                       Washington, D.C.  20036
                       (202) 628-4199

                       STEVEN J. McCOOL, ESQUIRE
                       1776 K Street, N.W.
                       Suite 300
                       Washington, D.C.  20006
                       (202) 393-7088

For Defendant Raynor:  G. GODWIN OYEWOLE, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       9th Floor
                       Washington, D.C.  20004
                       (202) 347-7777
                       THOMAS J. SAUNDERS, ESQUIRE
                       10 N. Calvert Street
                       Suite 715
                       Baltimore, Maryland  21202
                       (202) 550-4662 & (410) 547-9087

For Defendant Smith:   JOHN J. CARNEY, ESQUIRE
                       CARNEY AND CARNEY
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C.  20004
                       (202) 434-8234
                       JONATHAN RUBENS, ESQUIRE
                       601 Pennsylvania Avenue, N.W.
                       Suite 900
                       Washington, D.C.
                       (202) 487-3633

For Defendant Handy:   MICHAEL LASLEY, ESQUIRE
                       1730 K Street, N.W.
                       Suite 304
                       Washington, D.C.  20006
                       (202) 508-3690
                       ADDIE O'BRYANT, JR., ESQUIRE
                       ANDERSON & O'BRYANT, P.C.
                       1107 Seventh Street, N.W.
                       Washington, D.C.  20001
                       (202) 371-0013

                                    THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 3**

APPEARANCES (Continued):
For Defendant Nunn:    VERONICE A. HOLT, ESQUIRE
                       3003 Van Ness, N.W.
                       #W919
                       Washington, D.C.  20008
                       (202) 244-2659

Court Reporter:        THERESA M. SORENSEN, CVR-CM
                       Official Court Reporter
                       Room 4800-H, U.S. Courthouse
                       Washington, D.C.  20001
                       (202) 273-0745

            Proceedings reported by stenomask recording,
         transcript produced by transcription.

                                    THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

---

**Page 4**

                          P R O C E E D I N G S
 1
 2          THE DEPUTY CLERK:  This is the case of The United
 3    States v. Kevin Gray, Rodney Moore, John Raynor, Calvin
 4    Smith, Timothy Handy and Lionel Nunn, Criminal Case Number
 5    2000-157.  Mr. Heaphy, Mr. Olsen, and Ms. Jeffress for the
 6    United States; Mr. Carter, Mr. Baugh, Mr. Coburn, Mr.
 7    McCool, Mr. Oyewole, Mr. Saunders, Mr. Carney, Mr. Rubens,
 8    Mr. Lasley, Mr. O'Bryant and Ms. Holt for the defendants.
 9          MR. HEAPHY:  Your Honor, good morning.  Before we
10    bring the jury in, I think tomorrow is a day on which I'm
11    going to have a baby, and would ask for tomorrow off.  We're
12    at the point in the trial, the next sequence we intend to
13    call are my responsibility, and if it's possible to take
14    tomorrow.
15          THE COURT:  Is there a way we can rearrange some
16    other witnesses?
17          MR. HEAPHY:  We can try, Your Honor, yes.
18          THE COURT:  Let's try.
19          MR. HEAPHY:  We'll try to do that.
20          THE COURT:  Yes.
21          MR. HEAPHY:  Mr. Olsen, I think, had tried to make
22    some arrangements to see someone tonight so that he can be
23    available tomorrow.
24          THE COURT:  All right.  Let's try.
25          MR. HEAPHY:  All right.

---

**Page 5**

 1          THE COURT:  I would rather not take the day off.
 2          MR. HEAPHY:  I will not be available, then,
 3    tomorrow, Your Honor.
 4          THE COURT:  I understand.
 5          MR. HEAPHY:  And I don't know if it's appropriate
 6    to -- I would suggest some general instruction to the jury
 7    that there may be days on which counsel are unavailable for
 8    some reason.  I don't know that they need any more specific
 9    information, but I'm concerned about the impression that it
10    creates, and some kind of neutrally phrased instruction --
11          THE COURT:  Well, I can say that today because Mr.
12    Oyewole had a car accident on the way here this morning.
13    I've just informed Mr. Saunders; he reached chambers.  He's
14    going to the hospital to be checked out, and Mr. Saunders
15    advises that there is no problem with him going forward
16    today.  But I can advise the jury that from time to time,
17    some counsel will be absent, but co-counsel will be prepared
18    to go forward.
19          MR. HEAPHY:  That's fine, Your Honor.  Thank you.
20          THE COURT:  All right.
21          MR. OLSEN:  Your Honor, just one other matter.
22    The Court asked that we provide the juvenile motion that we
23    filed with Judge Satterfield.
24          THE COURT:  Yes.
25          MR. OLSEN:  I am giving at this time a copy of the

---

United States District Court                        Theresa M. Sorensen, CVR-CM
For The District of Columbia                        Official Court Reporter

United States of America v.    CR 00-157    June 3, 2002
Kevin L. Gray, et al    AM Session    Volume 51

Page 138

1   This goes to the government being permitted to ask the jury,
2   "Was anybody here involved in That's Foster," and suggesting
3   that I had misled the jury because I did not ask him was
4   anybody involved. I asked him was anybody here charged. We
5   had the exact same thing come up when Mr. Coburn came up
6   here and we asked the question was anybody -- he asked a
7   question about the murders, and then he said, "Well, were
8   you involved," and we made him ask the honest question,
9   okay? The government is trying to paint me as a liar in
10  front of the jury by misquoting what I asked the witness.
11  That's just not acceptable.
12       THE COURT: Your request is denied.
13       What is your --
14       MR. LASLEY: Your Honor, I would just like to join
15  Mr. Carney's motion for a mistrial in reference to the
16  statement. I know the Court has ruled on it. I just want
17  to join in that motion. In reference to the he looked at
18  the indictment evidence, and in reference to his decision
19  when, in fact, 99-355 indictment, as well as the 55-2000
20  indictment, the standing is not a part of that.
21       THE COURT: Okay, that's denied.
22       MR. SAUNDERS: Very briefly, Your Honor. I just
23  simply want to join in Mr. Baugh's and Mr. Carney's motions,
24  and Mr. Coburn's request.
25       THE COURT: Okay. That's denied.

Page 139

1       MS. HOLT: I join them all also.
2       (End of discussion at the bench.)
3       THE COURT: The witness may stand down.
4       (Whereupon, the witness was excused at 12:06 p.m.)
5       THE COURT: Government, call your next witness.
6       MS. JEFFRESS: The government calls Ms. Frances
7   Frierson.
8       FRANCES K. FRIERSON, GOVERNMENT'S WITNESS
9           DIRECT EXAMINATION
10  BY MS. JEFFRESS:
11  Q.   Good afternoon, Ms. Frierson.
12  A.   Good afternoon.
13  Q.   Could you please introduce yourself to the ladies and
14  gentlemen of the jury by stating your full name?
15  A.   My name is Frances K. Frierson.
16  Q.   Could you spell your first and last names for the
17  court reporter?
18  A.   F-r-a-n-c-e-s, last name, F-r-i-e-r-s-o-n.
19  Q.   Ms. Frierson, what is your current job?
20  A.   Bartender.
21  Q.   Before you took that job did you have another job for
22  a long period of time?
23  A.   Yes, I did.
24  Q.   What was that position?
25  A.   Internal security.

Page 140

1   Q.   Where was that?
2   A.   People's Drug Stores.
3   Q.   Briefly just tell the jury what you -- what your
4   duties were working internal security for People's Drug
5   Stores.
6   A.   Employee theft.
7   Q.   And what were your duties in connection with that?
8   A.   Watching employees, as well as management,
9   pharmacists, and also prosecuting them.
10  Q.   How long did you have that job?
11  A.   Approximately 18 years.
12  Q.   Was that in the Washington, D.C. area?
13  A.   Everywhere, everywhere where there was a People's
14  Drug Store. The metropolitan area as well as out of town.
15  Q.   Do you currently live in the Washington, D.C. area?
16  A.   Yes, I do.
17  Q.   How long have you lived in this area?
18  A.   Approximately 29 years.
19  Q.   Where were you from originally?
20  A.   West Virginia.
21  Q.   Are you married?
22  A.   Yes, I am.
23  Q.   Do you have any children?
24  A.   I have one.
25  Q.   In the 29 years you've lived in Washington, D.C., is

Page 141

1   there any specific part of the city that you've lived in?
2   A.   The southeast area.
3   Q.   What neighborhood, specifically?
4   A.   I don't understand the question.
5   Q.   What part of southeast Washington? Could you give me
6   the general neighborhood or intersection or street where
7   you've lived near?
8   A.   Alabama Avenue.
9   Q.   The Alabama Avenue area?
10  A.   Right.
11  Q.   Now, Ms. Frierson, back in 1992 did you used to
12  frequent the neighborhood around Alabama Avenue and Congress
13  Street, S.E.?
14  A.   Yes, I did.
15  Q.   Why did you spend time there?
16  A.   My girl friend lived over there.
17  Q.   Where in particular did your girl friend live?
18  A.   On Smith Place.
19  Q.   Now, I'd like to draw your attention to July 26th of
20  1992. Did you hear gunshots that day while you were out on
21  Smith Place?
22  A.   Yes, I did.
23  Q.   Let me ask you, where were you exactly before the
24  gunshots happened, before that all started? What did you do
25  when you got to that area?

36 (Pages 138 to 141)

United States of America v.       CR 00-157      June 3, 2002
Kevin L. Gray, et al      AM Session      Volume 51

---

Page 142

1  A.   I sat on a wall.
2       MS. JEFFRESS:  Could I see Exhibit MG-303?
3       (Whereupon, Government's Exhibit Number MG-303 was
4  marked for identification.)
5  BY MS. JEFFRESS:
6  Q.   Ms. Frierson, do you have your glasses?
7  A.   That's what I'm looking for.  Oh, yeah, I have them.
8  Q.   I'd like, if you would, just to take a look at the
9  screen in front of you.
10  A.   Yes.
11  Q.   I'm trying to move the arrow out of the way.  Do you
12  see what's on the screen in front of you?
13  A.   Yes, I do.
14  Q.   Is that a paragraph?
15  A.   Yes, it is.
16  Q.   What's shown in paragraph?
17  A.   Smith Place.
18  Q.   And is this a fair and accurate depiction of what
19  Smith Place, S.E., looked like back on July 6th of 1992?
20  A.   Yes, it is.
21       MS. JEFFRESS:  I'd like to move Exhibit MG-303
22  into evidence, Your Honor.
23       THE COURT:  Received.
24       (Whereupon, Government's Exhibit Number 303, previously
25  marked for identification, was admitted into evidence.)

---

Page 143

1  BY MS. JEFFRESS:
2  Q.   Now the jury can see it, Ms. Frierson.  Could you
3  show them where Smith Place, S.E., is on that photo?
4  A.   What, do I pick this pencil up and do it?
5  Q.   You can pick the pen and up --
6  A.   Okay.  Right here (indicating).
7  Q.   Where, specifically, did you girl friend live?
8  A.   In this building right here (indicating).
9  Q.   Okay.
10       MS. JEFFRESS:  Could we enlarge that portion of
11  Smith Place.
12  BY MS. JEFFRESS:
13  Q.   That's the building on the right?
14  A.   Yes, right there (indicating).
15  Q.   Now, you had said you were sitting ont he wall.
16  Describe for the ladies and gentlemen of the jury what you
17  saw when you first arrived and what you did when you first
18  arrived on Smith Place that evening.
19  A.   When I -- I parked on the right-hand side across from
20  this apartment building (indicating).  Then I went -- and I
21  was fumbling around in my car, and then a car pulled up.
22  No, before that, there was a -- a gentleman sitting on the
23  wall.  He had headphones on.
24  Q.   Now, the gentleman sitting on the wall, where
25  exactly, if you could show the jurors, where exactly was the

---

Page 144

1  wall?
2  A.   The wall is right here (indicating).  The wall is
3  right here (indicating).
4  Q.   And that's in front of the building that you have
5  previously indicated?
6  A.   Yes, ma'am.
7  Q.   And the gentleman who was sitting on the wall, what
8  was he doing?
9  A.   He had headphones on.  Nothing, just standing --
10  sitting there with headphones on.
11  Q.   And where, specifically -- you said you drove into
12  the area?
13  A.   Yes.
14  Q.   Where did you park?
15  A.   I parked on -- on -- across the street from the
16  apartment.
17  Q.   Okay.  What did you do after you parked your car?
18  A.   I was fumbling around in my car, and then I went and
19  sat on the wall.  He had left, and I went and sat on the
20  wall.
21  Q.   Were you waiting for your girl friend on the wall
22  there?
23  A.   Right.
24  Q.   Now, I think I had said July 26th, 1992.  Was it
25  actually the evening of the 25th of 1992?

---

Page 145

1  A.   I really can't remember the date.
2  Q.   Was it the evening?
3  A.   Yes.
4  Q.   Now, Ms. Frierson, after you were seated on the wall,
5  what happened next?
6  A.   I saw this -- the guy had already left that was
7  sitting on the wall, and I saw this car pull up, and it
8  pulled up in front of my car.  It was an aqua-colored car.
9  I observed these two guys getting out of the car, and they
10  were dressed in -- I call it Ninja stuff.  It's all black
11  stuff.  And then there is another guy that was driving the
12  car, and the guys that got out of the car had walked up
13  Smith Place to where the alley is.  The next thing I heard
14  was bam-bam-bam-bam-bam-bam-bam.  And then the guy that was
15  in the aqua color -- the drive of the aqua color car had got
16  out nonchalantly like and looked up at the street, and got
17  back in the car, and made a U-turn, and then went up -- made
18  a U-turn and went up Smith Place to the street.
19  Q.   Now, let's go through this step-by-step, if we could.
20       (Whereupon, Government's Exhibit Number MG-302 was
21  marked for identification.)
22  BY MS. JEFFRESS:
23  Q.   Ms. Frierson, do you see the exhibit that is now on
24  the screen?
25  A.   Yes, I do.

---

37 (Pages 142 to 145)

United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

June 3, 2002
Volume 51

Page 146

1  Q.    Is this basically the same exhibit as MG-303 which
2  you just looked at just from a different angle?
3  A.    Yes.
4  Q.    Does this fairly and accurately show the area around
5  Smith Place, S.E.?
6  A.    Yes.
7        MS. JEFFRESS:  I'd like to move 302, MG-302 into
8  evidence, Your Honor.
9        THE COURT:  Received.
10     (Whereupon, Government's Exhibit Number MG-302,
11  previously marked for identification, was admitted into
12  evidence.)
13  BY MS. JEFFRESS:
14  Q.    Now the jurors can see it, Ms. Frierson.  Could you
15  again indicate where Smith Place is?
16  A.    Right here (indicating).
17  Q.    And that's the upper right-hand side of the exhibit?
18  A.    Right.  Right here, Smith Place (indicating).
19  Q.    Okay.
20        MS. JEFFRESS:  Could we enlarge the whole area of
21  Smith Place to the right of Congress?
22        THE WITNESS:  Here (indicating).
23  BY MS. JEFFRESS:
24  Q.    Okay.  Now, the wall that you were sitting on, is
25  that shown in this area that's been highlighted?

Page 147

1  A.    Yes, it is.
2  Q.    Where is that?
3  A.    This is the wall.
4  Q.    Now, could you show the jurors on this paragraph,
5  where you can see both sides of the street, where your car
6  was parked?
7  A.    On this side of the street (indicating).  Do I put
8  the pencil up there?
9  Q.    If you could use the pencil, I think that's easier.
10  A.    Right here on this side of the street (indicating).
11  Q.    All right.  Is it about in that spot on the street
12  where your car was?
13  A.    Yes.
14  Q.    Now, you said an aqua blue color car pulled up.
15  Where did that car pull up?
16  A.    In -- in front of me.
17  Q.    Okay.  Which side of Smith Place did the car approach
18  from?
19  A.    Down -- down this way (indicating).  Coming down the
20  street.
21  Q.    Did they park on the right-hand side of the street
22  facing the right direction, towards 15th Street?
23  A.    Right.
24  Q.    And could you describe what you remember about what
25  that car looked like?

Page 148

1  A.    Aqua color blue.
2  Q.    Was it a small car or a large car?
3  A.    Yeah, a small car.
4  Q.    And you said initially two men got out of the car?
5  A.    Exactly.
6  Q.    What do you remember those two men looked like?
7  A.    They had all black on.
8  Q.    That's what you described as Ninja?
9  A.    Yes.
10  Q.    Do you remember how tall or short, medium they were
11  in height?
12  A.    They weren't big guys.  They were small guys, and I'd
13  say maybe from five-seven to five-nine because I'm
14  five-seven myself.
15  Q.    Okay.  And the third person, what did the third
16  person do?
17  A.    He -- after these guys got out of the car and went p
18  Smith Place, he got out of the car and looked, and then he
19  got back in the car.
20  Q.    Now, the two who went up Smith Place, which direction
21  did they go?
22  A.    Up where the alley is, up this way.
23  Q.    Indicating towards the alley over to the left-hand
24  side, away from 15th Street?
25  A.    Right.

Page 149

1  Q.    And how quickly did they head towards that alley
2  area?
3  A.    It wasn't running.  It was a really fast walk.
4  Q.    And the third person, what did that person look like?
5  A.    I'd say he was from six-foot to maybe six-four, and
6  built pretty good.  He had a white t-shirt on and bluejeans.
7  Q.    Did you get a look at him enough to estimate what age
8  that person was?
9  A.    I would say he was in about his twenties.  He wasn't
10  very -- he didn't look old.
11  Q.    And you said about six-foot to six-foot-four?
12  A.    Yes.
13  Q.    Do you remember anything else about his appearance?
14  A.    No.
15  Q.    And you said built pretty good.  What do you mean by
16  that?
17  A.    Well, he wasn't fat or -- he was built good.
18       (Laughter.)
19  Q.    I think they understand.  Okay.  Now, could you
20  explain exactly what that person did when he got out of the
21  car?
22  A.    Just looked up towards the alley.
23  Q.    Looked up towards the alley where the other two had
24  run?
25  A.    Right.

38 (Pages 146 to 149)



United States of America v.
Kevin L. Gray, et al

CR 00-157
AM Session

June 3, 2002
Volume 51

Page 150

1  Q.  Where exactly did he stand?
2  A.  By the car.
3  Q.  Do you remember who had been driving the car?
4  A.  The bigger guy.
5  Q.  The one you're talking about now who stayed with the
6  car?
7  A.  Right.
8  Q.  And when the other two men ran down the alley, what
9  did he do?
10  A.  He just stood there.
11  Q.  Did he go towards the alley at all or did he just
12  stay by the car?
13  A.  No, he did not leave from the alley.
14  Q.  Now, how long did it take after the two men started
15  walking quickly towards the alley area, how long did it take
16  before you started hearing gunshots?
17  A.  Probably within seconds.
18  Q.  Now, how long, Ms. Frierson -- you had described a
19  person who was sitting on the wall when you got there who
20  walked away before you sat down on the wall. How long
21  between that person leaving the area of the wall and this
22  second car arriving, what was the approximate time period
23  between those two things?
24  A.  Probably about five minutes.
25  Q.  Now, you described hearing gunshots. Could you

Page 151

1  describe more specifically what exactly you heard?
2  A.  It sounded like two guns going off.
3  Q.  Why did it sound like two guns?
4  A.  It -- because it was like bam-bam-bam. It was just
5  too many, too many gunshots for one gun.
6  Q.  Okay. Were there different types of shots? Could
7  you tell a difference between two types of shots, or was it
8  just the sheer number that made you think it was two guns?
9  A.  It sounded like two different kinds of shots.
10  Q.  And how many shots, approximately, did you hear?
11  A.  I would say more than 15.
12  Q.  And were they rapid, slow, or how would --
13  A.  Yeah, they were rapid.
14  Q.  How long did the rapid fire last?
15  A.  About 30 seconds. How long it takes you to shoot a
16  whole bunch of bullets.
17  Q.  Now, what happened after you heard those gunshots?
18  A.  The aqua color car made a U-turn and went back
19  towards the alley.
20  Q.  Okay. At what point did the driver get back into the
21  aqua color car?
22  A.  Within seconds after the gunshots.
23  Q.  And what exactly did he do?
24  A.  Got back in his car and made a U-turn and went up
25  towards the alley. You could -- you could see -- you know,

Page 152

1  because you could see from right there. Then he went here
2  (indicating), and then he went through this alley right
3  there (indicating).
4  Q.  I think you said before that he nonchalantly --
5  A.  Nonchalantly.
6  Q.  -- got back into the car?
7  A.  Exactly.
8  Q.  Is that what you said before?
9  A.  (Witness nods head affirmatively.)
10  Q.  What makes you say that?
11  A.  Just didn't seem to bother him, just get back in --
12  like you would get in your car.
13  Q.  And what did he do after he made that U-turn on Smith
14  Place?
15  A.  Went down -- went through this alley right here
16  (indicating).
17  Q.  Okay. So you saw the car turn right at that corner
18  there?
19  A.  Exactly.
20  Q.  Now, in between seeing him -- hearing the gunshots
21  and seeing him get back in the car and make that U-turn, did
22  you see anything else?
23  A.  The guys running up the alley.
24  Q.  Okay. At what point did you see that?
25  A.  After the gunshots.

Page 153

1  Q.  What exactly did you see? Could you tell the jurors?
2  A.  After the gunshots, the guys ran up through this
3  alley.
4  Q.  So while you were hearing the gunshots could you see
5  anyone shooting?
6  A.  No, I did not see them shoot.
7  Q.  And why is that? What could you see from your
8  position? Were you still on the wall?
9  A.  Yes, I was still on the wall.
10  Q.  What could you see from that vantage point?
11  A.  I just -- when the guys walked here (indicating), and
12  that's where the gunshots started, but you could not see
13  them with the guns. The next thing I know, then I see these
14  same guys get out of this car, and then they run up this
15  alley right here (indicating).
16  Q.  So you could see them running from the bottom portion
17  of the street that's on the left -- or the alley on the
18  left, running up, away from Savannah Street; is that what
19  you're indicating with the arrow?
20  A.  No, running this way (indicating). It goes to
21  Alabama Avenue.
22  Q.  Up towards Alabama Avenue again?
23  A.  Yes.
24      MS. JEFFRESS: Could we see the whole map,
25  perhaps?

39 (Pages 150 to 153)

United States of America v.    CR 00-157    June 3, 2002
Kevin L. Gray, et al    AM Session    Volume 51

Page 154

BY MS. JEFFRESS:
1
2   Q.   Just could you show the ladies and gentlemen of the
3   jury, then, where exactly you saw them running, using the
4   whole map there?
5   A.   Pardon?
6   Q.   Could you show again, now that they can see the whole
7   map, where you saw them running?
8   A.   Up towards this way (indicating). This goes to
9   Alabama Avenue (indicating), this right here. It goes to
10  Alabama Avenue.
11  Q.   Is Alabama Avenue --
12  A.   Wait a minute. Maybe I'm not doing this right.
13  Right there, this alley right here (indicating).
14  Q.   You're indicating --
15  A.   That alley right there goes to Alabama Avenue.
16  Q.   You're indicating the alley between Smith Place and
17  Alabama Avenue?
18  A.   Exactly.
19  Q.   How quickly were the men running after the gunshots,
20  after you heard the gunshots?
21  A.   Running.
22  Q.   And which way did the man who was driving the aqua
23  blue car, which way did he drive the car?
24  A.   Through the alley.
25  Q.   Was he going in the same direction that the two men

Page 155

1   had been running?
2   A.   Exactly.
3        MS. JEFFRESS: Nothing further, Your Honor.
4              CROSS-EXAMINATION
5   BY MR. BAUGH:
6   Q.   Good afternoon, Ms. Frierson.
7   A.   Hello.
8   Q.   A couple of questions. Not like on television. No
9   one is going to scream at you.
10       What did you do after you heard the shots fired?
11  A.   What did I do?
12  Q.   Un-huh.
13  A.   Well, after the shots were fired and the guy had
14  left, there was a lot of people there, and then we went up
15  to the alley.
16  Q.   Did you ever see any guns out there?
17  A.   No, I never saw the guns.
18  Q.   All right. Then lastly, ma'am, and I know you told
19  the police what you saw that night?
20  A.   Yes.
21  Q.   And then later you were interviewed by the police?
22  A.   Yes.
23  Q.   Ma'am, can you identify anyone that you saw out there
24  that night?
25  A.   No, I cannot.

Page 156

1        MR. BAUGH: One second, please.
2        (Brief pause in proceedings.)
3   BY MR. BAUGH:
4   Q.   There's nothing about the location or anything like
5   that that could enable you to identify the people who did
6   the shooting?
7   A.   No, I cannot identify them.
8   Q.   Thank you, ma'am. No further questions.
9        MR. COBURN: Your Honor, may I inquire of Mr.
10  Keller what exhibit number we're up to? I'm sorry to have
11  to keep asking that. I know we're in the forties.
12       THE DEPUTY CLERK: Forty-five.
13       MR. COBURN: Thank you very much.
14             CROSS-EXAMINATION
15  BY MR. COBURN:
16  Q.   Good afternoon, Ms. Frierson.
17  A.   Good afternoon.
18  Q.   Ma'am, you were telling us about an incident that
19  occurred just about ten years ago; is that right?
20  A.   Yes.
21  Q.   Have you had occasion to review anything, any written
22  documents, or any notes, or anything like that in order to
23  refresh your recollection about this 10-year-old incident
24  before testifying about it here today?

Page 157

1   A.   I talked to Amy.
2   Q.   Ms. Jeffress?
3   A.   Right.
4   Q.   Was there any -- was there a report or anything like
5   that that you read before testifying?
6   A.   No.
7   Q.   Nothing at all; is that right?
8   A.   Nothing at all.
9   Q.   So between the time of the incident in 1992 and
10  today, in the year 2002, your testimony is that there are no
11  documents that you've reviewed with respect to the subject
12  matter of your testimony; is that right?
13  A.   No, because I had forgotten about it.
14  Q.   Okay. With respect to -- well, let me take you
15  through this in order. You indicate that when you first
16  observed this vehicle there were three African-American
17  males inside it; is that right?
18  A.   Yes.
19  Q.   You said the vehicle was blue in color; is that
20  correct?
21  A.   Yes.
22  Q.   Is it correct to say that it was aqua blue in color?
23  A.   That's what I would call it, aqua blue.
24  Q.   Okay. It's also correct, is it not, Ms. Frierson,
25  that it was an American -- a newer model American car; is

40 (Pages 154 to 157)

RECEIVED

SEP 2 9 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT